UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

|  |  |  |
|---|---|---|
| UNITED STATES COMMODITY FUTURES TRADING COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. _____ |
| v. | ) ) | |
| R2 CAPITAL GROUP LLC, RAST INVESTOR GROUP, LLC, MADIGAN ENTERPRISES, INC., BULLETPROOF VEST, INC., RYAN TOMAZIN, RYAN MADIGAN and RANDELL A. VEST, | ) ) ) ) ) ) | COMPLAINT FOR PERMANENT INJUNCTION, CIVIL MONETARY PENALTY, AND OTHER EQUITABLE RELIEF |
| Defendants. | ) ) ) | |

Plaintiff, the United States Commodity Futures Trading Commission ("Commission" or "CFTC"), by its attorneys, alleges as follows:

I.

SUMMARY

1.     From at least December 2009 through the present  (the "relevant period"), defendants Ryan Tomazin ("Tomazin"), Ryan Madigan ("Madigan"), Randell A. Vest ("Vest"), RAST Investor Group, LLC ("RAST"), Madigan Enterprises, Inc. ("Madigan Enterprises"), Bulletproof Vest, Inc. ("Bulletproof Vest"), and their company, R2 Capital Group LLC ("R2 Capital") (collectively, "defendants"), fraudulently solicited and accepted approximately $2.4 million from at least four (4) individuals to participate in a commodity pool, R2 Commercial Capital Partners I L.P. (the "Commercial Pool"), to trade foreign exchange ("forex") and, later, futures contracts, including E-mini S&P 500 futures contracts and E-mini Dow futures contracts.

2.      Although defendants placed $2.4 million of the pool participants' funds in a trading account, defendants lost approximately $1.2 million through trading, and misappropriated the remaining $1.2 million for their personal use.

3.      In soliciting potential and existing pool participants, defendants falsely and fraudulently represented that the pool was continuing to trade forex, when in truth the pool had ceased trading forex and was instead trading in financial futures and other securities products.

4.      Defendants also knowingly, willfully, or with reckless disregard for the truth thereof, distributed false account statements and performance reports to pool participants that represented that the Commercial Pool was earning profits during a period where no trading occurred, and while defendants were misappropriating pool funds.

5.      By virtue of this conduct and the conduct further described herein, defendants have engaged in acts and practices in violation of provisions of the Commodity Exchange Act ("Act"), 7 U.S.C. §§ 1 *et seq*. (2012), and certain of the Commission's Regulations ("Regulations") promulgated thereunder, 17 C.F.R. §§ 1.1 *et seq*. (2013).

6.      The acts and omissions of Tomazin, Madigan and Vest occurred within the scope of their agency, employment, and/or office with RAST, Madigan Enterprises and Bulletproof Vest, respectively, and with R2 Capital; therefore, RAST, Madigan Enterprises, Bulletproof Vest and R2 Capital are liable for these acts and omissions pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2012), and Regulation 1.2, 17 C.F.R. § 1.2 (2013).

7.      During the relevant period, Tomazin, Madigan and Vest controlled R2 Capital, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, the acts of R2 Capital described herein; therefore, Tomazin, Madigan and Vest are liable for the acts of R2 Capital pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2012).

8.      Accordingly, pursuant to Section 6c of the Act, as amended, 7 U.S.C. § 13a-1 (2012), the Commission brings this action to enjoin defendants' unlawful acts and practices and to compel compliance with the Act, as amended, and Commission Regulations.

9.      In addition, the Commission seeks civil monetary penalties and remedial ancillary relief, including, but not limited to, trading and registration bans, restitution, disgorgement, rescission, pre- and post-judgment interest, and such other relief as the Court may deem necessary and appropriate.

10.     Unless restrained and enjoined by this Court, defendants are likely to continue to engage in the acts and practices alleged in this Complaint or in similar acts and practices, as described more fully below.

## II.

## JURISDICTION AND VENUE

11.     This Court possesses jurisdiction over this action pursuant to Section 6c(a) of the Act, as amended, 7 U.S.C. § 13a-1(a) (2012), which authorizes the Commission to seek injunctive and other relief against any person whenever it shall appear to the Commission that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order thereunder.

12.     Venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e) (2012), because at least some of the acts and practices in violation of the Act and Regulations occurred within this district.

III.

