UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| UNITED STATES COMMODITY FUTURES TRADING COMMISSION, ) ) ) | |
| Plaintiff, ) | Civil Action No. _____ |
| v. ) ) | |
| R2 CAPITAL GROUP LLC, RAST INVESTOR GROUP, LLC, MADIGAN ENTERPRISES, INC., BULLETPROOF VEST, INC., RYAN TOMAZIN, RYAN MADIGAN and RANDELL A. VEST, ) ) ) ) ) ) | |
| Defendants. ) ) | |

### PLAINTIFF COMMODITY FUTURES TRADING COMMISSION'S MEMORANDUM IN SUPPORT OF MOTION FOR *EX PARTE* STATUTORY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY PRELIMINARY INJUNCTION SHOULD NOT BE ENTERED

Plaintiff Commodity Futures Trading Commission ("CFTC" or the "Commission") submits its

Memorandum of Law in Support of its Motion for an *Ex Parte* Statutory Restraining Order, and for an

Order to Show Cause why a preliminary injunction should not be entered against R2 Capital Group,

LLC ("R2 Capital"), RAST Investor Group, LLC ("RAST"), Madigan Enterprises, Inc. ("Madigan

Enterprises"), Bulletproof Vest, Inc. ("Bulletproof Vest"),[1] Ryan Tomazin ("Tomazin"), Ryan

Madigan ("Madigan"), and Randell A. Vest ("Vest") (collectively, "defendants").

---

[1] RAST, Madigan Enterprises and Bulletproof Vest are collectively referred to as "defendant holding companies."

I.   INTRODUCTION

This civil enforcement action arises out of defendants' defrauding customers out of millions of dollars.  Plaintiff Commission is moving for an *ex parte* statutory restraining order to prevent defendants from dissipating and misappropriating the remainder of customers' funds, to prevent defendants from destroying books and records, and to prohibit defendants' continued illegal conduct.

From at least December 2009 through the present (the "relevant period"), defendants fraudulently solicited and accepted approximately $2.4 million from at least four (4) customers to participate in a commodity pool,[2] known as the R2 Commercial Capital Partners I L.P. (the "Commercial Pool"), to trade foreign exchange ("forex") and futures contracts, including E-mini S&P 500 futures contracts and E-mini Dow futures contracts.

Although defendants placed $2.2 million of the pool participants' funds in a trading account, defendants lost approximately $1.2 million through trading, and misappropriated the remaining $1.2 million for their personal use and unauthorized expenditures.

In soliciting potential and existing pool participants, defendants falsely and fraudulently represented that the pool was continuing to trade forex, when in truth the pool had ceased trading forex and was instead trading in financial futures and other securities products.  Defendants also

---

[2] A "commodity pool operator" means any person—

Engaged in a business that is the nature of a commodity pool, investment trust, syndicate, or similar form of enterprise, and who, in connection therewith solicits, accepts, or receives from others, funds, securities, or property, either directly or through capital contributions the sale of stock or other forms of securities, or otherwise, for the purpose of trading in commodity interests, including any—

(I)      Commodity for future delivery, security futures product, or swap . . .
(II)     Who is registered with the Commission as a commodity pool operator.

Section 1a(11) of the Act, 7 U.S.C. §1a(11) (2012).

knowingly or recklessly distributed false account statements and performance reports to pool participants that represented that the Commercial Pool was earning profits during a period where no trading occurred, and while defendants were misappropriating pool funds.

With this conduct, defendants are violating Sections 4b(a)(1)(A)-(C) and 4b(a)(2)(A)-(C) of the Commodity Exchange Act (the "Act" or "CEA"), 7 U.S.C. §§ 6b(a)(1)(A)-(C) and 6b(a)(2)(A)-(C) (2012), by fraudulently soliciting customers to enter into margined or leveraged foreign currency transactions and futures contracts, misappropriation, and issuing false account statements to customers. R2 Capital is also violating 4$o$(1)(A) & (B) of the Act, 7 U.S.C. § 6$o$ (2012) for the same fraudulent conduct described above, because R2 Capital is acting as a commodity pool operator ("CPO") at the time of the fraudulent conduct.

The defendant holding companies and R2 Capital are also charged with Tomazin, Madigan and Vest's violations of the Act and Commission Regulations ("Regulations"), pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2012), and Regulation 1.2, 17 C.F.R. § 1.2 (2013), because the fraudulent solicitations, misappropriations and false statements by Tomazin, Madigan and Vest occurred within the scope of their employment, office or agency with each of their respective holding companies, and with R2 Capital. Tomazin, Madigan and Vest are liable for the acts of R2 Capital pursuant to Section 13c(b) of the Act, 7 U.S.C. § 13c(b) (2012), because they controlled R2 Capital and knowingly induced R2 Capital's violations or failed to act in good faith.

On August 6, 2014, pursuant to Section 6c(a) of the Act, 7 U.S.C. §13a-1 (2012), the CFTC filed a Complaint for Injunctive and Other Equitable Relief (the "Complaint") for defendants' violations of the Act and Regulations. In light of the seriousness of the defendants' ongoing violations, the Commission now moves for an *ex parte* Statutory Restraining Order ("SRO") freezing

the defendants' assets and prohibiting defendants and their agents from destroying, altering or disposing of, and requiring defendants to permit the Commission to inspect and to produce to the Commission, when and as requested, any books, records, electronically stored data or other documents wherever they may be.

Defendants' conduct is ongoing and serious.  They continue to promise customers that their funds will be returned, have not repaid customers, R2 Capital and Vest are still registered with the Commission, and defendants may solicit future pool participants.  The only meaningful opportunity to locate and recover funds and to determine the scope of the damage perpetrated by these illegal transactions is to issue an *ex parte* order under 7 U.S.C. § 13a-l(a).

Therefore, the CFTC respectfully requests that the Court grant its application for an *ex parte* Statutory Restraining Order.

