# Exhibit A

## SUBSCRIPTION AGREEMENT

R2 Commercial Capital Partners I L.P.
2901 E. Alameda Ave.
Denver, CO 80209

To Whom It May Concern:

By signing this Subscription Agreement, I hereby tender this subscription and apply for the purchase of the number of limited partnership interest(s) (the "Units") set forth below in R2 Commercial Capital Partners I L.P., a Colorado limited partnership, at a price of $100,000.00 per Unit, and I enclose a check or other payment payable to the Partnership in the amount set forth below for such Units.

I hereby acknowledge receipt of a copy of the Confidential Private Placement Memorandum as indicated below, and I hereby specifically accept and adopt each and every provision of the Limited Partnership Agreement annexed to and as contained within said Memorandum and I agree to be bound thereby in all respects.

I hereby represent, warrant and guarantee to you as follows:

1. I am 21 years of age or over, have adequate means of providing for my current and future needs and personal contingencies and have no need for liquidity in my investments;
2. I, if executing the Subscription Agreement in a representative or fiduciary capacity, have full power and authority to execute and deliver this Subscription Agreement on behalf of the subscribing individual, ward, partnership, trust, estate, corporation or other entity, and I have full right and power to perform pursuant to such Subscription Agreement and become a Limited Partner in the Partnership pursuant to the Limited Partnership Agreement; and,
3. I am a natural person or entity who fulfills the definition of an "accredited investor" as set forth in Regulation Section 230.501(Rule 501) of Regulation D as promulgated by the Securities & Exchange Commission.

If I am purchasing the Units subscribed for hereby in a fiduciary capacity, the necessary representatives and warranties shall be deemed to have been on behalf of the person or entity for whom I am so purchasing.

I understand and recognize that:

(a) This subscription may be accepted or rejected in whole or in part by the General Partners in their sole and absolute discretion;
(b) No federal or state agency has made any finding or determination as to the fairness for public investment, nor any recommendation or endorsement, of the Units; and
(c) There are restrictions on the transferability of the Units; there will be no public market for the Units and accordingly, it may not be possible for me to readily liquidate my investment, if at all, in the Partnership in the event of an emergency.

As part of this Subscription Agreement and by my execution hereof, I hereby constitute and appoint the said General Partner of R2 Commercial Capital Partners I L.P. with full power of the substitution, my true and lawful attorney-in-fact for me and in my name, place and stead to make, execute, sign, acknowledge, swear to, deliver, record and file any documents or instruments, which may be considered necessary or desirable by the General Partners to carry out fully the provisions of the Limited Partnership Agreement. The Power of Attorney hereby granted shall be deemed and to be coupled with an interest and shall be irrevocable and survive my death, incapacity, insolvency, dissolution or termination of the undersigned of any delivery by me of an assignment of the whole or any portion of my interest. My place of residence is shown below. Further, by execution below, I authorize the attachment of this Power of Attorney to any filings made with the Secretary of State of Colorado and any other jurisdiction in which the Partnership shall conduct business.

I hereby acknowledge and agree that I am not entitled to cancel, terminate or revoke this Subscription Agreement or any agreements hereunder and that such subscription and agreements shall survive my death or disability.

This Subscription Agreement and all rights hereunder shall be governed by, and interpreted in accordance with, the laws of the State of Colorado.

**Checks should be made payable to: "R2 Commercial Capital Partners I  L.P."**

In WITNESS WHEREOF, I hereby execute and agree to be bound by this Subscription Agreement, consisting of two pages, this 1st day of April 2010.

_____  _____
Witness as to Limited Partner                Signature of Limited Partner

_____  _____
Witness as to Joint Owner                    Signature of Joint Owner (if any)

27-1932235                                              10 Units at $100,000 = $1,000,000
Social Security Number or                       # of Units @ $100,000.00
Federal Tax Identification Number         (i.e., two at @$100,000.00 = $200,000.00)

                                                                    Derek Miller
_____        Limited Partner (Printed)
Confidential Memorandum Number
(This number is in the upper r/h corner of the CIM)   1209 N Orange Street
                                                                    Mailing Address

                                                                     Wilmington
                                                                    City

                                                                    DE                    18801
                                                                    State               Zip Code

                                                                    617-3374-3450
                                                                    Telephone: Home

                                                                    602-906-4953
                                                                    Telephone: Office

                                                                     _+61414-849304_____
                                                                    Telephone: Cell

                                                                    derek@phillips-foundation.com
                                                                    Email

The General Partner hereby accepts the foregoing Subscription to the terms foregoing Subscription Agreement subject to the terms and conditions thereof and of the Limited Partnership Agreement.

