# Exhibit A

**Memorandum Number _____**

# Confidential Information Memorandum

**December 15, 2009**

**$20,000,000.00**

**R2 Commercial Capital Partners I L.P.**

**A Colorado Limited Partnership**

**200 Units of Limited Partnership Interests**
**Price: $100,000.00 per Unit**
**One Unit Minimum**

This Confidential Information Memorandum describes the participation in units of interest in a limited partnership ("Partnership") formed pursuant to the laws of the State of Colorado to engage primarily in the business of participation in arbitrage trading funds ("Arbitrage Trades") in both US domiciled funds and foreign investment funds.  R2 Capital Group LLC, a Colorado limited liability company ("R2"), is the General Partner of the Limited Partnership ("General Partner"). Upon acceptance by R2 of Application Agreements meeting the requirements described herein, Applicants will be admitted as Limited Partners ("Partners") in the Limited Partnership.  All Partners will be obligated to enter into the Limited Partnership Agreement ("Agreement") in substantially the form described herein.

The investment objectives of the Limited Partnership are as follows: (1) to acquire an interest in the Arbitrage Trades, (2) to participate in the ongoing investment associated activities thereon, if appropriate, and (3) to provide cash distributions to the General and Limited Partners.  There can be no assurance that the Limited Partnership's investment objectives will be achieved.

Inherent in this Limited Partnership are various risks, including, but not limited to, the speculative nature of Arbitrage Trading operations, the speculative revenues from trade profits thereof, the inability to sell or transfer units, potential liability of the partnership, uninsured risks, and possible loss of the entire investment. See "RISK FACTORS."

The Limited Partnership will be a separate entity and the Partners will not, by virtue of such interest, have any rights or obligations with respect to the General Partner or any other limited partnership.

PARTICIPATION IN THIS LIMITED PARTNERSHIP IS SPECULATIVE AND INVOLVES A HIGH DEGREE OF RISK. THERE IS NO PUBLIC MARKET FOR THE UNITS. ALL PARTNERS AS LIMITED PARTNERS MAY BE SUBJECT TO LIMITED LIABILITY FOR THE LIMITED PARTNERSHIPS OBLIGATIONS TO THE EXTENT SUCH LIABILITIES ARE NOT SATISFIED BY INSURANCE PROCEEDS, ASSETS OF THE LIMITED PARTNERSHIP THE GENERAL PARTNER' S INDEMNIFICATION. SEE "RISK FACTORS."

R2 Commercial Capital Partners I L.P.
c/o R2 Capital Group LLC
2901 E. Alameda Ave.
Denver, Colorado 80209

The Date of this Confidential Information Memorandum is December 15, 2009

PARTICIPATION AS A LIMITED PARTNER HEREIN INVOLVES A HIGH DEGREE OF RISK AND ONLY THOSE PERSONS WHO ARE ABLE TO BEAR THE FINANCIAL RISKS REFERRED TO IN THIS MEMORANDUM

1

SHOULD CONSIDER PARTICIPATING IN THIS PARTNERSHIP. SEE "RISK FACTORS" FOR A DETAILED DESCRIPTION OF SOME OF THE RISKS DESCRIBED HEREIN.

NEITHER THIS MEMORANDUM NOR OTHER INFORMATION DESCRIBING THE LIMITED PARTNERSHIP UNITS HAVE BEEN FILED WITH, SUBMITTED, APPROVED OR REVIEWED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES COMMISSION OR SIMILAR STATE REGULATORY AGENCY. NEITHER THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES COMMISSION OR SIMILAR STATE REGULATORY AGENCY HAS PASSED UPON, APPROVED, DISAPPROVED OR COMMENTED UPON THE RISKS, MERITS OR ANY OTHER ASPECT OF THE LIMITED PARTNERSHIP, THE UNITS, THIS MEMORANDUM OR THE CONTENTS HEREOF. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THIS MEMORANDUM IS PREPARED SOLELY FOR THE BENEFIT OF QUALIFIED PERSONS ACCEPTABLE TO THE GENERAL PARTNER WHO MEET THE SUITABILITY STANDARDS SET BY THE GENERAL PARTNER (SEE "PLAN OF ORGANIZATION AND SUITABILITY STANDARDS"). ANY REPRODUCTION OR DISTRIBUTION OF THIS MEMORANDUM, IN WHOLE OR IN PART, OR THE DIVULGENCE OF ANY OF THE INFORMATION CONTAINED HEREIN WITHOUT THE PRIOR WRITTEN CONSENT OF R2 IS PROHIBITED. THE PROSPECTIVE PARTNER, BY ACCEPTING DELIVERY OF THIS MEMORANDUM, AGREES TO RETURN IT AND ALL ENCLOSED DOCUMENTS TO R2 IN THE EVENT HE OR SHE DECIDES NOT TO PARTICIPATE IN THE PARTNERSHIP DESCRIBED HEREIN.

THE INFORMATION CONTAINED IN THIS MEMORANDUM HAS BEEN OBTAINED FROM SOURCES BELIEVED BY R2 TO BE RELIABLE, AND SUCH INFORMATION IS BELIEVED BY R2 TO BE ACCURATE AND COMPLETE. HOWEVER, NEITHER THE DELIVERY OF THIS MEMORANDUM NOR ANY SALE OF THE UNITS DESCRIBED HEREIN SHALL, UNDER ANY CIRCUMSTANCES, CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS TRUE AND ACCURATE AS OF ANY TIME SUBSEQUENT TO THE DATE HEREOF. NO PERSON OTHER THAN R2 HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION CONCERNING THE INTERESTS DESCRIBED HEREIN, AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATIONS MUST NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY R2 CAPITAL PARTNERS L.P.. NO PERSON HAS BEEN AUTHORIZED TO MAKE ANY REPRESENTATIONS OTHER THAN THOSE CONTAINED IN THIS MEMORANDUM.

THE PURPOSE OF THIS MEMORANDUM IS TO PROVIDE THE PROSPECTIVE PARTICIPANT WITH THAT INFORMATION WHICH R2 BELIEVES IS PERTINENT IN MAKING AN INFORMED DECISION AS TO PARTICIPATION IN THE PARTNERSHIP. IT IS RECOGNIZED THAT ADDITIONAL INFORMATION MAY BE DESIRED BY A PROSPECTIVE PARTNER BEFORE MAKING HIS OR HER DECISION. THEREFORE, EACH PROPOSED PARTNER IS ENCOURAGED TO MAKE FURTHER INQUIRY IN AN EFFORT TO SATISFACTORILY ANSWER ANY QUESTIONS HE OR SHE MAY HAVE. REQUESTS FOR FURTHER INFORMATION SHOULD BE MADE TO R2, AND SUCH INFORMATION SHOULD ONLY BE RELIED UPON WHEN FURNISHED IN WRITTEN FORM AND SIGNED BY AN OFFICER OF R2.

PROSPECTIVE PARTNERS ARE NOT TO CONSTRUE THE CONTENTS OF THIS MEMORANDUM OR ANY SUBSEQUENT COMMUNICATION FROM R2 OR ANY AFFILIATE AS LEGAL OR TAX ADVICE. EACH PERSON IS ENCOURAGED TO SEEK INDEPENDENT LEGAL AND TAX ADVICE REGARDING HIS OR HER PARTICULAR SITUATION AND, MORE SPECIFICALLY, ANY PARTNER IN THE PARTNERSHIP REFERRED TO HEREIN. R2 MAKES NO REPRESENTATIONS AS TO THE EFFECT OF PARTICIPATING IN THE UNITS DESCRIBED HEREIN ON THE PARTICULAR FEDERAL OR STATE INCOME TAX SITUATION OF ANY PROSPECTIVE PARTNER.

ANY COMMUNICATION REGARDING PARTICIPATION IN THE UNITS DESCRIBED HEREIN SHALL ONLY BE MADE THROUGH PERSONAL NEGOTIATIONS BETWEEN A PROSPECTIVE PARTNER AND AN AUTHORIZED REPRESENTATIVE OF R2. SUCH PERSONAL NEGOTIATIONS ARE INTENDED BY R2 TO INSURE, AMONG OTHER THINGS, ADHERENCE TO THE SUITABILITY STANDARDS REQUIRED OF POTENTIAL PARTNERS AND TO PROVIDE POTENTIAL PARTNERS THE OPPORTUNITY TO SEEK SUCH EXPLANATIONS AND/OR ADDITIONAL INFORMATION ABOUT THE PARTNERS AS THEY MAY DESIRE.

CERTAIN STATEMENTS, ESTIMATES AND PROJECTIONS CONTAINED IN OR ACCOMPANYING THIS MEMORANDUM HAVE BEEN PREPARED BY R2 AND ITS VARIOUS ADVISORS AND AFFILIATES, AND ARE CONTAINED HEREIN FOR THE LIMITED PURPOSE OF EVALUATING THE PROPOSED PLAN OF THE PARTNERSHIP BY ILLUSTRATING, UNDER CERTAIN LIMITED ASSUMPTIONS, THE RESULTS OF PROJECTED OPERATIONS. WHILE PRESENTED WITH NUMERICAL SPECIFICITY, THE PROJECTIONS ARE BASED ON CERTAIN ASSUMPTIONS THAT ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, POLITICAL, REGULATORY AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES, ALL OF WHICH ARE DIFFICULT TO PREDICT AND MANY OF WHICH ARE BEYOND THE CONTROL OF R2 AND ITS ADVISORS AND AFFILIATES, AND UPON ASSUMPTIONS WITH RESPECT TO FUTURE BUSINESS DECISIONS THAT ARE SUBJECT TO CHANGE. THERE CAN BE NO ASSURANCE THAT THE PROJECTIONS OR THE UNDERLYING ASSUMPTIONS WILL BE REALIZED, AND THE ACTUAL RESULT OF OPERATIONS IS VERY LIKELY TO BE MATERIALLY DIFFERENT FROM THOSE SHOWN. UNDER NO CIRCUMSTANCES SHOULD THE INCLUSION OF THE PROJECTIONS BE REGARDED AS A REPRESENTATION, WARRANTY OR PREDICTION BY THE PARTNERSHIP OR ANY OTHER PERSON WITH RESPECT TO THE ACCURACY THEREOF OR THE ACCURACY OF THE UNDERLYING ASSUMPTIONS, OR THAT THE PARTNERSHIP WILL ACHIEVE OR IS LIKELY TO ACHIEVE ANY PARTICULAR RESULTS. THERE CAN BE NO ASSURANCE THAT THE PARTNERSHIP'S ACTUAL FUTURE RESULTS WILL NOT VARY MATERIALLY FROM THE PROJECTIONS.

THIS OFFERING IS BEING SUBMITTED AS AN OFFERING WITHIN THE PROVISIONS OF RULE 506 OF REGULATION D AS PROMULGATED BY THE SECURITIES ACT OF 1933, AS AMENDED AND IS THEREFORE EXEMPT FROM FEDERAL REGISTRATION REQUIREMENTS.

### FOR ALL STATES

THE NATIONAL SECURITIES MARKETS IMPROVEMENT ACT (P.L. 104-290 NSMIA) SIGNED INTO LAW ON OCTOBER 11, 1996 DIVIDES THE REGULATORY RESPONSIBILITIES BETWEEN STATE AND FEDERAL SECURITIES REGULATORS IN THE REGISTRATION OF OFFERINGS.  TITLE 1 OF NSMIA IS THE CAPITAL MARKETS EFFICIENCY ACT.  IT AMENDS SECTION 18 OF THE SECURITIES ACT TO EXPRESSLY PROHIBIT STATE GOVERNMENTS FROM REQUIRING THE REGISTRATION, OR EVEN IMPOSING CONDITIONS ON OFFERINGS OF "COVERED SECURITIES", A TERM DEFINED IN THE ACT.  HOWEVER, THE ACT PRESERVES A STATE'S AUTHORITY TO BRING ENFORCEMENT ACTIONS.  THE STATES WILL ALSO RETAIN THE AUTHORITY TO REQUIRE NOTICE FILINGS AND FEES WITH REGARD TO SOME OFFERINGS AND, AS A COROLLARY, SUSPEND THE SALE OF SECURITIES WITH A STATE WHEN FILINGS OR FEES ARE NOT SUBMITTED.  THE TERM, "COVERED SECURITIES" INCLUDES PRIVATE PLACEMENTS UNDER FEDERAL REGULATION D, RULE 506.  THIS OFFERING INTENDS TO QUALIFY AS A PRIVATE PLACEMENT UNDER RULE 506.

## Table of Contents

SUMMARY OF THE PARTNERSHIP ........................................................................................ 5

    General ........................................................................................................................... 6-8

RISK FACTORS ....................................................................................................................... 8

    Specific Risks of the Partnership ..................................................................................... 8

    Tax Matters ................................................................................................................. 8-11

    General Risks of Arbitrage Trading ................................................................................ 11

FINANCIAL RISK MITIGATION ....................................................................................... 11-12

THE LIMITED PARTNERSHIP ............................................................................................... 12

PLAN OF ORGANIZATION AND SUITABILITY STANDARDS ............................................ 12

LIMITED TRANSFERABILITY AND RIGHTS OF FIRST REFUSAL ................................. 12-13

PROPOSED ACTIVITIES ......................................................................................................... 13

    Initial Operations ............................................................................................................ 11

    The Trade Account .......................................................................................................... 11

    Partnership's Participation in Costs and Revenues in the Trade Account ........................ 15

    Investment Policy ........................................................................................................... 16

    FAQ's ....................................................................................................................... 16-19

SOURCE AND APPLICATION OF PROCEEDS ...................................................................... 19

PARTICIPATION IN COSTS AND REVENUES WITHIN PARTNERSHIP .............................. 19

COMPENSATION AND REIMBURSEMENT .................................................................... 19-20

MANAGEMENT .............................................................................................................. 20-21

PRIOR ACTIVITIES ............................................................................................................... 21

INDEMNIFICATION ............................................................................................................. 21

CONFLICTS OF INTEREST .................................................................................................... 22

DEFINITIONS ................................................................................................................... 22-24

TAX ASPECTS .................................................................................................................. 24-36

COMPETITION, MARKETS AND REGULATION .................................................................. 37

LITIGATION .......................................................................................................................... 37

FURTHER INFORMATION ..................................................................................................... 37

R2 Commercial Capital Partners I L.P. – Subscription Document – Exhibit "A"

R2 Commercial Capital Partners I L.P. – Limited Partnership Agreement – Exhibit "B"

## SUMMARY OF THE MEMORANDUM

THE FOLLOWING IS A SUMMARY OF CERTAIN INFORMATION CONTAINED IN THIS MEMORANDUM. THIS SUMMARY IS PROVIDED FOR CONVENIENCE ONLY AND SHOULD NOT BE CONSIDERED COMPLETE. IT IS QUALIFIED IN ITS ENTIRETY BY AND IS SUBJECT TO THE DETAILED INFORMATION CONTAINED ELSEWHERE IN THIS MEMORANDUM AND/OR INCORPORATED BY REFERENCE IN THIS MEMORANDUM. EACH PROSPECTIVE INVESTOR IS URGED TO READ THIS MEMORANDUM IN ITS ENTIRETY AND ALL DOCUMENTS ATTACHED HERETO OR REFERRED TO HEREIN.

**General**

**The Partnership**. R2 Capital Group LLC, ("R2"), as General Partner, will invite qualified parties to become Limited Partners ("Partners") in the Partnership, which has or will be formed under Colorado law and shall be governed by the Limited Partnership Agreement and Colorado Partnership Law. Operations of the Partnership will be conducted under the Limited Partnership Agreement, which names R2 as General Partner. The Participants will have all of the rights and will be subject to all of the liabilities of a limited partnership under the Limited Partnership Agreement and Colorado Partnership Law. The General Partner shall have the authority to manage the day-to-day Operations, as hereinafter defined. See "PLAN OF ORGANIZATION AND SUITABILITY STANDARDS," "PROPOSED ACTIVITIES," and the Limited Partner Agreement attached hereto.

**Initial Capitalization**. Units in the Partnership will be offered and sold by officers, directors, employees and/or agents of the General Partner on a "best efforts" basis. Some Units in the Partnership will be offered and sold by placement agents utilized by R2 in each case on a "best efforts" basis. A capitalization amount of $100,000.00 must be obtained before capital of the Partnership will be utilized by the Partnership for any purpose. In the event that all Units are not subscribed at the termination of the Capitalization Period or the extensions thereof, the General Partner may: (i) close the Partnership and conduct such Operations on Trade Accounts as the Partnership Capital will permit; (ii) acquire the remaining Units; or (iii) retain the remaining Working Interests represented by those Units and be responsible for the costs and expenses associated therewith. See "PLAN OF ORGANIZATION AND SUITABILITY STANDARDS."

THIS OFFERING IS BEING SUBMITTED AS AN OFFERING WITHIN THE PROVISIONS OF RULE 506 OF REGULATION D AS PROMULGATED BY THE SECURITIES ACT OF 1933, AS AMENDED, AND IS THEREFORE EXEMPT FROM FEDERAL REGISTRATION REQUIREMENTS.

### FOR ALL STATES

THE NATIONAL SECURITIES MARKETS IMPROVEMENT ACT (P.L. 104-290 NSMIA) SIGNED INTO LAW ON OCTOBER 11, 1996 DIVIDES THE REGULATORY RESPONSIBILITIES BETWEEN STATE AND FEDERAL SECURITIES REGULATORS IN THE REGISTRATION OF OFFERINGS. TITLE 1 OF NSMIA IS THE CAPITAL MARKETS EFFICIENCY ACT. IT AMENDS SECTION 18 OF THE SECURITIES ACT TO EXPRESSLY PROHIBIT STATE GOVERNMENTS FROM REQUIRING THE REGISTRATION, OR EVEN IMPOSING CONDITIONS ON OFFERINGS OF "COVERED SECURITIES", A TERM DEFINED IN THE ACT. HOWEVER, THE ACT PRESERVES A STATE'S AUTHORITY TO BRING ENFORCEMENT ACTIONS. THE STATES WILL ALSO RETAIN THE AUTHORITY TO REQUIRE NOTICE FILINGS AND FEES WITH REGARD TO SOME OFFERINGS AND, AS A COROLLARY, SUSPEND THE SALE OF SECURITIES WITH A STATE WHEN FILINGS OR FEES ARE NOT SUBMITTED. THE TERM, "COVERED SECURITIES" INCLUDES PRIVATE PLACEMENTS UNDER FEDERAL REGULATION D, RULE 506. THIS OFFERING INTENDS TO QUALIFY AS A PRIVATE PLACEMENT UNDER RULE 506.

**Capitalization Period**. The Capitalization Period, the period of time during which Participants will be accepted and payments for Units will be received, will begin on the date of this Memorandum and will continue through December 31, 2009, subject to an extension of up to 120 days; provided, however, that the General Partner, in its sole and absolute discretion, may terminate the Capitalization Period at any time prior to that date. After an amount is accepted the equivalent to one (1) unit or the amount of $100,000.00, the segregated funds will be distributed to the Partnership for the purpose of commencing preparatory Partnership Operations. At such time, the General Partner shall continue to accept applications for participation in the Partnership until the Capitalization Period expires. See "PROPOSED ACTIVITIES" and "DEFINITIONS" "PLAN OF ORGANIZATION AND SUITABILITY STANDARDS."

**Initial Operations**. The Partnership has entered or intends to enter into a joint venture with one or several Arbitrage Trading operations in which the Partnership and the Trade Group will share trade profits. The Arbitrage Trading operations will share trade profits, for which the Partnership will fund 100% of the trade accounts. R2 will enter into a turnkey agreement with the Arbitrage Trader on behalf of the Partnership. To the extent that less than 200 units are subscribed at the close of the Capitalization Period, the Partnership will distribute trade profits on a per unit basis. Each Unit purchased shall entitle the Partner to an interest in the Partnership which will have the economic return based on time-adjusted pro rata share of the partnership interest. See "PROPOSED ACTIVITIES."

When the Partnership commences Operations, the Partnership will enter into a Turnkey Contract (herein so called) with the Arbitrage Trading operations, pursuant to which the Arbitrage Trading operations will acquire trade interests in trading accounts for the benefit of the Partnership, invest the Partnership's proportionate funding necessary to establish sufficient trading accounts for trading activity.  The Partnership shall commence when one unit is committed to the Partnership.  The Partnership will enter into turnkey agreement at a minimum of $100,000 or one unit and a maximum of $20,000,000 or 200 units (the "Turnkey Price").

Subject to the terms of the Turnkey Contract, Arbitrage Trading operation and not the Partnership, will be responsible for all costs in excess of the Turnkey Price, legal, accounting, insurance, commissions and all other undisclosed costs associated with trading activities.  Except as provided for herein, the Partnership's total financial responsibility for legal, accounting, insurance, commissions, regulatory compliance and other undisclosed costs will be the Turnkey Price.  See "PROPOSED ACTIVITIES," "COMPENSATION AND REIMBURSEMENT," "PRIOR ACTIVITIES" and "DEFINITIONS."

**Operating Agreement**. Upon the Partnership commencing Operations, the General Partner, on behalf of the Partnership, will enter into a Trade Agreement with an Arbitrage Trade Operation, and/or its assignees or other professionals, as Operator (the "Operator"). The Operator will be responsible for the supervision of the trade activities, oversight of trade operations and if appropriate, the payment of undisclosed fees and costs at time of entering into turnkey agreement.

**Suitability Standards**. Applications will be accepted only from prospective Partners who represent to the General Partner that they meet certain suitability standards and requirements. The General Partner and/or its Affiliates may purchase Units whereby it or its Affiliates will be a Partner subject to the same obligations and limitations as any other Partner, except for certain limitations relating to transferability of such Units. See "PLAN OF ORGANIZATION AND SUITABILITY STANDARDS" and "COMPENSATION AND REIMBURSEMENT' and the "LIMITED PARTNERSHIP AGREEMENT' attached hereto as Exhibit A.

**Organizational Costs**. When the Partnership commences Initial Operations, (Limited Partnership) will be responsible for payment of Organizational Costs pursuant to the terms of the Turnkey Contract. See "PLAN OF ORGANIZATION AND SUITABILITY STANDARDS - Organizational Costs."

