# DECLARATION OF KYONG J. KOH
# PURSUANT TO 28 U.S.C. 1746

I, Kyong J. Koh, hereby make the following declaration based upon my personal knowledge:

## I. BACKGROUND

1. I am a Commodity Futures Trading Commission's ("Commission" or "CFTC") futures trading investigator. I have been asked to review and/or determine:

    a. the corporate status, Commission registration and National Futures Association ("NFA") membership status for Ryan Tomazin ("Tomazin"), Ryan Madigan ("Madigan") and Randell A. Vest ("Vest"), RAST Investor Group, LLC ("RAST"), Madigan Enterprises, Inc. ("Madigan Enterprises"), Bulletproof Vest, Inc. ("Bulletproof Vest"), and R2 Capital Group LLC ("R2 Capital");

    b. R2 Capital agreements with its customers ("pool participants");

    c. the number and identity of pool participants with accounts at R2 Capital, and in particular those with accounts in the limited partnership known as the R2 Commercial Capital Partners I L.P. ("Commercial Pool");

    d. the dollar amount of Commercial Pool participant deposits given to R2 Capital;

    e. representations made by R2 Capital and its principals to Commercial Pool participants who made cash deposits;

    f. the existence of trading accounts in the name or control of R2 Capital, the Commercial Pool and their principals;

g. total deposits, withdrawals, transfers, and profits and losses for the trading accounts in the name of R2 Capital and the Commercial Pool held at Futures Commission Merchants ("FCMs") registered with the Commission; and

h. deposits, withdrawals, and transfers between bank accounts in the name of Tomazin, Madigan, Vest, RAST, Madigan Enterprises, Bulletproof Vest, the Commercial Pool and R2 Capital, and the use of the funds.

2. I am over 21 years of age and employed as a futures trading investigator in the Division of Enforcement ("Division") of the Commission. I have worked as an investigator for the Commission since December 1997. I received a Bachelor of Science degree in Finance from The University of Maryland and a Masters in Business Administration from The Pennsylvania State University.

3. My responsibilities as a Futures Trading Investigator include the investigation of registered and unregistered commodity futures, foreign exchange ("forex"), and options trading firms and individuals located throughout the United States, in order to ensure compliance with and enforcement of the Commodity Exchange Act and the rules and regulations promulgated thereunder. I routinely analyze and review financial records, including but not limited to, trading account statements and bank records.

## II. SUMMARY

4. As discussed in detail below, my analysis and findings include the following:

a. From at least December 2009 through the present (the "relevant period"), Tomazin, Madigan and Vest owned, operated and controlled R2 Capital individually and through their respective holding companies, RAST, Madigan Enterprises, and Bulletproof Vest (collectively, "holding companies").

b. During the relevant period, R2 Capital owned and operated at least two commodity pools, one known as R2 Commercial Capital Partners I L.P. (the "Commercial Pool"), and the other known as the R2 Global Fund I L.P. ("Global Fund").

c. During the relevant period, R2 Capital, through Tomazin, Madigan, and Vest, solicited and accepted approximately $2.4 million from at least four (4) customers to participate in a commodity pool, *i.e.*, the Commercial Pool, to trade foreign exchange ("forex"). In mid-2010, R2 Capital switched from trading in forex to trading in futures contracts, including E-mini S&P 500 futures contracts and E-mini Dow futures contracts.

d. During the relevant period, of the approximately $2.4 million it took in, R2 Capital lost approximately $1.2 million through trading forex and financial futures at two FCMs.

e. The remaining approximately $1.2 million of pool participant funds that was not lost trading was transferred, deposited or comingled into the individual bank accounts of Tomazin, Madigan and Vest and their holding companies.

f. Tomazin, Madigan and Vest then used these funds for personal expenses or other unauthorized expenditures.

g. During the relevant period, Tomazin, Madigan and Vest, individually and as the owners of R2 Capital, distributed to at least one prospective and actual pool participant a "Confidential Information Memorandum," a "Limited Partnership Agreement," and a "Subscription Agreement," *See* Exh. 1, which contained the following representations:

1. R2 Capital would receive a management fee of 50% of the profits earned by the Commercial pool, only if profits were earned. All remaining profits would be divided on a pro rata basis. *Id.*, Agreement and Certificate of Limited

Partnership of R2 Commercial Capital Partnership, L.P. at § 10.2(d).