THE PARTIES

13.     Plaintiff Commodity Futures Trading Commission is an independent federal regulatory agency that is charged by Congress with the administration and enforcement of the Act, as amended, and the Commission Regulations promulgated thereunder.  The Commission maintains its principal office at Three Lafayette Centre, 1155 21st Street, N.W., Washington, D.C. 20581.

14.     Defendant Ryan Tomazin resided in Denver, Colorado and then Stamford, Connecticut, during the relevant period.  In 2009, Tomazin formed R2 Capital as a limited liability company, with himself as its registered agent.  During the relevant period, Tomazin was also the sole owner, manager and principal of defendant RAST Investor Group, Tomazin's alter ego and holding company.  Tomazin has never been registered with the Commission in any capacity.

15.     Defendant RAST Investor Group, LLC, is a limited liability company formed in 2008 by defendant Tomazin in Denver, Colorado, solely owned and operated by defendant Tomazin, and through which defendant Tomazin co-owned, controlled and operated defendant R2 Capital.

16.     Defendant Ryan Madigan resides in Raleigh, North Carolina.  During the relevant period, Madigan was also an officer and principal of defendant Madigan Enterprises, Madigan's alter ego and holding company.  During the relevant period, Madigan was never registered with the Commission in any capacity.

17.    Defendant Madigan Enterprises, Inc. is a corporation formed in 2004 by defendant Madigan's father in Pittsford, New York, and through which defendant Madigan co-owned, controlled and operated defendant R2 Capital.

18.    Defendant Randell A. Vest resides in Fort Myers, Florida.  During the relevant period, Vest was also the sole owner, manager and principal of defendant Bulletproof Vest, defendant Vest's alter ego and holding company.  Vest first registered with the Commission on September 27, 2013, as an Associated Person ("AP") of R2 Capital.

19.    Defendant Bulletproof Vest, Inc. is a corporation formed in 2009 by defendant Vest in Fort Myers, Florida, solely owned and operated by defendant Vest, and through which defendant Vest co-owned, controlled and operated defendant R2 Capital.

20.    Defendant R2 Capital Group LLC is a Colorado limited liability company created by Tomazin in November 2008, and was initially jointly and equally owned and controlled by Tomazin and Madigan, and located at Tomazin's home address.  In July 2009, defendants Tomazin, Madigan and Vest, through RAST, Madigan Enterprises and Bulletproof Vest (collectively, "defendant holding companies"), assumed total and equal control, ownership and management of R2 Capital.  R2 Capital was never registered with the Commission in any capacity until September 27, 2013, when it registered as a Commodity Pool Operator ("CPO").

IV.

STATUTORY BACKGROUND

21.    Prior to July 16, 2011, Section 1a(5) of the Act, 7 U.S.C. § 1a(5) (2006), defined a "commodity pool operator" as any firm or individual engaged in a business which is of the nature of an investment trust, syndicate, or similar form of enterprise, and that, in connection therewith, solicits, accepts, or receives from others funds, securities, or property, either directly

through capital contributions, the sale of stock or other forms of securities, or otherwise, for the purpose of trading in any commodity for future delivery on or subject to the rules of any contract market.  Upon the effective date of Title VII of the Dodd-Frank Act on July 16, 2011, the definition of a CPO was clarified, expanded, and re-designated in Section 1a(11) of the Act, as amended, 7 U.S.C. § 1a(11) (2012).

V.

FACTS

A.  Defendants' Trading Activities And Fraudulent Activities

22.   During the relevant period, Tomazin, Vest, and Madigan equally owned, and jointly controlled, the operations of R2 Capital through defendant holding companies.  Upon information and belief, Tomazin and Madigan are primarily, but not exclusively, responsible for R2 Capital's operations, including managing the accounting, reporting and investor relations responsibilities; Tomazin is also the sole signatory on each of R2 Capital's and the Commercial Pool's bank accounts, including an account used to accept pool participant deposits; and Madigan, who solicited at least one investor, is a signatory on trading account opening documents for R2 Capital and the Commercial Pool, described immediately below. Vest is primarily, but not exclusively, responsible for managing R2 Capital's trading operations and managing the firm's trading platform.