II.   FACTS

A.   The Parties

Plaintiff, CFTC, is an independent federal regulatory agency responsible for administering and enforcing provisions of the Act and the Regulations.  7 U.S.C. § 2(a) (2012).

Defendant Ryan Tomazin resided in Denver, Colorado and then Stamford, Connecticut, during the relevant period.  *See* Declaration of Kyong J. Koh ("Koh Decl.") attached hereto at ¶ 7.  In 2009, Tomazin formed R2 Capital as a limited liability company, designating himself as its registered agent.  *Id*. at ¶ 6, Exh. 2, R2 Articles of Organization at 1.  During the relevant period, Tomazin was also the owner, manager and principal of defendant RAST Investor Group, Tomazin's alter ego and holding company.  *Id.* at ¶ 8, Exh. 6, Articles of Organization and Operating Agreement of Rast Investor Group, LLC at 6.[3]  Tomazin has never been registered

---

[3] Tomazin's wife held a 50% ownership interest in RAST.  *Id.*

with the Commission.  *Id.* at ¶ 7, Exh. 5, NFA Certification of Non-Registration at ¶ 6.

Defendant RAST Investor Group, LLC, is a limited liability company formed in 2008 by defendant Tomazin in Denver, Colorado, and through which Tomazin co-owned, controlled and operated defendant R2 Capital.  *Id*. at ¶ 8, Exh. 6.

Defendant Ryan Madigan resides in Raleigh, North Carolina.  Koh Decl. at ¶ 9.  During the relevant period, Madigan was also an officer and principal of defendant Madigan Enterprises, Madigan's alter ego and holding company.  *Id*. at ¶ 10, Exhibit 9, Madigan Enterprises Inc. Entity Information.  During the relevant period, Madigan was never registered with the Commission.  *Id*. at ¶ 9, Exhibit 8, NFA Certification of Non-Registration at ¶ 6.

Defendant Madigan Enterprises, Inc. is a corporation formed in 2004 by defendant Madigan's father in Pittsford, New York, and through which defendant Madigan co-owned, controlled and operated defendant R2 Capital.  *Id.*, at ¶ 10, Exh. 10, Madigan Enterprises, Inc. Entity Information.

Defendant Randell A. Vest resides in Fort Meyers, Florida.  *Id*. at ¶ 11.  During the relevant period, Vest was also the sole owner, manager and principal of defendant Bulletproof Vest, defendant Vest's alter ego and holding company.  *Id.* at ¶ 11, Exh. 11.  Vest first registered with the Commission on September 27, 2013, as an Associated Person ("AP") of R2 Capital. *Id.*, at ¶ 11, Exh. 12, NFA Certification of Registration.

Defendant Bulletproof Vest, Inc. is a corporation formed in 2009 by defendant Vest in Ft. Meyers, Florida, and through which Vest co-owned, controlled and operated defendant R2 Capital.  *Id.*, at ¶ 12, Exh. 11.

Defendant R2 Capital Group LLC is a Colorado limited liability company created by Tomazin in November 2008, and was initially jointly and equally owned and controlled by

Tomazin and Madigan, and located at Tomazin's home address.  *Id.* at ¶¶ 13-14, Exh. 2.  In July

2009, defendants Tomazin, Madigan and Vest, through defendant holding companies, assumed

total and equal control, ownership and management of R2 Capital.  *Id.* at ¶ 15, Exh. 4, Operating

Agreement of R2 Capital Group, LLC Amended as of July 1, 2009 at 24.  R2 Capital was not

registered with the Commission until September 27, 2013, when it registered as a CPO.

      B.  <u>National Futures Association Action</u>

In October 2013, the National Futures Association ("NFA") began an investigation of R2

Capital, a registered CPO, and NFA Member Vest, resulting in the December 20, 2013 Member

Responsibility Action ("MRA") by the NFA.  *Id.* at ¶¶ 47-49, Exh. 16, Member Responsibility

Action.  As a result of its investigation, the NFA deemed the MRA "necessary to protect

investors in commodity pools and other investment vehicles controlled by R2 Capital and Vest . .

. because of their failure to cooperate with the NFA in its examination and investigation of R2

Capital by failing to produce books, records and other information from them."  *Id.* at 2.  In its

MRA, the NFA found that "R2 Capital, Vest and Tomazin have provided NFA with misleading,

incomplete and conflicting information regarding the firm's operation, specifically in connection

with the Commercial Pool, and [that the NFA] cannot account for a significant portion of the

pool's assets, which appear to have been disbursed through so-called loans and other payouts to

the owners of the firm."  *Id.*  Specifically, the NFA determined that "Vest, Tomazin and Madigan

may have converted pool assets totaling more than $1 million for their own personal use, through

numerous payments to themselves or their holding companies."  *Id.* at 4.

In contravention of the terms of the MRA, R2 Capital, Vest and its agents have disbursed

or transferred the funds from the Commercial Pool's trading account and pool accounts without

prior NFA approval and have failed to repay in full all existing loans or advances of pool assets.

*Id.* at 1.  Moreover, defendants continue to misrepresent to pool participants that the Commercial

Fund still exists and customer funds will be returned.  Koh. Decl. at ¶¶ 43-46; Exhibit 1,

Declaration of Pool Participant Derek Miller ("Miller Decl.") attached hereto at ¶ 21; Exhibit 2,

Declaration of Pool Participant Tyson Morgan ("Morgan Decl."), attached hereto at ¶ 24; Exhibit

3, Declaration of Pool Participant Sean Robertson Irvine ("Irvine Decl.") attached hereto at ¶¶ 12-15.

    C.  <u>Management</u>

During the relevant period, Tomazin, Vest, and Madigan equally owned, and jointly

controlled, the operations of R2 Capital through defendant holding companies.  Koh Decl. at ¶

15, Exhibit 4, Amended Operating Agreement of R2 Capital at 24.