Accepted this \_\_\_\_\_ day of _____, 2010.

R2 Capital Group LLC

By: _____

       Ryan Tomazin, Senior Managing Member

# Exhibit B

# RYAN M. MADIGAN
*Executive Biography*

Ryan Madigan is an accomplished international executive with over 10 years of progressive experience driving operations, generating significant revenue growth, and leading cross-functional teams while delivering major cost reductions. He possesses a proven ability to secure major sales increases while positively affecting the bottom line. He has a thorough knowledge of turnaround situations, business development with full P&L responsibility, mergers & acquisitions, contract negotiations, and enterprise resource planning. Given his financial sevices experience, he also has a deep understanding of private-equity expectations.

Earlier in his career, Mr. Madigan served as Account Development Manager & Global Accounts Manager for Financial Markets with MCI / British Telecom. He then became President of DH Associates, where he co-founded and managed the printing and sales brokerage company that grew to $50M and three locations. He worked collaboratively with the Board of Directors in an operational role focused on P&L management, revenue generation and cost saving strategies. In this role, he grew the organization from $25M to $50M over a five-year period by driving new sales initiatives and transitioned the Company from a brokerage firm to full service manufacturing. He spearheaded the acquisition of a $3M graphics and pre-press company and developed it into a $6M organization that supported DH Associates' customers. He also closed three additional acquisitions that helped the Company capture $30M in additional revenue and become a major player in the flexible packaging industry.

Mr. Madigan then became Chief Operating Officer of Master Packaging Inc., where he led a turnaround initiative, successfully resolving significant overhead costs, weak profits, an inferior MIS system and outdated production equipment. He was accountable for revenue generation, cost saving strategies, change management, inventory and supply chain, and multi-million dollar contract negotiations. He was also responsible for capital equipment acquisition, vendor relationships and employee relations. His efforts in this role saved approximately $4.5M in raw material and servicing costs (a 15% overall improvement) after he supervised all vendor contract re-negotiations worldwide. He improved EBITDA by $4.5M (a 300% improvement from –$1.5M to $3M). He reduced excess inventory by nearly 20% and improved on-time delivery by 18%+ (from 80% to 98%) after installing a new ERP system. He also delivered $4M in annual savings through a cost reduction plan that slashed overhead expenses and downsized the management team while improving overall efficiency. These achievements were consummated in the sale of the business to a private equity group.

Following his time at Master Packaging, Mr. Madigan became Vice President & Managing Member for Invest Financial Group, where he was responsible for managing six investment bankers. He leveraged his operational expertise in all due diligence activity for the firm and collaborated with a diverse client base to address and resolve a myriad of corporate challenges involving finance, market prices, legal, operational, corporate structure and employee performance issues. He also developed brand awareness and retention strategies, continuous process improvements, committee leadership, new capital acquisition and compensation packages. While in this role, he personally raised $3M as part of a $30M second round of funding initiative by tapping into a network comprised of high-net worth professionals. He helped lead the comprehensive due diligence of the Department of Housing and Urban Development's STEP Program which has delivered up to 60% cash-on-cash returns. He was also responsible for refinancing of one of the firm's portfolio companies through debt restructuring with two new lenders.

Currently, Mr. Madigan is Managing Partner of R2 Capital Group, where he is responsible for assisting in raising capital, trader and quantitative analyst relationships, and management of key clients. He is also responsible for the day-to-day management of dealer relationships and leads Qualitative and Quantitative reviews of fund performance in comparison to stated Fund Performance Objectives. His accomplishments in this role have included raising the first $2.5M of capital seeded into the fund and contributing to year-to-date profit performance of 33%. He has also increased the firm's offering abilities and decreased overall costs after securing dealer relationships typically out of reach for similar-sized investment funds.

Mr. Madigan received his Master of Business Administration from Rochester Institute of Technology. He also received his Bachelor of Science in Management from Gettysburg College. In addition, he served as a Board Member for the Flexible Packaging Association for three consecutive years.