**Management**. The management and all business of the Partnership shall be the responsibility of the General Partner.  The Arbitrage Trading Operation for the trade will be established in each trade agreement. See "PROPOSED ACTIVITIES - Initial Operations."

**Partner's Capital Contribution**. The General Partner will be required to contribute an aggregate of zero percent (0%) of the Partnership's Initial Capital.  R2's participation in excess trade profits, if any, may be outside the Partnership as an industry participant or may take the form of a purchase of Units.

**Compensation and Reimbursement**. R2 will receive a fee of 50% of all trading activity profits for initiating Partnership trading.  However, R2 will not receive any fees if there is a difference between the Turnkey Price and the actual cost to establish a Trade Account.  R2 will pay all Offering and Organizational Costs. R2 has entered or will enter into turnkey agreements with the Arbitrage Trading Operation pursuant to which the Arbitrage Trading operation will be obligated to conduct the trading, management and oversight of the trade accounts in an aggregate minimum cost to R2 of $100,000 per trade account. The difference between the Turnkey Contract entered into between the Limited Partnership and R2, and the turnkey agreements between R2 and the Arbitrage Trading Operation shall net R2 zero, so R2 must pay all other Costs of Initial Operations relating to the Partnership from fee generated from trade profits.  R2 shall earn 50% on all Trade Profits such earnings must first be used for Operational Expenses and any excess earnings shall be deemed compensation.

R2 may receive additional compensation in connection with operating agreements, reimbursement of direct expenses paid for the Partnership, and other transactions that may arise in connection with the Operations of the Partnership.

**Participation in Costs and Revenues from Initial Operations**. The Operator and the Partnership will collectively acquire 100% of the Arbitrage Trade Account, for which the Partnership will pay 100% of the costs to establish the trading position and 100% of all costs of Operations thereafter, which are anticipated to be immaterial. The target returns for the Partnership are 10% monthly, but all profits after fees will be distributed on a pro rata basis to all Partners, and shall be distributed as often as practical to the Partners. R2 will enter into a turnkey agreement with the Arbitrage Trading Operation pursuant to which the Arbitrage Trading Operation will be obligated to establish a trade position, distribute trade profits and maintain any trading regulations.

The Partners, if the Partnership commences operations, will be allocated one hundred percent (100%) of all items of costs and expenses attributable to Initial Operations allocable to the Partnership (and the tax benefits associated therewith), and will be allocated 100% of all revenues, income, gains and proceeds from the trade account allocable to the Partnership. The Limited Partners are entitled to all monthly returns after feeds and direct expenses have been paid. The General Partner will pay one hundred (100%) percent of all items of costs and expenses attributable to Initial Operations allocable to the Partnership and will only receive a 50% fee from all Partnership profits from Partnership Operations prior to Limited Partner returns being paid. See "RISK FACTORS - Specific Risks of the Partnership: Nature of the Liability of a Partnership" and "PARTICIPATION IN COSTS AND REVENUES WITHIN PARTNERSHIP"

**Distribution of Revenues**. Partnership net revenues which, in the judgment of the General Partner, are not required to meet obligations of the Partnership, or held for working capital reserves, shall be distributed as often as practicable to the Partners.

**Application of Proceeds**. Assuming initial capitalization of the Partnership described herein, it is anticipated that the proceeds will be expended by the Partnership as described below under "SOURCE AND APPLICATION OF PROCEEDS."

**Reports to Partners**. The General Partner will furnish monthly activity operating reports to Partners and monthly statements with estimated expenses.

**Trade Accounts.** The Trade Accounts are established through a turnkey trading agreement with the Arbitrage Trading Operation. The Partnership and the Arbitrage Trading Operation intend to generate net monthly returns to the Partnership. Activities of the Arbitrage Trading Operation include but are not limited to trading of bank debentures, notes, domestic bank issues, international bank issues and other debentures. Total Net Profits to the Partnership may vary, but it is the intentions of the General Partner to distribute to the Partners and to retain a 50% management fee from Partnership profits to the General Partners. When the partnership receives its initial capitalization, the Partnership will commence Initial Operations. All invested capital beyond the minimum investment level will be invested within a subsequent two week period. Each Partner's investment will be tracked independently and will be established for receipt of returns based upon the date of the initial investment. Trading will be initiated weekly unless the following occurs; (i) trading has ceased for banking "holidays", (ii) trade has suspended due to federally mandated stoppage, or (iii) Arbitrage Trading Operation requests that trading sums are larger than minimum investment cited in this offering. PROPOSED ACTIVITIES" The Trade Accounts, "COMPENSATION AND REIMBURSEMENT and DEFINITIONS"

**Tax Status.** The Partnership does not intend to seek a ruling from the Internal Revenue Service with respect to whether it will be treated for federal income tax purposes as a partnership rather than an association taxable as a corporation. In addition, the Partnership does not presently intend to seek a ruling from the Internal Revenue Service on any other federal or state tax matter that may arise in connection with the formation, organization and/or operation of the Venture. See "TAX ASPECTS."

**Conflicts of Interest.** The General Partner is and intends to become a partner and/or an operator in other entities engaged in operations similar to that of the Partnership or otherwise make or arrange for similar operations as those contemplated for the Partnership. Such Activities may place constraints on the time that R2 and its officers have to devote to Partnership activities. See "COMPENSATION AND REIMBURSEMENT," "PRIOR ACTIVITIES" and "CONFLICTS OF INTEREST."

7

A PROSPECTIVE PARTNER IS URGED TO READ THE BALANCE OF THIS MEMORANDUM, WHICH DETAILS THE 1NFORMATIOIN, THIS SUMMARY AND CONTAINS OTHER IMPORTANT INFORMATION ABOUT THE PARTNERSHIP.   COPIES OF THE TURNKEY CONTRACT AND THE OPERATING AGREEMENT WILL BE FURNISHED UPON REQUEST.

## RISK FACTORS

PARTICIPATION IN THE PARTNERSHIP INVOLVES A HIGH DEGREE OF FINANCIAL RISK. AN INDIVIDUAL CONTEMPLATING SUCH PARTICIPATION SHOULD CONSIDER THE FOLLOWING SPECIAL RISK FACTORS IN ADDITION TO THOSE DISCUSSED ELSEWHERE IN THIS MEMORANDUM.

**Specific Risks of the Partnership**

**New Operations**. The Limited Partnership is or will be newly formed and has limited financial resources. Upon Initial Capitalization, Partnership funds will be sufficient to initiate trade accounts, complete appropriate accounting work and have proper legal oversight. R2 has minimal capital. Thus, to the extent there are cost overruns in excess of the Turnkey Price; R2 will have limited resources to pay such overruns. See "PLAN OF ORGANIZATION AND SUITABILITY STANDARDS," "MANAGEMENT," and "PRIOR ACTIVITIES."

**Non-Transferability. Lack of Liquidity of Interest and Limited Qualification of the Partnership**. A Partner has the status of a limited partner under the provisions of Colorado Partnership Law.  A Partner's right in a specific Partnership Trade Account is not assignable except in connection with the assignment of rights of all of the Partners in the same Trade Account. Partners should not expect to be able to readily liquidate their interest, if needed, and, therefore, the Units may not represent satisfactory collateral for a loan. See "LIMITED TRANSFERABILITY AND RIGHTS OF FIRST REFUSAL," of the "LIMITED PARTNERSHIP AGREEMENT" attached hereto and the "SUBSCRIPTION DOCUMENT" attached hereto.

As Limited Partnership interests, no public market exists for the Units and it is anticipated that none will ever exist. The transferability provisions in the Partnership Agreement make the Units a non-liquid investment. Participation in this Partnership is limited to persons qualifying under the suitability standards set forth in "PLAN OF ORGANIZATION AND SUITABILITY STANDARDS".

**Nature of the Liability of a Partner**. The Limited Partnership Agreement provides that no Partner (other than the General Partner or by a vote of the partners) shall have any right or authority to take any action on behalf or in the name of the Partnership or to obligate the Partnership to any third party for any reason or in any matter whatsoever, and that each Partner shall indemnify, defend and hold harmless the Partnership and all other Partners  (including R2 as the General Partner) from and against any loss, claim, cause of action, item of damages, expense or cost (including attorneys' fees and court costs) arising directly or indirectly out of any act of such Partner in breach of the Limited Partnership Agreement. Further, the Limited Partnership Agreement provides that any act of any Partner inconsistent with the delegated rights and authority of the General Partner shall constitute a breach thereof by the Partner so acting, rendering such Partner liable for damages and subject to expulsion from the Partnership.

The Partnership may be dissolved by, among other things, a unanimous vote of the Partners or a cessation of Partnership business. Upon dissolution, the Partnership is not terminated, but continues until all Partnership affairs are completed. Absent an agreement to the contrary by and between a Partnership, the Partnership, the creditors of the Partnership and the persons or partnership continuing the business of the Partnership. In the event that the business of the Partnership is continued without the liquidation or the winding-up of its affairs, the creditors of the first or dissolved partnership are also creditors of the partnership so continuing the business. Under the Limited Partnership Agreement, only the General Partner may conduct Operations relating to creditors whether before or after dissolution of the Partnership.

The Limited Partnership Agreement provides that each Partner waives his or her right to cause or obtain the dissolution and liquidation of the Partnership, except upon the occurrence of certain specified events, or to withdraw from the Partnership for any reason, and provides, except upon the occurrence of certain special events, for the continuation of the Partnership upon the occurrence of any event which would otherwise give rise to the dissolution and liquidation of the Partnership under applicable law. Furthermore, each person proposing to become a Partner shall represent and warrant to the

8

Partnership, as an express condition to the acceptance of his or her application that he or she possesses the requisite financial suitability and capacity to participate in the Partnership upon the terms and conditions established therefore, and that he or she is not, as of the date of any such application, and has not been at any time during the ninety (90) day period immediately preceding the date of such proposed participation, insolvent or adjudicated bankrupt under the federal bankruptcy statutes.

**Turnkey Obligations**. The Partnership is responsible for all costs associated with the Partnership's Working Interests. While the Limited Partners will not be a signatory to the Operating Agreement and thus should have no liability to third parties for costs of Initial Operations in excess of the Turnkey Price, to the extent the Partnership is unable to meet such liability, the Partnership could be adversely affected.

**Operating Agreement**. Upon termination of the Capitalization Period, assuming the Partnership commences Operations, the Partnership will enter into an Operating Agreement, which will govern the relationship, responsibilities and obligations of the parties with respect to the Operations of the Trade Account. The Operating Agreement has or will appoint Arbitrage Trading Operations and/or their assignees as Operator for the Trade Account. To the extent the Operator is unable to perform its obligations to the Partnership, the Partnership will be adversely affected. The Operator will be responsible to oversee all trading activities, legal, accounting, insurance, commissions, regulatory compliance and other undisclosed requirements of the Trade Account.

## Tax Matters

**General Considerations.** Although participation in the Partnership is intended to create significant economic benefits  by generating financial income from the Trade Account, favorable federal income tax treatment may be presently available for certain taxpayers.

Any deductions for federal income tax purposes available to a Partner resulting from his or her participation in the Partnership, and the year in which such deductions are taken, may have a material effect upon the economic result afforded him or her. The benefit to a particular Partner of various deductions will depend on the nature and extent of other income, deductions and credits of that Partner. **Accordingly, each prospective Partner should consult his or her personal income tax advisor and/or income tax preparer.**

All federal income tax matters discussed herein are subject to change without notice by legislation, administrative action, and judicial decision. Such changes could deprive the Partnership and its Partners of certain tax benefits they might otherwise receive and mayor may not be retroactive with respect to transactions occurring prior to the effective date thereof. See "TAX ASPECTS - Possible Changes in Federal Tax Laws."

**Tax Classification of the Partnership**. The availability of the tax benefits of participating in the Partnership depends upon the classification of the Partnership as "partnership" rather than an association taxable as a corporation for federal income tax purposes. R2 believes that under current law, if the issue were litigated, it is more probable than not that the Partnership would be treated as a partnership for federal income tax purposes, and not as an association taxable as corporation. This conclusion is not binding on the Internal Revenue Service (the "Service"), and is conditioned on the maintenance of certain conditions. Should the Partnership be treated as "an association taxable as a corporation" for federal income tax purposes, (i) income, gains, losses, deductions and credits of the Partnership would not flow through to the Partners, (ii) the taxable income of the Partnership would be subject to the federal income tax imposed on corporations, and (iii) distributions would be treated as corporate distributions to the Partners and could be taxable as dividends. See "TAX ASPECTS - Tax Status of the Limited Partnership."

**Allocations for Income Tax Purposes**. The Partnership intends to allocate among the Partners their allocable shares of income, gain, loss, deduction and credit in accordance with the terms of the Partnership Agreement. Such allocable shares shall include all of the Partnership's intangible development costs ("Intangible Costs") arising from Initial Operations, which are paid from the Partnerships' capital contributions. While the Partnership intends to make such allocations, no assurance can be given that the Internal Revenue Service will not challenge the allocations of federal income tax items and assert that they are properly allocable among the Partners in some other manner. See "TAX ASPECTS - Allocations."

**Passive Activity Limitations**. It is expected that the Partnership will initially incur tax losses from Initial Operations, primarily from deductions of Intangible Costs. The availability of tax losses generated to the Partners by the Limited Partnership to offset the Partner's income from other sources depends on (i) the determination that the Partnership does not have an effect on the Partner's liability that is substantially equivalent to a limited partnership. There can be no assurance that the Service will not challenge the Partnership's conclusions with regard to these determinations. If losses generated by the Partnership are classified as "passive", such losses would not be available to deduct against the Partner's income from other sources. See "TAX ASPECTS -Limitations on Passive Activity Losses."

**Taxable Income**. To the extent Partner's are able to deduct losses generated by the Partnership, the basis of each Partner's interest will be reduced. Amounts realized by a Partner on the sale of his or her Limited Partnership interest may produce taxable gain that may be ordinary income to some extent. Thus, the tax deductions afforded in the early years may only defer to later years a Partner's overall federal income tax liability. See "TAX ASPECTS."

**Tax Preference and Recapture of Intangible Costs and Depletion**. Certain Intangible Costs are subject to recapture, as ordinary income, on disposition by the Partnership assets at a gain, or upon disposition by a Partner of an interest in the Partnership at a gain. See "TAX ASPECTS - Tax Preference Income: Alternative Minimum Tax."

**Internal Revenue Audit**. If the Internal Revenue Service audits the Partnership, there can be no assurance that the Service will not challenge certain deductions allocated to the Partners. See "TAX ASPECTS - Audit of Tax Returns."

**State and Local Tax Aspects**. Certain states and localities in which Partners may reside or where the Partnership conducts business may levy income taxes for which such Partners may be liable in respect to their share of Partnership income, and it may be necessary for such Partners to file income tax returns with such states or localities to report such income.

**Earned but Undistributed Income**. The Partner's have no right to demand distribution of Partnership income. Therefore, each Partner may incur tax liability with respect to income earned by the Partnership and may have to pay taxes on his or her allocable share of such income regardless of whether such income is actually distributed to him or her by the Partnership.

**Management Fees**. The payment of management fees by the Partnership for services rendered thereto will be deductible only to the extent such payments are ordinary and necessary business expenses and are reasonable in amount (Code Sections 162 and 707). See "TAX ASPECTS - Management Fees." (No management fees are currently allocated in the Partnership)

**Sharing of Risks**. Within the Partnership, the Partners will bear all of the financial risk associated with the development and establishment of the Trade Account.  The Partners will also bear all of the financial risk associated with a marginally productive Partnership Trade Account. See "PARTICIPATION IN COSTS AND REVENUES WITHIN PARTNERSHIP." In addition, each of the Partners shall have the status of limited partners in a limited partnership.  See "RISK FACTORS - Specific Risks of the Partnership: Nature of the Liability of a Partner."

**Conflicts of Interest** There are conflicts of interest inherent in the activities of the Partnership. R2 and/or its Affiliates presently act and intend to act in the future as general partners and limited partners of other partnerships and intend to manage other Trade Account ventures and to own and operate other Trade Accounts on its own behalf as well as on behalf of others. In addition, R2 will hold its own Trade Account. Any conflicts of interest could adversely affect the Partnership and/or the interests of the Partners. See "CONFLICTS OF INTEREST."

**Dependence on Key Officers**. The ability of R2 to manage the Limited Partnership is predominantly dependent upon R2's Managing Partners. See "MANAGEMENT."

**Compensation and Reimbursement to Managing Partner Regardless of Profitability**. The General Partner may receive certain fees and other compensation, payments and reimbursements regardless of profitability or loss of Operations. See "PARTICIPATION IN COSTS AND REVENUES WITHIN PARTNERSHIP," "COMPENSATION AND REIMBURSEMENT" and "CONFLICTS OF INTEREST."

**General Risks of Arbitrage Trading**

**Trading Risks**. While Arbitrage Trading is speculative by its very nature and involves a high risk of loss, the General Partner has taken substantial measures to mitigate these risks. Trade Accounts are established to take advantage of ongoing volatility and uncertainty in the domestic and international financial markets. Many risks arise from a lack of experience, knowledge, economic information and careful evaluation. Since initial capitalization will be sufficient to establish a Trade Account, no capital calls are anticipated for ongoing operations. Partners must be prepared to lose all of their capital contribution, as there can be no assurance that establishing a Trade Account will be profitable for Partners. Arbitrage Trade Accounts sometimes experience economic decline that is rapid and irregular.

**Financial Market Risks**. Financial Markets are inherently risky in their nature and in the economic impacts on the market. Other Financial Markets include unusual or unexpected market losses, market gains, hedge positions and other unanticipated financial market conditions. Substantial liability for financial losses is borne entirely by the Partners. The Limited Partnership may be subject to bear liability for the entire portion of the Trade Account due to changes in the Financial Markets. Such liabilities to third parties could reduce the funds available for ongoing trading, which could substantially reduce or eliminate Partnership gains.

**Regulation and Marketability of Arbitrage Trading**. The availability of a ready market for Arbitrage Trading, if any, may change partially or substantially based upon regulatory or general marketability of the Trade Account.  These changes may include total elimination of trade activities or immaterial changes to the trading activities or any iteration in between. Changes may include changes to interstate commerce, international commerce and other government regulations affecting the Trade Account. In addition, certain daily allowable trading activity constraints may change from time to time; the effect of which cannot be predicted by the General Partner. There is no assurance that the Partnership will be able to maintain the Trade Account, despite current existing business relationships to place funds into trade activities on a weekly basis. See "COMPETITION, MARKETS AND REGULATION."

**Delay in Distributions of Income**. Unavailability of or delay in receiving trade profits, delays in obtaining division orders from Arbitrage Trading operations and other circumstances may delay the distribution of income, if any, for significant periods after initial development of the Trade Account, if any.

**Possible Shortages**. In the past, increased Arbitrage Trading activities have, from time to time, created shortages of certain opportunities necessary in the establishment of a new Trade Account. Due to a shortage of such opportunities and general inflationary trends, the prices at which the Trade Account was available escalated during such periods. Although not presently anticipated, there is a possibility that further price escalations will increase the Partnership's ability to establish future Trade Accounts, thus increasing the total funding required to start the Trade Account.

**Competition.** There are numerous individuals, partnerships, and independent companies and financial institutions with which the Partnership will be in competition which have greater financial and technical resources than those available to the Partnership.  Such an inferior competitive position could have a material adverse effect upon the productivity, marketability and profitability of the Partnership. See "COMPETITION, MARKETS, AND REGULATION."

**Ability to Accept Risks**. Participation in the Partnership will be offered solely to prospective partners who are willing and can afford to accept and bear for an indefinite period of time the substantial risks described herein, who do not require immediate income from their capital contributions in the Partnership, and whose annual recurring income is subject to the highest federal income tax rate. See "PLAN OF ORGANIZATION AND SUITABILITY STANDARDS."

## FINANCIAL RISK MITIGATION

While there are several risks in the debt markets which are detailed in our Private Placement Memorandum, there are three that an investor must pay special attention to. The first is investment strategy, the second is execution which is the risk related to successfully implementing the investment strategy, and the third is to understand the level of protections that are in place to prevent something from going wrong. We have taken numerous steps to substantially mitigate these three risk categories.

**Investment Strategy.**  We have established an investment strategy under which we participate in matched trades (riskless arbitrage) without holding positions as the base strategy. By restricting ourselves to matched trading of debt securities, financial contracts, and financial instruments, underlying risks related to investments in the debt markets such as credit risk and interest rate risks are significantly hedged as this strategy will not leave us exposed overnight. This strategy and investment policy allows, in theory, only winning trades from riskless principal transactions.  Additionally, relatively short term positions may be held capitalizing on temporary market trends, as determined technically by our Investment Manager.  See "Investment Policy". Our strategy is currently concreted via contracts with our ongoing Investment Manager trade partners.

**Execution.**  An investor faces the risk that we may not successfully execute the intended investment strategy so that investor earns the targeted returns. For these reasons, we have done exhaustive due diligence on the market to identify numerous Arbitrage Trading counterparties/liquidity providers in order to minimize this credit/market risk. We have formed a strategic alliance with a US based Investment Manager and several international financial institutions that have the ability to source transactions consistent with our strategy. We can currently take advantage of regular trading opportunities available through this business relationship and others. Historically, past, these opportunities alone have provided for net returns that exceed our minimum expectations.

**THE LIMITED PARTNERSHIP**

**The Partnership**. The Partnership shall have the status of a limited partnership under the laws of the state of Colorado, and the Partners shall have the status of limited partners therein. See "RISK FACTORS - Specific Risks of the Partnership: Nature of the Liability of a Partnership." The Partnership, if funded, will contribute up to the equivalent of a 100% of the Trade Account for which it will pay, subject to the fee limitations of the Turnkey Contract, 100% of all costs to establish the account, manage the account, perform legal oversight, financial compliance and regulatory requirements on the account. Additionally the Partnership will also be responsible for 100% of operating expenses thereafter.