2. All pool participant funds would be deposited directly into the Commercial Pool's bank account and there would be no commingling of funds between the Commercial Pool and R2 Capital except for the payment of bills or disbursements on behalf of the Commercial Pool. *Id.* at § 6.7.

3. There would be no loans between the Commercial Pool and any other entities controlled by R2 Capital or any person or entity directly or indirectly controlling, controlled by or under common control of R2 Capital (*id.* at 15);

4. The Commercial Pool would be subject to an annual third party audit. *Id.* at 19.

5. R2 Capital would maintain "complete books of account" for the Commercial Pool, and R2 Capital would furnish to pool participants monthly statements with profits or losses and estimated expenses (*id.* at §§ 8.2(e), 17.2); and

6. R2 Capital, as the general partner, would not possess Commercial Pool property. *Id.* at § 8.3.

h. During the relevant period, Tomazin, Madigan and Vest, transferred and purportedly loaned Commercial Pool assets to themselves; did not inform pool participants that their investment was losing money and/or the extent to which it was losing money; changed the investment strategy of the Commercial Pool from trading forex to trading financial futures—without informing at least half of the pool participants of this change; did not provide all pool participants with regular monthly account statements and annual reports; did not conduct any audits of the Commercial Pool; and did not inform Commercial Pool participants that they had transferred or purportedly

loaned any of the approximately $1.2 million in Commercial Pool participant funds to themselves.

## III. RECORDS REVIEWED

5. I have reviewed the following documents and records and performed the following tasks in connection with the preparation of this declaration:

a. Interviewed Commercial Pool participants Tyson Morgan, a principal of Northport Investments, LLC ("Northport"), Sean Irvine and Derek Miller, and reviewed their sworn declarations and attachments thereto.

b. Reviewed US Bank accounts documents and transactions in the names of RAST Investor Group, LLC for the period of October 10, 2008 through January 31, 2014; R2 Commercial Capital Partners I LP for the period of January 13, 2010 through January 31, 2014; and R2 Capital Group, LLC for the period of November 12, 2008 through January 31, 2014, produced by the US Bank pursuant to an investigative subpoena issued by the Commission. US Bank accounts documents and transactions in the names of Ryan J. and Sara Tomazin for the period of December 2010 through November 2013, provided by the NFA from their own investigation.

c. Reviewed Fifth Third Bank accounts documents and transactions in the names of Randell A. Vest or Jenna B. Vest for the period of February 2010 to June 2010, account ending in #8753; Randell A. Vest, later renamed Randell A. Vest or Jenna Blake Forti, for the period of January 2009 through November 2009, account ending in #4751; Randell A. Vest for the period February 2010 through June 2010, account ending in #8738; Randell A. Vest, for the period of October 2009 through November 2009, account ending in #5329; Randell A. Vest, account ending in #7743; Ryan M. Madigan for the period of

5

September 2013 to February 2014, account ending in #9884; Ryan M. Madigan or Dina Madigan, for the period of April 2009 through March 2014, account ending in #9396; Ryan M. Madigan, account ending in #5816; Invest Financial Group, Inc., account ending in #0658; Invest Financial Group, account ending in #1037; Texan Certified Homes, Inc., account ending in #0930; Bulletproof Vest Incorporated, account ending in #6855; Joseph W. Madigan or Ryan M. Madigan or Claudia F. Madigan, account ending in #3846; produced by the Fifth Third Bank pursuant to an investigative subpoena issued by the Commission.

 d. Reviewed First Western Bank account documents and transactions regarding Ryan Tomazin and RAST Investor Group, produced by the First Western Bank pursuant to an investigative subpoena issued by the Commission.

 e. Reviewed Peoples United Bank account documents and transactions in the names of Bulletproof Vest, Inc., accounts ending in #7750 and #3036, produced by the Peoples United Bank pursuant to an investigative subpoena issued by the Commission.