23.   On or about November 10, 2008, defendant Tomazin filed R2 Capital's Articles of Organization with the Colorado Secretary of State, identifying Tomazin as R2 Capital's registered agent and Tomazin's home address in Denver, Colorado as its mailing address.  On September 18, 2009, Tomazin filed a Certificate of Limited Partnership for the Commercial Pool, identifying Tomazin as the Commercial Pool's registered agent, Tomazin's home address

6

in Denver, Colorado, as its mailing address, and R2 Capital as the Commercial Pool's General Partner.

24.     During the relevant period, defendants solicited or caused to be solicited approximately $2.4 million from at least four (4) pool participants for the purpose of trading forex through the Commercial Pool.  These funds were deposited directly into either the Commercial Pool or R2 Capital bank accounts.

25.     Defendants induced one or more prospective pool participants to participate in the Commercial Pool by providing them with a "Confidential Information Memorandum," a "Subscription Agreement," and a "Limited Partnership Agreement" which falsely and fraudulently represented the following:

a)  R2 Capital would receive a management fee limited to 50% of the profits earned by the Commercial Pool, paid only if the Commercial Pool earned profits.  The remaining profits would be divided on a pro rata basis between the pool participants;

b)  All pool participant funds would be deposited directly into the Commercial Pool's bank account, and there would be no commingling of funds between the Commercial Pool and R2 Capital, or any affiliate thereof, other than temporarily for the payment of bills or disbursements on behalf of the Commercial Pool;

c)  There would be no loans between the Commercial Pool and any other entities controlled by R2 Capital or any person or entity directly or indirectly controlling, controlled by or under common control of R2 Capital;

d)  The Commercial Pool would be subject to annual third party independent auditing;  R2 Capital would maintain complete and accurate books and records of

all assets of the Commercial Pool, and R2 Capital would furnish to pool

participants monthly statements with profits or losses and estimated expenses; and

e)  R2 Capital, as the general partner, would not possess Commercial Pool property.

In truth, and contrary to these representations, defendants misappropriated participant funds

while the Commercial Pool was losing money; defendants comingled participant funds with their

own funds; defendants purportedly loaned funds from the Commercial Pool to themselves; the

Commercial Pool was never subject to a third-party independent audit; and R2 Capital failed to

maintain accurate books and records or furnish true and accurate monthly account statements to

pool participants.

26.   In December 2009, defendants opened, or caused to be opened, the Commercial

Pool's trading account at the now-defunct futures commission merchant ("FCM") Peregrine

Financial Group ("PFG"), where defendants used pool participant funds to trade forex.  Upon

information and belief, defendants transferred, or caused to be transferred, approximately $2.2

million from the Commercial Pool's bank account to the Commercial Pool's trading account at

PFG.  The Commercial Pool incurred trading losses of more than $1.4 million at PFG, and the

almost $800,000 of remaining funds were returned to the Commercial Pool's bank account

before October 2010.

27.   In August 2010, R2 Capital opened a Commercial Pool trading account at

Interactive Brokers, LLC ("IBL"), a registered FCM.  Between October 2010 and July 2011, R2

Capital traded E-mini S&P 500 futures and securities products in this account.  This trading

account realized gains of more than $200,000.  Defendants falsely and fraudulently concealed

from at least two pool participants that defendants had closed the PFG forex account, that Pool

Participants' funds had been transferred to a new account at IBL, that the Commercial Pool was

no longer trading forex, and that the Commercial Pool was now trading E-mini S&P 500 futures and securities products.

28.    After netting the Commercial Pool's $1.4 million in trading losses in the PFG trading account against the $200,000 in trading gains in the IBL account, the $2.4 million Commercial Pool sustained total net losses of approximately $1.2 million, leaving what should have been approximately $1.2 million in assets in the Commercial Pool.

29.    During the relevant time, defendants both orally and in writing falsely represented to pool participants that their share of the Commercial Pool had increased in value due to successfully trading, when in fact no trading was taking place.  For example, from August 2011 through March 2013, defendants knowingly, willfully, or with reckless disregard for the truth, generated and issued false monthly account statements to pool participants, that misrepresented that the fund returned profits from its successfully trading, increased in value, and incurred trading expenses charged to pool participants.  These account statements were false because the Commercial Pool ceased all trading a month earlier, in July 2011, and thus no profits or expenses could have been incurred from trading after that time.