Tomazin and Madigan handled R2 Capital's day-to-day operations, including managing

the accounting, reporting and investor relations responsibilities.  *Id.* at ¶ 16.  Madigan, who

solicited at least two customers, is a signatory on trading account opening documents for R2

Capital and the Commercial Pool.  *Id.* at ¶ 17, Exh. 15; *see also* Exh. 1, Miller Decl. at ¶¶ 1-7;

Morgan Decl. at ¶¶ 6-7.  Vest informed the NFA that he was primarily responsible for managing

R2 Capital's trading operations and managing the firm's trading platform.  Koh Decl. at ¶ 18,

Exh. 16, ¶ 5.  However, Vest participated in the solicitation of at least one pool participant who

invested $1,105,000.  *See* Exh. 2, Morgan Decl. at ¶¶ 6-7, 9.

On November 10, 2008, Tomazin filed R2 Capital's Articles of Organization with the

Colorado Secretary of State, identifying Tomazin as R2 Capital's registered agent and Tomazin's

home address in Denver, Colorado as its mailing address.  Koh Decl. at ¶ 13, Exh. 2.  On

September 18, 2009, Tomazin filed a Certificate of Limited Partnership for the Commercial

Pool, identifying Tomazin as the Commercial Pool's registered agent, Tomazin's home address

in Denver, Colorado, as its mailing address, and R2 Capital as the Commercial Pool's General

Partner.  *Id.* at ¶ 14, Exhibit 14, R2 Commercial Capital Partners I L.P. Certificate of Limited Partnership.

      D.  <u>Defendants' Fraudulent Statements and Omissions</u>

      During the relevant period, defendants solicited approximately $2.4 million from at least four pool participants for the purpose of trading forex through the Commercial Pool.  Koh Decl. at ¶ 4(c).  These funds were deposited directly into either the Commercial Pool or R2 Capital bank accounts.  *Id*. at ¶ 22.  Defendants induced one or more prospective pool participants to participate in the Commercial Pool by providing them with a "Confidential Information Memorandum," a "Limited Partnership Agreement," and a "Subscription Agreement."  *Id.* at ¶ 4(g), Exh. 1; Exh. 2, Morgan Decl. at ¶¶ 8-9, Ex. A.  These documents falsely and fraudulently represented the following:

1.  R2 Capital would receive a management fee of 50% of the profits earned by the Commercial pool, only if profits were earned.  All remaining profits would be divided on a pro rata basis.  Koh Decl., Exhibit 14, Agreement and Certificate of Limited Partnership of R2 Commercial Capital Partnership, L.P. at § 10.2(d).

2.  All pool participant funds would be deposited directly into the Commercial Pool's bank account and there would be no commingling of funds between the Commercial Pool and R2 Capital except for the payment of bills or disbursements on behalf of the Commercial Pool.  *Id.* at § 6.7.

3.  There would be no loans between the Commercial Pool and any other entities controlled by R2 Capital or any person or entity directly or indirectly controlling, controlled by or under common control of R2 Capital (*id.* at 15);

4.  The Commercial Pool would be subject to an annual third party audit.  *Id.* at 19.

5. R2 Capital would maintain "complete books of account" for the Commercial Pool, and R2 Capital would furnish to pool participants monthly statements with profits or losses and estimated expenses (*id.* at §§ 8.2(e), 17.2); and

6. R2 Capital, as the general partner, would not possess Commercial Pool property. *Id.* at § 8.3.

Defendants also made oral misrepresentations to prospective pool participants to fraudulently induce them to invest. For example, defendant Madigan falsely and fraudulently promised at least one potential pool participant that the pool would generate monthly returns of 8% to 10%, that Madigan himself had invested $1 million of his own funds in the pool, and that any fees paid to Madigan and his partners would only come from pool profits. Exh. 1, Miller Decl. at ¶ 4. Tomazin and Madigan falsely represented to another pool participant that he could expect "double-digit returns" from the pool. Exh. 2, Morgan Decl. at ¶ 7.

Contrary to these representations, as established below, defendants misappropriated participant funds while the Commercial Pool was losing money; commingled participant funds with their own funds; loaned funds from the Commercial Pool to themselves; did not invest their own funds in the pool; and failed to conduct an annual third-party audit.

E. Trading and False Representations

Between January 2010 and May 2010, more than $2.2 million was transferred from the R2 Commercial Pool's US Bank account to Commercial Pool trading account at now-defunct futures commission merchant ("FCM") Peregrine Financial Group (the "PFG forex account"), using pool participant funds to trade forex. *See* Koh Decl. at ¶ 24. Defendants deposited $2.2 million into the PFG forex account, sustaining losses of $1.4 million. *Id.* at ¶ 25. In August 2010, defendants opened another trading account at FCM Interactive Brokers (the "IB trading account"), and R2 Capital traded

E-mini S&P 500 futures and other security products, realizing gains of approximately $237,000. *Id.* at ¶ 28. After netting the Commercial Pool's $1.4 million losses in the PFG forex account and the approximately $200,000 trading gains in the IB trading account, approximately $1.2 million in assets should have remained in the Commercial Pool. *Id.* at ¶ 29.

In July 2011, the Commercial Pool ceased all trading. *Id.* at ¶ 37. However, in August 2011, defendants falsely represented, in writing to at least one pool participant that the Commercial Pool was increasing in value due to successful trading, when in fact no trading was taking place. Exh. 2, Morgan Decl. at ¶¶ 11, 14-15; Koh Dec. at ¶ 38. For approximately 19 months, from August 2011 through March 2013, defendants generated and issued to at least one pool participant false monthly account statements that misrepresented that the fund returned profits from trading, increased in value, and incurred trading expenses. *Id.*

In 2012 and 2013, defendants also periodically issued to at least one pool participant narrative written reports, which misrepresented that the Commercial Pool had earned substantial profits from trading futures contracts in late 2011 and all of 2012, when in fact the pool had ceased trading after July 2011. Exh. 2, Morgan Decl. at ¶16; Koh Decl... at ¶¶ 38-39.