# Exhibit C



To whom it may concern,

Let this letter service as confirmation that the US based entity PIM 126 LLC is currently subscribed as a Limited Partner to R2 Commercial Capital Fund I L.P.

The current equity value of the PIM 126 LLC account, as of the end of July 2012, is $252,037.68 USD.  This value is an estimate only and subject to adjustments per month and 2012 year end accounting review.

Currently, and for the past 8 months, R2 Commercial Fund I L.P. has been engaged in a legal matter that has affected 100% of R2 Commercial Fund I assets.

The firm, however, has worked through all the material steps to re-establish chain of custody and we fully expect resolution this week. Upon resolution, the fund will immediately begin client distributions, including honoring redemption requests made by PIM 126 LLC.

No principal value of the fund has been lost nor is any portion of the fund otherwise encumbered.  A Judgment in favor of the fund was awarded by the State of FL and the process of releasing the funds has begun by the holding bank.

This legal process has been far from perfect and filled with many missed dates due to continued bank protests and rolling legal disputes. Through legal action in the form of a judgment, R2 has been able to decouple R2 Commercial Fund I from all liabilities associated with the original action.

All legal actions have now ceased and the bank is fully cooperating working to release all holds on capital.  This process will take another few days, but once complete funds will immediately be wired into an R2 account for distribution.

This has been an unfortunate situation for R2 and the clients of R2 Commercial Fund I. A situation which is now thankfully at and end.

Best Regards,


Ryan Madigan

Managing Partner

R2 Capital Group, LLC


<u>(Past performance is not necessarily an indicator of future performance. This fund is speculative and may involve a substantial risk of loss.)</u>

# Exhibit D

| | |
|---|---|
| **From:** | Derek Miller |
| **To:** | Marsh, Luke B |
| **Subject:** | Fwd: Fw: US trip |
| **Date:** | Monday, July 14, 2014 8:19:44 PM |

---------- Forwarded message ----------
From: **Derek Miller** <chasingryan2012@gmail.com>
Date: Tue, Jul 15, 2014 at 10:02 AM
Subject: Fwd: Fw: US trip
To: Derek Miller <gotothetopnow@gmail.com>

---------- Forwarded message ----------
From: **Derek Miller** <miller_derek2003@yahoo.com>
Date: Mon, May 14, 2012 at 12:32 PM
Subject: Fw: US trip
To: Chasing Ryan <chasingryan2012@gmail.com>

----- Forwarded Message -----
**From:** Ryan Madigan <rm@r2-capital.com>
**To:** Derek Miller <miller_derek2003@yahoo.com>
**Sent:** Sunday, 17 July 2011 11:31 PM
**Subject:** Re: US trip

Read this please in detail. I apologize in advance for any typos, sending from my phone. Also for the painful detail, but I believe it necessary for you to absorb prior to our call. I'm not smart enough to make all this crap up nor would it be in my nature to ever do so. Read on.

So first a few comments on your email.

Listen Derek, I'm as frustrated as you are. David came very close to completely ruining our business. It's taken this long to re-gain credibility and get back on our horse. We have several sets of documents out to new clients, we will close on new funds in short term. We have verbal commitments, just working out timing and amounts. This will get the new fund moving.

The presentation is done, tweaking a last few slides. It's really amazing and I encourage you to use.

I'm not trying to rub your nose in the balance. But I will shoot out a full accounting for you of what your acct would look like today if not drawn down on, factoring in compounding interest. I understand your cash needs, just need to get on same page as to the progress that could have been made.

As for trading directly with my trader, you have no access to the markets through my contacts without me or R2. We have reciprocal agreements with his firm to handle certain types of clients specifically for this reason. This is common place between funds. You mentioned in the past you had institutional funds you had speaking with, this is a way for you to onboard that capital. It's also a way for you to get back in the game. If it's not interesting to you we can throw out the idea. Just trying to help.

Onto the legal nightmare. This crap with our main source of funding is just one step of bad luck after another, but there is light at the end of the tunnel.

I will walk you through why there is yet to be a file on record for either case.

Her case they are still trying to file. They have had to go back and forth with the Federal courts in supplying the right case law to support the claims they are making. This is simply lawyer word smithing and will get resolved.
As of Friday, they were just about done with this. Taken longer than expected.