The principal office for the Partnership is 2901 E. Alameda Ave, Denver, Colorado 80209. The Partnership is a separate legal entity from R2 and its Affiliates. There will be no commingling of funds between the Partnership and R2 or any Affiliate thereof other than as may temporarily occur during the payment of bills and or distributions by R2 on behalf of the Partnership. The rights of the Partnerships will be defined by the Limited Partnership Agreement and Colorado Partnership Law. Limited Partners will acquire an interest in the Partnership and not in R2.

**PLAN OF ORGANIZATION AND SUITABILITY STANDARDS**

**Eligible Potential Partners**. The General Partner reserves the right to refuse to accept the application of any person. Participation in the Partnership is intended only for persons meeting certain minimum suitability standards and who are able to make the representations contained in the Limited Partnership Agreement annexed hereto.

**General Partner's Capital Contributions**. The General Partner shall contribute to the Partnership, as its initial capital contribution, the sum of zero percent (0%) of Initial Partnership Capital.

**Partnerships' Capital Contributions**. Initial Partnerships' capital contributions may be accepted by the General Partner in the amount of $100,000.00 per Unit. Capital contributions must be paid in full, in cash, upon application. Funds included with unaccepted applications will be promptly returned in full without interest as described below.  After an amount of $100,000.00 is accepted, the Turnkey Contract Price of $100,000.00 will be disbursed by the Partnership to the Arbitrage Trading Operation for the purpose of commencing trading operations. At such time, the General Partner shall continue to accept applications for participation in the Limited Partnership until the Partnership is fully capitalized or the Capitalization Period expires.

**Participation in Units by General Partner**. The General Partner, and its Affiliates and/or its officers, directors or employees, may participate in the initial capitalization of the Partnership on the same terms and conditions (except transferability) as all other Partners. See "LIMITED TRANSFERABILITY AND RIGHTS OF FIRST REFUSAL."

12

**Organizational Costs**. All Organizational Costs will be paid by R2 pursuant to the Turnkey Contract when the Partnership is capitalized and commences Operations. If the minimum capitalization amount is not received, R2 will be responsible for the payment of all Organizational Costs.

**Suitability Standards**. Except as otherwise permitted by law, prospective Partners must be qualified as "accredited investors" as that term is defined in Rule 501(d) (I) under the Securities Act of 1933, as amended, from the signed "Limited Partnership Subscription Document" delivered to the General Partner by the prospective Partner prior to the time of participation in the Partnership and from such other information available to the General Partner. An "Accredited Investor" is defined as:

(i) A bank as defined in section 3(a)(2) of the Securities Act of 1933, as amended;

(ii) A private business development company as defined in section 202(a) (22) of the Investment Advisors Act of 1940;

(iii) Any organization described in section 501(c) (3) of the Internal Revenue Code (the "Code"), corporation, or similar business trust, or Partnership not formed for the specific purpose of acquiring the Units, with total assets in excess of $5,000,000;

(iv) An individual whose net worth, individually or in addition to that of his or her spouse, at the present time, exceeds $1,000,000;

(v) An individual who has had individual income in each of the two most recent years in excess of $200,000 or joint income with his or her spouse in excess of $300,000 in each of those years and who reasonably expects the same income level in the present year;

(vi) An entity, all of the equity owners of which are "accredited investors;" or

(vii) An individual or entity that may otherwise be deemed an "accredited investor" as that term is defined in Rule 501(a) of Regulation D as promulgated by the Securities and Exchange Commission.

## LIMITED TRANSFERABILITY AND RIGHTS OF FIRST REFUSAL

The Limited Partnership Agreement provides that a Partner (except in certain circumstances where the General Partner or its Affiliates acquire Units) is obligated to hold his or her interest and is prohibited from transferring, assigning or otherwise disposing of same without first satisfying certain conditions. One such condition provides that the General Partner may request an opinion of counsel (the cost of which shall be borne by the Partner seeking the transfer, assignment or disposition to the effect that such transaction will not result in certain adverse tax consequences or violations of law. In addition, the Units are subject to certain rights of first refusal. No Partner will be admitted as a Substitute Partner without prior written approval of R2.

**No Right of Presentment**. Neither the Partnership nor the General Partner has obligated itself to repurchase, redeem or allow withdrawal, has not established a procedure for repurchasing, redemption or withdrawal, and has no present plan to repurchase, redeem or allow withdrawal of any Units from the Partners.  Any consideration for Presentment will not be taken sooner than six (6) months after initial funding by any individual Partner.

**Payment of Costs through Utilization of Revenues.** To the extent the Partnership may have its own revenues, such revenues may also be utilized in the payment of certain costs incurred by the Partnership, including Operating Expenses. To the extent Partnership revenues are utilized and reinvested, federal income tax liability and/or deductions may accrue to the Partners even though no funds are actually distributed to the Partners. Revenues will be utilized typically for short term activities in progress and the payment of certain operating costs.

## PROPOSED ACTIVITIES

**Initial Operations**

When the Partnership commences Operations, the Partnership will enter into a Turnkey Contract with an Arbitrage Trading Operation, pursuant to which the Arbitrage Trading Operation will, among other things, be responsible for paying all costs associated with the Partnership's Arbitrage Trading Account in connection with the establishment of the account, legal oversight of the account, insurance, accounting and any regulatory activities associated with establishing each Trade Account with a minimum Turnkey price of $100,000.00 per Account, or an aggregate of up to $20,000,000.00 for up to 200 Trade Accounts (the "Turnkey Price"). The Arbitrage Trading Operation, and not the Partnership, will be responsible for all costs in excess of the Turnkey Price, if any, relating to the Partnership's Trade Account portion of the establishment of the Accounts, the legal, accounting, regulatory or other miscellaneous expenses of the Trade Account and the Organizational Costs relating thereto. The Partnership's total financial responsibility to the General Partner for the costs relating to the Partnership's Trade Account portion of the establishment of an Account. In the event that Completion attempts on a Trade Account are not successful, the cost of "unwinding" such Account will be borne by the Arbitrage Trading Operation pursuant to its obligations under the Turnkey Contract, and any remaining Completion funds will be returned to Partners. In the event that Completion attempts on a Trade Account are not attempted, the amount otherwise designated for such operation will be returned to the Partners. See "PROPOSED ACTIVITIES," "COMPENSATION AND REIMBURSEMENT," "PRIOR ACTIVITIES" and DEFINITIONS."

**Business Model & Profit Drivers**

The R2 Commercial Capital Partners business model is to successfully identify Arbitrage matched trade opportunities with strategic alliances to buy/sell debt securities and other permitted arbitrage investments. The profits drivers on Arbitrage transactions are as follows:
- Spread - difference between buy and sell price
- Leverage - ability to borrow to increase the size of a profitable trade
- Frequency - number of times transactions can be executed over a period of time

**Benefits to Our Approach**
- Riskless principal transaction focus
- Low operating costs
- Cash liquidity
- Global strategic alliances
- Transparency to a US company governed by US law with global reach
- Leverage enhanced trades while minimizing risk

**The Trade Account**

The following is a brief description of the interests that make up the Trade Account and the manner of the establishment of the account by the Partnership.

The Arbitrage Trading Operation and the Partnership intend to establish and develop Trade Accounts representing a 100.00% operating interest for the Partnership. Each Trade Account is a single financial trade contract, subject to, appropriate financial market regulations, the revenue and gain rights to which are derived from trading of inequities in the financial markets including notes, bank issues, financial contracts and financial instruments. The Trade Account will be subject to joint venture trade profit agreements made within the Turnkey agreements.

The Arbitrage Trade Operation has, based on currently available financial market information, ability to place up to 200 Trade Accounts into active operation. Prior to the commencement of trading activities, however, the Arbitrage Trade Operation may review additional financial market data and trade account history from other potential trade opportunities and recommend that the Partnership explore and develop such other Trade Accounts in substitution for the currently identified accounts described herein. In the event that the Arbitrage Trading operation selects an alternative Trade Account, Partners will be appropriately notified. The Account will focus on investments that will capitalize on changes in the

financial markets and the Arbitrage Trading Operations believes that the economic considerations will be substantially the same (or more favorable) than the Trade Account previously selected.

**Partnership's Participation in Costs and Revenues in the Trade Account**

The Partnership, if fully funded, will be acquiring the economic equivalent of a 100% interest in a Trade Account.  The Partnership will be responsible for the Turnkey Price for establishing the Trade Account, and 100.00% of all expenses in operating such account thereafter. As General Partner, R2 will have a Management Fee Interest for which it will pay 0% of the costs to establish the Trade Account, but will use the Management Fee to fund operations and will only receive "compensation" after all operating expenses are paid.

**<u>Other Partnership Operations</u>**. In the event that the Partnership should determine that additional Partnership activities are not justified, the General Partner will use its best efforts to dispose of the Partnership's interest in the Trade Account on the best terms available for the benefit of the Partnership, subject to appropriate Partners' Vote.

**<u>Farmout of Trade Account by the Partnership</u>**. Although the Partnership does not presently intend to Farmout the Trade Account relationship oversight, it has the authority to vote to do so. The Partnership may vote to Farmout portions of the management of the Trade Account if the Partners determine that the best interest of the Partnership would be served. If the Partnership determines to Farmout a management interest, the Partnership will make every effort to retain such economic interest and concessions that are consistent with industry practice.

**<u>Dealings Among Related Parties</u>**. The Partnership may participate (however, it is not presently anticipated that it will do so) in joint venture partnerships and Farmouts with other partnerships or limited partnerships sponsored by the General Partner or its Affiliates. There will be no loans between this Partnership and any other entities controlled by the General Partner or its Affiliates.

**<u>Assignment to Partnership Properties</u>**. Assignment to the Partnership's interest in the Trade Accounts will be held in the name of the Partnership.  The assignment to the partnership will be made through the Partnership joint venture agreement in order to facilitate the establishment of such Trade Accounts by the Partnership and for other valid purposes.

**<u>Operating Agreement</u>**. The Limited Partnership intends to enter into an Operating Agreement, which will govern the Operations of the Trade Account.  Un-named Arbitrage Trading operations, as intended Operator and pursuant to the Operating Agreement, will be responsible for conducting Arbitrage Trade management of the Trade Account, overseeing day-to-day trading, employing appropriate financial professionals, keeping detail trading records, and other related matters.

**<u>Distribution of Revenues</u>**. Subject to a contrary vote, Partnership net revenues which, in the judgment of the General Partner, are not required to meet obligations of the Partnership, or held for working capital reserves, shall be distributed as often as practicable to the Partners.

**<u>Services.</u>** The General Partner will provide technical services and perform such acts, employ such persons and execute such agreements as may be necessary or in its judgment, appropriate, in order to contract for establishing the Trade Account, if appropriate, Completion of the Trade Account and provide for operational support. The General Partner will be responsible to the Partnership for the Operation of each Trade Account. The General Partner will pay and collect all monies the Partnership is obligated to pay and collect. The General Partner presently intends that establishing the account, legal, accounting and regulatory oversight for the Partnership will be carried on by unaffiliated independent contractors.

**Investment Policy**

1.  R2 shall receive deposit of the subscription monies (approved by the Managers) from one or more investors into a custodial account. R2 shall permit monies deposited in the custodial account to be used for Permitted Investments arranged by R2 Capital Group., LLC, as Manager or as Series Manager, subject to the following conditions:

    a.  Trades (other than purchases and sales of short-term U.S. Treasury obligations and relatively short term positions capitalizing on market trends, as determined by the Investment Manager/Trader) shall be matched trades that constitute a riskless principal transaction except in cases of force majeure.  An event of *force majeure* includes acts of God (including fire, flood, earthquake, storm, hurricane or other natural

disaster), war, invasion, act of foreign enemies, hostilities (whether war is declared or not), civil war, rebellion, revolution, insurrection, military or usurped power or confiscation, terrorist activities, nationalization, government sanction, blockage, embargo, labor dispute, strike, lockout or interruption or failure of electricity or telecommunications beyond the control of the Managers or the Financial Institution/Custodian.

b.   The purchase price for any debt securities shall represent a discount to the fair market value of the debt securities (such calculation method to be agreed upon by Managers, Manager's and its Financial Institution partners, and Trader(s)).

c.   "*Permitted Investments*" are restricted to:
   - Financial Contracts
   - Financial Instruments
   - Marketable debt securities of relatively high rated issuers;
   - Short-term U.S. Treasury obligations (maturing in 1 year or less);
   - Investments in investment companies or investment funds which engage in matched "permitted investments" that meet the terms, conditions and limitations set forth in this Policy

## FAQ's

**1. What is R2 COMMERCIAL CAPITAL PARTNERS? Is it a hedge fund?**

R2 COMMERCIAL CAPITAL is a Colorado series limited liability Partnership. Some call us a hedge fund as that term is used to generally to describe private investment companies.

**2. What asset class does R2 COMMERCIAL CAPITAL PARTNERS fit in?**

Alternative investment

**3. What do I receive for my money?**

Limited Partnership units of membership interest into R2 COMMERCIAL CAPITAL PARTNERS.

**4. Is my investment safe?**

While we have taken steps to mitigate risks of investing in R2 COMMERCIAL CAPITAL PARTNERS, no investment is ever safe or risk free because of many factors that no one has control over. It is possible that in an event of force majeure or bankruptcy of the Custodian or one of the prime broker counterparties that you could lose your investment.  The monies may only be used by R2 COMMERCIAL CAPITAL PARTNERS in accordance with its Investment Policy.

**5. How are my subscription monies used by R2 COMMERCIAL CAPITAL PARTNERS?**

To establish a trade account and participate in the profits from transactions in accordance with the Investment Policy herein.

**6. Is any part of my investment money used for R2 COMMERCIAL CAPITAL PARTNERS working capital?**

No.

**7. How long do I invest**

The Partnership has been developed as a 50-year partnership, minimum investment holding is six months and the general term of our Turnkey Contracts are a minimum of one year.

16

**8. Can I redeem my investment early?**

Only if Manager fails to perform as agreed within a specified timeframe (e.g., the first 90 days) following closing. Otherwise the minimum holding period is six months.

**9. What is the minimum investment?**

US$100,000.00.

**10. Can I invest assets other than cash?**

Not at this time.

**11. Can I be a signatory on the custodial account?**

No.

**12. Can I view the custodial account online?**

Not yet.  This functionality will be provided as the fund grows.

**Returns**

**13. Are returns guaranteed?**

No, "best efforts" only.

**14. What are the material factors that affect returns, if any?**

Returns depend on Manager's ability to identify and complete transactions that meet R2 COMMERCIAL CAPITAL PARTNER's Investment Policy. Returns, if any, are a function of three elements of matched trading: (i) spread, (ii) leverage, (iii) frequency. Each of these elements varies. There is no guarantee that Manager will identify or close any transactions or generate any returns.

**15. When will returns, if any, be paid?**

Returns, if any, will be paid/offered monthly, on a best effort basis.

**16. Who is the Manager?**

R2 Capital Group, LLC.

**17. What type of transactions does Manager engage in?**

Investment into Trade partnerships and/or direct investments with Traders that execute matched trades persuant to our Investment Policy.

**18. Does R2 COMMERCIAL CAPITAL PARTNERS buy/sell equity securities or derivatives?**

No.

**19. What is riskless arbitrage?**

The basic premise is a riskless transaction consisting of purchasing an asset at one price and simultaneously selling that same asset at a higher price, generating a profit on the difference.  Arbitrage serves as the Investment Policy.

**20. Does R2 COMMERCIAL CAPITAL PARTNERS carry margin on the custodial account holding the money?**

Not at this time

**21. Are there any upfront fees deducted from my investment by R2 COMMERCIAL CAPITAL PARTNERS or Manager?**

No.

**22. What is the expected expense ratio?**

R2 COMMERCIAL CAPITAL PARTNERS will pay customary fees and expenses to Custodian &/or Prime Brokerage (less than 1.0% per transaction). Manager is permitted to bill R2 Global for its reasonable expenses, but has not done so to date.

**22. How does Manager make money?**

Manager receives compensation for its services to R2 COMMERCIAL CAPITAL PARTNERS by collecting fees on profits of 50% and will distribute all additional profits to partners.

**25. Who is the "trader?"**

One of several relationships R2 Capital has developed.

**26. How does R2 COMMERCIAL CAPITAL PARTNERS find matched trades?**

The General Partner and Investment Manager have numerous global relationships to buy and sell debt securities and trade financial contracts via Prime Brokerage liquidity providers that meet our Investment Policy.

**27. How many trades will R2 COMMERCIAL CAPITAL PARTNERS do in a year?**

Depends on market condition.

**28. Is R2 COMMERCIAL CAPITAL PARTNERS a "trade program?"**

Yes.

**Other**

**29. What are the tax consequences of investment?**

Because the tax aspects are complex and certain of the tax consequences may differ markedly among investors, you should consult your tax advisors in evaluating the tax aspects of an investment in R2 COMMERCIAL CAPITAL PARTNERS. The key tax issues are:
1. Allocation of Tax Items.
   a. If the IRS should seek to reallocate tax items among the Members, you could be allocated additional taxable income and be required to pay unanticipated tax.
2. Audit.
   a. An audit of R2 COMMERCIAL CAPITAL PARTNERS may result in an audit of your tax return.
3. Income Taxed at Ordinary Rates.
   a. It is anticipated that the income generated will be taxed to you as ordinary income.

**30. Is Manager a licensed broker-dealer?**

No

**31. Is R2 COMMERCIAL CAPITAL PARTNERS registered under the Investment Company Act of 1940, as amended?**

No, exempt under Section 3(c)(1) of such Act. However, we are going through the process of becoming an RIA or FCA

**32. Is Manager registered under the Investment Advisors Act of 1940, as amended?**

No, exempt under Section 203(b)(3) of such Act.

**33. How can I be reassured you are not operating a Ponzi Scheme?**

**Ponzi scheme:** a fraudulent investment operation that pays returns to separate investors from their own money or money paid by subsequent investors, rather than from any actual profit earned. The Ponzi scheme usually offers returns that other investments cannot guarantee in order to entice new investors, in the form of short-term returns that are either abnormally high or unusually consistent. The perpetuation of the returns that a Ponzi scheme advertises and pays requires an ever-increasing flow of money from investors in order to keep the scheme going.

1. By definition, "Fully Subscribed" investment pools do not continue to raise money and must pay returns out of organic earnings from the Fund's investment operations
2. Fund shall be subject to annual third party independent auditing
3. Monthly Investor Letters and statements of accounts will be provided to Limited Partners

<h2 style="text-align:center">SOURCE AND APPLICATION OF PROCEEDS</h2>

Upon closing of the Capitalization Period, assuming sale of all Units, the Partners' contributions will be $20,000,000.00 In addition, the General Partner will contribute zero percent (0%) of all Initial Partnership Capital actually received by the Partnership. The following tables reflect anticipated applications of Partnership funds assuming subscription for 200 Units, excluding Additional Assessments.

<h3 style="text-align:center">ESTIMATED INITIAL CAPITALIZATION [1]</h3>

| | | |
|---|---|---|
| Partnerships' Capital Contributions | $20,000,000.00 | 100% |
| General Partner's Capital Contributions | | 0% |
| Total | $20,000,000.00 | 100% |

(1)Assuming all Units are sold.

<h3 style="text-align:center">ESTIMATED EXPENDITURES OF LIMITED PARTNERSHIP</h3>

| | Amount |
|---|---|
| Turnkey Price [1] | $20,000,000.00 |
| Organizational Costs [2] | 0.00 [2] |
| Total | $20,000,000.00 |

(1) See "PROPOSED ACTIVITIES."
(2) Included in Turnkey Price. See "PROPOSED ACTIVITIES."

## PARTICIPATION IN COSTS AND REVENUES WITHIN PARTNERSHIP

**Interest of Partners**. The interest of a Partner in the Partnership as it relates to Initial Operations will be the proportion which such Partner's Unit(s) bear(s) to the total Units of all Partners in the Partnership. The fraction thus attained will represent the fractional interest of each such Partner in the costs and revenues, if any, of the Partnership attributable to the Partners relating to Initial Operations, which is one hundred percent (100%) of the costs of the Partnership. The General Partner and/or its Affiliates, to the extent they acquire Units, will share in Partnership costs and revenues in the same manner as any other Partner who purchases Units. The General Partner will bear 0% of the costs of the Partnership.

All revenues of operation and production incurred by the Partnership in connection Initial Operations will be allocated one hundred percent (100%) to the Limited Partners, after a 50% Management Fee is paid to the General Partner.

## COMPENSATION AND REIMBURSEMENT

In the event the Partnership is fully capitalized and commences Initial Operations, the General Partner will receive certain consideration and reimbursement, both directly and indirectly, for serving as General Partner of the Partnership. These considerations will include receipt of a Management Fee of 50% from all monthly Partnership profits

**Monthly Reimbursement to General Partner**. R2 shall receive, on the same schedule as Partnership distributions, a Management Fee of 50% for each Trade Account. The General Partner shall be responsible for all Partnership expenses (including office rent , accounting, legal, secretarial, telephone, salaries and other incidental expenses) for its General Administration.

**Onetime Management Fee and Turnkey Contracts**. R2 will receive no fees for establishing the Trade Account. R2 must use any funds received from Management Fees for general operating expenses of the Partnership prior to taking profits for R2. R2 has entered into a turnkey agreement with the Arbitrage Trading Operation pursuant to which the Arbitrage Trading Operation is obligated to conduct the account establishment, legal, insurance and accounting of Initial Operations relating to the Trade Account for an aggregate of up to $20,000,000.00. The difference between the Turnkey Contracts entered into between the Limited Partnership and R2, and the turnkey agreements between R2 and the Operator from which R2 must pay all costs of Initial Operations relating to the Trade Accounts, should be deemed to be compensation to R2. For purposes of this Partnership, there will be no difference between the Turnkey Price and the price paid by the Partnership.

**Carried Interests**. No carried interest will be held by either the Arbitrage Trading Operation or R2 as General Partner. R2 will only receive a Management Fee of 50% net of operating expenses. See "PARTICIPATION IN COSTS AND REVENUES WITHIN PARTNERSHIP."

**Transfer of Units**. The Limited Partnership Agreement provides for a right of first refusal to the General Partner and the Partners regarding the sale of Units by a Partner. If the income received from any such Unit purchased by the General Partner or the price received by the General Partner on subsequent resale exceeds the price paid, such excess may be considered to be additional compensation to the General Partner. For a more detailed description of these rights and obligations, see the Limited Partnership Agreement. No transfer of units is permitted within the six-month "lock-up" period for the Partnership.