 f. Sent, pursuant to Section 4g of the Commodity Exchange Act, on February 14, 2014, a production demand to FCMs registered with the Commission. The Section 4g demand required the FCMs to provide trading information in their possession for R2 Capital, Tomazin, Vest, Madigan, RAST, Bulletproof Vest, and Madigan Enterprises. In response, two FCMs registered with the Commission provided documents and statements for accounts held by the Commercial Pool and R2 Capital, each at a different FCM, during the relevant period: one trading account in the name of R2 Commercial Capital Partners I LP at Peregrine Financial Group ("PFG") which traded exclusively forex, from January 2010 through July 2010 (the "PFG Account"); the other trading account in the

name of R2 Capital Group, LLC, at Interactive Brokers, LLC ("IBL"), which traded financial futures products, but not forex, from August 2010 until July 2013.

g. Reviewed documents produced by Northport, a private equity fund based in Northfield, Illinois, pursuant to an investigative subpoena issued by the Commission, including email communications, account trading statements, and other materials relating to Northport's investment with R2 Capital.

h. Reviewed registration records provided by the National Futures Association ("NFA") for the named individuals and entities.

i. Reviewed documents and analyses provided by the NFA in connection with its investigation of R2 Capital and Vest, including the NFA's Member Responsibility Action ("MRA") and Associate Responsibility Action ("ARA") filed December 20, 2013.

j. Reviewed Hein and Associates documents produced pursuant to a Commission investigative subpoena which included the accounting services for R2 Capital Group and the R2 Commercial Pool.

k. Reviewed Spicer Jeffries documents produced pursuant to a Commission investigative subpoena which included accounting paperwork for R2 Global Fund.

l. Reviewed state, business, networking, company and corporation website information on the creation, status and relationships of Tomazin, Madigan, Vest, their respective holding companies, and R2 Capital.

## IV. **FINDINGS AND ANALYSIS**

**Corporate Status and Relationships Between Individuals and Entities**

6. R2 Capital Group LLC is a Colorado limited liability company created by Ryan Tomazin in November 2008 and located at Tomazin's home address: 2901 East Alameda Ave.,

Denver, CO 80209.  *See* Exh. 2, Articles of Organization, R2 Capital.  It was initially jointly and equally owned and controlled by Ryan Tomazin and Ryan Madigan.  Exh. 3, R2 Capital Group, LLC Operating Agreement at 6.  R2 Capital's ownership was amended in July 2009 as Tomazin, Madigan and Randell Vest, through their respective holding companies – RAST, Madigan Enterprises and Bulletproof Vest – assumed total and equal control, ownership and management of R2 Capital.  Exh. 4, R2 Capital Group, LLC Operating Agreement Amended As of July 1, 2009.  R2 Capital was never registered with the Commission in any capacity until September 27, 2013, when it registered as a Commodity Pool Operator ("CPO").

7. Ryan Tomazin was a resident of Denver, Colorado and then Stamford, Connecticut, during the relevant period.  Tomazin formed R2 Capital as a limited liability company, with himself as its registered agent.  Tomazin has never been registered with the Commission in any capacity.  Exh. 5, NFA Certification of Non-Registration.

8. RAST Investor Group, LLC ("RAST"), is a limited liability company formed in 2008 in Denver, Colorado by Ryan Tomazin.  Exh. 6, Organization Documents for RAST Investor Group, LLC.  It is owned by Tomazin and his wife, and through which Tomazin co-owned, controlled and operated R2 Capital.  RAST has never been registered with the Commission in any capacity.  Exh. 7, NFA Certification of Non-Registration.

9. Ryan Madigan is a resident of Raleigh, North Carolina.  During the relevant period, Madigan was an authorized trader on the Commercial Pool's futures accounts held at IBL.  Madigan was never registered with the Commission in any capacity.  Exh. 8, NFA Certification of Non-Registration.

10. Madigan Enterprises, Inc. is a corporation formed in 2004 by Madigan's father in Pittsford, New York, and through which Ryan Madigan co-owned, controlled and operated R2

Capital. Exh. 9, Madigan Enterprises, Inc. Entity Information. During the relevant period, Madigan was also an officer and principal of Madigan Enterprises. Madigan Enterprises has never been registered with the Commission in any capacity. Exh. 10, NFA Certification of Non-Registration.