30.    During 2012 and 2013, defendants also periodically issued narrative written reports to pool participants, which misrepresented that the Commercial Pool had earned substantial profits from trading futures contracts in the latter half of 2011 and all of 2012, when in truth the Commercial Pool had ceased all trading after July 2011.

31.    Defendant R2 Capital was required to disclose the Commercial Pool's cessation of trading, and its resultant absence of trading profits, because it is a CPO and therefore has a fiduciary to its pool participants.

32.    Upon information and belief, pool participants maintained and/or deposited additional funds with the Commercial Pool as a result of these false account statements and reports that represented false "profit" returns.

33.    All of the representations by defendants, described herein, were material because they affect actual and prospective pool participants' decision to invest, withdraw funds or possibly invest additional funds.

### B.   Defendants Misappropriated Pool Participants' Funds

34.    During the relevant period, on information and belief, defendants Tomazin, Madigan, and Vest misappropriated the approximately $1.2 million in assets which remained in the Commercial Pool after trading losses.  Defendants routinely diverted and misappropriated substantial sums from the R2 Capital and Commercial Pool bank accounts to themselves and defendant holding companies until all but a few hundred dollars of the remaining $1.2 million of pool participant funds were dissipated.  These transfers took the form of checks, direct wire transfers, and purported loans to the individual defendants and defendant holding companies, all without the pool participants' knowledge, in violation of the terms of the Limited Partnership and Subscription agreements, and contrary to their representations to actual and prospective pool participants.  Defendants then spent these misappropriated funds on personal trips, private school tuition for their children, other investments and miscellaneous personal expenses.  None of these misappropriated funds has been returned to the Commercial Pool or the pool participants.

### C.   Defendants Concealed Their Misappropriation Of Participant Funds

35.    During the relevant time, defendants repeatedly concealed their misappropriation of pool participant funds.  For example, in July 2013, a pool participant requested a partial redemption of its funds.  In response, defendants falsely and fraudulently represented that the

funds were still held in the Commercial Pool, when in truth the funds had already been almost entirely misappropriated by defendants.  To conceal their misappropriation of pool participant's funds, defendants falsely asserted that circumstances beyond defendants' control prevented the immediate redemption of the pool participant's funds, including false representations of technical difficulties at banks or the FCM; that the SEC, CFTC and/or National Futures Association ("NFA") were holding the funds in escrow; and that the federal government shutdown in October 2013 prevented the redemption of these funds.

36.    In October 2013, shortly after R2 Capital registered with the Commission as a CPO, the NFA noticed several inconsistencies in the information R2 Capital represented in its registration.  Accordingly, in November 2013, the NFA commenced an unannounced examination of R2 Capital, and discovered that defendants were unable to produce basic documents and other information associated with the operation of the business, and the limited bank records produced by defendants to the NFA revealed a high number of questionable transactions.

37.    As a result, on December 20, 2013, the NFA instituted a Member Responsibility Action ("MRA") against R2 Capital and an Associate Responsibility Action ("ARA") against Vest.  The MRA/ARA, inter alia, bars Vest and R2 Capital "from soliciting or accepting any funds from customers or investors" and "from disbursing or transferring any funds over which they or any person acting on their behalf exercises control . . . without prior approval from NFA."  The MRA/ARA also found "that Vest, Tomazin and Madigan may have converted pool assets totaling more than $1 million for their own personal use, through numerous payments to themselves or their holding companies," and required defendants R2 Capital and Vest to immediately provide copies of the MRA/ARA to all pool participants.

38.    Contrary to the requirements of the MRA/ARA, to date, defendants R2 Capital and Vest have not provided pool participants with copies of the MRA/ARA, and have liquidated or caused to be liquidated the remaining funds in the R2 Capital and Commercial Pool bank accounts.

### D. R2 Capital Commingled Pool Participant Funds

39.    Pursuant to Commission Regulation 4.20(c), 17 C.F.R. § 4.20(c) (2013), no CPO may commingle the property of any pool that it operates or that it intends to operate with the property of any other person.

40.    As described above, defendants misappropriated pool participant funds after depositing the funds in the R2 Capital and Commercial Pool bank accounts.  Before the misappropriation occurred, however, R2 Capital commingled pool participant funds by, among other things, transferring pool participant funds from R2 Capital's and/or the Commercial Pool's bank accounts into the personal bank accounts of Tomazin, Madigan and Vest and the defendant holding companies.