Defendants also routinely, orally, and in writing, misrepresented to existing pool participants that the pool was successfully generating profits from trading, when in fact it was losing money or not trading at all. *See* Exh. 1, Miller Decl. at ¶¶ 13, 15; Exh. 3, Irvine Decl. at ¶ 7. Defendants also falsely and fraudulently represented that the pool was continuing to trade forex, when in truth the pool had ceased trading forex and was instead trading in financial futures and other securities products. *See* Exhibit 1, Miller Decl. at ¶ 16; Exh. 3, Irvine Decl. at ¶¶ 4, 9.

Defendants falsely represented to at least one pool participant that they had invested $1 million of their own funds, when in truth defendants did not invest any of their own money in the

pool.  Exh. 1, Miller Decl. at ¶ 4; Koh Decl. at ¶ 23.  Defendants represented that the pool would be

independently audited, but it was not.  Koh Decl. at ¶ 41; Exh. 2, Morgan Decl. at ¶ 8d.

Pool participants relied on these statements in continuing to maintain their money with the

Commercial Pool.  Each of these statements was material because they affected actual and prospective

pool participants' decision to participate in the Commercial Pool, withdraw funds, or deposit

additional funds.  Exh. 1, Miller Decl. at ¶ 6; Exh. 2, Morgan Decl. at ¶¶ 9, 17; Exh. 3, Irvine Decl.

at ¶ 6-8.

F.  Misappropriation and Concealment

During the relevant period, defendants Tomazin, Madigan and Vest misappropriated for

personal use, and unauthorized expenditures, the approximately $1.2 million in assets which remained

in the Commercial Pool after trading losses, contrary to the representations to actual and prospective

pool participants, and in violation of the terms of the Limited Partnership and Subscription

Agreements.  Koh Dec. at ¶¶ 30-32.

Moreover, defendants concealed their misappropriation from pool participants.  For

example, in response to a pool participant's request for a partial redemption of funds, defendants

fraudulently represented that the funds were still held by the Commercial Pool and that technical

difficulties at banks or FCMs, the SEC, CFTC, and/or NFA, or the government shutdown in October

2013 is preventing redemption.  *See* Koh Decl. at ¶¶ 43-46; Exh. 1, Miller Decl. at ¶¶ 18-22.

Defendants continue to represent to pool participants that they will be repaid within days,

although their funds have been dissipated.  Koh Decl. at ¶¶ 43-46; Exh. 1, Miller Decl. at ¶ 21; Exh. 2,

Morgan Decl. at ¶¶ 19, 22-24; Exh. 3, Irvine Decl. at ¶¶ 13-15.

III.   ARGUMENT

A.   Defendants Violated Sections 4b(a)(1)(A)-(C) and 4b(a)(2)(A)-(C) of the Act[4]

The anti-fraud provisions of the Act provide, in relevant part, that it is unlawful "for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity in interstate commerce or for future delivery that is made, or to be made, on or subject to the rules of a designated contract market, for or on behalf of any other person . . .

(A) to cheat or defraud or attempt to cheat or defraud the other person;

(B) willfully to make or cause to be made to the other person any false report or statement or willfully to enter or cause to be entered for the other person any false record; [or]

(C) willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract for or, in the case of paragraph (2), with the other person."

Sections 4b(a)(1)(A)-(C) of the Act, 7 U.S.C. §§ 6b(a)(1)(A)-(C) (2012).

To establish that defendants violated sections 4b(a)(2)(A) and (C), or 4b(a)(2)(A) and (C), of the Act the Commission need only show that (1) a misrepresentation, misleading statement, or deceptive omission was made; (2) with scienter; and (3) that the misrepresentation or misleading statement was material. *CFTC v. Flint McClung Capital LLC*, No. 11-cv-01644-CMA-BNB, 2012 WL 639321, at *6 (D. Colo. Feb. 28, 2012), *citing CFTC v. R.J. Fitzgerald &*

---

[4] Section 4b(a)(1)(A)-(C) applies to futures contracts, and specifically states that it applies to: "any contract of sale of any commodity in interstate commerce or for future delivery . . ."  After July 16, 2011, Section 4b(a)(2)(A)-(C), as amended, applies to forex transactions, agreements, or contracts offered by defendants as if they were futures contracts.  *See* Section 2(c)(2)(C)(iv), 7 U.S.C. § 2(c)(2)(C)(iv).  Since defendants traded forex and futures, both provisions are included in the Complaint.

*Co.*, 310 F.3d 1321, 1328 (11th Cir. 2002).

    1.  <u>Defendants made fraudulent misrepresentations and omissions.</u>

In soliciting prospective and existing pool participants to invest, make additional deposits, and maintain their funds with R2 Capital, the defendants knowingly misrepresented that:

- The Commercial Pool was continuing to trade, and trade successfully, after July 2011, when in fact all trading had ceased (Koh Decl. at ¶ 37; Exh. 2, Morgan Decl. ¶¶11, 14-15);

- The Commercial Pool would generate returns of 8% to 10% per month (Exh. 1, Miller Decl. ¶ 4);

- The Commercial Pool was successfully trading, when in fact it was losing money or not trading at all (Exh. 1, Miller Decl. at ¶¶ 13, 15; Exh. 3, Irvine Decl. at ¶ 7);

- there would be no commingling of funds between the Commercial Pool and R2 Capital, or any affiliate thereof (Koh Decl., Exh. 15 at § 6.7);

- there would be no loans between the Commercial Pool and any other entities controlled by R2 Capital (*id.* at 15);

- all funds invested by pool participants would be deposited directly into the Commercial Pool's bank account (*id.* at § 6.7);

- an annual third-party audit would occur (*id.* at 19); and

- R2 Capital, as the general partner, would not possess Commercial Pool property. *Id.* at § 8.3.