Meanwhile the guys who she started "noticing" of the suit went bat shit crazy when they found out what's going on. They had no clue this was coming as their partner didn't even tell them he was suing her or that she threatened to sue them. Real nice guy. They are all now running for cover and there was a buzz saw of legal activity on this Thursday and Friday. This was the desired effect of her suit. I will elaborate in detail when we speak.

As for his suit, until last week all the legal proceedings to date, both in NYC and DC, have been with judges directly trying to determine if this would actually go to court. Until it's decided a case will go to court, and its then actually filed, there is no "docket." The judge in DC district court decided last Thursday this was going to court. On Thursday of this week the case was still not showing in the court system. Her lawyers are of course questioning why this is and have sent a certified letter to the judge asking him wtf? They are eager to get into discovery and push this along, their assumption was this guy would be eager as well as he is the one pressing this. Yet here we are with no filing yet.

There are only two reasons that it would not be in the system.

1- bureaucracy moving at a slow pace and it will show up early this week. This could be the situation, who knows. They will find out early this week. If it is, they will move forward in normal course.

2- even though the judge set a court date, this guy still would have had to file the actual suit. There is a chance he hasn't done this yet for some unknown reason. Cold feet, his lawyers (who are also being sued by her) walked out on him, he was bluffing, who knows?  If this the case it's going to get hot this week.

The fact her case doesn't have a filing yet is simply operational and will be sorted in short term. She has only
"noticed" them of suit at this point and will "serve" then when the filing is complete. The "notice" had it's impact already.

Keep in mind I don't get info real time, i get it second hand and this is moving fast. So when there is a diversion from the plan, such as not being able to "serve" vs "notice" due to the

case still trying to be filed, that info comes to me after the fact. What I need to be doing is telling you what has happened vs what is going to happen as often times things are playing out not the same or not in same timeline for many many reasons. This is what I mean by not taking things black and white.

His case not being filed has everyone on the edge of our seats. If it's just the DC courts being slow, that will resolve itself early in the week and we'll know tomorrow or Tuesday if that's the situation.

If he hasn't filed yet, that could be a very interesting turn of events.

I can tell you, the reaction from this guy's partners over being sued because of his actions, so far, have been universally negative on the situation. Meaning they want no part of a law suit, they are terrified of the fact set, they are highly pissed at their partner and they will be jamming him to make this go away. Two have already wanted to settle this immediately.

Also on Friday, this clown's lawyers firm called her lawyer to discuss her naming them in the suit. I don't know yet if the same lawyers who are being sued called or other lawyers from that firm called. They were not able to connect but will next week.

At the end of the day, what has happened here is fraud. This one guy took her money, put it into this limited partnership with all these other guys and tried to make money with it without her consent. None of them claim to know this was happening when it happened (and this is most likely true), but she's made it clear at this point what has happened and all of them just want distance from the whole mess all together.

By this guy suing her, everyone attached to that entity, including the lawyers, are furthering that fraud. This is the basis of her whole case, the facts support it 100%.

Another thing came up this week as well. Depending on the terms of their limited partnership with each other, he may even be in breach of that agreement by suing. For example, in our business it takes a majority vote for us to file a suit. If he did this on behalf if his entity, without their permission and there is language in their operating agreement similar to ours, they can sue him. They may even be able to pull the suit back, i just dont know. He can of course sue if he wants to, but it would then be him personally suing and it's a different case all together. Even more thin. Basically, it's just another hornets nest for him.

I'm sure some of this will be playing out this week. We have no line of sight into his operating agreement so who knows what he can and cannot do on behalf of the Limited Partnership.

 I know if one of my partners did something like this, I would kick his ass and make it go away. Peer pressure is going to be a bitch for him.

Some humor, one of the attorneys representing one of the guys being sued, after being presented the fact set by my client's lawyers as to why his client is being sued, his reply was literally "oh shit."

So, i hope this level of painful detail helps you understand the complexity of what's going on. Let's put a firm call in place for Thursday of this week. I feel by then I will have more info

on where this whole thing stands. In the meantime, I will send out to you our presentation on Tuesday once we tweak the last two slides.

Hang tight

Ryan

Sent from my iPhone

On Jul 17, 2011, at 4:02 AM, Derek Miller <miller_derek2003@yahoo.com> wrote:

> Thanks.
>
> will do.