## MANAGEMENT

The management of the operations and other business of the Partnership shall be the responsibility of the General Partner. The Limited Partnership Agreement provides for the appointment of R2 Capital Group, LLC as General Partner. All decisions concerning the day-to-day affairs and the operations of the Partnership by the General Partner, during the period so designated, shall be binding upon each of the Partners and the Partnership.

R2, the General Partner, was organized under the laws of the State of Colorado in July 2009 for the principal purpose of reviewing financial market opportunities and potential Arbitrage opportunities that would provide economic benefit to partnerships and limited partnerships formed by R2. It is anticipated and intended that the services that R2 will provide to the Partnership in connection with its operations will also be supplied by R2 to other limited partnerships, or entities with which R2 may participate in connection with acquisition, management and development of Trade Accounts.

In order to manage the Partnership, R2 may rely upon and retain the services and advice of various consultants on a per diem or hourly basis. In addition, R2 may employ financial analysts, traders and other professionals on a consulting basis when appropriate.

R2 is a consulting, wealth management and advisory firm that was founded by Ryan Tomazin, Ryan Madigan and Randell Vest.

Mr. Ryan Tomazin is Founder and Senior Managing Member of R2 Capital Group LLC. Mr. Tomazin has worked at a real estate startup company for the past 8 years. Functionally working as Director of Finance and CFO at Integrated Asset Services over those 8 years, he has worked to secure financing and debt structures that have allowed the company to grow and become cash flow positive. Mr. Tomazin worked five years for Wall Street investment banking firms in M&A divisions. He held positions of Associate and Vice President. He has individually raised $100 million over the past three years for private equity, real estate and debt offerings. Currently, Mr. Tomazin is the CFO for Integrated Asset Services, and a General Partner in a fund focusing on developing partnerships with Wall Street banks to manage and liquidate their owned real estate on an international basis. Mr. Tomazin holds a BA in Accounting, Finance and Statistics from the University of Denver.

Mr. Randell Vest is Founder and Senior Managing Member of R2 Capital Group LLC. Mr. Vest holds an Investment Banking license and has over twelve years of experience in the financial services industry. Areas of investment success include option contracting, private equity management, raising capital, investing in commercial property via syndication and building government replacement housing. Mr. Vest is founder of Invest Financial Group, LLC. a Florida based Asset Management and financial services company and the sister company of R2. Through Invest Financial Group, Mr. Vest is currently driving several private equity/venture capital investments including corporate financings and building residential homes through participation in Government funded Stimulus programs in major US Cities. Mr. Vest holds a BS in Physics and Mathematics from Eastern Kentucky University and a BS in Civil Engineering from the University of Kentucky.

Mr. Ryan Madigan is Founder and Senior Managing Member of R2 Capital Group LLC. Mr. Madigan comes from a strong entrepreneurial and operations background. Mr. Madigan has worked for several funds ranging from Private Equity to Venture Capital as both senior management and board member. Mr. Madigan has 8 years + experience in raising capital in the private sector. He has built several entrepreneurial ventures including a $50MM Flexible Packaging Company, a small boutique investment company and several successful telecom related businesses. Mr. Madigan has been recognized in a number of publications as an experienced senior manager, he also sits on the board of several trade related organizations. Mr. Madigan received a BA in Economics from Gettysburg College and an MBA from the Rochester Institute of Technology. Mr. Madigan has over 13 years of financial services and operational experience.

All three founders are partners in an Arbitrage Trading Fund which is one of the contemplated Arbitrage Trading Operations for the Partnership. R2 intends to employ the services of the same Arbitrage Trading operation as the Trade Account operator to managed accounts on behalf the Partnership.

The methodology employed by R2 Capital Group LLC in account establishment and management has received extremely positive results because R2 spends the time and resources needed to select prudent and proven fund managers for trading and operating its Trade Accounts. R2 takes pride in keeping all of its investor partners informed on all phases of account development and trading activities as they relate to their investments. However, it is imperative that each Partner understand that the selection, development and documenting of each Trade Account is a time consuming but very important process. R2 Capital Group believes this will allow the Partnership the opportunity to achieve the outstanding results that R2 and its affiliated companies have enjoyed to date.

## PRIOR ACTIVITIES

Under normal circumstances, substantially all earnings are distributed to partners. On occasion however, distributions may be delayed for unforeseen reasons. It should not be assumed that any Partners in this Partnership will have either success or failure comparable to those experienced by Partners in any prior program sponsored by R2. Each Trade Account has unique characteristics and R2 believes that a Partner cannot predict future performance of any given Trade Account based

upon the performance of a prior Trade Account, even if the prior Trade Accounts in the Arbitrage Trading Operation. R2 further believes the rates of return, or lack thereof, related to prior programs are not material as indicative of the future performance of this Limited Partnership. It should also be noted that all Trade Accounts change over time, some more frequently and periodically than others. Moreover, actual account performance, if obtained, should not be compared with prior account performance.

For these and other reasons, including the unpredictability of the Arbitrage market as a whole, developments and differences in program structure, account details, program size and economic conditions, operating results obtained by any prior program should not be considered as indicative of the operating results obtainable by this Limited Partnership.

## INDEMNIFICATION

The Partnership has agreed to defend and hold the General Partner harmless and to indemnify it, under certain circumstances, with respect to suits or proceedings (including appeals) to which the General Partner may be a party or witness or threatened to be made a party or witness, and any inquiry or investigation that could lead to such an action, suit or proceeding, by reason of the fact that it is, or was, the General Partner of the Partnership. Under such indemnification provisions, the Partnership has agreed to pay the General Partner's expenses, including attorneys' fees and judgments or amounts paid in settlement.

The Limited Partnership Agreement also provides that each Partner shall, in certain circumstances, indemnify, defend and hold harmless the Partnership and all other Partners from and against any loss, claim, cause of action, item of damages, expense and cost (including attorneys' fees and court costs) arising directly or indirectly out of any act of such Partner that is inconsistent with the delegated rights and authority of the General Partner of the Partnership.

## CONFLICTS OF INTEREST

The Partnership is expected to enter into a Turnkey Contract with an Arbitrage Trading Operation, in its individual capacity, concerning the establishment of accounts and, if attempted, the Completion of the Trade Accounts (and certain other services) for the Turnkey Price. Pursuant to such contract, the Arbitrage Trading operation will be entitled to any amounts representing the differences, if any, between the Turnkey Price and the actual costs to the Arbitrage Trading Operation of its turnkey agreements. .

If, after the Partnership acquires a Trade Account, the Partnership later determines that any Trade Account is unsuitable for continued operations because of, among other things, lack of funds or high risks involved, or if the Trade Account has been downgraded by events occurring after the assignment to the Partnership to the point that trading would no longer be desirable or if the Partnership determines that the best interest would otherwise be served, the Partnership may Farmout the Trade Account or sell or otherwise dispose of the Partnership or the interest therein. The decision with respect to making a Farmout and the terms of a Farmout may involve conflicts of interest, as the General Partner may benefit from cost savings and reduction of risk.

Most of the areas of conflict of interest, which are described above, are common to many trading programs. The terms of the Limited Partnership Agreement are intended to ameliorate the conflicts of interest inherent in such a situation to the extent practicable, taking into consideration the uncertainties involved in attempting to determine in advance the economics of the Trade Account, the progress of the account historically and other exploratory activity related to the trading platform and the ongoing operations.

In connection with establishing the terms of loans or advances to the Partnership, commercial banks may consider cash balances of the Partnership that are not required for the conduct of Partnership business operations. To the extent the terms of such loans may be affected by the Partnership's deposits, the General Partner may have an incentive to maintain a larger portion of the Partnership assets in the form of cash balances than would otherwise be necessary.

## DEFINITIONS

Certain terms as used herein have special meanings that are set forth below and other terms of general use in the industry are also defined below for your reference. Certain other terms are defined throughout this Memorandum.

"AFFILIATE" with respect to the General Partner shall mean (i) any person or entity directly or indirectly owning, controlling or holding, with power to vote, ten percent (10%) or more of the outstanding voting securities of the General Partner; (ii) any entity, ten percent (10%) or more of which outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, by the General Partner; (iii) any person or entity directly or indirectly controlling, controlled by or under common control of the General Partner; (iv) any officer, director or partner of the General Partner; and (v) if the General Partner is an officer, director, or partner, any company for which the General Partner acts in any such capacity. For purposes of this Memorandum and accompanying documentation, any partnership of which R2 is a general partner, or any limited partnership in which R2 is a partner, is an Affiliate.

"ARBITRAGE TRADING OPERATION" shall mean one or several trade groups capable of conducting Arbitrage Trading and/or its assignees.

"CAPITALIZATION PERIOD" shall mean the period of time during which Partners shall be accepted up to and including December 31, 2009, unless extended by the General Partner for a period of not more than one hundred and twenty (120) days; provided, however, that the General Partner, in its sole and absolute discretion, may terminate the Capitalization Period at any time prior to such date.

"CODE" shall mean the Internal Revenue Code of 1986, as from time to time amended and any federal legislation that may be substituted therefore.

"COMPLETION" of a Trade Account is an indefinite term. In the context of the Partnership, Completion shall mean the execution of contractual documents regarding the account, and/or funding of the account or operations which the Arbitrage Trading Operation decides to employ in a good faith effort to make a Trade Account compatible and compliant with current regulations. The costs of establishing the account, setting up account logins/passwords and commencing trading, as well as Completion costs but will be included in the Turnkey Completion Price and will be subject to additional assessments. Such effort shall not require an obligation by the General Partner or the Partnership to attempt a Completion in more than one Trade Account.

"EXPENSES AND COSTS" shall mean all of the costs and expenses of the Partnership, including but not limited to the following, each of which shall have the special meaning set forth opposite each such term:

a) "ORGANIZATIONAL COSTS" shall mean the aggregate of (i) expenses for printing and mailing material used in connection with the applications for participation in the Partnership and/or collection of assessments; (ii) marketing costs, commissions and allocable salaries and expenses of employees of the General Partner assisting with the organization and formation of the Partnership and/or the initial capitalization and/or collection of assessments; (iii) charges of depositories in connection with the Units; (iv) attorneys' and accountants' fees in connection with the organization and formation of the Partnership and the preparation of this Memorandum and/or the collection of assessments; (v) "General and Administrative Expenses" of the General Partner during the Capitalization Period; and (vi) any and all other expenses incurred by the Partnership or the General Partner in connection with the formation of the Partnership, the applications for participation in the Partnership, and the collection of assessments, if any.

b) "OPERATING EXPENSES" shall mean the customary expenses of operations of a limited partnership, and relating to Trade Account but excluding salaries, General Partner expenses, depreciation or amortization.

c) "GENERAL AND ADMINISTRATIVE EXPENSES" shall mean all customary and routine legal, accounting, travel, office rent, telephone, compensation to officers and employees, and other incidental expenses of the General Partner necessary to the conduct of Partnership Operations.

"FARMOUT" means an agreement whereby the Limited Partnership would agree to assign its interest in a certain specific Trade Account owned by it to other parties, while retaining some part of its original interest (such as an overriding royalty interest, or other type of interest), subject to the continued operation of a Trade Account or other performance by the other parties as a condition of the assignment.

"INITIAL OPERATIONS" shall mean all activities commenced in connection with the acquisition of the Partnership's interest in the Trade Accounts including legal and accounting services, organizational, general and administrative actions.

The term "INITIAL OPERATIONS", however, does not include reinvesting, expanding trading or restructuring trade agreements, or any activities to materially change the initial Trade Account.

"INITIAL UNIT PAYMENT" shall mean that portion of Initial Capitalization due upon application by a Limited Partner (i.e., $50,000.00 per Unit).

"INITIAL LIMITED PARTNERSHIP CAPITAL" shall mean the total capital contribution to the Partnership actually paid by the General Partner and/or the Partners with respect to the acquisition of Units or interests in the Partnership, but excluding Additional Assessments or other assessments, if any.

"INVESTMENT TAX CREDIT" shall mean a credit against income taxes for federal income tax purposes.  Investment tax credits are usually computed as a percentage of the cost of the investment in certain types of assets.

"LIMITED PARTNERSHIP AGREEMENT" or "AGREEMENT" shall mean the Limited Partnership Agreement between R2 Capital Group LLC as the General Partner, and the Limited Partners pursuant to which the Partnership has been formed, a copy of which is attached hereto.

"LIMITED PARTNER" means a partner in a limited partnership whose liability is limited to the amount of his investment in the partnership (exclusive of any assessments and undistributed partnership earnings).

"LIMITED PARTNERSHIP" means a partnership that contains one or more general partners and one or more limited partners, the day-to-day operations of which are managed by the general partner(s) and which limits the liability of the limited partner(s) to his (their) investment in the limited partnership.

"MANAGEMENT FEE" means a Fifty percent (50%) fee paid to the General Partner from any and all Partnership Trade Profits prior to distribution of any and all funds to Partners to pay for Operational Expenses and compensation to the General Partner.

"GENERAL PARTNER" shall mean R2 Capital Group LLC, (or its successor or replacement, if any) when acting in the capacity of the General Partner of the Partnership.

"ORGANIZATION COSTS" means the direct costs incurred in the creation of a new business organization, such as an arbitrage trading limited partnership.

"OPERATIONS" shall mean any Limited Partnership activity related to (i) establishing Trade Accounts; (ii) conducting daily oversight of account performance; (iii) executing and managing all contracts and documents associated with trade activities; and (iv) conducting any activity incident to the foregoing as may be deemed necessary by the Partners in furtherance of a Limited Partnership purpose.

"PROCEEDS" shall mean the amount realized by the Partnership on the returns generated from trading activities.

"SUBSEQUENT OPERATIONS" shall mean activities not part of Initial Operations that the Partnership deems necessary to develop a Trade Account subsequent to Initial Operations with respect thereto.

"SUBSTITUTE PARTNER" shall mean any person not previously a Partner who purchases Units from a Partner in accordance with the terms of the Limited Partnership Agreement. All Partners shall have the status of limited partners. After admission, all Substitute Partners shall have all of the rights of a Partner.

"TRADE ACCOUNT" or "TRADE ACCOUNTS" shall mean the accounts established with Partnership funds for the sole purpose of trading activities, or undivided interest therein, and other contract rights and interests in trading platforms. Nothing herein shall prevent another venture or other entity organized by the General Partner or any of its Affiliates from establishing a trade account which, subsequent to such development, is determined to be in the same trade platform as any trade account owned by the Partnership

"TURNKEY CONTRACT" shall mean the agreement to be entered into by and between the Arbitrage Trading Operation and the Partnership providing for the obligation of the Arbitrage Trading Operation to bear the costs of establishing, developing and Completion of the Trade Accounts at a fixed or Turnkey Price.

"TURNKEY PRICE" shall mean the fixed amount to be paid by the Partnership to the Arbitrage Trading Operation to perform the Turnkey Contract.

"UNITS" shall mean interests in the Limited Partnership initially authorized under the Limited Partnership Agreement and allocated to the Partners shown on the books and records of the Partnership.

"PARTNERSHIP" shall mean this Limited Partnership formed under the laws of the State of Colorado and governed by the Limited Partnership Agreement and Colorado Partnership Law.

"PARTNERS" shall mean all persons or entities which are a party to the Limited Partnership Agreement and who participate in Units and are accepted as Partners pursuant to the Limited Partnership Agreement. The term "Partner" shall mean any of the Partners and includes the General Partner unless the context requires otherwise.

"PARTNERS' INITIAL CAPITAL" shall mean the total capital contribution to the Partnership actually paid by the Partners, excluding Additional Assessments or other assessments.

## TAX ASPECTS

The full implications of federal, state and local laws that may affect the tax consequences of participating in the Partnership are too complex and numerous to describe in this Memorandum. Therefore, each prospective Partner should satisfy himself as to the federal and state income and other tax consequences of participating in the Partnership by obtaining advice from his own tax counsel, particularly with respect to any tax proposals that may at some future date be enacted into law.

The discussion below is a general description of some of the federal income tax aspects of participation in the Partnership described herein. This summary, while not exhaustive, includes a discussion of the material tax issues involving a reasonable possibility of challenge by the Internal Revenue Service ("Service" or IRS"). The discussion is directed primarily toward individual taxpayers that are citizens of the United States. PERSONS WHO ARE TAX-EXEMPT ENTITIES, CORPORATE ENTITIES IN GENERAL AND CORPORATE ENTITIES THAT ARE SUBJECT TO SPECIALIZED RULES, (e.g., S CORPORATIONS OR INSURANCE COMPANIES), AND PERSONS WHO ARE NOT UNITED STATES CITIZENS AND TRUSTS ARE CAUTIONED TO CONSULT THEIR TAX ADVISORS BEFORE PARTICIPATING IN THE PARTNERSHIP.

Some of the federal income tax aspects applicable to this Partnership are unsettled and not free from doubt. Moreover, in determining the deductibility of certain expenditures made by the Partnership, there are many factual and legal questions involved, including but not limited to the proper characterization of income and expense, the reasonableness of amounts involved, the purpose of the expenditures and the period or periods to which the expenditures are properly attributable. Partners should not read this summary as a prediction of a favorable outcome of the tax issues concerning which no favorable prediction is made.

The material tax benefits of participating in the Partnership will be deductions attributable to intangible account establishment and development costs ("Intangible Costs"), accelerated cost recovery on trading activities and, if trading is achieved, profits. Assuming Partnership Operations are conducted as proposed herein, the Partnership believes that, in the aggregate, the material tax benefits contemplated in this Memorandum more likely than not will be realized by a Partner as set forth below. Partners, however, must not construe this statement, as an indication that all tax benefits described in this summary will likely be realized. In addition, this conclusion concerning the realization of the tax benefits is based on the facts existing as of the date of this Memorandum concerning the operation of the Partnership, and certain representations of the General Partner, and is subject to the discussion below. Final disallowance of any deduction would adversely affect the Partner. There can be no assurances that some of the deductions taken by the Partnership will not be challenged and disallowed in whole or in part or permitted as deductions only in a subsequent taxable year of the Partnership.

Prospective Partners should be aware that the Partnership initially expects to report tax losses from Operations. To the extent allowed, the deductions afforded in the early years of the Partnership could operate to defer to the year of such sale

or disposition, and not eliminate, a Partner's overall federal income tax liability. Any gain from the sale or disposition of a Partnership Interest will be taxed at ordinary rates to the extent attributable to unrealized receivables (which term includes recapture of depreciation, depletion and other Costs). Therefore, the tax benefit any particular prospective Partner may derive from participating in the Partnership will depend, in part, on the value of such a tax deferral to the Partner.

While the Partnership must file a federal income tax return, the Partnership is not required to pay any federal income tax. Instead, each Partner reports on his individual federal income tax return his distributive share (as determined by the Limited Partnership Agreement) of income, gains, losses, deductions and credits of the Partnership, irrespective of any actual cash distributions made to such Partner during his taxable year. Subject to the passive activity loss limitations discussed below, a Partner may offset his allocable share of Partnership losses in any taxable year against the Partner's income from other sources to the extent of the tax basis of the Partner's Interest in the Partnership. A Partner's deductions will further be limited to the amount he or she has "at risk" with respect to the activities of the Partnership.

**Tax Status of the Limited Partnership**. The Partnership has not requested, and does not intend to request, a ruling from the Internal Revenue Service that it will be treated as a partnership for federal income tax purposes. As set forth below, however, General Partner believes that if the question were litigated it is more likely than not that for federal income tax purposes the Partnership would be determined to be a partnership and not an association taxable as a corporation. Such treatment for federal income tax purposes depends on the Partnership's organization as well as its actual operation.

Under the "check the box" regulations, Treasury Regulation 301.7701-1 et seq, the Partnership should be treated as a partnership for federal income tax purposes because (i) the Partnership will be engaged in a trade or business and, therefore, pursuant to Regulation 301.7701-1(a)(2), it should be treated as a separate entity; (ii) pursuant to Regulation 301.7701-2(a), the Partnership should be treated as a business entity because it is not properly classified as a trust under Regulation 301.7701-4; (iii) the Partnership would not be considered a corporation as defined in Regulation 30 1.770 1-2(b); and (iv) the Partnership does not intend to elect to be classified as an association pursuant to Regulation 301.7701-3(a) and, therefore, should be treated as a partnership under the "default rule" of Regulation 301.7701-3(b)(I).

If the Partnership were classified as an association for any taxable year, the Partnership would be taxed as a corporation, the taxable income of the Partnership for such year would be subject to federal income tax at corporate tax rates, the Partners would be treated as shareholders and distributions by the Partnership, if and when made, would be taxable to the Partners as dividends or otherwise treated as corporate distributions. In such event, there would be no flow through of items of Partnership income, deduction, gain or loss to the Partners, with the result that most of the tax benefits mentioned below would not be available to the Partners.

**Trusts Taxed as Corporations**. Any trust participating in the Partnership, as a result of its participation, may be treated for federal income tax purposes as an association taxable as a corporation. As such, all income would be taxed at corporate rates at the corporate level, whether or not such income was distributed to the beneficiaries. Treasury regulations indicate that trusts created by beneficiaries as a device to carry on a profit-making business that normally would have been carried on through a more traditional business organization may be taxed as a corporation or partnership under the Code. Such a characterization would depend in part on a factual determination of whether the particular trust had associates and an objective to carry on business and divide gains there from. See Treasury Regulation section 301.7701-4(b) and 301.7701-2.

It is possible that a trust's ownership of a Partnership Interest may itself, or in combination with other factors, cause the trust to be considered engaged in a trade or business and be taxable as an association. At least two cases have held that limited partners may be considered engaged in the trade or business in which the partnership itself is engaged. See Don Roy, Ltd. v. United States, 301 F.2d 200 (9th Cir. 1962); George A. Butler, 36 T.C. 1097 (1961).

The determination of when one is engaged in a trade or business is in part a question of fact. The Partnership, however, will be engaged in a trade or business if it is operated in the manner presently contemplated.