11. Randell A. Vest resides in Fort Myers, Florida. During the relevant period, Vest was also the sole owner, manager and principal of Bulletproof Vest, his holding company. Exh. 11, Articles of Incorporation for Bulletproof Vest Incorporated. Vest first registered with the Commission on September 27, 2013, as an Associated Person of R2 Capital. Exh. 12, NFA Certification of Registration.

12. Bulletproof Vest, Inc. is a corporation formed in 2009 by Vest in Fort Myers, Florida, solely owned and operated by Vest, and through which Vest co-owned, controlled and operated R2 Capital. Exh. 11. Bulletproof Vest has never been registered with the Commission in any capacity. Exh. 13, NFA Certification of Non-Registration.

**Management of R2 Capital**

13. On November 10, 2008, Tomazin filed R2 Capital's Articles of Organization with the Colorado Secretary of State, identifying himself as R2 Capital's registered agent and his home in Denver, Colorado as its mailing address. Exh. 2.

14. On September 18, 2009, Tomazin filed a Certificate of Limited Partnership for the Commercial Pool, identifying himself as the Commercial Pool's registered agent, his home in Denver, Colorado, as its mailing address, and R2 Capital as the Commercial Pool's General Partner. Exh. 14.

15. During the relevant period, Tomazin, Vest, and Madigan equally owned, and jointly controlled, the operations of R2 Capital through their respective holding companies. Exh. 4.

16. Tomazin and Madigan handled R2 Capital's day-to-day operations, including managing the accounting, reporting and investor relations responsibilities.

17. Tomazin, Madigan and Vest were signatories during the relevant period on trading account opening documents for R2 Capital and/or the Commercial Pool, and as principals of R2 Capital, all had trading authority. Exh. 15, PFG Account Opening Documents at 33 (listing Tomazin, Madigan and Vest as signatories); IBL Account Opening Documents.

18. Vest informed the NFA that he was primarily responsible for managing R2 Capital's trading operations and managing the firm's trading platform. Exh. 16, NFA Member Responsibility Action at ¶ 5. However, Vest was also responsible for participating in the solicitation of at least one pool participant which invested $1,105,000 in the Commercial Pool.

**Solicitation and Representations to Potential Pool Participants**

19. During the relevant period, R2 Capital, through Tomazin, Madigan and Vest, solicited funds from prospective pool participants by representing that the Commercial Pool would be investing in forex.

20. According to pool participant Derek Miller, Madigan told him that the Commercial Pool would return profits of 8% to 10% per month, that Madigan himself had invested $1 million of Madigan's own personal funds in the Commercial pool, and that the Commercial Pool would employ a 20% "stop-loss" such that Madigan could never lose more than 20% of his invested principal.

21. At least one of the Commercial Pool participants—a private equity fund known as Northport—was solicited by R2 Capital and its principals by providing them with a R2 Capital "Confidential Information Memorandum," "Subscription Agreement," and "Limited Partnership Agreement," which represented the following:

    a. R2 Capital would receive a management fee limited to 50% of the profits earned by the Commercial Pool, paid only if the Commercial Pool earned profits. The remaining profits would be divided on a pro rata basis between the pool participants (Exh. 1 at § 10.2(d).);

    b. All pool participant funds would be deposited directly into the Commercial Pool's bank account, and there would be no commingling of funds between the Commercial Pool and R2 Capital, or any affiliate thereof, other than temporarily for the payment of bills or disbursements on behalf of the Commercial Pool (*id.* at § 6.7);

    c. There would be no loans between the Commercial Pool and any other entities controlled by R2 Capital or any person or entity directly or indirectly controlling, controlled by or under common control of R2 Capital (*id.* at 15);

    d. The Commercial Pool would be subject to annual third party independent auditing (*id.* at 19);

    e. R2 Capital would maintain complete and accurate books and records of all assets of the Commercial Pool, and R2 Capital would furnish to pool participants monthly statements with profits or losses and estimated expenses (*id.* at §§ 8.2(e), 17.2); and

    f. R2 Capital, as the general partner, would not possess Commercial Pool property (*Id.* at § 8.3).

**Pool Participant Funds Deposited Into R2 Capital and Commercial Pool Bank Accounts**

22. Based upon my analysis of the US Bank documents, between January 2010 and May 2010, Commercial Pool participants deposited a total of $2,471,181.64 with R2 Capital based upon the Commercial Pool's and R2 Capital Group's US Bank statements. Exh. 17, US Bank Analysis[1], p.1.