## VI.

## VIOLATIONS OF THE COMMODITY EXCHANGE ACT

## COUNT ONE

## FRAUD IN CONNECTION WITH COMMODITY FUTURES CONTRACTS
### Violations of Sections 4b(a)(1)(A)-(C) of the Act

41.    The allegations set forth in paragraphs 1 through 40 are re-alleged and incorporated herein by reference.

42.    Sections 4b(a)(1)(A)-(C) of the Act, 7 U.S.C. §§ 6b(a)(1)(A)-(C) (2012), provide, in relevant part, that it is unlawful "for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity in interstate commerce or for future

delivery that is made, or to be made, on or subject to the rules of a designated contract market, for or on behalf of any other person . . . (A) to cheat or defraud or attempt to cheat or defraud the other person; (B) willfully to make or cause to be made to the other person any false report or statement or willfully to enter or cause to be entered for the other person any false record; [or] (C) willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract for or, in the case of paragraph (2), with the other person."

43.    During the relevant period, defendants cheated or defrauded or attempted to cheat or defraud other persons; issued or caused to be issued false statements; and willfully deceived or attempted to deceive other persons in connection with the offering of, or entering into futures contracts and the margined or leveraged forex transactions alleged herein, by fraudulently soliciting prospective and existing pool participants by making material misrepresentations and omissions, including but not limited to the following:

a)   Making false and fraudulent statements in the solicitation of prospective and actual pool participants, including the "Confidential Information Memorandum," the "Limited Partnership Agreement," and the "Subscription Agreements" as set forth above;

b)   misrepresenting that participants' funds were used to effect transactions only in forex;

c)   misrepresenting the profitability of the pool, and that the Commercial Pool was successfully trading;

d)   failing to disclose defendants' lack of trading;

e)   misappropriating pool participant funds for their personal use and enjoyment;

f)   distributing false account statements and written and oral reports to pool

participants;

g)   failing to provide the MRA/ARA to pool participants, disclose the findings

therein to pool participants, or even to divulge the existence of these actions to

pool participants; and

h)   making fraudulent written and oral promises to redeem pool participants' funds,

that misrepresented the value of customers' accounts and customers' holdings;

all in violation of Sections 4b(a)(1)(A)-(C) of the Act, to be codified at 7 U.S.C. §§ 6b(a)(1)(A)-(C) (2012).

44.   Defendants engaged in the acts and practices described above knowingly, willfully or with reckless disregard for the truth.

45.   Tomazin, Madigan and Vest, directly or indirectly, controlled R2 Capital and did not act in good faith, or knowingly induced, directly or indirectly, the acts constituting R2 Capital's violations alleged in this count.  Tomazin, Madigan and Vest are thereby liable for R2 Capital's violations of the Act and Regulations, as alleged in this count, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2012).

46.   The foregoing acts of fraudulent solicitation, misappropriation and false statements by Tomazin, Madigan and Vest occurred within the scope of their employment, office or agency with each of their respective defendant holding companies, and with R2 Capital.  Therefore, the defendant holding companies and R2 Capital are liable for Tomazin, Madigan and Vest's violations of the Act and Regulations, as alleged in this count, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2012), and Regulation 1.2, 17 C.F.R. § 1.2 (2013).

14

47.     Each act of fraudulent solicitation, misappropriation and false statement or report, including but not limited to those specifically alleged herein, is alleged as separate and distinct violations of Sections 4b(a)(1)(A)-(C) of the Act, 7 U.S.C. §§ 6b(a)(1)(A)-(C) (2012).

<u>COUNT TWO</u>

FRAUD IN CONNECTION WITH FOREX CONTRACTS
Violations of Sections 4b(a)(2)(A)-(C) of the Act

48.     The allegations set forth in paragraphs 1 through 47 are re-alleged and incorporated herein by reference.

49.     For conduct before July 16, 2011, Sections 4b(a)(2)(A)-(C) of the Act, 7 U.S.C. §§ 6b(a)(2) (A)-(C) (Supp. III 2009), made it unlawful "for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, or other agreement, contract, or transaction subject to paragraphs (1) and (2) of section 5a(g), that is made, or to be made, for or on behalf of, or with, any other person, other than on or subject to the rules of a designated contract market—(A) to cheat or defraud or attempt to cheat or defraud the other person; (B) willfully to make or cause to be made to the other person any false report or statement or willfully to enter or cause to be entered for the other person any false record; [or] (C) willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract for or, in the case of paragraph (2), with the other person."