Defendants' deceptive omissions also include a failure to inform pool participants of the existence of the NFA's MRA against R2 Capital and Vest, failure to disclose that they were misappropriating customer funds, and failure to disclose that the pool had changed from trading

13

forex to trading financial futures. Exh. 1, Miller Decl.; Exh. 2, Morgan Decl.; Exh. 3, Irvine Decl.

2. Defendants acted with scienter.

Defendants acted with the requisite scienter required under Section 4b of the Act. *See Flint McClung*, 2012 WL 639321, at *6 (internal citations omitted) (holding that knowledge or recklessness is sufficient to establish liability under Section 4b(a)(2)(A) and (C)). Scienter is established when a defendant performs acts "with knowledge of their nature and character." *Id.* The Commission need not prove evil motive or intent to injure an investor, or that the defendant wanted to cheat or defraud pool participants. *Cange v. Stotler & Co.*, 826 F.2d 581, 589 (7th Cir. 1987).

Here, the defendants made misrepresentations or omissions of material fact with the requisite scienter. As the persons operating R2 Capital and the Commercial Pool, soliciting customers and handling customer funds, Tomazin, Madigan and Vest knew that the Commercial Pool stopped all trading in July, 2011 and/or that customer funds were either being misappropriated to themselves and their holding companies. The defendants likewise knew that R2 Capital and Vest were, in fact, subject to a MRA/ARA action, and the account statements provided to participants falsely represented that Commercial Pool was earning profits as a result of the defendants' profitable trading –when in truth, trading had already ceased.

Thus, defendants acted with the requisite scienter.

3. Defendants' Misrepresentations and Omissions were Material

Lastly, defendants misrepresentations and omissions were material. A statement is material "if there is a substantial likelihood that a reasonable investor would consider the information in making a decision to invest." *R &W Technical Servs. Ltd. v. CFTC*, 205 F.3d 165, 169 (5th Cir. 2000). "Any fact that enables customers to assess independently the risk

inherent in their investment and the likelihood of profit is a material fact. *In re Commodities Int'l Corp.*, [1996-1998 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 26,943 at 44,563-64 (CFTC Jan. 14, 1997). Misrepresentations concerning profiting from commodity futures trading and risk of loss are generally deemed to be material and violative of the antifraud provisions of the Act. *See, e.g., CFTC v. Avco Fin. Corp.*, 28 F. Supp. 2d 104, 115-116 (S.D.N.Y. 1998), *aff'd in part, rev'd in part, remanded in part on other grounds sub. nom. CFTC v. Vartuli*, 228 F.3d 94 (2d Cir. 2000). "Indeed, misrepresentations concerning profit and risk go to the heart of a customer's investment decision and are therefore material as a matter of law." *CFTC v. Noble Wealth Data Info. Servs.*, 90 F. Supp. 2d 676, 686 (D. Md. 2000), *aff'd in part, vacated in part sub nom. CFTC. v. Baragosh*, 278 F.3d 319 (4th Cir. 2002).

Defendants' misrepresentations and omissions are material. The fact that defendants were misappropriating money, commingling pool participant funds, loaning money to themselves, did not conduct an annual third-party audit, continuing to represent that the pool was profitable from August 2011 to March 2013, despite the fact that no trading occurred during that period, and concealing from at least two pool participants that they were no longer trading forex, but were trading other products, were material facts. A reasonable investor would have considered this information in deciding whether to invest and in assessing the risk inherent in their investment. *See Flint McClung*, 2012 WL 639321, at *7 ("[d]efendants' misrepresentations and omissions were material in that a reasonable customer would want to know, among other things, that defendants were not trading forex as promised and that pool participant funds were being misappropriated").

4. <u>Defendants' Fraud by Misappropriation in Violation of Section 4b of the Act.</u>

Defendants violated Sections 4b(a)(1)(A) and (C) and 4b(a)(2)(A) and (C) of the Act by misappropriating at least $1.2 million in pool participant funds that they solicited and accepted in connection with trading forex and commodity futures. Misappropriation of pool participant funds constitutes "willful and blatant" fraud in violation of Section 4b(a) of the Act. *See Flint McClung*, 2012 WL 639321, at *7 (citing *Noble Wealth*, 90 F. Supp. 2d at 687) (defendants violated the predecessor of 4b(a)(2)(A) and (C) by diverting customer funds for operating expenses and personal use); *CFTC v. Trimble*, C.A. No. 11-cv-02887, 2013 WL 317576, at *6 (D. Colo. Jan. 28, 2013) (holding that defendants violated sections 4b(a)(2)(A) and (C) of the Act by misappropriating customer funds); *CFTC v. Skorupskas*, 605 F. Supp. 923, 932 (E.D. Mich. 1985) (defendant violated Section 4b when she misappropriated pool participant funds by soliciting funds for trading and then trading only a small percentage of those funds, while disbursing the rest to investors, herself, and her family).

Defendants misappropriated pool participant funds. Defendants received $2.4 million in pool participant funds to trade forex. Koh Decl. at ¶ 4(c). After netting trading losses and gains, the Commercial Pool should have been left with assets of $1.2 million. *Id.* at ¶ 4(d)-(e). However, defendants misappropriated these amounts through purported loans and for personal expenses. *Id.* at ¶ 4(f).

Accordingly, defendants committed fraud by misappropriation in violation of Sections 4b(a)(1)(A) and (C), and 4b(a)(2)(A) and (C), of the Act, 7 U.S.C. §§ 6b(a)(1)(A) and (C), 6b(a)(2)(A) and (C).