**From:** Ryan Madigan <rm@r2-capital.com>
**To:** Derek Miller <miller_derek2003@yahoo.com>
**Sent:** Sunday, 17 July 2011 2:01 PM
**Subject:** Re: US trip

Derek,

We are overdue for a talk.

Now that you have gotten this off your chest, take the pot off boil and let's discuss each one of these points in detail this week.

The world is not black and white and you are WAY over simplifying extremely complex situations on all fronts.

I will speak with you this week. If after that conversation you still feel we are misleading you, you feel I am being untruthful, or I feel our relationship is going to become advesarial, which you are clealrly I implying, we will return to you the balance of your funds and we can go our separate ways.

Let me know what day and time work for you.

Ryan.

Sent from my iPhone

On Jul 16, 2011, at 7:12 PM, Derek Miller <miller_derek2003@yahoo.com> wrote:

> Just so we have some perspective:
> 1: We gave you $1mill USD.  You have managed it down to around $200K. You keep telling me we are making money. How exactly?

2: We placed this money with R2 because you assured us there was a 20% stop loss agreement in place. You failed to manage that. You have admitted liability for that.
3: You have stated in writing that you would "top up the account" to the level that it should have been to account for the additional money you lost when you failed to stop the losses at 20%. This is the only reason we are still account holders with R2.
4: Telling me the withdrawals is whats hurting us is delusional. It's our money.
5: You assured us we would have the account back to start value within a year.........Hasn't happenned.
6: You keep telling me you have a lot of additional funding coming on board any day now. You are no closer now than you were 10 months ago.
7: Telling me to put more capital in to fix my own account is delusional. Tha'ts exactly what David said.
8: You're the banker, you can't convince people to invest, what chance does anyone else have?
9: You have been reporting for some months on a court case that actually was never a court case. Ooops!
10: If there are people being "SERVED" there is a court docket number.  If you are really talking to the lawyers as you say, this number is public record. What is it? I require my lawyer to confirm this is happenning.
11: We are approaching 1 year since the last meeting we had with you.  The account has returned a yield slightly better than I can get here in Brisbane in a bank for the last 10 months.  We have risked/lost around 3/4 of the capital to get to this point.
12: The story has changed many times, that doesn't scare me. The fact that you can't supply a docket number for a court case does!
13: I can take clients direct to your trader.  Why do I need you for that?

I want answers not supposition stories and threats.  We put our faith in you some time ago.  It's time to step up rub some dirt on it and get back in the game and prove we weren't wrong.

Derek

---

**From:** Ryan Madigan <rm@r2-capital.com>
**To:** Derek Miller <miller_derek2003@yahoo.com>
**Sent:** Saturday, 16 July 2011 12:18 AM
**Subject:** Re: US trip

My travel is tight, go ahead an plan and I will do my best to accomodate.

Just so we have some perspective.

1- Your returns on the account have been steady and WAY over market. IE your making money.
2- The withdrawls and not adding any additional funds are what are hurting your progress. For me to help you, you need to help yourself. IE get some cash in here, we will work with you on comississions etc..until we can get you back on your feet. But I need cash to do it.
3- The purpose of the powerpoint is to provide you with some assistance in raising capital. Will give you something tangible.
4- I have another option for you. If you have large clients looking for a bigger fund, our trader's fund is currently managing $500M under managment. He is killing it as well and may be a fit for some of your bigger guys. We can bring them diectly to him. He will blow them out of the water.
5- We have been checking the courts, neither case is posted as of yet. Will advise when we get there.

A stationary target is easy to hit. Your best path is to raise money. My fund is solid, now risk adverse and making money. I have now also given you another option in offering a direct view into a larger fund.

Outside of this, there is nothing else currently I can do until we are larger and can assist. As my father would say, get up, rub some dirt on it, and get back in the game.


Best Regards,

Ryan Madigan
Managing Partner
R2 Capital Group LLC



"This e-mail message and any files transmitted with it are for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message. Please note that any views or opinions presented in this e-mail are solely those of the author and do not necessarily represent those of The Company. Finally, the recipient should check this e-mail and any attachments for the presence of viruses. The Company accepts no liability for any damage caused by any virus transmitted by this e-mail. Past performance is not necessarily indicative of future results. Trading and investing involves significant risk of loss and is not appropriate for all investors."

**From:** Derek Miller <miller_derek2003@yahoo.com>
**To:** Ryan Madigan <rm@r2-capital.com>
**Sent:** Thu, July 14, 2011 8:34:56 PM
**Subject:** US trip

Ryan,

We will be in the US in a few weeks.