If an Interest in the Partnership is sold at a gain, amounts deducted for Intangible Costs must be recaptures on such disposition. Therefore, gain would be ordinary income to the extent Intangible Costs have been deducted if, but for the deduction, they would have been reflected in the adjusted basis of the property. Moreover, in certain circumstances, Intangible Costs deductions will be considered items of tax preference. See "Tax Preference Income: Alternative Minimum Tax.",

**Farmout and Other Sales or Transfer of Accounts.** The Partnership will be primarily engaged in the establishment, development and oversight of the Trade Account and possible subsequent leveraging of the Trade Account or trading platform. These subsequent transactions could take the form of a sale, a sharing arrangement, a new partnership or other contemplated transactions.  The tax treatment of such transactions will depend upon the form of the transaction and the nature of any Interest in the Trade Account retained by the Partnership.

Section 1231 gains and losses characterized as capital gains and losses are combined with all the taxpayer's other capital gains and losses. A non-corporate taxpayer's net capital gain (i.e., the excess of net long-term capital gains and losses. A non-corporate taxpayer's net capital gain over net short-term capital loss) is generally subject to tax at a maximum rate of twenty percent (20%). A non-corporate taxpayer may deduct losses from sales or exchanges of capital assets to the extent of his gains from such sales or exchanges plus the lesser of (i) $3,000 or (ii) the excess of such losses over such gains. See also "Tax Preference Income" below.

If the Partnership is deemed a "dealer" with respect to its Trade Account, which is unlikely in light of the Partnership's proposed Operations, then all gains on the sale of a Trade Account will be taxed at ordinary income rates rather than capital gain rates.

Finally, if the Partnership enters into certain Farmout agreements or other "sharing arrangements", the transaction will not be characterized as a sale, but rather as a lease or sublease or an investment in a separate joint venture depending upon the nature of the Interest retained by the Partnership as "Farmor". In a typical transaction the Farmor might assign all (or a portion) of its Interest in a Trade Account to the assignee ("Farmee") in exchange for the Farmee's agreement to bear all costs of the obligation well on the Trade Account. Such agreement generally also provides that (1) the Farmee earns an Interest in the Farmor's continued operation of the Trade Account, (2) the Farmee is entitled to payout on the obligation account.

If the Partnership enters into a Farmout, the General Partner will attempt to minimize the effect of Revenue Ruling 77-176 in negotiating any Farmout or farming transactions on behalf of the Partnership. However, to the extent any such transaction produces taxable income under the ruling, the Partners' tax liability attributable to such transaction may exceed cash distributed from the Partnership. In addition, the fair market value of such property is a factual question and may be adjusted by the Service to produce additional tax liabilities for the Partners.

**Partnership Organizational Expenses**. Expenses connected with the organization and capitalization of the Partnership, known as syndication fees, are not deductible by the Partners or the Partnership and are not eligible for the 60-month amortization period accorded to organizational expenses. Syndication fees include expenditures connected with the initial capitalization of the Partnership, such as sales commissions, some professional fees, selling expenses and printing costs. Under Treasury Regulations, such syndication expenses are not deductible. Such expenses are instead capitalized, thereby reducing the gain, if any, which would otherwise be recognized on the liquidation of the Partnership.

Other expenses incident to the organization of the Partnership and chargeable to a capital account may be amortized over the ascertainable life of the Partnership. If a proper election is made by the Partnership, these expenses may be deducted through amortization over a period of not less than 60 months. If the Partnership is liquidated within the 60-month period, the Partnership should be able to deduct as a loss the balance of the deferred expenses.

All Organizational Costs incurred in connection with the organization and capitalization of the Partnership, except for commissions, will be paid by the General Partner out of its Excess Profits. The General Partner intends to allocate a portion of its Fee attributable to Organizational Costs to non-amortizable syndication expenses and a portion to amortizable organization expenses. There can be no assurance that the Service will not take the position that some of the expenses treated by the Partnership as amortizable organization expenses or deductible Intangible Costs are non-amortizable syndication expenses and that any such claim by the Service would not be sustained by the courts if litigated. Further, no assurance can be given that amounts allocated by the Partnership to amortizable organization expense should instead be capitalized as part of the cost of the Trade Account. If the Service were successful in this contention, the Partners would not be able to amortize amounts otherwise allocable to amortizable organization expenses.

**Management Fees**. Management fees paid by the Partnership will be deductible only to the extent such fees are ordinary and necessary business expenses and are reasonable in amount. See Code sections 162 and 707. The General Partner will

27

determine whether all or only part of the amounts paid for the management fee for Initial Operations or management fee for assessments, if any, paid by the Partnership are properly deductible under the Code in the year paid. The issue as to the allocation of such management fees between deductible ordinary and necessary business expenses, organization and offering costs, and other costs required to be capitalized, if any, and the reasonableness thereof, are inherently factual and, to a certain extent, predicated upon future events. For that reason, the General Partner cannot predict the outcome of a challenge with regard to these matters, but consistent with the other portions of this offering, there are no management fees currently scheduled in this offering. There can be no assurance that the Internal Revenue Service will not attempt to disallow, in whole or in part, a deduction for management fees that the General Partner determines are properly deductible and that, if litigated, any such position by the Service would not be sustained by the courts, at least as to a portion of such fees. There is a substantial risk that any portion of the management fees treated as a deductible payment could be reclassified in whole or in part as a syndication fee, an organization expense, a lease acquisition cost, a payment for services to, be performed over the life of the Partnership or for some other cost that is not currently deductible. If any such position of the Service were sustained, the deductions attributable to the payment of the management fees would be disallowed, reduced or delayed, and the tax liability of the Partners of the Partnership would be increased.

**Organization and Administrative Expenses**. Under the terms of this Memorandum and the Limited Partnership Agreement, the General Partner will be reimbursed for Organization and Administrative Expenses incurred in the course of conducting the business of the Partnership. Under the Code, the reimbursements will be deductible only if they constitute ordinary and necessary business expenses. The General Partner will cause the Partnership to deduct the reimbursement for Organization and Administrative Expenses as an ordinary and necessary business expense. Because of the factual questions involved in determining what constitutes ordinary and necessary business expenses, there can be no assurance that the Internal Revenue Service will not challenge the deduction.

**Tax Basis in Partnership Interest**. The tax basis of a Partner in its Partnership Interest is important for several reasons including, but not limited to, determining: (1) the current deductibility of a Partner's distributive share of Partnership losses; (2) income tax consequences of distributions; and (3) gain or loss on the sale of a Partnership Interest. A Partner's adjusted basis in its interest in the Partnership will be its capital contribution to the Partnership increased by: (1) its distributive share of Partnership income and gain (including tax-exempt income); and (2) its share of liabilities of the Partnership for federal income tax purposes; and decreased (but not below zero) by: (a) distributions from the Partnership to the Partner; (b) its distributive share of Partnership losses; (c) its share of any reduction in the Partnership's liabilities to the extent such liability was included in its basis; and (d) its share of nondeductible expenses of the Partnership that are not properly chargeable to a capital account.

Code section 613A(c) (7) (D) requires each individual Partner, rather than the Partnership, compute depletion and gain or loss on the sale of the asset. A literal reading of Code section 705 (which governs the determination of a partner's basis in his partnership interest) would preclude a Partner from increasing the basis of his or her Partnership Interest for gain recognized on the sale of partnership Trade Account because such gain is no longer a Partnership item. Treasury Regulations issued under Code section 705, however, provide for an adjustment to the basis of a Partner's Interest for gain recognized on the Partnership's disposition of its interest.

**Treatment of Cash Distributions from the Partnership**. A Partner generally will not recognize gain or loss for federal income tax purposes when he or she receives a cash distribution from the Partnership in respect of, and not in liquidation of his or her Partnership Interest so long as it is not in exchange for his or her Interest in "unrealized receivables" (which include potential recapture of capital account depletion, Intangible Costs and ACRS deductions) or "inventory items". A Partner will recognize gain on cash distributions (including any reduction in Partnership indebtedness for which no Partner is personally liable) that exceed the adjusted basis in his or her Partnership Interest immediately prior to such distribution. See also "At-Risk Recapture of Losses" below.

**Tax on self-employment Income**. Individuals are required to pay a tax on their income from self-employment, that is, from carrying on a trade or business as a sole proprietor or as a partner. The tax is designed to afford Social Security coverage to self-employed individuals. The tax is levied as part of the estimated tax liability of self-employed persons. The self-employment tax is imposed on "self-employment income," which is based on "net earnings from self-employment." Net earnings from self-employment include a limited partner's distributive share (whether or not distributed) of income or loss from any trade or business carried on by his or her Partnership.

While the portion of self-employment tax allocable to Social Security is subject to an annual earnings cap, the portion of the self-employment tax allocable to Medicare is not subject to such cap and, therefore, an investment in the Partnership by an investor who has otherwise paid his or her maximum Social Security tax for the year (either through self-employment tax or through FICA tax as an employee) could still subject the investor to an additional Medicare tax with respect to his or her share of Partnership income.

**Sales of Interest in the Partnership**. If a Partner sells his or her Interest in the Partnership pursuant to the provisions of the Limited Partnership Agreement, he or she will recognize taxable gain or loss on the sale measured by the difference between the amount realized by him or her on such sale and his or her adjusted tax basis in his or her Partnership Interest. The amount realized by such Partner will include his or her allocable share of Partnership debt, if any, as well as the amounts paid to him or her as a result of the sale. If the Partnership Interest has been held by the selling Partner for more than one year, the realized and recognized gain or loss on the sale will be taxed as long-term capital gain or loss, except to the extent the sale price is attributable to unrealized receivables (which includes ACRS, depletion and Intangible Cost recapture) or inventory items. The portion of the sale price attributable to those items will be taxed to the selling Partner as ordinary income.

**Liquidation of the Partnership**. On expiration of its term or as otherwise provided in the Limited Partnership Agreement, the Partnership will dissolve and, if not reconstituted, after payment of its liabilities, distribute its property or proceeds from the sale of its property to the Partners in complete liquidation. The Partnership will not recognize gain or loss as a result of the liquidating distribution. Each Partner will recognize gain or loss as a result of the Partnership's sale of its assets. Assuming each item of Partnership property is distributed to the Partners on a pro rata basis, each Partner will recognize gain to the extent any money distributed exceeds the adjusted basis of such Partner's Interest in the Partnership immediately before the distribution. A Partner will recognize loss on the liquidating distribution if no property other than cash, unrealized receivables (which include ACRS, depletion and Intangible Cost recapture) and inventory are distributed to a Partner. Such Partner will recognize such loss only to the extent the adjusted basis of such Partner's Interest in the Partnership exceeds the sum of the cash, the basis of unrealized receivables (which includes ACRS, depletion and Intangible Cost recapture) and the basis of inventory distributed. The basis of property distributed to each Partner (other than cash) will be an amount equal to the adjusted basis of such Partner's Interest in the Partnership reduced by the amount of cash distributed to him or her. The tax consequences of the liquidation of the Partnership described herein reflect only the general rules for such a liquidating distribution. On actual liquidation of the Partnership, various exceptions to these rules may alter the tax consequences described above.

**Termination of the Partnership**. Under Code section 708(b)(1)(B), a partnership will terminate for tax purposes if 50% or more of the Interests in the Partnership's capital and profits are sold or exchanged within a single twelve-month period. Treasury Regulation section 1.708-1 (b) (1) (ii) provides that neither the liquidation of a Partnership Interest nor the contribution of property to a Partnership constitutes a "sale or exchange" within the meaning of Code section 708. Consequently, the reduction of a Partner's relative Interest in the Partnership because of his failure to contribute Optional Additional Assessments should not constitute a "sale or exchange" within the meaning of Code section 708. Nevertheless, if within a short time before or after such reduction, the reduced Partner received distributions from the Partnership and another Partner made a contribution to the Partnership, the Service may take the position, under principles set forth in Treasury Regulation sections 1.708-1 (b) (1) (ii) and 1.731-1 (c) (3), that such reduction constituted a sale or exchange of such reduced Partner's Interest in the Partnership. If within a twelve-month period 50% or more of the Interests of the Partners in the Partnership were shifted, under such circumstances, the Partnership may be deemed to have terminated within the meaning of Code section 708.

**Activities engaged in for Profit**. Code section 183 provides that if an activity is not "engaged in for profit", the only amounts deductible with respect to that activity are: (1) those expenses that would be deductible whether or not incurred in connection with an activity engaged in for profit, (e.g., certain Interest and taxes); and (2) those expenses otherwise deductible had the activity been engaged in for profit, but only to the extent of the income from the activity, reduced by otherwise allowable non-business deductions. Although Code section 183(a) refers to an activity engaged in by an individual, it also applies to the activities of a partner in a partnership. See Revenue Ruling 77-320, 1977-2 C.B. 78; Edward B. Hager. 76 T.C. 759 (1981). Moreover, in determining whether Code section 183 applies to a partnership, the Tax Court has determined that the question is whether the partnership itself (rather than the individual partners) has the proper profit objective. See Taube v. Commissioner, 88 T.C. 464 (1987) and Brannen v. Commissioner. 78 T.C. 471 (1982).

However, it is possible that the Service might take the position that Code section 183 will also apply to an individual partner of a partnership or a Limited Partnership in a Limited Partnership if that partner or Partner lacks the proper profit objective, notwithstanding the existence of such objective at the partnership or Limited Partner level. If it is determined the Partnership or a Partner is not engaged in an activity for profit, a substantial portion of the deductions arising from Partnership Operations could be disallowed. The issue of whether an activity is engaged in for profit is primarily a question of fact. The resolution of this issue may be based in part on the intent of the Partners, as evidenced by objective factors. THEREFORE, NO ONE SHOULD PARTICIPATE IN THE PARTNERSHIP UNLESS HIS OR HER OBJECTIVE IS TO SECURE AN ECONOMIC PROFIT SEPARATE AND APART FROM ANY TAX BENEFITS THAT MAY FLOW FROM THE PARTNERSHIP. Because of the factual nature of this issue, counsel to the Partnership cannot predict the outcome of a challenge under Code section 183.

**Allocations**. Under Code section 704, allocations of all Partnership items of income, gain, loss, deduction and credit must have "substantial economic effect" to be recognized for federal income tax purposes. Regulations issued under Code section 704(b) provide that an allocation will have substantial economic effect if it satisfies a two-part test. First, the allocation must have economic effect; second, the economic effect must be substantial.

With respect to the second test, the regulations provide that generally the economic effect of an allocation is substantially there is a reasonable possibility that the allocation (or allocations) will affect substantially the dollar amounts to be received by the partners from the partnership, independent of tax consequences. However, the regulations provide that the economic effect of an allocation (or allocations) is not substantial if at the time the allocation becomes part of the partnership agreement: (i) the after-tax economic consequences of at least one partner may, in present value terms, be enhanced compared to such consequences if the allocation (or allocations) were not contained in the partnership agreement; and (ii) if there is a strong likelihood that the after-tax economic consequences of no partner will, in present value terms, be substantially diminished compared to such consequences if the allocation (or allocations) were not contained in the partnership agreement.

According to the regulations, an allocation will have economic effect if the partner to whom the allocation is made receives the economic benefit or bears the economic burden or risk associated with the allocation. The regulations state that, in general, an allocation will have economic effect if throughout the term of the partnership the partnership agreement:

(i) provides for the determination and maintenance of the partners' capital accounts in accordance with the rules set forth in the regulations;

(ii) requires that on liquidation of the partnership (or any partner's interest in the partnership), liquidating distributions must in all cases be made by the later of the end of the taxable year in which the liquidation occurs or 90 days after the liquidation, in accordance with the positive capital account balances of the partners; and

(iii) either obligates a partner with a deficit in his or her capital account following the liquidation of his or her Interest in the partnership to restore such deficit or contains a "qualified income offset" pursuant to which a partner that unexpectedly receives an allocation, adjustment or distribution described in Treasury Regulation section 1.704-1 (b)(2)(ii)(d)(4), (5) or (6) will be allocated income and gain in an amount and manner sufficient to eliminate any deficit capital account balance of such partner as quickly as possible.

If a partnership agreement contains a qualified income offset instead of a deficit restoration clause the allocation will have economic effect only to the extent it does not create or increase a deficit capital account balance.

In each case, capital account balances must be determined after taking into account all adjustments for the partnership taxable year in which the liquidation occurs (other than the adjustments made pursuant to (ii) or (iii) above). The courts have also used a capital account analysis to determine whether an allocation should be recognized for federal income tax purposes (e.g., Allison v. United States, 701 F.2d 933 (Fed. Cir. 1983); Goldfine v. Commissioner, 80 T.C. 843 (1983); Holladav v. Commissioner, 72 T.C. 571 (1979), aff'd, 649 F.2d 1176 (5th Cir. 1981); Orrisch v. Commissioner. 55 T.C. 395 (1970).

The Treasury Regulations set forth special rules regarding allocations with respect to assets and corresponding adjustments to capital accounts. Code section 613A(c)(7)(D) provides for the allocation of partnership depletable basis to the partners as of the date the partnership acquires the property, so that each partner may separately determine his or her depletion

deduction with respect to the property and gain or loss on the disposition of such property. Consequently, these items are not partnership items and would not be reflected in the partners' capital accounts. The Treasury regulations set forth rules for determining "simulated" depletion and gain or loss on the sale of partnership interest for purposes of adjusting the partners' capital accounts. The Limited Partnership Agreement provides for the calculation of these "simulated" amounts and allocates them in the same proportions the Partners were allocated adjusted basis with respect to Partnership assets. The application of these rules on liquidation of the Partnership appears to be in conflict with the general rule that liquidating distributions must be made on the basis of capital account balances. In an attempt to comply with all of the rules set forth in the regulations, the Limited Partnership Agreement initially provides for the distribution of interest in kind or of the cash realized from the sale thereof to the Partners in the same proportions the Partners were allocated basis in such remaining interests, with corresponding adjustments to capital accounts. Then, after all allocations and the corresponding adjustments have been made to the capital accounts as provided in the Limited Partnership Agreement, the remaining Partnership property or cash realized from the sale thereof will be distributed to the Partners in accordance with their capital account balances (the computation of which is defined in the Limited Partnership Agreement).

Code section 613A(c)(7)(D) provides that a partnership must allocate to each partner as of the date of acquisition of an economic interest his or her proportionate share of the adjusted basis of the interest as determined in accordance with his or her Interest in capital or income. Code section 613A(c)(7)(D) and the proposed regulations issued there under provide that a partner's proportionate share of the adjusted basis of partnership property shall be determined in accordance with his or her Interest in partnership capital. However, a partner's share of the adjusted basis of partnership interest may be determined in accordance with his or her Interest in the partnership if the partnership agreement so provides, unless either:

(i) written provision has been made for the share of any partner in partnership income to be reduced for any purpose other than merely to reflect the admission of a new partner, or

(ii) at the time of allocation any partner expects his or her income Interest to be reduced pursuant to an understanding with another partner or partners.

Under the Treasury Regulations issued pursuant to Code section 704(b), allocations of partnership interest will be recognized as being in accordance with the partners' Interests in partnership capital under Code section 613A(c) (7)(D) provided:

(i) such allocations do not give rise to capital account adjustments under Treasury Regulation section 1.704-1 (b )(2)(iv)(k) the economic effects of which are insubstantial; and

(ii) all other allocations and capital account adjustments under the partnership agreement are recognized under Treasury Regulation section 1.704-1(b) (4) (v).

Otherwise, such adjusted basis must be allocated among the partners pursuant to Code section 613A(c) (7) (D) in accordance with the partners' actual Interests in partnership capital or income. The Limited Partnership Agreement allocates basis in partnership interests in the proportion the Partners share Net Cash Flow, Net Proceeds and Federal Income Tax Items (as defined in the Limited Partnership Agreement) as of the date of acquisition Partnership Interests. While the question is primarily one of fact, it is more probable than not that this allocation of basis will be recognized as being in accordance with the Partners' Interests in Partnership capital or income under Code section 613A(c) (7) (D).

If less than all the Partners participate in a Subsequent Operation, the General Partner may admit additional Partners to obtain sufficient funds to undertake the Subsequent Operation, subject to an appropriate vote of the Partners. If the Subsequent Operation is undertaken on a newly acquired economic interests, the basis of such interests will be allocated among the Partners (including any additional Partners) participating in the Subsequent Operation. If, on the other hand, the Subsequent Operation is undertaken on the property previously acquired by the Partnership, it is possible that the additional Partner will not be permitted to claim either cost or percentage depletion with respect to any income from the economic interest in the Subsequent Operation. Percentage depletion may not be available to the additional Partners if after Initial Operations the economic interest constitutes proven asset. Partners may only claim cost depletion to the extent of their basis in the Partnership's economic interest (See "TAX ASPECTS - Depletion."), if the Subsequent Operation is conducted on an asset previously acquired by the Partnership, the Limited Partnership Agreement reallocates to the additional Partners a portion of the basis in that asset that had previously been allocated to the Partners that did not participate in the Subsequent Operation. However, there is no clear authority for such a reallocation. The Partnership was required to allocate the basis of

31

each economic interest on the date it acquired that interest and the Code contains no provision for reallocating that basis to newly-admitted Partners. Consequently, no assurance can be given that the Partnership will be permitted to reallocate the basis of any economic interests. Finally, because it is likely that any economic interest acquired by the Partnership will have a low original cost to the Partnership, the amount of cost depletion that can be claimed with respect to production from any such asset would be nominal.

The allocations of Federal Income Tax Items to the Partners made in the Limited Partnership Agreement should satisfy the "substantiality" portion of the test in the Regulations because the economic consequences of the allocations should be equivalent to the tax consequences of such allocations. Likewise the allocation of Federal Income Tax Items to the Partners made in the Limited Partnership Agreement should have "economic effect" since the Limited Partnership Agreement contains the three (3) requirements for economic effect listed above.

**Election to Adjust Tax Basis of Partnership Interest**. As a result of the tax accounting complexities inherent in, and the substantial expense that would be attendant to, making the election to adjust the tax basis of Partnership Interests provided by Code sections 734, 743, and 754, the General Partner does not presently intend to make such election on behalf of the Partnership. The absence of any such effective election and of the power to compel the making of such an election may, in many circumstances, result in a reduction in value of a Partner's Interest to any potential transferee and may be considered an additional impediment to the transferability of Partnership Interests.