23. The US Bank statements for R2 Capital and the Commercial Pool show no evidence of Madigan or any other R2 principal investing $1 million, or any funds, in the Commercial pool.

**Funds Transferred From Commercial Pool and R2 Capital Bank Accounts and Trading Activity**

24. Between January 2010 and May 2010, over $2.2 million was transferred from the Commercial Pool US Bank account to the Commercial Pool trading accounts at PFG, where the Commercial Pool traded forex. Exh. 17, p.2.

25. Between January 2010 and August 2010, the Commercial Pool trading account at PFG incurred losses of close to $1.4 million. Exh. 18, PFG Trading Analysis[2].

26. Between February 2010 and September 2010, approximately $780,000 of Commercial Pool funds at PFG was transferred from the PFG accounts to both R2 Capital and Commercial Pool US Bank accounts, leaving less than $1,000 at PFG. Exh. 17, p.2.

27. In August 2010, defendants opened another trading account at IBL, which was funded by approximately $535,000 of the funds that came back from the Commercial Pool's PFG trading account (Exh. 17, p.3). Between August 2010 and July 2011, R2 Capital's

---

[1] I prepared Exhibit 17 by reviewing, analyzing and summarizing the Commercial Pool and R2 Capital's bank account statements, provided by US Bank to the Commission in response to an investigative subpoena.
[2] I prepared Exhibit 18 by reviewing, analyzing and summarizing the Commercial Pool's PFG trading account statements, provided by PFG to the Commission in response to the 4g order described above.

Commercial Pool trading account at IBL traded various futures instruments including the E-mini S&P contracts, but not forex.

28. Between August 2010 and July 2011, R2 Capital's Commercial Pool account at IBL had trading gains of approximately $237,000. Exh. 19, IBL Trading Analysis[3].

29. Between October 2010 and October 2011, R2 Capital's Commercial Pool account at IBL transferred approximately $779,000 to its Commercial Pool US Bank account (Exh. 17, p.3). After netting the Commercial Pool's $1.4 million loss in the PFG account and the gains in the IBL account, approximately $1.2 million in assets should have remained in the Commercial Pool.

**Funds Transferred from Trading and Bank Accounts to R2 Capital and its Principals**

30. Between February 2010 and February 2012, approximately $706,000 was transferred from the R2 Commercial Pool US Bank account to the R2 Capital Group LLC US Bank account. Exh. 17, p.4.

31. Between February 2010 and November 2013, over $931,000 was transferred from the R2 Capital US Bank account to the bank accounts of Tomazin, Madigan and Vest, and their holding companies, RAST, Madigan Enterprises, Bulletproof Vest (Exh. 20, US Bank R2 Capital disbursement list, and Exh. 21, US Bank R2 Capital disbursement summary[4]). The amount of these transfers is summarized as follows:

| RAST | $ | 209,275.00 |
|---|---|---|
| Bulletproof Vest | $ | 308,640.00 |
| Madigan Enterprises | $ | 413,592.41 |

---

[3] I prepared Exhibit 19 by reviewing, analyzing and summarizing the R2 Capital's Commercial Pool trading account statements at IBL, provided by IBL to the Commission in response to the 4g order described above.
[4] Exhibit 20 is a summary of funds purportedly disbursed from the R2 Capital's US Bank account, provided to the CFTC by NFA investigators, who informed me that the NFA received that summary document from defendants in response to the NFA investigation in November 2013. Exhibit 21 was prepared by me by conducting my own independent review, analysis and summary of US Bank statements obtained during the Commission's investigation, as described above.

32. An additional approximately $350,000 was spent on unauthorized expenditures, including approximately $290,000 for futures trading consultations and purported legal fees from a non-lawyer. Exh. 21, p.1.

33. Tomazin and Vest informed the NFA that a portion of those transfers were loans made to Vest and Madigan and/or their holding companies. Exh. 16, NFA Member Responsibility Action at ¶ 11. To date, none of these purported loans have been paid back.