50.     For conduct on or after July 16, 2011, Sections 4b(a)(2)(A)-(C) of the Act, as amended, to be codified at 7 U.S.C. §§ 6b(a)(2)(A)-(C) (2012), make it unlawful "for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, or swap, that is made, or to be made, for or on behalf of, or with,

any other person other than on or subject to the rules of a designated contract market—(A) to cheat or defraud or attempt to cheat or defraud the other person; (B) willfully to make or cause to be made to the other person any false report or statement or willfully to enter or cause to be entered for the other person any false record; [or] (C) willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract for or, in the case of paragraph (2), with the other person." Sections 4b(a)(2)(A)-(C) of the Act apply to the forex transactions, agreements or contracts offered by defendants as if they were futures contracts. Section 2(c)(2)(C)(iv) of the Act, to be codified at 7 U.S.C. § 2(c)(2)(C)(iv)(2012).

51.    During the relevant period, defendants cheated or defrauded or attempted to cheat or defraud other persons; issued or caused to be issued false statements; and willfully deceived or attempted to deceive other persons in connection with offering of, or entering into futures contracts and the margined or leveraged forex transactions alleged herein, by fraudulently soliciting prospective and existing pool participants by making material misrepresentations and omissions, including but not limited to the fraudulent conduct described in Count One of this Complaint, as set forth above, and all in violation of Sections 4b(a)(2)(A)-(C) of the Act, to be codified at 7 U.S.C. §§ 6b(a)(2)(A)-(C) (2012).

52.    Defendants engaged in the acts and practices described above knowingly, willfully or with reckless disregard for the truth.

53.    Tomazin, Madigan and Vest, directly or indirectly, controlled R2 Capital and did not act in good faith, or knowingly induced, directly or indirectly, the acts constituting R2 Capital's violations alleged in this count. Tomazin, Madigan and Vest are thereby liable for R2

16

Capital's violations of the Act and Regulations, as alleged in this count, pursuant to Section

13(b) of the Act, 7 U.S.C. § 13c(b) (2012).

54.    The foregoing acts of fraudulent solicitation, misappropriation and false statements

by Tomazin, Madigan and Vest occurred within the scope of their employment, office or agency

with each of their respective defendant holding companies, and with R2 Capital.  Therefore, the

defendant holding companies and R2 Capital are liable for Tomazin, Madigan and Vest's

violations of the Act and Regulations, as alleged in this count, pursuant to Section 2(a)(1)(B) of

the Act, 7 U.S.C. § 2(a)(1)(B) (2012), and Regulation 1.2, 17 C.F.R. § 1.2 (2013).

55.    Each act of fraudulent solicitation, misappropriation and false statement or report,

including but not limited to those specifically alleged herein, is alleged as separate and distinct

violations of Sections 4b(a)(2)(A)-(C) of the Act, 7 U.S.C. §§ 6b(a)(2)(A)-(C) (2012).

<u>COUNT THREE</u>

FRAUD BY A COMMODITY POOL OPERATOR
Violations of Section 4<u>o</u>(1)(A) and (B) of the Act

56.    The allegations set forth in paragraphs 1 through 55 are re-alleged and

incorporated herein by reference.

57.    Section 4<u>o</u>(1) of the Act, 7 U.S.C. § 6<u>o</u>(1) (2012), prohibits CPOs from using the

mails or any other means or instrumentality of interstate commerce to (A) employ any device,

scheme or artifice to defraud any client or participant or prospective client or participant; or (B)

engage in any transaction, practice or course of business which operates as a fraud or deceit upon

any client or participant or prospective participant.

58.    As set forth above, during the relevant period, defendant R2 Capital acted as a

CPO by soliciting, accepting, or receiving funds from others while engaged in a business that is

of the nature of an investment trust, syndicate, or similar form of enterprise, for the purpose of, among other things, trading in futures contracts.