5. <u>Defendants Fraud by Issuing False Statements in Violation of Section 4b of the Act</u>

Defendants violated Sections 4b(a)(1)(B) and 4b(a)(2)(B) of the Act by providing false

monthly account statements to at least one pool participant, purportedly showing profitable returns from trading occurring between August 2011 to March 2013, when, in fact, trading ceased in July 2011.  *See* Ex. 2, Morgan Decl. at ¶ 11, 14-15, Ex. C (Trading Statements reflecting increase in trading balance from $364,198.72 to $482,978.41 between August 31, 2011 and March 31, 2013, even though trading did not occur during this time period).  Defendants also issued periodic narrative reports to at least one pool participant in 2012 and 2013 fraudulently misrepresenting that the pool had returned profits from its successful trading.  *Id.* at ¶ 16, Ex. D (R2 Capital Memo Re: "2011 Performance and Year in Review" stating that "[o]ver the 14 months between October 2010 and December 2011, the Fund did not have a single negative returning month . . . the Fund returned just over 30% net return to the investors.").

Delivering, or causing the delivery of, false account statements to customers constitutes a violation of Sections 4b(a)(1)(B) and 4b(a)(2)(B) of the Act.  *See, e.g., Skorupskas*, 605 F. Supp. at 932-33 (finding that defendant violated Section 4b(a) of the Act by issuing false monthly statements to customers); *CFTC v. Sorkin*, [1982-1984 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 21,855 at 27,585 (S.D.N.Y. Aug. 25, 1983) (determining that distribution of false account statements which falsely report trading activity or equity is a violation of Sections 4*o* and 4b of the Act); *CFTC v. Weinberg*, 287 F. Supp. 2d 1100, 1107 (C.D. Cal. 2003) (false and misleading statements as to the amount and location of investors' money violated Section 4b(a) of the Act.); *Noble Wealth*, 90 F. Supp. 2d at 685-87 (defendants violated Section 4b(a) of the Act through the delivery of false account statements).

Thus, defendants violated Section 4b(a)(1)(B) and 4b(a)(2)(B) of the Act by providing false monthly account statements to customers.

B.  R2 Capital Violated Section 4*o*(1)(A) and (B) of the Act.

Defendant R2 Capital committed fraud while acting as a CPO during the relevant period in violation of Section 4*o*(1)(A) and (B) of the Act, 7 U.S.C. § 6*o*(1)(A) and (B).

Section 4*o*(1) of the Act, 7 U.S.C. § 6*o*(1), broadly prohibits fraudulent transactions by CPOs and their APs.  Section 4*o*(1)(A) makes it unlawful for a CPO, or an AP of a CPO, to employ any device, scheme or artifice to defraud any client or participant or prospective client participant by use of the mails or any other means or instrumentality of interstate commerce. Section 4*o*(1)(B) of the Act makes it unlawful for a CPO to engage in any transaction, practice or course of business that operates as a fraud or deceit upon any client or participant or prospective participant.  During the relevant period, R2 Capital acted as a CPO by soliciting and accepting funds from others to be pooled for the purpose of trading commodity futures contracts.

The same conduct that constitutes violations of Section 4b(a), discussed above, can constitute violations of Section 4*o*(1).  *Skorupskas*, 605 F. Supp. at 932-933; *see also In re R&W Technical Servs., Ltd., et al.*, [1998-1999 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 27,582 at 47,745 (CFTC Mar. 16, 1999), *aff'd in part, R&W Technical Servs. Ltd. v. CFTC*, 205 F.3d 165 (5th Cir. 2000) (since the Commission found that respondent violated Section 4b(a) of the Act, no further analysis was needed to conclude that respondent also violated Section 4*o*(1)). However, while scienter must be established to prove violations of Section 4b of the Act, *scienter is not a required element* to prove a violation of Section 4*o*(1)(B) of the Act.  *In re Kolter*, <1994-1996 Transfer Binder> Comm. Fut. L. Rep. (CCH) ¶ 26,262 at 42,198 (CFTC Nov. 8, 1994) (citing *Messer v. E.F. Hulton & Co.*, 847 F.2d 673, 678-79 (11th Cir. 1988)).

During the relevant period, R2 Capital acted as a CPO by soliciting and accepting funds from others to be pooled for the purpose of trading commodity futures contracts.  Accordingly,

the same fraudulent conduct that constitutes violations of Section 4b(a) of the Act, as described above, constitutes violations of Section 4*o* of the Act.  *Skorupskas*, 605 F. Supp. at 932-33.

    C.  <u>Defendants violated Commission Regulation 4.20(c).</u>

Regulation 4.20(c), 17 C.F.R. § 4.20(c) (2013) provides that: "[n]o commodity pool operator may commingle the property of any pool that it operates or that it intends to operate with the property of any other person."

During the relevant period, R2 Capital violated Regulation 4.20(c) by commingling funds received from pool participants with other's funds, by, among other things, transferring pool participant funds directly into the personal bank accounts of Tomazin, Madigan and Vest, their respective holding companies, and R2 Capital.

    D.  <u>Tomazin, Madigan and Vest are liable for R2 Capital's violations of the Act pursuant to Section 13(b) of the Act.</u>

Tomazin, Madigan, and Vest are liable for R2 Capital's violations of the Act and Regulations, pursuant to Section 13(b) of the Act, because they are controlling persons of R2 Capital and knowingly induced the violations of R2 Capital or failed to act in good faith. *See Flint McClung*, 2012 WL 639321, at *9 (when a person who possesses, directly or indirectly, the power to direct or cause the direction of an entity's management and policies either knowingly induces, directly or indirectly, the entity's violative acts or fails to act in good faith, he is liable as a controlling person of the entity under Section 13(b) of the Act); *Monieson v. CFTC,* 996 F.2d 852, 858 (7th Cir.1993) (same); *CFTC v. Wall St. Underground, Inc.*, 281 F. Supp. 2d 1260, 1272 (D. Kan. 2003) *aff'd and remanded by* 128 F. App'x 726 (10th Cir. 2005); *In re Apache Trading Corp.,* [1990–1992 Transfer Binder] Comm. Fut. L. Rep. (CCH) T 25,251 at 34,766 (CFTC Mar. 11, 1992).