I would like a meeting to discuss a go forward position. All the power point slides in the world are not exciting our banks and our brick wall is approaching at a rapid rate. It is a miracle that we are not dead already.

What is the update on a court docket number?

I want to be able to have a clear picture.

We will be planing the trip over the next 48 hours or so. Will get you the dates when we will be in the US then. Any chance you can meet us in Vegas? Yeah I know, sounds like a jaunt..... Carolyn is an officer in an organisation that has chosen Vegas for there board meeting and convention this year. Luckilly I have a good friend who lives there.

Derek

--
**Derek & Carolyn**
"You only get one shot at life!"
"Make the most of it!"

# Exhibit E

## FINAL SETTLEMENT AND MUTUAL RELEASE AGREEMENT

1.  This Final Settlement and Mutual Release Agreement (hereinafter the "Agreement") is entered into on March 4th, 2014 by P.I.M. 126 LLC of 1209 N. Orange Street Wilmington, DE 18801 (hereinafter referred to as "Party-1") and Ryan and Swede Tomazin with address at 201 Commons Park South, Suite #2202, Stamford, CT 06902 (hereinafter referred to as "Party-2"). (Party-1 and Party-2 are referred to herein collectively as the "Parties" and sometimes in the singular as "Party").

2.  Party-1 entered into an Agreement (hereinafter the "Agreement") involving Party-2, pursuant to which funds were deposited into a fund for investment purposes (hereinafter the "Fund"). Within the Agreement Party-1 remitted funds to R2 Commercial Fund I, L.P. in the sum of $1,000,000.00 USD; for which Party-2 invested in accordance with the private placement memorandum. This Agreement is to serve as confirmation by Party-1 that the $1,000,000.00 USD is the full value of the original investment into the Fund. This Agreement is also to confirm that Party-1 affirms and accepts the full value of the investment currently to be $291,000.00 USD. This agreement is to release Party-1 of all obligations, liabilities and assets associated with the Fund and to acknowledge that all obligations, liabilities, assets or wind down expenses due by the fund will be the full responsibility of Party-2. Upon acceptance of this agreement by both Parties, Party-2 shall remit $291,000.000 USD to Party-1 as the full and final value of the investment made into the Fund.

3.  This Agreement is not intended to be, and shall not be construed as, any admission of liability or wrongdoing of any kind by either Party.

4.  This Agreement, the Fund PPM and Fund subscription documents are private and confidential and the contents and existence thereof shall not be disclosed by either of the Parties to any third parties whatsoever other than to their respective professional advisors or unless required by law to make disclosure, in which case notice thereof and adequate time to object shall be given to the other Party. Neither Party shall make disparaging statements about the other Party, either in written or oral form.

5.  Each Party that executes this Agreement represents and warrants that it is entering into this agreement to replace any and all other written or oral agreements between the Parties, that no oral promise or agreement not expressed herein has been made and contains the entire agreement between them. This Agreement may not be altered, amended or modified, except by a further written agreement signed by the Parties.

6.  This Agreement may be executed in counterparts, each of which shall constitute an original, but all of which shall constitute one and the same Agreement. Facsimile or electronically scanned signatures, when received, shall have the same force and effect as original signatures.

7.  This Agreement will remain in force until 6pm Friday March 7th 2014 CMT upon which time this agreement will be deemed cancelled, unless validated by copies of wire transfer receipts received by electronic communication to cwphillips007@gmail.com, to the agreed

1

value of $291,000 USD.  See Appendix 1.

8.      Party 1 reserves the right to pursue recovery action including any and all costs and monetary damages that may be awarded upon cancellation of this Agreement.

READ, CONSIDERED AND AGREED:

P.I.M. 126 LLC

Signature:
Title:       _Springing Member_____
Date:       __March 2nd 2014_____

RYAN TOMAZIN

Signature:
Title:
Date:       3/4/2014

2

Appendix 1

PIM 126 LLC instructs Party 2 to use the following wire co-ordinates.

| | |
|---|---|
| Bank Name: | Westpac Australia |
| Account Name: | Carolyn Phillips |
| Account Number: | 678779 |
| Sort Code: | 734026 |
| IBAN: | 734026678779 |
| Swift Code: | WPACAU2S |