**Repayment of Loans**. Each Partner will be subject to federal income tax on his or her distributive share of the net taxable income of the Partnership, whether or not such income is actually distributed to him or her. Advances against production received by the Partnership (such as a loan or an advance secured by a specific share of future production), if any will be treated as loans to the Partnership and will not be recognized as income by the Partnership on receipt. Proceeds from production used to pay such advances or other loans will be ordinary income, subject to depletion, to the Partnership in the year the production is realized. The principal portion of repayments will not be deductible by the Partnership, but the Partnership will be entitled to a deduction of Interest, if any paid on the advances or loans. During repayment of such advances or loans, the taxable income of the Partners from the property subject to the advance or loan may be greater than the net cash proceeds there from distributed to them. Therefore, taxes will be payable on revenues used to repay the principal amount of the advance or loan, as well as on remaining Partnership revenues available for distribution, whether or not actually distributed.

**Limitations on Passive Activity Losses**. Code Section 469 imposes limitations on taxpayers' ability to deduct losses from passive activities against the taxpayer's other income. In general, a taxpayer may not deduct losses from a passive activity against income from wages and salaries (or other so called "active" income) or against income from Interest, dividends and royalties ("portfolio income"). However, a taxpayer may deduct against such income losses from activities in which the taxpayer materially participates (subject to other limitations in the Code). The passive activity loss rules apply to individuals, estates, trusts, closely held C corporations (50% of the value of which is owned by five or fewer individuals), and "personal service corporations." An activity will be classified as "passive" if the activity is a rental activity or the conduct of a trade or business in which the taxpayer does not "materially participate." A taxpayer materially participates in an activity if the taxpayer is involved in the operations of the activity on regular, continuous, and substantial basis. A taxpayer is not treated as materially participating in an activity if his or her interest in that activity is held as a limited partner in a limited partnership.

In computing a taxpayer's passive activity loss limitation, the taxpayer must determine his or her aggregate deductions and losses from all passive activities for the taxable year and offset them against his or her aggregate income and gains from passive activities during the taxable year. Similarly, the taxpayer must aggregate all credits earned during the taxable year from passive activities and offset them against the tax liability allocable to all passive activities during the taxable year. Although a taxpayer is permitted to offset losses from one passive activity against income and gains from another passive activity, the taxpayer may not offset his or her losses from passive activities against his or her wages, salary, or other income derived from the active conduct of a business, nor against income from interest, dividends, or royalties not derived in the ordinary course of a trade or business, or against the gain from the sale of property producing such income.

Should a taxpayer have net losses from passive activities and net credits from passive activities, both net losses and credits may be carried forward indefinitely and deducted against any future net income and tax liability, respectively, from passive activities. Any unused losses are held in suspense until the taxpayer disposes of his or her entire Interest in the passive activity in a taxable transaction to an unrelated person. On disposition of a passive activity, the taxpayer is generally

permitted to deduct the suspended passive losses against the taxpayer's other income or gain (after first offsetting them against gain recognized on the disposition and against net income for the taxable year from all passive activities). Suspended credits, however, must continue to be carried forward until used to offset tax on income from other passive activities. If the disposition is because of the taxpayer's death, the suspended losses can only be used to the extent they exceed the amount by which the property's basis is increased as a result of the taxpayer's death. If a disposition is by means of an installment sale, the suspended losses may only be recognized in any taxable year to the extent of the percentage of the total gain on the sale that is recognized during that taxable year.

**At-Risk Limitation on Deductions for Expenses**. This limitation applies to each activity engaged in and not on an aggregate basis for all activities. For the purpose of initially computing the amount of such limitation, the amount "at risk" for each taxpayer is limited to: (1) the amount of money contributed to the activity, (2) the adjusted basis of other property contributed to the activity, and (3) any amount borrowed with respect to the activity for which the taxpayer is personally liable for repayment or with respect to which he or she has pledged property (other than property used in the activity) as security for the repayment of the amount borrowed from any person other than a person who has an Interest in the activity or who is a related party (as defined), limited however, to the net fair market value of his or her Interest in such pledged property. "Loss" is defined as the excess of allowable deductions for a taxable year from an activity over the amount of income actually received or accrued by the taxpayer during such year from the activity.

The amount the taxpayer has "at risk" may not include the amount of any loss against which the taxpayer is protected through non-recourse financing, guarantees, stop loss agreements or other similar arrangements. The amount of any such loss disallowed in any taxable year shall be carried over to the first succeeding taxable year. Further, a taxpayer's "at risk" amount in subsequent taxable years with respect to the activity involved shall be reduced by that portion of the loss allowable as a deduction.

**At-Risk Recapture of Losses**. The "at-risk" rules also provide that a Partner must recognize income to the extent his or her "at-risk" basis is reduced below zero (limited to loss amounts previously allowed to the Partner over any amounts previously recaptured). Distributions to a Partner, changes in the amount of recourse indebtedness attributable to a Partner or the commencement of guarantees or similar arrangements may reduce a Partner's amount "at-risk." A Partner may be allowed a deduction for the recaptured amounts included in taxable income if he or she increases his or her amount "at-risk" in a subsequent taxable year.

**Tax Preference Income: Alternative Minimum Tax**. Individuals, corporations, trusts and estates are subject to an "alternative minimum tax" on certain tax preference items. Treasury Regulation section 1.58-2(b) (pursuant to the regulatory authority granted in Code section 702(a)(7) requires that a partner, in computing his or her individual tax preference items, take into account separately those income and deduction items of a partnership that enter into his or her computation of tax preference items. A Partner in the Partnership may also realize tax preference items for any taxable year attributable to percentage depletion in excess of depletable basis (determined without regard to the depletion deduction for the taxable year). The Alternative Minimum Tax for individuals is a two-tier tax system. A 26% rate applies to the extent that Alternative Minimum Taxable Income less the exemption amount does not exceed $175,000 ($87,500 for married taxpayers filing separately). Above that dollar amount a 28% rate applies. Alternative Minimum Taxable Income is defined as adjusted gross income, plus tax preference items such as access Intangible Costs, less specially computed net operating loss and itemized deduction amounts. For property other than Section 1250 property and property the taxpayer had elected to depreciate on the straight line method, a taxpayer may reduce his or her Alternative Minimum Taxable Income only for depreciation computed based on the 150% (rather than the 200%) declining balance method. In general, the net operating loss deduction must be reduced by tax preference items in computing the Alternative Minimum Taxable Income. The alternative minimum tax exemption amount is $45,000 for a joint return or surviving spouse, $33,750 for an unmarried individual other than a surviving spouse, and $22,500 for married individuals filing separate returns, estates or trusts. In addition, a taxpayer must reduce his or her exemption amount by 25% of the amount by which his or her Alternative Minimum Taxable Income exceeds $150,000 ($112,500 for single persons who are not surviving spouses and $75,000 for married persons filing separate returns, estates and trusts). An individual is required to pay the alternative minimum tax only if the amount of such tax exceeds his or her "regular tax," as defined.

Partners may individually elect to amortize their allocable shares of the Partnership's Intangible Costs over a five-year period beginning with the year the expenditure is made. If this election is made, there will be no preference items on these amounts. However, such amounts will still be treated as Intangible Costs for purposes of the recapture rules.

**Participation by IRAs, Employee Benefit Plans and Similar Tax Exempt Organizations**. IRAs and employee benefit plans including trusts formed as part of such plans and certain charitable and other organizations described in Code section 50I(c) are exempt from federal income tax. However, such entities are subject to tax on unrelated business taxable income. Unrelated business taxable income is gross income derived by an exempt organization from (any unrelated trade or business regularly carried on by it or by a partnership of which it is a member. Specific deductions directly connected with the carrying on of such trade or business, computed with modifications, including a $1,000 deduction, is allowed. Since the Partnership will carry on a trade or business, a tax-exempt Partner may be considered to be regularly carrying on the trade or business of the Partnership and Partnership income allocated to a tax-exempt Partner may be unrelated business taxable income to such Partner, unless such income is specifically exempt from such classification.

The receipt of unrelated business taxable income by a tax-exempt entity generally has no effect on that entity's tax-exempt status or on the exemption from tax of its other income. However, for certain types of tax-exempt entities, the receipt of any unrelated business income may have extremely adverse consequences. ACCORDINGLY, EACH PROSPECTIVE TAX-EXEMPT PARTNER IS URGED TO CONSULT ITS OWN TAX ADVISOR REGARDING THE POSSIBLE CONSEQUENCES OF PARTICIPATING IN THE PARTNERSHIP.

**Foreign Partners**. The Partnership expects most Partners will be United States residents. However, the federal income taxation of non-resident alien individuals, foreign corporations and other foreign entities (hereinafter referred to collectively as "foreign participants") is a highly complex matter that may be affected by applicable tax treaties and other considerations.

Under Code section 875, a non-resident alien individual or foreign corporation is deemed engaged in a trade or business within the United States if the partnership of which such foreign venture is a member is so engaged. In general, if foreign participants participate in the Partnership, all items of Partnership income included in their distributive shares, including gains on the sale or other disposition of Partnership properties will be subject to United States taxation as income that is effectively connected with a United States trade or business ("Effectively Connected Income"). Consequently, such Partners will be required to file United States income tax returns and will be subject to United States tax on their distributive shares of net business income from the Partnership at the same rates applicable to a United States citizen, resident or corporation. In determining a Partner's distributive share of net business income from the Partnership, such investor would be permitted the same deductions allowed to a United States citizen, resident or corporation.

Partnerships that have Effectively Connected Taxable Income must now pay withholding tax on the income allocable to foreign partners at an amount equal to the foreign partners' income allocation times the highest applicable tax rate. The amount withheld is generally treated as a distribution to the foreign partner and is credited against the foreign participant's United States income tax liability.

Although there is little direct authority on this issue, it is likely that a non-resident alien individual would be subject to United States estate tax on the value of his or her Partnership Interest if he or she owns such Partnership Interest at the time of his or her death. However, a non-resident alien who transfers a Partnership Interest by gift would not, in most cases, be subject to United States gift tax. Finally, certain transfers could cause a non- resident alien to become liable for the generation-skipping transfer tax.

The above rules on United States taxation are subject to modification by applicable income and estate tax treaties. THEREFORE, FOREIGN PROSPECTIVE PARTNERS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS WITH RESPECT TO PARTICIPATING IN THE PARTNERSHIP AND THE EFFECT OF THE TAX LAWS OF OTHER JURISDICTIONS IN, WHICH THEY ARE SUBJECT TO TAXATION WITH RESPECT TO SUCH PARTICIPATION.

**State and Local Income Taxes**. Certain states or localities where the Partnership may engage in business or where the Partners may reside may levy income taxes for which the Partners may be liable with respect to their share of the Partnership income, and it may be necessary for each Partner to file state or local income tax returns to report income in such jurisdictions. The General Partner has reached no conclusions on matters of state or local income tax law.

**Tax Shelter Registration**. The Tax Reform Act of 1986 added a provision requiring the registration of "tax shelters" with the Service. For this purpose, a "tax shelter" is an investment with a "tax shelter ratio" greater than 2 to 1 as of the close of any of the first five years ending after the date on which the investment is offered for sale. An investment meeting this ratio

test must be registered with the Service if the investment must be registered with a state or federal securities commission, or sold pursuant to an. exemption from registration pursuant to a notice filing, or is a substantial investment. A substantial investment is defined as any investment for which the aggregate amount that may be offered for sale exceeds $250,000 and five or more investors are expected.

The "tax shelter ratio" with respect to any year, the ratio that the aggregate amount of deductions and 350% of the credits potentially available to any investor for all periods up to and including the close of such year bears to the "investment base" as of the close of such year. As applied to the Partnership, "investment base" would mean the amount of money contributed to the Partnership by a Partner as of the close of such year. Treasury Regulations issued pursuant to this provision clearly state that for purposes of determining the "tax shelter ratio," gross deductions are not offset by gross income. Consequently, the definition of "tax shelter" is broad and will encompass many investments that are not marketed or customarily designated as tax shelters.

The General Partner does not believe that participating in the Partnership necessarily constitutes an investment in "securities" for purposes of applicable federal and state securities law. Nevertheless, the General Partner has estimated the aggregate amount of deductions and credits that may be generated by Partnership activities and has concluded that the "tax shelter ratio", if deemed applicable, is not reasonably expected to exceed 2 to 1 for any Partnership as of the close of anyone of the first five (5) years of the Partnership. Therefore, the Partnership has not been registered with the Service.

**<u>Audit of Tax Returns</u>**. In light of the announced emphasis by the Service on audits of tax shelter investment programs, the tax returns of the Partnership may be audited and such audit may result in adjustments. Any adjustment of the Partnership's tax return would, at a minimum, result in a corresponding adjustment of the federal income tax liability of individual Partners, and may result in a full audit of their individual tax returns (thereby resulting in adjustments to non-Partnership, as well as Partnership, income and deductions). In addition, an initial audit of a Partners' individual tax return could result in the audit of the Partnership tax return, thereby possibly triggering the consequences just indicated to all Partners in the Partnership.

On audit, the tax treatment of Partnership items will be determined at the partnership level in a unified partnership audit proceeding. Partners (other than partners with less than a 1 % Interest in the profits of a partnership with more than 100 partners), referred to as "Notice Partners," would be notified at the beginning of the partnership audit proceeding and as to the final partnership administrative adjustment ("FPAA"). One partner of a partnership will be designated as the "Tax Matters Partner." On settlement with any partner prior to mailing a notice of the FPAA to the Tax Matters Partner, the Service will be required to offer consistent settlement terms with any other partner who requests such settlement terms before the expiration of 150 days after such mailing of the FPAA to the Tax Matters Partner. Only the partnership, through the Tax Matters Partner, will have a right to contest the Service's determination in court within ninety (90) days following the notice of FPAA. If the Tax Matters Partner does not file a petition for judicial review, any other Notice Partner would have a right to file such petition, within sixty (60) days following such ninety (90) day period. However, only one proceeding may go forward on behalf of the partnership, which would be the first action filed in the Tax Court, or, if no petition is filed with the Tax Court, the first action filed by a partner in either a United States District Court or the United States Claims Court. All other actions would be dismissed. However, each partner with an interest in the outcome would be allowed to participate in the action. The court acquiring jurisdiction of the proceedings will have jurisdiction to determine all items of the partnership taxable year to which the FP AA relates and the proper allocation of such items among the partners. The decision of that court would be reviewable if the Tax Matters Partner or any Notice Partner seeks review. Any partner may file a request for administrative adjustment of partnership items. The Tax Matters Partner may file a petition for review with respect to any part of the requested adjustment that is disallowed, in which case other partners would be treated as parties to the action. Suits by individual partners, other than the Tax Matters Partner, would also be allowed with respect to certain disallowed items in requests for administrative adjustment filed by such partners, with certain limitations. The Tax Matters Partner is required to keep the partners informed of all administrative and judicial proceedings.

The period of time in which assessments of deficiencies and claims for refunds may be made with respect to federal income taxes attributable to "partnership items" is three years from the date of filing of the partnership return or, if later, the last date prescribed for filing such return determined without extensions. The period may be extended with respect to any partner by agreement with such partner or for all partners by agreement with the Tax Matters Partner. A "partnership item" is any item required to be taken into account for the partnership's taxable year under any provision of subtitle A of the Code to the extent Treasury Regulations provide that such item is more appropriately determined at the partnership level. Additionally, assessments may be made at any time against partners who sign or actively participate in a fraudulent return.

Also, as to other partners affected by such return the period of assessment is extended from three to six years. The period of limitations is also six years in any case in which there is an omission from gross income of any amount properly includable that exceeds 25% of the amount of the gross income stated in the return. If no partnership return is filed, assessments may be made at any time.

**Penalty for Substantial Understatements**. Code section 6662, in part, imposes an accuracy-related penalty of 30% of the amount of any underpayment attributable to (i) negligence or intentional disregard of rules or regulations; and (ii) "substantial understatements" of income tax. A "substantial understatement" is defined as a reported liability that understates the amount of tax owed by the greater of 10% or $5,000 ($10,000 for corporations other than S corporations and personal holding companies). An understatement is reduced by that portion of the understatement attributable to an item (other than a "tax shelter" item) if there is "substantial authority" for the taxpayer's treatment of such item on his or her return or if the taxpayer's return (including the partnership return in the case of a partnership item) adequately discloses the facts relating to the item's tax treatment. The Treasury Regulations issued under Code section 6661 (now included in Section 6662) provide that the "substantial authority" standard requires stronger support than a mere "reasonable basis" for taking the position but the treatment need not be "more likely than not" the proper treatment. Under Treasury Regulations, there is substantial authority for the tax treatment of an item only if the weight of the authorities supporting the treatment is substantial in relation to the weight of authorities supporting contrary positions.

With respect to an item attributable to a "tax shelter," however, a more stringent standard applies for the reduction of understatements attributable thereto. A "tax shelter" is defined as a partnership or other entity or any other plan or arrangement a significant purpose of which is to avoid or evade tax. The regulations provide that the principal purpose of an entity, plan or arrangement is not the avoidance or evasion of federal income tax if the entity, plan or arrangement merely claims tax benefits provided by the Code, such as claiming ACRS deductions, percentage depletion, or deductions attributable to the payment of Intangible Costs. An item will be considered a tax shelter item if such item is directly or indirectly attributable to a significant purpose of a tax shelter to avoid or evade federal income tax. The regulation gives as an example a partnership established to acquire and overvalue property for the purpose' of claiming investment tax credit; the investment tax credit with respect to the property would be a tax shelter item. With respect to an item attributable to a tax shelter, in addition to having "substantial authority" for his or her position, the taxpayer must reasonably believe that the treatment claimed by him or her was "more likely than not" the proper treatment for such an item. EACH PROSPECTIVE PARTNER SHOULD CONSULT HIS OR HER PERSONAL TAX ADVISOR WITH RESPECT TO THE SUBSTANTIAL UNDERSTATEMENT PENALTY.

**Reports.** The Partnership will annually compute its taxable income or loss for the appropriate taxable period, and in computing such taxable income or loss, it will deduct Intangible Costs, ACRS and other deductible costs to the extent allowable under applicable federal income tax laws and regulations. Each Partner will compute his or her depletion deduction individually. The Partnership will file federal income tax returns which will be for information purposes only, and it will not pay federal income tax on the taxable income computed on that return. Each Partner will be furnished either a copy of the Partnership's federal income tax return or extracts of information therefrom suitable for his or her use in the preparation of his or her individual income tax return, and each Partner will include in his or her individual federal income tax return his or her allocable share of the Partner taxable income (whether or not distributed) or loss, as computed on the federal income tax return of the Partnership.

Each Partner is required to treat Partnership items on his or her return consistently with the treatment on the Partnership return unless the Partner files a statement with the Service identifying the inconsistency. If a Partner fails to satisfy these requirements the Service may assess any deficiency attributable to any computational adjustment required to make the treatment consistent with the Partnership return without commencement of a Partnership proceeding or notification to the Partner that the inconsistent item will be treated as a non-partnership item.

If a Partner sells an Interest in the Partnership, the selling Partner must promptly notify the Partnership of such transfer. The Partnership is required to file a return for the year of the sale setting forth the name and address of the selling Partner and the transferee. By regulation the Secretary of the Treasury may require other information and establish rules regarding the time and manner for filing this return. The Partnership must also furnish the information shown on the return to the persons named therein. A penalty may be imposed for failure to give notice, file the return or furnish information in a timely manner.

**Partners Required to Maintain Information**. Partners are required to maintain the records concerning their share of the basis of the assets and distributions made to the Partnership. The Partnership will allocate the adjusted basis of each economic interest to the Partners as set forth in the Limited Partnership Agreement, and provide a report of such allocation to each Partner, who then must keep his or her own records.

Possible Changes in Federal Tax Laws. The statutes and Treasury Regulations with respect to all of the foregoing tax matters are subject to continual change by Congress or the Department of Treasury. Similarly, interpretations of these statutes and Treasury Regulations may be modified or affected by judicial decision or the Department of Treasury. Any such change may have an effect on the discussion set forth above.

Furthermore, in recent years there have been a number of other proposals made in Congress by government agencies and the executive branch of the federal government for changes in federal income tax laws. In addition, the Service has proposed and is still considering changes in Treasury Regulations and procedures, and numerous private interest groups have lobbied for regulatory and legislative changes in federal income taxation. Many of such proposals would, if adopted, have the overall effect of reducing the tax benefits presently associated with participating in partnerships such as this Partnership.

It is likely that further proposals will be forthcoming or that previous proposals will be revived in some form in the future. It is impossible to predict with any degree of certainty what past proposals may be revived or what new proposals may be forthcoming, the likelihood of adoption of any such proposals, the likely effect of any such proposals upon the income tax treatment presently associated with limited partnerships, investments, or the effective date of any legislation which may derive from any such past or future proposals.

**CONSULTATION WITH PERSONAL TAX ADVISORS. THE FOREGOING ANALYSIS IS NOT INTENDED AS A SUBSTITUTE FOR CAREFUL TAX PLANNING. EACH PROSPECTIVE PARTNER IN THE PARTNERSHIP SHOULD CONSULT WITH HIS OR HER OWN PERSONAL TAX ADVISOR CONCERNING (i) THE APPLICABILITY TO AND EFFECT ON HIM OR HER OF THE UNITED STATES INCOME TAX LAWS AND THEIR ADMINISTRATION, AND (ii) THE APPLICABILITY TO AND EFFECT ON HIM OR HER OF STATE, LOCAL AND FOREIGN TAX LAWS AND THEIR ADMINISTRATION.**

**THE TAX BENEFITS OF A LIMITED PARTNERSHIP DO NOT ELIMINATE THE RISKS.**

## COMPETITION, MARKETS AND REGULATION

**Competition.** The financial trading industry is highly competitive. The Limited Partnership will encounter frequent and intense competition from major financial and banking institutions and other independent trading platforms in its effort to secure trading contracts. Many of such competitors have financial resources and staffs larger than those available to the Partnership.