**Spending and Use of Funds Transferred into Bank Accounts of Tomazin, Madigan and Vest and Their Holding Companies**

34. Once Tomazin, Madigan and Vest had the money in their personal or holding companies' bank accounts, they spent these funds for personal expenses such as dining at restaurants, paying mortgages, shopping, and other miscellaneous and unauthorized expenses.

35. By September 2010, R2 Capital had stopped trading the Commercial Pool's PFG forex account, transferred the remaining pool participant funds to a new account at IBL, and began trading E-mini S&P 500 futures and securities products instead of forex.

36. At least two of the Commercial Pool participants have executed sworn declarations stating that neither R2 Capital nor Tomazin, Madigan and Vest ever informed them of the change in the pool's trading strategy and the change in FCMs, that it had ceased trading forex, and was now trading financial futures.

37. The trading records from IBL indicate that the Commercial Pool ceased all trading in July 2011.

38. From August 2011 through March 2013, R2 Capital generated and issued to at least one pool participant monthly account statements, which represented that the Commercial Pool returned profits from its successfully trading, increased in value, and incurred trading expenses charged to pool participants.

39. During 2012 and 2013, R2 Capital also periodically issued to at least one pool participant, narrative written reports representing that the Commercial Pool had earned profits from trading futures contracts in the latter half of 2011 and all of 2012.

40. Neither R2 Capital nor its principals ever provided annual reports to at least two of the Commercial Pool participants.

41. In November or December 2013, R2 Capital represented to the NFA that the accounting firms of Hein and Associates and Spicer Jeffries were their accountants. The records produced by those firms to the CFTC indicated that neither of those firms conducted an independent audit of R2 Capital or the Commercial Pool. Further, the Spicer Jeffries records concern the R2 Global Fund, not the Commercial Pool.

42. From 2010 through 2013, Tomazin represented orally to Commercial Pool participant Sean Irvine that the Commercial Pool was doing well, that it was not losing money, and that it was trading forex the entire time.

**Pool Participants' Requests for Redemptions**

43. Commercial Pool participant Northport, through its principal Tyson Morgan, stated that Northport requested a partial redemption of its funds in July 2013. In response, Ryan Tomazin represented that the funds were still held by the Commercial Pool. Between July 2013 and the present, Tomazin periodically represented to Northport that the return of the Northport's invested funds was being delayed or prevented by, among other things, technical difficulties at banks or the FCM; that the SEC, CFTC and/or NFA were holding the funds in escrow; and that the federal government shutdown in October 2013 prevented the redemption of these funds.

44. Pool participant Derek Miller stated that he has been seeking full redemption of his funds since the summer of 2010. He has repeatedly been informed that the return of his funds has been delayed or prevented by, among other things, a lawsuit in which R2 Capital was involved in Washington, DC or New York City, and then Florida, and the funds being held in escrow by the NFA.

45. Neither the CFTC nor the NFA has held Commercial Pool funds in escrow.

46. At least three of the Commercial Pool participants have not received the return of their requested funds invested with the pool.

**NFA Action**

47. In November 2013, the NFA commenced an unannounced examination of R2 Capital, and discovered that R2 Capital was unable to produce basic documents and other information associated with the operation of the business, and the limited bank records produced by R2 Capital to the NFA revealed a high number of questionable withdrawals.

48. During the course of the NFA's investigation, R2 Capital, through Tomazin and Vest, represented to the NFA that some of the questionable withdrawals were actually purported loans made to themselves, or their holding companies, from the Commercial Pool bank accounts.

49. On December 20, 2013, the NFA instituted a MRA against R2 Capital and an ARA against Vest. The MRA/ARA prohibits Vest and R2 Capital "from soliciting or accepting any funds from customers or investors" and "from disbursing or transferring any funds over which they or any person acting on their behalf exercises control . . . without prior approval from NFA." The MRA/ARA also found "that Vest, Tomazin and Madigan may have converted pool assets totaling more than $1 million for their own personal use, through numerous

16

payments to themselves or their holding companies," and required R2 Capital and Vest to immediately provide copies of the MRA/ARA to all pool participants. *See* Exh. 16 at 1-2, 4.

50. To date, neither R2 Capital nor its principals have provided pool participants with copies of the MRA/ARA.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Washington, D.C. on August 4, 2014.

_____
Kyong J. Koh