59.     R2 Capital violated Section 4o(1)(A) and (B) of the Act, 7 U.S.C. § 6o(1)(A) and (B) (2012), in that it employed or is employing a device, scheme or artifice to defraud actual and prospective pool participants or engaged or is engaging in transactions, practices, or a course of business which operated or operates as a fraud or deceit upon the pool participants or prospective pool participants.  The fraudulent acts include, inter alia, those described in Counts One and Two of this Complaint, as set forth above.

60.     Tomazin, Madigan and Vest, directly or indirectly, controlled R2 Capital and did not act in good faith, or knowingly induced, directly or indirectly, the acts constituting R2 Capital's violations alleged in this count.  Tomazin, Madigan and Vest are thereby liable for R2 Capital's violations of the Act and Regulations, as alleged in this count, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2012).

61.     The foregoing acts of fraudulent solicitation, misappropriation and false statements by Tomazin, Madigan and Vest occurred within the scope of their employment, office or agency with each of their respective defendant holding companies, and with R2 Capital.  Therefore, the defendant holding companies and R2 Capital are liable for Tomazin, Madigan and Vest's violations of the Act and Regulations, as alleged in this count, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2012), and Regulation 1.2, 17 C.F.R. § 1.2 (2013).

62.     Each act of fraudulent solicitation, misappropriation and false statement or report, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Section 4o(1) of the Act, 7 U.S.C. § 6o(1) (2012).

## COUNT FOUR

COMMINGLING OF POOL PARTICIPANT FUNDS
Violation of Commission Regulation 4.20(c), 17 C.F.R. § 4.20(c)

63.     The allegations set forth in paragraphs 1 through 62 are re-alleged and
incorporated herein by reference.

64.     During the relevant period, R2 Capital violated Commission Regulation 4.20(c),
17 C.P.R. § 4.20(c) (2013), by commingling funds received from pool participants with others'
funds by, among other things, transferring pool participant funds directly into the personal bank
accounts of Tomazin, Madigan and Vest, their respective holding companies, and R2 Capital.

65.     Tomazin, Madigan and Vest, directly or indirectly, controlled R2 Capital and did
not act in good faith, or knowingly induced, directly or indirectly, the acts constituting R2
Capital's violations alleged in this count.  Tomazin, Madigan and Vest are thereby liable for R2
Capital's violations of the Act and Regulations, as alleged in this count, pursuant to Section
13(b) of the Act, 7 U.S.C. § 13c(b) (2012).

66.     The foregoing acts of unlawful commingling of funds by Tomazin, Madigan and
Vest occurred within the scope of their employment, office or agency with each of their
respective defendant holding companies, and with R2 Capital.  Therefore, the defendant holding
companies and R2 Capital are liable for Tomazin, Madigan and Vest's violations of the Act and
Regulations, as alleged in this count, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. §
2(a)(1)(B) (2012), and Regulation 1.2, 17 C.F.R. § 1.2 (2013).

67.     Each instance of improper receipt and commingling of pool participant funds,
including but not limited those specifically alleged herein, is alleged as a separate and distinct
violation of Commission Regulation 4.20(c), 17 C.P.R. § 4.20(c) (2013).

VII.

RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that the Court, as authorized by Section 6c

of the Act, 7 U.S.C. § 13a-l (2012), and pursuant to its own equitable powers, enter:

a)      An order finding that defendants violated Sections 4b(a)(1)(A)-(C) of the Act, 7 U.S.C. §§

6b(a)(1)(A)-(C) (2012); 4b(a)(2)(A)-(C) of the Act, 7 U.S.C. §§ 6b(a)(1) & (2)(A)-(C) (Supp. III 2009),

with respect to conduct before July 16, 2011; 4b(a)(2)(A)-(C) of the Act, as amended, to be codified at 7

U.S.C. §§ 6b(a)(2)(A)-(C) (2012), with respect to conduct on or after July 16, 2011; 4o(1)(A) & (B) of

the Act, 7 U.S.C. §§ 6o(1)(A) & (B) (2012) with respect to conduct during the relevant period; and,

Commission Regulation 4.20(c), 17 C.F.R. § 4.20(c) (2013) with respect to conduct during the

relevant period;

b)      An order of permanent injunction prohibiting defendants and any of their agents, servants,

employees, assigns, attorneys, holding companies, alter egos, and persons in active concert or

participation with defendants, including any of their successors, from, directly or indirectly:

(i)          engaging in conduct in violation of Sections 4b(a)(1)(A)-(C), 4b(a)(2)(A)-(C)

and 4o(1)(A) & (B) of the Act, as amended, to be codified at 7 U.S.C. §§ 6b(a)(1)(A)-(C)

(2012), 6b(a)(2)(A)-(C) and 6o(1)(A) & (B), and Commission Regulation 4.20(c), 17 C.F.R. §

4.20(c) (2013);

(ii)         trading on or subject to the rules of any registered entity (as that term is defined

in Section la of the Act, as amended, to be codified at 7 U.S.C. § la);

(iii)        entering into any transactions involving commodity futures, options on

commodity futures, commodity options (as that term is defined in Regulation 1.3(hh), 17

C.F.R. § 1.3(hh) (2013)) ("commodity options"), security futures products, swaps (as that term

20

is defined in Section 1a(47) of the Act, as amended and as will be further defined by

Commission Regulation 1.3(xxx), 17 C.F.R. §1.3(xxx)), and/or foreign currency (as described

in Sections 2(c)(2)(B) and 2(c)(2)(C)(i),7 U.S.C. §§ 2(c)(2)(B) and 2(c)(2)(C)(i) (2012))

("forex contracts"), for their own personal accounts or for any account in which they have a

direct or indirect interest;

(iv)     having any commodity futures, options on commodity futures, commodity

options, security futures products, swaps, and/or forex contracts traded on their behalf;

(v)     controlling or directing the trading for or on behalf of any other person or

entity, whether by power of attorney or otherwise, in any account involving commodity futures,

options on commodity futures, commodity options, security futures products, swaps, and/or

forex contracts;

(vi)     soliciting, receiving, or accepting any funds from any person for the purpose of

purchasing or selling any commodity futures, options on commodity futures, commodity

options, security futures products, swaps, and/or forex contracts;

(vii)     applying for registration or claiming exemption from registration with the

Commission in any capacity, and engaging in any activity requiring such registration or

exemption from registration with the Commission, except as provided for in Regulation

4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2013);

(viii)     acting as a principal (as that term is defined in Regulation 3.1(a), 17

C.F.R. § 3.1(a) (2013)), agent or any other officer or employee of any person registered,

exempted from registration or required to be registered with the Commission except as

provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2013);

c)     An order directing defendants, as well as any of their successors, holding

companies and alter egos, to disgorge, pursuant to such procedure as the Court may order, all benefits received from the acts or practices which constitute violations of the Act and the Regulations, as described herein, and pre- and post-judgment interest thereon from the date of such violations;

d)      An order directing defendants to make full restitution to every person or entity whose funds they received or caused another person or entity to receive as a result of acts and practices that constituted violations of the Act and the Regulations, as described herein, and pre- and post-judgment interest thereon from the date of such violations;

e)      An order directing defendants to pay a civil monetary penalty for each violation of the Act and the Regulations described herein, plus post-judgment interest, in the amount of the higher of: 1) $140,000 for each violation of the Act and Regulations committed on or after October 23, 2008; or 2) triple the monetary gain to defendants for each violation of the Act and the Regulations, plus post-judgment interest;

f)      An order directing defendants and any of their successors, holding companies and alter egos, to rescind, pursuant to such procedures as the Court may order, all contracts and agreements, whether implied or express, entered into between them and any of the pool participants and pool participants whose funds were received by them as a result of the acts and practices which constituted violations of the Act and the Regulations, as described herein;

g)      An order requiring defendants to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2412(a)(2)(2012); and

h)      Such other and further relief as the Court deems proper.

Respectfully submitted,
UNITED STATES COMMODITY
FUTURES TRADING COMMISSION

BY: _Sophia Siddiqui_

LUKE B. MARSH, DC Bar No. 475635
Chief Trial Attorney
SOPHIA SIDDIQUI, PA Bar No. 206754
Trial Attorney
Commodity Futures Trading Commission
Division of Enforcement
1155 21st Street, N.W.
Washington, D.C. 20581
Tel: (202) 418-5322 (Marsh)
Tel: (202) 418-6774 (Siddiqui)
Facsimile: (202) 418-5124
lmarsh@cftc.gov
ssiddiqui@cftc.gov
Counsel for Plaintiff
U.S. Commodity Futures Trading Commission

Dated:  August 6, 2014