To establish that Tomazin, Madigan, and Vest each were "controlling persons" with respect to R2 Capital, the Commission must show that they had the ability to control R2 Capital. *Flint McClung*, 2012 WL 639321, at \*9. "A person has the requisite degree of control to be a controlling person when he or she has "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person whether through the ownership of voting securities, by contract, or otherwise . . . It is the power to control that matters, not whether the power is exercised by actually participating in or benefitting from the illegal acts." *See Wall St. Underground*, 281 F. Supp. 2d at 1272.

During the relevant period, Tomazin and Madigan were primarily responsible for R2 Capital's day-to-day operations, including managing the accounting, reporting and customer relations responsibilities. Tomazin was a signatory on each of R2 Capital's and the Commercial Pool's bank accounts, including an account used to accept pool participant deposits. Madigan was also a signatory on trading account opening documents for R2 Capital and the Commercial Pool. Vest is primarily, but not exclusively, responsible for managing R2 Capital's trading operations and managing the firm's trading platform, and he participated in customer solicitations. Each personally solicited customers, made false representations to customers orally and through their emails, limited partnership and subscription agreements, account statements and quarterly reports.

Accordingly, Tomazin, Madigan, and Vest are liable for R2 Capital's violations of the Act and Regulations, pursuant to Section 13(b) of the Act, because they are controlling persons of R2 Capital and knowingly induced the violations of R2 Capital or failed to act in good faith.

E.  **R2 Capital and Defendant Holding Companies Are Liable for Tomazin, Madigan and Vest's violations of the Act and Regulations pursuant to Section 2(a)(1)(B) of the Act**

R2 Capital and defendant holding companies are liable as principles for the acts of its agents Tomazin, Madigan, and Vest.  Under Section 2(a)(1)(B) of the Act and Regulation 1.2, "[t]he act, omission, failure of any official, agent or other person acting for any individual, association, partnership, corporation, or trust within the scope of his employment or office shall be deemed the act, omission or failure of such individual, association, partnership, corporation or trust, as well as of such official agent or other person."  7 U.S.C. § 2(a)(1)(B); *Flint McClung*, 2012 WL 639321, at *10.  As set forth above, Tomazin, Madigan and Vest committed their violative acts within the scope of their employment, office or agency with each of their respective holding companies, and within the scope of their agency as co-owners of R2 Capital. Accordingly, R2 Capital and the defendant holding companies are liable for Tomazin, Madigan and Vest's violations of the Act and Regulations, pursuant to Section 2(a)(1)(B), 7 U.S.C. 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2.

F.  Defendants' Serious and Continuing Violations of the Act and Regulations Justify the Issuance of an *Ex Parte* Order

Section 6c(a) of the Act empowers District Courts of the United States to grant restraining orders to freeze assets and prohibit any person from destroying records or denying Commission officials access thereto. 7 U.S.C. §13a-l(a)(2006).[5]  *See, e.g., CFTC v. Gale*, No. 1:12-cv-01932-JLK, 2013 WL 3776315, at *1 (D. Colo. June 25, 2013) (describing the granting of *ex parte* statutory

---

[5] Section 6c(a) of the Act, 7 U.S.C, § 13a-l(a) (2012), provides, in pertinent part; "[N]o restraining order (other than a restraining order which prohibits any person from destroying, altering, or disposing of, or refusing to permit authorized representatives of the Commission to inspect, when and as requested, any books and records or other documents or which prohibits any person from withdrawing, transferring, removing, dissipating, or disposing of any funds, assets, or other property and other than an order appointing a temporary receiver to administer such restraining order to perform such other duties as the Court may consider appropriate) or injunction for violation of the provisions of this Act shall be issued *ex parte* by said Court."

restraining order pursuant to Commission authority); *Flint McClung*, 2012 WL 639321, at *1 (same).

Mindful that notice "may result in the destruction of books and records and the dissipation of customer funds," Congress authorized courts to issue such relief *ex parte* in order "to prevent possible removal or destruction of potential evidence or other impediments to legitimate law enforcement activities and to prohibit movement or disposal of funds, assets and other property which may be subject to lawful claims of customers."  H.R. Rep. No. 97-565, at 53-54, 93 (1982), *reprinted in* 1982 U.S.C.C.A.N. 3871, 3902-03, 3942.  Such relief will "ensure that the court maintains jurisdiction over [the defendant's] assets, in order to allow the court the opportunity to determine later whether disgorgement of illegally acquired profits is appropriate." *CFTC v. Morgan, Harris & Scott Ltd.*, 484 F. Supp. 669, 679 (S.D.N.Y. 1979).  Under the statute, such restraining orders may be issued - on an *ex parte* basis - whenever it appears that any person has engaged, is engaging or is about to engage in any act or practice constituting a violation of the Act.  7 U.S.C. §13a-l(a)(2012).

R2 Capital and Vest are still registered with the Commission, R2 Capital is still operational, defendants have not given customers notice of the NFA's MRA, as required under its terms, and defendants continue to communicate with pool participants, promising that their money is forthcoming.  Exh. 1, Miller Decl. at ¶ 21; Exh. 2, Morgan Decl. at ¶ 24; Exh. 3, Irvine Decl. at ¶¶ 11-15.  Although the NFA attempted to investigate the Commercial Pool's assets, R2 Capital and Vest failed to produce all of the requested bank, trading and other records preventing the NFA from determining the nature of all transactions and the true and current net asset value of the Commercial Pool.  *See* Koh Decl., Ex. 15, MRA at 7.

Therefore, only a Court order freezing the Commercial Pool's and defendants' assets, prohibiting the destruction of records, and granting the Commission access to inspect and copy records,

will allow the Commission to identify the assets in defendants' accounts.  Indeed, given the ease of destroying documents, and in order to locate and recover funds, records must be preserved early in the litigation.  *See CFTC v. Clothier,* 788 F. Supp. 490, 493 (D. Kan. 1992) (holding that the CFTC's investigatory powers include getting information "from those who best can give it and who are most interested in not doing so").  Such relief will "preserve the status quo while an investigation is conducted to clarify the sources of various funds."  *Morgan, Harris & Scott,* 484 F. Supp. at 678.