**Markets**. The ability of the Partnership to operate in the financial trading market, if any, will depend on numerous factors beyond its control, the effect of which factors cannot be accurately predicted or anticipated. These factors include the availability of both domestic and foreign trading activities, the continued volatility of all financial trading markets, the commonality and capacity of competing Trade Accounts, fluctuations market data, the availability of a ready market and the effect of federal and state regulation of trading activities. There is no assurance that the Partnership will be able to maintain trading operations indefinitely, if at all.

**Regulation.** The total trading activity in the areas of Arbitrage are set by state regulatory agencies, federal regulatory agencies and financial market oversight entities through the establishment of allowable activities. These governing bodies determine the types of assets that can be traded and the information on which a trade operation can make decisions. Additional state regulations require trade activities to adhere to specific levels of information to guard against adverse market consequences.

Regulatory requirements, which are comparable, and in some cases, more restrictive than those described above, will be encountered in all jurisdictions in which trading activity is to be done. It is anticipated that various local, state and federal financial market control agencies will have an increasing impact on arbitrage trading activities. All necessary documents for all operations will be secured, or caused to be secured, by the General Partner.

**Possible Legislation**. No prediction can be made as to what additional legislation may be proposed, if any, affecting the competitive status of an Arbitrage Trading Operation, restricting the overall activities, or the market conditions for an Arbitrage Trading Operation nor can it be predicted which proposals, including those presently under consideration, if any, might be enacted or become effective.

## LITIGATION

R2 offers trading programs in the form of limited partnership interests to participating partners. Extensive federal court case histories generally support the proposition that limited partnership interests are not securities as that term is defined in federal and state law. However, courts in general will review each limited partnership on its own merits and then determine whether the investments are or are not "securities." While R2 believes that interests in its sponsored limited partnerships are not securities, there has been no determination of that issue by a court or any regulatory agency. The Partnership and the General Partner are not the subject of any material legal proceeding, action or suit presently pending.

## FURTHER INFORMATION

R2 will make available to any potential Partner, or his or her attorney, accountant, tax advisor or representative, any other information deemed necessary and appropriate by the potential Partner, or such other person, to the extent such information is available to R2 or may be obtained by it without unreasonable cost or effort. Such information should not be relied upon unless same is in writing and signed by an officer of R2.

EXHIBIT "B"

AGREEMENT AND CERTIFICATE OF LIMITED PARTNERSHIP
OF
R2 COMMERCIAL CAPITAL PARTNERS I L.P.

THIS AGREEMENT AND CERTIFICATE OF LIMITED PARTNERSHIP made and entered into at Denver, Colorado on September  15, 2009 by and between R2 Capital Group LLC a Colorado limited liability company, as sole General Partner ("General Partner"), and Robin Neihard  ("Initial Limited Partner"), and all other persons and/or entities who shall become limited partners by executing a subscription agreement in the form substantially similar and attached hereto as Exhibit "A" and made a part hereof ("Limited Partners").

WHEREAS, the General Partner, the Initial Limited Partner and the Limited Partners (collectively "Partners") desire and intend to form R2 Commercial Capital Partners I  as a limited partnership organized pursuant to the Colorado Partnership Law for the principal purpose of engaging in the business of participation in the development and establishment of up to 200 arbitrage trading accounts ("Trade Accounts"), and

WHEREAS, the Limited Partners are collectively willing to contribute to the Partnership up to $20,000,000.00 in the aggregate to meet the partnership objectives,

NOW, THEREFORE, in consideration of the covenants and mutual promises contained herein, the parties hereto, intending to be legally bound hereby, agree as follows:

1.    **Definitions**

As used in this Agreement, the following terms shall have the following meanings:

(a)  "Agreement" means this Agreement and Certificate of Limited Partnership.

(b)  "Accredited Investor" means an individual or entity that meets the definition of an "accredited investor" as that term is defined in Regulation D, as promulgated by the United States Securities and Exchange Commission.

(c)  "Cash Flow" of the Partnership shall have the meaning set forth in Section 10 of this Agreement.

(d)  "Capital Account" means the accounting record maintained by the Partnership for and on behalf of each Partner with respect to such Partner's capital contributions, as adjusted, pursuant to the terms and provisions of this Agreement.

(e)  "Code" means the Internal Revenue Code of 1986, as amended to date.  All references to particular sections of the Code shall be deemed to include references to corresponding provisions of subsequent law.

(f)  "Fiscal Year" of the Partnership and its taxable year for Federal income tax purposes means the calendar year.

(g)  "General Partner" means R2 Capital Group LLC. Any reference to the General Partner shall be deemed a reference to the original General Partner and a successor General Partner qualifying hereunder, if any.

(h)  "Interest" means a Partner's percentage of ownership in the Partnership and represented by the number of Units owned by a Partner constituting such Partner's Proportionate Share.

(i)  "Limited Partners" means and includes the persons and/or entities who shall execute a subscription agreement in the form attached hereto as Exhibit "A" and who shall make the corresponding required contribution of capital and thereby becoming Limited Partners in the Partnership.

41

(j)   "Net Cash Flow" means the cash receipts received by the Partnership from the operation of the Trade Accounts minus a 50% Management Fee earned on all Trading Profits.  All subsequent profits shall be distributed on a pro rata basis to the Partners.  Shall be calculated prior to payments and disbursements made by the Partnership with respect to the operation of the Partnership as more fully set forth in section 10.3(e) herein.

(k)   "Operator" means the person or entity with which the Partnership shall contract to develop, establish and operate the Trade Accounts.

(l)   "Partners" means all partners of the Partnership and includes the General Partner and all Limited Partners.  All references to any Partner shall, unless the context clearly requires otherwise, be deemed a reference to his predecessor and/or successor (other than a mere assignee) in interest.

(m)   "Project" means the Trade Accounts to be established and operated by the Partnership.

(n)   "Proportionate Share" with respect to any Limited Partner means that certain percentage calculated by dividing the number of Interests then held by such Limited Partner by the aggregate number of Interests then held by all of the then Partners.

(o)   "Schedule" means the document setting forth the identity of the Limited Partners and the number of Interests owned by each as set forth in the Subscription Agreement executed by each Limited Partner provided, however, that in the event of an amendment of the Agreement to reflect any change in the Limited Partners or in the number of Interests owned by any Limited Partner, the "Schedule" shall be deemed to be amended accordingly.

(p)   "Subscriptions" means the monetary or other capital contributed by a Partner for each and all of the agreed subscriptions for Interests in the Partnership.

(q)   "Unit" means one Interest in the Limited Partnership represented by a contribution of capital in the amount of $100,000.00 and bearing a 0.50% ownership interest in the Partnership.

All references to statutory provisions shall be deemed to include references to corresponding provisions of subsequent law.

## 2. Formation and Name of Partnership

The Partners hereby form a Limited Partnership ("Partnership") pursuant to the provisions of the Colorado Partnership. The name of the Partnership is and shall be R2 Commercial Capital Partners I L.P.

The principal place of business and offices of the Partnership and the Partnership mailing address is 2901 E. Alameda Ave, Denver, CO 80209.  The telephone number for the Partnership is (303) 919.3034. The General Partner reserves the right to change the principal place of business of the Partnership to such other place as it may determine from time to time upon prior written notice to the Limited Partners.

## 3. Terms

This Agreement shall become effective on the date written above and the Partnership shall continue in existence for a period of fifty (50) years, unless earlier dissolved and terminated pursuant to the provisions of this Agreement or by law.

## 4. Purpose of Partnership

The Partnership was organized for the purpose of engaging primarily in the business of participation in the establishment, development and operation of trading accounts in the arbitrage trading market.

The Partnership may enter into, make and perform all contracts and other undertakings and may engage in all activities and transportation as may be necessary in order to carry out the foregoing purpose. In addition, the partnership may engage in any other type of activity, which is lawful under the laws of the United States and the State of Colorado.

**5. Name and Address of Partners**

The name and address of the General Partner is as follows:

> **Name:**       R2 Capital Group LLC
> **Address:**    2901 E. Alameda Ave
>                 Denver, CO 80309

The name and address of the Initial Limited Partner is as follows:

> **Name:**       Hassayampa Investments, Inc. , Robin Neihardt
> **Address:**    711 South Carson Street
>                 Suite #4
>                 Carson City NV, 89701

**6. Contributions to Capital**

    **6.1 General Partner**

The General Partner shall not be required to contribute to the capital of the Partnership.

    **6.2 Limited Partners**

(a)    The Limited Partners shall contribute to the capital of the Partnership the amount of $20,000,000.00 in the aggregate, which shall be divided into 200 equal Units of participation as a Limited Partner hereto, representing a commitment for, and the contribution to capital of $100,000.00 per Unit, with a minimum investment per Limited Partner of one unit; for and on behalf of the Partnership, the General Partner shall receive such contributions of cash or property to the capital of the Partnership from any person or persons who shall be admitted to the Partnership as Limited Partners upon their execution and delivery of the subscription agreement set forth at the conclusion herein and upon the acceptance thereof by the General Partner property contributed to the Partnership in exchange for one or more Units of Partnership shall have a fair market value on the date of exchange equal to $100,000.00 for each Unit of Interest, such fair market value being determined by the General Partner. The General Partner may, in its sole and exclusive discretion, accept Subscriptions for partial units, and anything to the contrary notwithstanding, may accept less than the previously stated minimum purchase of one unit.

(b)    The Units shall be divided severally among the Limited Partners in accordance with the number set forth on the respective Subscriptions executed and delivered by each of the Limited Partners.

(c)    Except as otherwise permitted by law, contributions to the capital of the Partnership from the Limited Partners shall not be accepted from non-accredited investors.

    **6.3  Initial Limited Partner**

The Initial Limited Partner shall, upon execution of this Agreement, make a contribution to capital in the amount of one unit or make a commitment to the unit, which shall be the total contribution required to be made by the Initial Limited Partner.  Notwithstanding any provisions of this Agreement to the contrary, the Initial Limited Partner shall be entitled to purchase one Unit of the Partnership and receive a credit for said contribution towards the total capital contribution required for a Unit.  At the option of the Initial Limited Partner, at such time as other Limited Partners are admitted, the Subscription Agreement for the Initial Limited partner may be canceled at which time the capital contributed by the Initial Limited Partner shall be returned, without interest, to the Initial Limited Partner who shall henceforth have no Interest in the Partnership whatsoever.
.

6.4 **Limited Liability of Limited Partners**

Anything in this Agreement or elsewhere to the contrary notwithstanding, the personal liability of the Limited Partners and each of them arising out of or in any manner relating to the Partnership or its business shall not be assessable and shall not exceed the amount of the capital contributions required pursuant to Section 6.2, and upon the payment of such capital contribution, the Limited Partners shall not have any further personal liability to contribute money or any other capital to or in respect of the liabilities or obligations of the Partnership. Upon the payment of each Limited Partner's capital contributions set forth in the corresponding Subscription Agreement, such Limited Partner shall not have any liability or responsibility to the Partnership or its creditors in any event whatsoever and each Limited Partner's liability shall be limited to such Limited Partner's capital contribution.

6.5 **Interest**

No interest shall be paid on the capital contributions of any Partner.

6.6 **Withdrawal**

No Partner shall be entitled to withdraw any portion of his capital account except as may be permitted by and in accordance with the terms of this Agreement.

6.7 **Use of Capital Contributions**

The total capital to be contributed by the Limited Partners shall be used and applied, at the sole and exclusive discretion of the General Partner, to carry out the purposes of the Partnership.  All capital contributions received by the Partnership from the Limited Partners in the form of cash or money shall be deposited directly into the Partnership bank account and shall be immediately available for the purposes of the Partnership.  Said funds will be dispersed at a time, method and manner to be determined by the General Partner, in its sole and exclusive discretion, for the purpose of commencing preparatory, drilling and operations of the Project.  Except as otherwise set forth herein, the General Partner shall continue to accept applications and Subscriptions for participation in the Partnership until the Partnership is fully capitalized.

7. **Loans and advances to the Partnership**

In the event that the General Partner shall determine, at any time or from time to time in its sole and exclusive discretion, that the Partnership requires additional funds (in excess of the contributions to capital of the Partnership) in order to pay the expenses and/or obligations of the Partnership, the General Partner may borrow such funds for and on behalf of the Partnership, with interest payable at rates then prevailing, from any lender, commercial bank, financial institution and/or any other entity or person including Partners; provided, however, that any loan to the Partnership shall be on a non-recourse basis whereby the lender shall have recourse against only the Partnership.  The Partners, including the General Partner, shall have no liability or obligation whatsoever for the payment thereof. Nothing contained herein shall be interpreted or construed to require the General Partner to borrow on behalf of the Partnership or to advance any of its own funds to or for the benefit of the Partnership.

8. **Powers and Duties of the General Partner**

8.1 **Powers of the General Partner**

Subject to the limitations imposed by law and this Agreement, the General Partner, in its full, sole and exclusive discretion, shall have the power to manage, control and make any and all decisions affecting the business and assets of the Partnership, including, but not limited to, the power to:

(a)  Establish, maintain and draw upon checking and other accounts in the name of the Partnership in such bank or banks, or brokerage account, or otherwise, as the General Partner may from time to time select in its sole and exclusive discretion;

(b)  Negotiate, enter into and execute any and all contracts necessary, desirable or convenient with respect to the business of the Partnership;

(c)  Execute any notifications, statements, reports, returns or other filings that are necessary or desirable to be filed with any State or Federal Agency, Commission, or Authority, including any State, or Federal Securities Commission;

(d)  Sell, exchange, dispose of, transfer, sublease or otherwise alienate all or any part of the business, none of which shall be construed as a termination within the meaning of Section 14;

(e)  Execute, acknowledge and deliver any and all instruments which are necessary to effectuate any of the foregoing or are otherwise desirable;

(f)  Employ accountants, title companies, attorneys and/or any other persons, firms, corporations, consultants or entities on such terms and for such compensation as it shall determine; and

(g)  To purchase, hold and sell securities of any sort, excepting commodities and derivatives, and any rights therein, to vote proxies and exercise all rights, on behalf of the Partnership.

8.2 **Duties of the General Partner**

The General Partner shall manage the affairs of the Partnership in a prudent and businesslike manner and shall devote such time to the Partnership affairs as is reasonably necessary for the conduct of such affairs.  It is expressly understood and agreed that the General Partner shall not be required to devote its entire time or attention to the business of the Partnership nor shall it be restricted in any manner from participating in other business or activities.

In carrying out its obligations, the General Partner shall:

(a) Render annual reports to the Limited Partners with respect to the operations of the partnership;

(b) Furnish to the Limited Partners, within 90 days after the end of each Fiscal Year, a balance sheet with a report of the receipts, disbursements, net profits, losses and cash flow of the Partnership, and the share of the net profits, losses and cash flow of each Partner for such Fiscal Year;

(c) Obtain and maintain such liability and other insurance as may be deemed necessary or appropriate by the General Partner;

(d) Deposit all funds of the Partnership in one or more bank accounts with such banks or savings and loan or trust companies as the General Partner may designate;

(e) Maintain complete and accurate books and records of all assets owned or leased by the Partnership and complete and accurate books of account (containing such information as shall be necessary to record allocations and distributions), and make such records and books of account available for review and inspection by any Partner or his duly authorized representative (at the expense of such Partner) during regular business hours and at the principal office of the Partnership upon not less than 10 business days written request of same;

(f) Prepare and distribute to all Partners, within 90 days after the end of the Fiscal Year, all reasonable tax reporting information and arrange for the preparation and filing of all necessary Federal, State and local tax returns of the Partnership;

(g) Cause to be filed such certificates and do such other acts as may be required by law to qualify and maintain the Partnership as a Limited Partnership in the State of Colorado, including without limitation, the proper filing of a Certificate of Limited Partnership;

(h) Cause the Partnership, at all times, to satisfy and comply with all the requirements and conditions of any and all loans;

45

(i)  Within ten days after receipt of notice that the Partnership is in default under the terms and conditions of any loan, mortgages, or other obligations in excess of $1,000 advise each of the Limited Partners of such default;

(j)  Cause an appropriate amendment of the outstanding Certificate of Limited Partnership to be prepared in order to properly reflect the return of all or any portion of the contributions of any Limited Partner and properly file said amendment simultaneously with or within a reasonable time after the distribution(s) representing the return of any Limited partner's contribution; and

(k)  Cause all persons dealing with the Partnership, or with the General Partner or any agent or employee of the Partnership acting on behalf of the Partnership, to be aware of the character of the Partnership as a Colorado Limited Partnership.

### 8.3 Prohibitions on Actions and Limitations of Power of the General Partner

The General Partner shall have no authority to:

(a)  Do any act in contravention to this Agreement;

(b)  Do any act which would make it impossible to carry on the business of the Partnership;

(c)  Possess Partnership Property or assign the right of the Partnership to specific Partnership Property for other than a Partnership purpose; or

(d)  Admit a person as a General Partner or as a Limited Partner except as otherwise expressly permitted in this Agreement.

### 8.4 Reliance on Acts of the General Partners

No financial institution or any other person, firm, corporation or entity of any kind dealing with the General Partner shall be required to ascertain whether the General Partner is acting in accordance with this Agreement, but such financial institution or such other person, firm, corporation or entity shall be protected in relying solely upon the deed, transfer or assurance of and the execution of such instrument or instruments by the General Partner.

### 8.5 Liabilities of the General Partner

In carrying out their duties hereunder, the General Partner shall not be liable to the Partnership or to any other Partner for any actions taken in good faith and reasonably believed to be in the best interests of the Partnership, and the General Partner shall only be liable for willful misconduct, fraud, and/or breach of its obligations under this Agreement.

### 8.6 Employment by or Dealings with Partnership

The General Partner may, directly or indirectly, engage itself, any partner or persons or firms or entities associated with any partner, on behalf of the Partnership for specific purposes of providing services to the Partnership and the General Partner may otherwise deal with the Partnership on terms and for compensation or commissions that are fair and equitable under the circumstances; provided, however, any and all fees or prices to be charged to the Partnership in connection therewith shall not exceed those customarily charged for such in the area or in a comparable geographical location by persons dealing at arm's length and having no affiliation with the recipient.

## 9. Rights and Prohibitions of Limited Partners

### 9.1 Rights of limited Partners

Limited Partners shall not in any way be prohibited from or restricted in engaging or owning an interest in any other

business venture of any nature including any venture which might be competitive with the Business of the Partnership, and, subject to Subsection 8.6, the Partnership may engage Limited Partners or persons or firms or entities associated with them for specific purposes and may otherwise deal with such Limited Partners.

Each Limited Partner shall be entitled to (i) have the Partnership books maintained at the principal place of business of the Partnership, and during normal, business hours with a prior appointment with the General Partner, inspect and copy any of them; (ii) have on written demand true and full information of all matters affecting the Partnership and a formal  account of Partnership affairs whenever circumstances render it just and reasonable, (iii) have dissolution and winding up of the Partnership as provided by this Agreement, and (iv) have such additional rights as are elsewhere provided in this Agreement.

### 9.2 Prohibitions with Respect to Limited Partners

No Limited Partner shall have the right:

(a) To take part in the management and control of the Partnership business or to sign for or to bind the Partnership, such power being vested solely in the General Partner;

(b) To have his capital contribution repaid, except to the extent provided in this Agreement, or to demand property other than cash in payment of his Partnership capital contribution;

(c) To require partition of partnership property or to compel any sales or appraisement of Partnership assets or sale of a deceased Partner's interest therein, notwithstanding any provisions of law to the contrary; or

(d) To sell or assign his interest in the Partnership or to constitute the vendee or assignee there under a substituted Limited Partner except as provided in this Agreement.

### 9.3 Death. Incompetence or Bankruptcy of Limited Partner

The death, incompetence or bankruptcy of a Limited Partner shall not dissolve or terminate the Partnership. Upon the death, incompetence or bankruptcy of a Limited partner, his executor, administrator or personal representative shall have the same rights that such Limited Partner would have had under this Agreement as if he had not died or become bankrupt or incompetent. The successor in interest of a deceased Limited Partner shall be admitted as a substituted Limited Partner, however, only upon compliance with Section 11.3.

## 10. Profits, Losses and Cash Flow

### 10.1 Determination of Profits and Losses

The net profits and net losses of the Partnership shall be determined in accordance with the accounting methods followed by the Partnership for federal income tax purposes and shall specifically include an operating deficit account.

### 10.2 Allocation of Profits and Losses:

(a) Each Partner shall have and own an undivided Interest in the Partnership equal to his respective percentage Interest in the Partnership in accordance with the terms hereof.  No Partner shall have any right whatsoever to partition any property or assets of the Partnership.

(b) Subject to this Agreement, the percentage of Interest of the Partners in the Partnership for purposes of allocating net profits, net losses, cash flow arising from operation of the Project, shall be as set forth herein.

(c) In any given fiscal year in which the Partnership has incurred an ordinary loss as reported for federal income tax purposes, the loss shall be allocated to the Partners and divided among them pro-rata in proportion to the respective number of interests owned by each of them.

(d) Notwithstanding anything herein to the contrary, the allocation of net profits shall be divided as follows:  The first 50% is paid as a Management Fee to the General Partner.  After the payment of Management Fees, 100% to the Partnership to the Partners.  Of the amount to be received by the Partnership, the General Partner will receive 0% of the 100% and the Limited Partners will collectively receive 100% of the 100%.  The amount to be paid to the Limited Partners shall be allocated among the Limited Partners pro-rata in proportion to the respective number of Interests owned by each Limited Partner.

(e) Profits and losses to be allocated to each Partner shall be maintained in such Partner's Capital Account.  For the purpose of this Agreement, the term "Capital Account" of any Partner as of any date shall mean the amount of cash or property contributed by such partner to the capital of the Partnership in accordance with the provisions hereof, properly adjusted to reflect the following:

   i.   the distributive shares to such partner of income, gain, loss, deduction or credit of the Partnership, the distributive share of such items of the Partnership for the period from the close of the last such Fiscal Year of the Partnership to such date, and

   ii.  Distributions by the Partnership to such Partner, including, if such date shall not be the close of the Fiscal Year of the Partnership, distributions by the Partnership to such Partner during the period from the close of the last such Fiscal Year of the Partnership to such date.