Therefore, due to defendants' ongoing and serious fraud, the Court should grant an *ex parte* order under 7 U.S.C. §13a-l(a)(2012).

G.     Defendants' Serious and Ongoing Illegal Conduct Warrants the Entry of an
         Order to Show Cause Why a Preliminary Injunction Should Not Be Entered

In addition to the *ex parte* statutory restraining order freezing assets, so as to preserve funds from further dissipation which would likely be subject to an eventual order of disgorgement, and providing the Commission staff with access to books and records, the evidence of defendants' pattern of ongoing illegal conduct warrants the entry of an Order to Show Cause why a preliminary injunction should not be entered.  The CFTC therefore respectfully request an order to preliminarily enjoin defendant from further violations of the Act pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1(a).

Section 6c of the Act provides United States district courts with broad discretion to fashion appropriate relief and to take such action as is necessary in the futures realm to prevent injury to the public, afford redress to aggrieved parties, and to deter violations of the Act.  *CFTC v. Co Petro Mktg. Grp., Inc.*, 680 F.2d 573, 583 (9th Cir. 1982) (holding that Section 6c of the Act provides the court with authority to issue a broad variety of orders).  Indeed, Section 6c(c) of the Act, 7 U.S.C. § 13a-1(c), explicitly provides this Court with the authority to enter any

proscriptive or prescriptive injunctive relief "as is necessary to remove the danger of Violation of [the] Act or any such rule, regulation, or order."

Because this enforcement action is not private litigation, restrictive concepts ordinarily associated with requests for injunctive relief—such as irreparable injury or inadequacy of other remedies—do not apply. *CFTC v. Muller*, 570 F.2d 1296, 1300 (5th Cir. 1978) (holding that, in an action for a statutory injunction, "the agency need not prove irreparable injury or the inadequacy of other remedies as required in private injunctive suits, [instead, proof of a] *prima facie* case of illegality is sufficient."); *CFTC v. Hunt*, 591 F.2d 1211, 1220 (7th Cir. 1979) ("Actions for statutory injunctions need not meet the requirements for an injunction imposed by traditional equity jurisprudence. Once a violation is demonstrated, the moving party need only show that there is some reasonable likelihood of future violations."). "The function of a court in deciding whether to issue an injunction authorized by a statute of the United States to enforce and implement Congressional policy is a different one from that of the Court when weighing claims of two private litigants." *United States v. Odessa Union Warehouse Co-op*, 833 F.2d 172, 174-75 (9th Cir. 1987).

Further, the Commission is entitled to a preliminary injunction against defendants that prohibits further violations of the Act and Regulations, and further provides for necessary ancillary equitable relief, upon a showing that a violation has occurred and violations are likely to continue unless enjoined. *Muller*, 570 F.2d at 1300; *Hunt*, 591 F.2d at 1220. This determination is based upon the totality of circumstances surrounding the defendant's violations, such as the egregiousness of the defendant's actions, the recurrent nature of the violations, the degree of scienter involved, and the likelihood for future violations. *Skorupskas*, 605 F. Supp. at 942-43. Significantly, "the commission of past illegal conduct is highly suggestive of the

24

likelihood of future violations." *CFTC v. Crown Colony Commodity Options, Ltd.*, 434 F. Supp. 911, 915 (S.D.N.Y. 1977).  Here, there is ample evidence establishing that defendants violated and may continue to violate the Act and Regulations as alleged in the Complaint, and accordingly this Court should enter an Order requiring defendants to Show Cause why a preliminary injunction should not be entered pursuant to Fed. R. Civ. P. 65(a).

IV.    <u>CONCLUSION</u>

From at least December 2009 through the present, defendants fraudulently solicited customers to participate in a commodity pool.  Defendants also knowingly or recklessly distributed false account statements and performance reports to pool participants that represented that the Commercial Pool was earning profits during a period where no trading occurred, and while defendants were misappropriating pool funds in violation of Sections 4b(a)(1)(A)-(C) and 4b(a)(2)(A)-(C) of the Act, 7 U.S.C. §§ 6b(a)(1)(A)-(C) and 6b(a)(2)(A)-(C).

Defendant R2 Capital also violated Sections 4*o*(1)(A) & (B) of the Act, 7 U.S.C. § 6*o*(1)(A) and (B), for the same fraudulent conduct described above, because R2 Capital was acting as a CPO at the time of the fraudulent conduct.  Defendants also violated Regulation 4.20(c), 17 C.F.R. § 4.20(c), by commingling funds from pool participants with others' funds.

Defendants' conduct is ongoing and serious.  They continue to promise customers that their funds will be returned, have not repaid customers, R2 Capital and Vest are still registered with the Commission, and defendants may solicit future pool participants.  The only meaningful opportunity to locate and recover funds and to determine the scope of the damage perpetrated by these illegal transactions is to issue an *ex parte* order under 7 U.S.C. § 13a-1(a).

Therefore, the CFTC respectfully requests that the Court grant its application for an *ex parte* Statutory Restraining Order.

Respectfully submitted,

UNITED STATES COMMODITY
FUTURES TRADING COMMISSION

BY: _____/s Luke Marsh_____
LUKE B. MARSH, DC Bar No. 475635
Chief Trial Attorney
SOPHIA SIDDIQUI, PA Bar No. 206754
Trial Attorney
Commodity Futures Trading Commission
Division of Enforcement
1155 21st Street, N.W.
Washington, D.C. 20581
Tel: (202) 418-5322 (Marsh)
Tel: (202) 418-6774 (Siddiqui)
Facsimile: (202) 418-5124
lmarsh@cftc.gov
ssiddiqui@cftc.gov
Counsel for Plaintiff
U.S. Commodity Futures Trading Commission

Dated: August 6, 2014