(f) Except as expressly provided herein, no Partner shall be entitled to withdraw any amount from his Capital Account in the Partnership and no Limited Partner shall have the right to demand and receive property other than cash in return for any contributions to the capital of the Partnership.

(g) Except as expressly provided herein, the General Partner shall make no distribution of the property to the Partnership to any Partner with respect to this interest in the Partnership and notwithstanding anything herein to the contrary, the General Partner shall make no distribution or take any other action in violation of Colorado Partnership Law.

(h) If there is a transfer or substitution of, or any other change in the number of Interests of any Limited Partner during the period covered by allocations hereunder, a daily net profit or net loss shall be computed by dividing the net profit or net loss for the period by the number of days in the period and assigning the result to each day in the period, and that portion of the daily net profit or net loss for each day to be allocated to the Limited Partner shall be so allocated in the proportion to the number of their respective Interests as of the close of business on each such day; provided, however, that profits and losses arising from the disposition of Partnership assets shall be taken into account as of the date' thereof.

10.3 **Distribution of Net Cash Flow**

(a) For and on behalf of the Partnership, the General Partner shall periodically distribute the Net Cash Flow of the Partnership to the Partners pro-rata in accordance with each Partner's respective Interest in the Partnership. Distributions of the Net Cash Flow may be made monthly, quarterly, semi-annually, or annually at the sole and exclusive discretion of the General Partner.  The General Partner will distribute as frequently as funds are made available and anticipates monthly distributions.  All such distributions shall be made in proportion to each Partner's respective percentage Interest as of the last day of the calendar month immediately preceding the date of the distribution.

(b) Distributions made with respect to any Fiscal Year of the Partnership shall be subject to adjustment, if any, by reference to the annual financial report with respect to such Fiscal Year.  In the event of any adjustment in any amount, such additional amount shall be distributed to the Partners on the same basis as if made on the day immediately following the end of such Fiscal Year as soon as practicable after delivery of such fiscal report and shall be deemed to be a distribution with respect to such Fiscal Year. The General Partner may, at its sole and exclusive discretion, reduce any subsequent distributions with respect to the Fiscal Year immediately following by the excess of the amount distributed over the amount required to be distributed with respect to the prior Fiscal Year.

(c) Except as otherwise provided herein or in Section 707 of the Code, the distributive shares of the items of income, gain, loss, deduction and credit of the Partnership for each taxable year of the Partnership during the term hereof shall be allocated among the Partners, subject, however, to the effect of any adjustments as a consequence of any decision made in accordance with Section 10 hereof with respect to such Year.

(d) In the case of distribution of property of the Partnership to any Partner or transfer of the interest of any Partner in the Partnership pursuant to the provisions hereof, the Partnership may, but shall not be required to, file an election contemplated by Section 754 of the Code in order to adjust the basis of such property and the Partnership for federal income tax purposes in the manner provided by Section 734 and 743 of the Code.

(e) Determination of the Net Cash Flow with respect to any period shall be a return of any and all payments and/or disbursements made or required to be made hereunder as to the day-to-day operations of the Partnership including, but not limited to, expenses, liabilities, payments to the Operator, payments to the General Partner and cash reserves established by the General Partner that, in its sole and exclusive discretion, are reasonably anticipated to be necessary to maintain liquidity of the Partnership or for anticipated expenses or liabilities or for the efficient and orderly conduct of the business of the Partnership.  Determination of the Net Cash Flow shall not include the following:

> i. Net proceeds resulting from a loan, financing, sale or any disposition of all or substantially all of the entire Project;

> ii. Contributions of capital to the Partnership;

> iii. Costs of organization of the Partnership, including but not limited to, costs of syndication of the Units;

> iv. Expenditures for the acquisition of property by the Partnership and for capital improvements or replacements to the extent, however, that such expenditures are financed by contributions to the capital of the Partnership; and

> v. Distributions to the Partners by the Partnership in accordance with this Section 10.3 hereof, provided, however, that the Net Cash Flow of the Partnership shall include any other funds, including but not limited to any amount previously set aside as reserves by the General Partner and no longer regarded as reasonably necessary in the efficient conduct of the Business of the Partnership, deemed to be available for distribution and designated as part of the Net Cash Flow of the Partnership by the General Partner in its discretion.

### 10.4 **Distribution of Proceeds of Sale or Termination of Partnership.**

(a) In the event of a sale, complete disposition or termination of the Partnership, the General Partner shall distribute the net proceeds resulting from such, if any, in the following order of priority:

> i. First, to the payment of all debts, expenses and liabilities of the Partnership (including, but not limited to any loans due and/or fees owed to the General Partner by the Partnership); then

> ii. Next, to any reserves that the General Partner, in its sole and exclusive discretion, deems necessary to set up in order to provide for any contingent liabilities of the Partnership, whether known or unknown at that time.  The Partnership does not anticipate any contingent liabilities.  After the expiration of such reasonable period of time as the General Partner, in its sole and exclusive discretion, deems advisable, the balance of such reserves, if any, shall be distributed in the manner as provided in this Section 10; and,

> iii. Next, to the payment of an amount equal to the positive capital account balance of each Partner, if any.

10.5 **Allocation of Taxable Profits and Losses on Sale.**

(a) The taxable profits and losses of the Partnership arising from the sale or substantially all of the assets of the Partnership, shall be allocated as follows:

      i. The balance of any profits or loss, if any, shall be allocated 100% to the Limited Partners, in proportion to and in no event greater than such Limited Partner's percentage of ownership in the Partnership.  In the event the General Partner elects to require restoration of capital account deficits, then allocation shall be made as is then necessary to comply with applicable Treasury Regulations 704(b).

11. **Transfer of Interests**

11.1 **General Partners:**

Subject to Sections 12 and 13, the interest of the General Partner as such, shall not be transferable, and any attempted assignment shall be ineffective to transfer any such interest.

11.2 **Limited Partners:**

Subject to Sections 11.4, 11.5, and 11.6, part or all of the interest of a Limited Partner shall be assignable, but the assignee shall not become a substituted Limited Partner, except pursuant to Section 11.3. An assignee who does not become a substituted Limited Partner shall have no rights hereunder except to receive any allocations or distributions which (but for the assignment) would have been made to the assignor. No assignment of the interest of a Limited Partner shall be effective as respects the Partnership until a duplicate original copy of the instrument of assignment, properly executed, shall have been received by the Partnership.  In the event that any Limited Partner shall wish to sell all or any part of his interest in the Partnership, then, as a condition precedent to the sale by such Limited Partner thereof, such Limited Partner shall give to the General Partner written notice containing a copy of a bonafide, legally enforceable written offer from a third party forthwith to purchase such interest for a consideration consisting solely of cash to be paid upon the assignment of such interest free and clear of all liens, encumbrances, equities and claims except as provided herein. For a period of 90 days after receipt of such notice from such Limited Partner, the General Partner shall have an option to purchase such interest from such Limited Partner for the same price set forth in the bonafide offer contained in such notice hereunder. If the General Partner shall waive its rights hereunder or shall fail to exercise its option to purchase such interest within the 90 day period, then the option of the General Partner hereunder shall be suspended at which time such Limited Partner shall have 30 days in which to accept the written offer to purchase such interest as contained in such notice and shall have the right to transfer such interest in accordance with the terms and provisions of such offer.

Nothing contained in this Section 11.2. shall prevent any Limited Partner from transferring his interest herein, in whole, or in part, whether by Will or into estate, by inter vivo gift, by sale for consideration, by distribution or liquidation or merger of consolidation, by distribution or liquidation or otherwise to any associate thereof. The term "associate", as used herein shall include (i) the Partnership; (ii) the General Partner; (iii) any corporation or organization of which such Limited Partner is, directly or indirectly, the beneficial owner of 50% or more of the equity securities thereof having voting control; (iv) any trust or other estate in which such Limited Partner has a substantial beneficial interest or as to which such Limited Partner serves as trustee or in a similar capacity having control; (v) any individual, corporation, organization, trust or other estate which is the beneficial owner of 50% or more of the equity securities of such Limited Partner; (vi) any substantial beneficiary of such Limited Partner; (vii) any spouse, child, grandchild or parent of such Limited Partner; (viii) any principal of such Limited Partner, and (ix) the United States, any state, territory, any political subdivision thereof, or the District of Columbia.

Notwithstanding the foregoing in this Section 11.2, nothing contained herein shall be interpreted or construed to permit any Limited Partner (i) to assign all or any part of his percentage interest in the Partnership to any individual person who shall

be under legal age, to any non-resident alien individual or foreign partnership referred to in the Code; or (ii) to cause a termination of the Partnership in accordance with Section 708 (b) (1) (B) of the Code.

### 11.3 Substitution of a Limited Partner

In the event of a transfer pursuant to the provisions of this Section 11, any transferee shall become only an assignee of a Limited Partner and shall not have the rights of a substituted Limited Partner, unless, with the approval of the General Partner, which approval may be withheld for any reason, such transferee shall execute any addendum to this Agreement, agreeing to be bound by all the terms and provisions hereof, to assume all the obligations of the transferor Limited Partner hereunder and to reimburse the Partnership for any costs incurred in connection with any action taken by the Partnership.

### 11.4. Legal Disabilities

A Limited Partner's interests in the Partnership or any portion thereof shall not be assigned or transferred to any person who is insane, incompetent, or has not reached legal age or to a person or entity not lawfully empowered to own such interest, and any assignment or transfer directly to a person or entity under any such disability may be disregarded by the Partnership in its discretion; provided, however, that a Limited Partner may transfer his interest free of any restrictions imposed by this Section 11.4 to a trust for the benefit of his spouse and/or issue or to a custodian for his minor issue, notwithstanding the legal disability of such beneficiaries.

### 11.5 Termination of Partnership

No Partner's interest or any portion thereof shall be transferable or assignable to the extent that any such transfer or assignment would result in the termination of the Partnership for Federal income tax purposes and any attempted assignment in violation hereof shall be ineffective to transfer any such interest.

### 11.6 Effects of Sales or Other Disposition of Interests

In the event a Limited Partner sells or otherwise disposes of his Interest during a Fiscal Year, income, expenses, deductions, credits, gains, losses and Cash Flow with respect to such Fiscal Year allocable to such Partnership interests during which Fiscal Year shall be allocated among the persons (including corporations, trust estates and partnerships) who were holders of such Interests during such Fiscal Year, in proportion to the number of full days that each such holder was recognized as the owner on the records of the Partnership of such Interests during such full calendar year, without regard to the results of the Partnership operations (including extraordinary gains or losses) for the period of the Fiscal Year that the Interest was actually held by the person selling or otherwise disposing of the Interest and without regard to the date, amount, or recipient of any distribution which may have been made with respect to such Interest for the Fiscal Year of sale or other disposition.

### 11.7 Investment Representation: Securities Restriction

All of the Partners hereby represent and warrant that they are purchasing their Interests in the Partnership for their own account and not with a view or intent to the distribution or resale thereof. The offering and sale of the Interests pursuant to this Agreement has not been registered under the Securities Act of 1933, and notwithstanding any other provisions of this Agreement, all Partners agree that no Interests may be sold or transferred to any person, unless (i) such interest is registered under the Securities Act 1933, or (ii) an opinion of counsel satisfactory to the Partnership is obtained to the effect that such registration is not necessary.

### 12. Retirement and/or Withdrawal of General Partner

The General Partner may elect to retire and/or withdraw from the Partnership at any time upon 60 days prior written notice to all Limited Partners; provided, however, that the retiring General Partner shall not be relieved of its obligations to the Partnership and Limited Partners arising prior to its retirement or withdrawal, and any obligations and/or liabilities resulting or arising from event, actions, inactions or transactions occurring during the period in which it was  the General Partner.

### 13.  Distribution Upon Termination of the Partnership

13.1 **Priority of Distribution of Assets of the Partnership**

In the event of termination of the Partnership, the affairs of the Partnership shall be wound up and an accounting made by the General Partners or Trustee. Thereafter, there shall be distributions of cash available as follows:

(a) To the payment of debts, liabilities and liquidation of the Partnership as well as expenses of liquidation.

(b) To the setting up of any reserves that the General Partner may deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Partnership; provided, however, that at the expiration of such time as the General Partner deem advisable (in the event more than two years from the event of termination and dissolution), the balance of such reserves remaining after payment of such contingent liabilities shall be distributed in a manner hereinafter set forth.

(c) The balance, if any, shall be distributed to the Partners in accordance with and to the extent of their capital account balance.

(d) The balance of all cash proceeds available shall be paid to the Limited Partnership.  All distributions to the Limited Partners shall be distributed among the Limited Partners pro-rata in proportion to the respective number of Interests owned by each of them.

13.2 **Election to Continue the Partnership**

Upon the retirement, insolvency, death, adjudication of bankruptcy, insanity or mental incompetence of a General Partner, all of the Limited Partners may elect, within 90 days after notice of such event, to reconstitute and continue the Partnership and, if there is not a remaining General Partner, the Limited Partners may designate a substituted General Partner(s). If a substituted General Partner(s) is so selected and accepted, such substituted General Partner(s) shall acquire (i) all of the departed General Partner's interest by paying to it the fair market value of such interest.  Any dispute as to such fair market value shall be promptly submitted to an arbitration committee composed of three persons, one chosen by the departed General Partner, one chosen by the substituted General Partner(s) and the third chosen by the other two. The procedures of such committee shall conform to the rules of the American Arbitration Association. Any portion of the departed General Partner's interest not so acquired shall become a Limited Partner Interest in accordance with Section 13.1. Subject to other written agreements and exceptions accepted by all the Limited Partners, the substituted General Partner(s) shall assume from after the date of substitution and upon becoming a party to this Agreement, all the rights, powers and obligations of a General Partner under this Agreement.

13.3 **Time for Winding Up**

A reasonable time shall be allowed for the orderly liquidation of assets of the Partnership and the discharge of liabilities to creditors so as to enable the General Partner to minimize the normal losses attendant upon a liquidation.

13.4 **Final Accounting**

Each of the Partners shall be furnished with a statement, certified by the Partnership's independent accountants, setting forth the assets and liabilities of the Partnership as of the date of complete liquidation. Upon the compliance by the General Partners or Trustee, as is applicable, with the foregoing distribution plan, the Limited Partners shall cease to be such, and the General Partner shall execute and cause to be filed a Certificate of Cancellation of the Partnership and any and all other documents necessary with respect to termination and cancellation.

14. **Financing Proceeds**

Subject to all other provisions of this Agreement, the General Partner, in its sole and exclusive discretion, may when necessary and in order to carry out the purpose and intent of the business of the Partnership, enter into financing arrangements with commercial banks or other financial institutions to borrow funds at prevailing interest rates on a strictly non-recourse basis. The foregoing shall not be deemed to obviate or otherwise lessen the responsibility and obligation that any third party may have to the Partnership.

### 15. **Amendment**

This Agreement may be amended by a written notice executed by the General Partner, provided, however that (i) it may be modified from time to time by the General Partner to reflect any change in the Partners or in the number of Interests owned by any Partner or for the purpose of clarification without changing the substance of the Agreement; and (ii) no amendment shall reduce a Partner's interest in the Partnership.

### 16. **Power of Attorney**

#### 16.1 **Powers**

Each of the Limited Partners hereby irrevocably constitutes and appoints the General Partner as his true and lawful attorney-in-fact to act in his name, place and stead and to make, execute, swear to, acknowledge, deliver and file:

   (a) Any certificates or other instruments which may be required to be filed by the Partnership under the laws of the State of Colorado or any jurisdiction in which the Partnership shall transact Business or in which the General Partner shall deem it advisable to file;

   (b) Any documents, certificates or other instruments, including without limiting the generality of the foregoing, any and all amendments and modifications of this Agreement or of the instruments described in Section 16.1(a), which may be required or deemed desirable by the General Partner to effectuate the provisions of any part of this Agreement or necessary to continue and to carry on the business of the Partnership; and

   (c) All documents, certificates and/or other instruments that may be required to effectuate the dissolution and termination of the Partnership or the organization of any new limited partnership occasioned by designated events as herein before provided.

The power of attorney granted hereby shall not constitute a waiver of or be used to avoid the rights of the Limited Partners to approve amendments to this Agreement or be used in any manner inconsistent with the status of the Partnership as a Limited Partner or the limited liability of the Limited Partners.

#### 16.2 **Survival of Power**

It is expressly intended by each, every and all of the Limited Partners that the foregoing power of attorney is coupled with an Interest, is irrevocable and shall survive the death and/or adjudication of incompetence or insanity of any Limited Partner. The foregoing power of attorney shall survive the delivery of an assignment by any of the Limited Partners of his entire interest in the Partnership, except that where an assignee of such entire interest has become a substituted Limited Partner, then the foregoing power of attorney of the assignor Limited Partner shall survive the delivery of such assignment for the sole purpose of enabling the General Partner to execute, acknowledge and file any and all instruments necessary to effectuate such substitution.

### 17. **Miscellaneous Provisions**

#### 17.1. **Non-Disclosure and Non-Circumvention Obligation**.

All Confidential Information received or acquired by the Limited Partners from the General Partner or the Partnership shall be subject to the following:

   (a) All Confidential Information shall be held in strict confidence by the Limited Partner and the Limited Partner shall protect the confidentiality of the Confidential Information with at least the same diligence and degree of care with which it protects the confidentiality of its own Confidential Information but in no event no less than a reasonable degree of care; and

   (b) All Confidential Information shall not be used by the Limited Partner to circumvent the General Partner or the Partnership or used for any purpose other than the purpose referred to in this Agreement; and

(c) The Limited Partners will not use any Confidential Information to circumvent or compete with the General Partner.

(d) The terms and conditions of this Agreement are and shall be considered confidential and the Limited Partners shall not disclose such to any person or entity other than the Limited Partner's attorney, legal counsel, income tax advisor and/or income tax preparer.

### 17.2 Books of Account

The General Partner shall keep and maintain, or cause to be kept and maintained, complete and accurate books, records and accounts of the Partnership. The Partnership books shall be kept on the accounting method, cash or accrual basis or such other method in accordance with generally accepted accounting principles consistent with those employed for determining partnership income for Federal income tax purposes. All books, records and accounts of the Partnership shall be maintained at the principal office of the Partnership. All Partners shall have the night to examine such books, records and accounts at reasonable hours upon 10 business day's written request of same.

### 17.3 Accounts and Accounting Decisions

Certified Public Accountants (the "Accountants") shall be retained by the General Partner on behalf of the Partnership. All decisions as to accounting matters, except as specifically provided to the contrary herein, shall be made by the General Partner in accordance with generally accepted accounting principles consistently applied. Such decisions shall be acceptable to the Accountants employed by the Partnership, and the General Partner may rely upon the advice of the Accountants (or their replacements or successors) as to whether such decisions are in accordance with generally accepted accounting principles.

### 17.4 Addresses and Notices

The address of the Partnership shall be at its principal office. The address for each Partner for all purposes shall be as set forth next to each Partner's name on the Schedule annexed hereto, or such other address of which the General Partner has received written notice. Any notice, demand or request required or permitted to be given or made hereunder shall be deemed given or made when delivered or sent by overnight or certified mail, return receipt requested to such Partner at such addresses.

### 17.5 Titles and Captions

All captions and titles herein are for convenience only. They do not form a substantive part of this Agreement, and they shall not restrict, enlarge or have any effect whatsoever on any of the substantive provisions of this Agreement.

### 17.6 Pronouns and Plurals

All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine, neuter, singular or plural as the identity of the person or persons and/or the context of this Agreement may require.

### 17.7 Further Action

The parties hereto shall, promptly and without charge, execute and deliver all documents, provide all information and take or forebear from all such action as may be necessary or appropriate to achieve the purposes of this Agreement.

### 17.8 Entire Agreement

This Agreement contains the entire understanding between and among the parties hereto and supersedes any and all prior understandings and agreements between or among them respecting the subject matter of this Agreement.

### 17.9 Counterparts

This Agreement may be executed in several counterparts, which taken together and all so executed, shall constitute one agreement, binding on all parties hereto, notwithstanding that all the parties are not signatory to the original of the same counterpart.

17.10 **Applicable Law**

This Agreement and all questions and/or disputes related hereto shall be governed by and interpreted in accordance with the laws of the State of Colorado.  All questions and/or disputes related hereto shall be heard by a Court of competent jurisdiction without a jury and the parties hereby designate the County of Denver, State of Colorado as the exclusive jurisdiction for such.  If an action is commenced to enforce the terms of this agreement, the losing party shall reimburse the prevailing party for any and all reasonable legal fees and court costs associated with same.  The failure or delay in exercising or enforcing any right hereunder shall not operate as a waiver of same.

17.11 **Benefits**

This Agreement shall inure to the benefit of and shall bind the parties hereto, their permitted successors and permitted assigns.

17.12 **Severability**

The validity or unenforceability of any provision of this Agreement in a particular respect shall not affect the validity or enforceability of any other provision of this Agreement or of the same provision of any other respect.  In the event that any of the terms or provisions of this Agreement are held to be invalid or unenforceable for any reason, the doctrine of severability shall apply and the remaining terms and provisions of this Agreement shall be valid, binding and enforceable. By including this provision, the parties do not intend to imply that any of the terms of this Agreement are invalid or unenforceable.

17.13 **Successors in Interest**

Except as otherwise provided herein, all provisions of this Agreement shall be binding upon, inure to the benefit of, and be enforceable by and against the respective theirs, executors, administrators, personal representatives, successors, and assigns of each Partner.

18. **Designation and Acceptance of Agent for Service of Process**

The name and address of the agent designated for service of process on behalf of the Partnership is as follows:

**Name:**          Ryan Tomazin

**Address:**       2901 E. Alameda
                   Denver, Colorado 80209

IN WITNESS WHEREOF, the parties hereto have executed this Agreement and Certificate of Limited Partnership on the date and year above first written.

ATTEST:

_____
Witness

GENERAL PARTNER
R2 Capital Group LLC

By: _____
    RANDELL A. VEST©, Senior-Managing Member

INITIAL LIMITED PARTNER
Hassayampa Investments, Inc.

By: _____

_____
Witness

    Robin Neihardt, Principal

56