# Exhibit 16

BEFORE THE
NATIONAL FUTURES ASSOCIATION

| | | |
|---|---|---|
| In the Matter of: | ) | |
| | ) | |
| R2 CAPITAL GROUP LLC | ) | |
| (NFA ID #418124), | ) | |
| | ) | NFA Case No. 13-MRA-009 |
| and | ) | |
| | ) | |
| RANDELL A. VEST | ) | |
| (NFA ID #467681) | ) | |

## NOTICE OF MEMBER RESPONSIBILITY ACTION AND ASSOCIATE RESPONSIBILITY ACTION UNDER NFA COMPLIANCE RULE 3-15

National Futures Association (NFA) hereby gives notice to R2 Capital Group LLC (R2 Capital), a registered commodity pool operator (CPO) and NFA Member, and Randell A. Vest (Vest), the sole associated person (AP) and listed principal of R2 Capital and an NFA Associate, that pursuant to NFA Compliance Rule 3-15, the President of NFA, with the concurrence of NFA's Executive Committee, has taken a Member Responsibility Action (MRA) against R2 Capital, and an Associate Responsibility Action (ARA) against Vest, whereby:

1.    R2 Capital, Vest and any person acting on R2 Capital's behalf are prohibited from soliciting or accepting any funds from customers or investors, soliciting investments for any commodity pools or other investment vehicles, including R2 Commercial Capital Partners I LP (Commercial Pool) or R2 Global Fund I LP (Global Pool), or placing any trades for themselves or on behalf of customers, commodity pools, or investors, except liquidation or risk reducing trades;

2.    R2 Capital, Vest and any person acting on R2 Capital's behalf are prohibited from disbursing or transferring any funds over which they or any person acting on their behalf exercises control from any trading accounts controlled by any of them and from any pool accounts (including bank, trading, or any other types of accounts) without prior approval from NFA;

3.    R2 Capital and Vest are required to immediately repay in full all existing direct and indirect loans or advances of pool assets to the Commercial Pool;

4.    Effective immediately, R2 Capital, Vest and any person acting on R2 Capital's behalf are prohibited from permitting any commodity pool they operate or control, including but not limited to the Commercial Pool and the Global Pool, to use any means to make any direct or indirect loans or

advances of pool assets to R2 Capital, Vest or any other person or entity affiliated with R2 Capital and Vest; and

5.     R2 Capital and Vest are required to provide copies of this MRA/ARA by overnight courier or e-mail to all: a) customers; b) pool participants; c) investors; and d) banks, brokerage firms, and other financial institutions with which money is on deposit in the name of R2 Capital, or over which R2 Capital exercises control, including but not limited to the Commercial Pool and the Global Pool.

This action is effective immediately and deemed necessary to protect investors in commodity pools and other investment vehicles controlled by R2 Capital and Vest – and/or by Ryan Tomazin (Tomazin) and Ryan Madigan (Madigan), both of whom are unlisted principals of R2 Capital – because of their failure to cooperate with NFA in its examination and investigation of R2 Capital by failing to produce books, records and other information that NFA has requested from them.  Additionally, R2 Capital, Vest and Tomazin have provided NFA with misleading, incomplete and conflicting information regarding the firm's operations, specifically in connection with the Commercial Pool, and cannot account for a significant portion of the pool's assets, which appear to have been disbursed through so-called loans and other payouts to the owners of the firm.  Consequently, NFA has been unable to determine whether R2 Capital, Vest, Tomazin and Madigan have misappropriated investors' funds and misled investors concerning their investments.

In support of these actions, NFA attaches the affidavit of Jason Gonzalez, who is a Manager in NFA's Compliance Department, and based thereon alleges as follows:

1.     R2 Capital has been registered with the Commodity Futures Trading Commission (CFTC) as a CPO and approved as an NFA Member since September 27, 2013.  According to NFA's Online Registration System (ORS), R2 Capital lists Vest as the firm's sole AP and principal and indicated its main office is located in New York, New York.

2.     In October, shortly after R2 Capital became approved as an NFA Member, NFA began reviewing information about the firm's operations and found several inconsistencies.  For example, contrary to the information in ORS, R2 Capital does not maintain an office in New York.  Instead, Vest works for R2 Capital "remotely" from a residence in Florida, while the firm's books and records are supposedly located in Colorado.  NFA also learned that Tomazin is one of the firm's owners, brings in new business, and handles the firm's operations, even though Tomazin is not registered as an AP or listed as a principal of the firm.

3.     R2 Capital operates two pools that the firm formed in 2010 and which filed exemptions from CFTC registration for which they supposedly qualified.

2

The Global Pool has a current net asset value (NAV) of approximately $1.5 million, which assets are held in a trading account at a futures commission merchant (FCM).  R2 Capital's other pool, the Commercial Pool, has a purported NAV of approximately $1.2 million.  However, when NFA's exam began, the only trading account at an FCM that R2 Capital identified for the Commercial Pool contained about $800.

4.      Based on inconsistent information received about the firm, NFA commenced an unannounced examination of R2 Capital on November 19, 2013.  Due to the conflicting information about the firm's location, NFA sent one exam team to Florida to meet with Vest and sent another exam team to Colorado where the firm's business records were supposedly located.

5.      The Florida exam team met with Vest, who indicated that R2 Capital is owned equally by three individuals:  Vest, Tomazin, and Madigan.  Vest said he has been associated with Tomazin and R2 Capital since 2009 and is responsible for managing R2 Capital's trading operations and developing the firm's trading platform.  Tomazin apparently resides in Connecticut and formed R2 Capital in 2008.  According to Vest, Tomazin is responsible for the firm's operations, including managing the accounting, reporting and investor relations responsibilities.  Vest also deferred to Tomazin for responses to NFA's inquiries about the firm and its operations.

6.      According to Vest, Madigan is a "passive owner" of R2 Capital.  However, at least one investor that NFA spoke to at the start of the exam indicated Madigan solicited his investment in the Commercial Pool, and records NFA obtained about R2 Capital's accounts at one FCM show that Madigan was the sole signatory in 2010 and 2011 on all the account opening documents for R2 Capital and both of its pools.  Despite this information, Madigan is not a registered AP or principal of R2 Capital, or an NFA Associate.

7.      Although R2 Capital indicated its business records were located in Colorado, the exam team did not find any books, records or firm personnel at the address provided to NFA.  In addition, throughout the ongoing examination and investigation of R2 Capital, NFA has repeatedly received incomplete records and information from the firm, Vest and Tomazin.  Specifically, R2 Capital, Vest and Tomazin have failed to produce all requested trading and bank records, including cancelled checks, wire advices, and support for deposits and withdrawals, as well as full and complete answers to numerous questions posed by the exam team about the firm's operations and activities.  In addition, neither Vest nor Tomazin could definitively identify the banks that held funds for the Commercial Pool or the dates when those accounts were opened and closed.  In fact,

3

at one time, Tomazin said there were accounts at two separate banks for the pool but, thus far, records for only one bank account have been provided to NFA.

8.   From the records NFA has obtained, it appears that pool participants contributed approximately $2.4 million to the Commercial Pool during 2010 and 2011.  NFA is unable to fully analyze the pool's trading performance at one FCM (FCM 1) due to a lack of records provided by R2 Capital, and NFA cannot obtain the records on its own since the FCM is now defunct.  However, bank records provided to NFA show that approximately $2.2 million of the total contributions to the Commercial Pool were transferred to FCM 1 in 2010, of which almost $780,000 was eventually returned to the bank account of the Commercial Pool or transmitted to R2 Capital's bank account on or before October 2010. Based on this information, NFA estimates the pool incurred trading losses of just over $1.4 million at FCM 1.

9.   The only other trading account for the Commercial Pool that has been disclosed to NFA was at another FCM (FCM 2).  The deposits at FCM 2 totaled approximately $535,000 and apparently consisted of $365,000 in funds that were previously held in the pool's account at FCM 1 and additional deposits of $170,000 the Commercial Pool received from a new participant.  NFA's analysis also shows that the Commercial Pool realized trading gains of close to $240,000 at FCM 2.

10.  After accounting for the gains and losses at both FCMs for net trading losses of approximately $1.2 million, the Commercial Pool's remaining assets should total approximately $1.2 million.  However, NFA cannot account for any remaining liquid assets in the Commercial Pool other than $800 at FCM 2, and most of those funds were withdrawn by R2 Capital soon after NFA's exam commenced.  Instead, the bank records NFA has received indicate that Vest, Tomazin and Madigan may have converted pool assets totaling more than $1 million for their own personal use, through numerous payments to themselves or their holding companies.

11.  R2 Capital, Vest and Tomazin have explained to NFA that a portion of the pool's missing funds – approximately $300,000 – represent purported "loans" to Vest and Madigan, supposedly for building and developing the R2 Capital trading platform.  Vest admitted that the Commercial Pool was "one source of financial support at R2 Capital."  Vest also indicated that he viewed the "loans" as a "line of credit" and estimates that he owes approximately $115,000, including principal and interest, to the Commercial Pool.

12.  Although R2 Capital has provided NFA with purported "loan schedules" showing loan amounts, interest rates, and other information, NFA has

4

received no further evidence of the loans, including any promissory notes or written agreements between the parties. Moreover, there is no evidence these purported loans are secured by any collateral. In addition, while the loan schedules reflected supposed repayments by Vest and Madigan totaling $57,500, the bank records NFA reviewed did not show any corresponding credits.

13.     Even after factoring in the supposed $300,000 in unpaid loans, R2 Capital, Vest and Tomazin have been unable to account for the remainder of the Commercial Pool's assets of approximately $1.2 million. A review of the bank records of R2 Capital and the Commercial Pool revealed numerous unexplained disbursements to Vest, Tomazin and Madigan between May 2010 and August 2011, revealing their apparent misappropriation of the Commercial Pool's assets. For example, NFA noted a transaction in August 2011 involving a $172,500 transfer from the Commercial Pool's bank account to R2 Capital's bank account, where the holding companies of Tomazin and Madigan each received $5,000 transfers the very same day, while $125,000 was paid to Vest's holding company two days later.

14.     The "loans" from the Commercial Pool not only violate NFA Compliance Rule 2-45, which prohibits commodity pools from making direct or indirect loans or advances of pool assets to the CPO or any other affiliated person or entity, but are also contrary to representations that R2 Capital has made to participants in the Commercial Pool. Specifically, the pool's offering memorandum expressly states, "There will be no loans between this Partnership and any other entities controlled by the General Partner or its Affiliates." (Emphasis added.)

15.     NFA also found that the owners of R2 Capital apparently converted monies directly from the Commercial Pool bank account for their own use. For example, NFA noticed deposits to the Commercial Pool's bank account totaling $40,000 in July 2010 from FCM 1 and an individual whom Tomazin represented was a participant in the Commercial Pool. However, it appears $30,000 of these funds was never transferred to the pool's trading account at FCM 2 and, instead, was paid out to each of the owners or their respective holding companies a few days after the bank account received the funds.

16.     When questioned by NFA, Tomazin claimed the Commercial Pool's remaining assets currently total approximately $1.2 million and consist of investments R2 Capital made on the pool's behalf into several privately-held companies. R2 Capital, Vest and Tomazin have represented that the pool acquired these assets with a total investment of $625,000 via cashier's checks or wire transfers. However, NFA has not received any documents to confirm these purported transactions, nor has NFA received any credible documentation, such as shares or stock certificates, to

5

confirm the investments even exist.  In addition, Tomazin also recently represented he is going to pay the Commercial Pool participants $1.2 million for their remaining shares in the pool by December 31, 2013. However, when NFA asked Tomazin to substantiate his ability to pay this amount, the only liquid assets he could demonstrate totaled less than $20,000.

17.    Moreover, information NFA has received – mainly from Tomazin – has been misleading or changed repeatedly throughout NFA's ongoing exam and investigation.  For example, Tomazin initially claimed he had "personal relationships" with all the private companies in which the Commercial Pool supposedly invested.  However, Tomazin later said he had relationships with only two of the companies and is now claiming some of these investments were made through an individual whom the Securities and Exchange Commission has charged with operating a Ponzi scheme.  Tomazin supposedly met this individual at a real estate conference.

18.    Tomazin also indicated several payments from the R2 Capital bank account in 2010 and 2011, totaling more than $50,000, represented fees for legal services.  However, based on information NFA independently obtained, it appears these payments actually represent the return of capital to an undisclosed participant in the Commercial Pool and its principal.  Other records that NFA has reviewed raise further questions about R2 Capital and its operations, including whether the firm is operating other commodity pools or investment vehicles that have not been disclosed to NFA.

19.    As the exam has progressed, NFA attempted to speak with participants in more detail about their investments and dealings with R2 Capital, but none of them have returned NFA's recent calls.  Therefore, NFA has been unable to confirm whether the participants are aware of the true nature and value of their investments in the Commercial Pool, particularly with regard to the supposed investments in the private companies; that pool assets have been loaned and likely converted through numerous payments to R2 Capital's owners (and their affiliates) and the amount of those loans/payments; or that pool assets have been used to fund R2 Capital's operations and develop the firm's trading platform.

20.    Additionally, NFA is uncertain whether the Commercial and Global Pools actually qualify for the exemptions from CFTC registration that R2 Capital previously filed on their behalf.  Specifically, in 2010, R2 Capital filed an exemption from CFTC registration under CFTC Regulation 4.13(a)(4) for both pools based on the fact that the pools had purported sophisticated investors.  However, based on the limited records received, NFA has been

unable to independently verify if the Commercial and Global Pools actually qualified for the claimed exemption.

21.    Furthermore, soon after R2 Capital became pending as an NFA Member CPO, the firm changed the 4.13(a)(4) exemptions for the Commercial and Global Pools, due to the CFTC's rescission of the 4.13(a)(4) exemption, and filed exemptions, effective January 1, 2013, under CFTC Regulation 4.13(a)(3) since each pool supposedly traded a minimal amount of futures. Then, when NFA's exam commenced in November 2013, R2 Capital withdrew the 4.13(a)(3) exemption for the Commercial Pool the very next day and indicated the pool was no longer active, even though it continued to have a futures trading account at FCM 2.

22.    Further, the day after NFA's exam commenced, R2 Capital changed the Global Pool's 4.13(a)(3) exemption and claimed relief under CFTC Regulation 4.7, which applies to pools whose participants are all qualified eligible persons (QEPs).  Information NFA has obtained from FCM 2 seems to indicate that, since the Global Pool started trading at FCM 2 in 2011, the pool's assets have been directed to futures trading only and, based on NFA's analysis, the pool did not meet the tests as outlined in CFTC Regulation 4.13(a)(3) on several days.  Therefore, the Global Pool apparently did not qualify for the 4.13(a)(3) exemption it had claimed effective January 1, 2013.  In addition, even though R2 Capital recently filed a 4.7 exemption for the Global Pool, NFA has been unable to independently verify if all the participants in the Global Pool are QEPs and, therefore, whether the pool actually qualifies for the 4.7 exemption.

23.    The failure of R2 Capital and Vest to produce all of the requested bank, trading and other records, including adequate, credible documentation to support the Commercial Pool's supposed investments in various private companies, has prevented NFA from determining the nature of all transactions, the true and current NAV of the Commercial Pool, and whether any pool assets have been misappropriated by the owners of R2 Capital.  R2 Capital has also permitted approximately $300,000 in loans and advances from the assets of the Commercial Pool, which currently remain unpaid and due to the pool.  Further, R2 Capital, Vest and Tomazin have provided misleading information to NFA, as well as indirect and contradictory responses to questions NFA has posed throughout its exam and investigation.

The MRA and ARA will remain in effect until such time as R2 Capital and Vest have demonstrated to the satisfaction of NFA that they are in complete compliance with all NFA Requirements.

R2 Capital and Vest are entitled to a prompt hearing on this matter before NFA's Hearing Committee if they so request.  The request for a hearing shall be made in writing to:

National Futures Association
300 South Riverside Plaza
Suite 1800
Chicago, Illinois  60606
Attn: Legal Department-Docketing

E-Mail: Docketing@nfa.futures.org
Facsimile: 312-781-1672

    Aggrieved parties may petition the CFTC for a stay of this MRA and ARA pending a hearing pursuant to and in conformity with the terms set forth in CFTC Regulation 171.41.

                                         **NATIONAL FUTURES ASSOCIATION**

Date: _Dec. 20, 2013_          By: _Daniel J. Roth_ per DAR.
                                         Daniel J. Roth, President

m/cxc/mra/R2 Capital, et al.

8

**AFFIDAVIT**

THE AFFIANT, JASON GONZALEZ, BEING DULY SWORN AND UNDER OATH STATES THAT:

1.     My name is Jason Gonzalez, and I am employed by National Futures Association (NFA) as a Manager in NFA's Compliance Department. In my capacity as a Manager, I oversaw NFA's examination of R2 Capital Group LLC (R2 Capital), a registered commodity pool operator (CPO) and NFA Member.

2.     R2 Capital has been registered with the Commodity Futures Trading Commission (CFTC) as a CPO and approved as an NFA Member since September 27, 2013. According to NFA's Online Registration System (ORS), R2 Capital lists Randell A. Vest (Vest) as the firm's sole AP and principal and indicated its main office is located in New York, New York.

3.     In October, shortly after R2 Capital became approved as an NFA Member, NFA began reviewing information about the firm's operations and found several inconsistencies. For example, contrary to the information in ORS, R2 Capital does not maintain an office in New York. Instead, Vest works for R2 Capital "remotely" from a residence in Florida, while the firm's books and records are supposedly located in Colorado. NFA also learned that Tomazin is one of the firm's owners, brings in new business, and handles the firm's operations, even though Tomazin is not registered as an AP or listed as a principal of the firm.

4.     R2 Capital operates two pools that the firm formed in 2010 and which filed exemptions from CFTC registration for which they supposedly qualified. The Global Pool has a current net asset value (NAV) of approximately $1.5 million, which assets are held in a trading account at a futures commission merchant (FCM). R2 Capital's other pool, the Commercial Pool, has a purported NAV of approximately $1.2 million. However, when NFA's exam began, the only trading account at an FCM that R2 Capital identified for the Commercial Pool contained about $800.

5.     Based on inconsistent information received about the firm, NFA commenced an unannounced examination of R2 Capital on November 19, 2013. Due to the conflicting information about the firm's location, NFA sent one exam team to Florida to meet with Vest and sent another exam team to Colorado where the firm's business records were supposedly located.

6.     The Florida exam team met with Vest, who indicated that R2 Capital is owned equally by three individuals: Vest, Tomazin, and Madigan. Vest said he has been associated with Tomazin and R2 Capital since 2009 and

is responsible for managing R2 Capital's trading operations and developing the firm's trading platform.  Tomazin apparently resides in Connecticut and formed R2 Capital in 2008.  According to Vest, Tomazin is responsible for the firm's operations, including managing the accounting, reporting and investor relations responsibilities.  Vest also deferred to Tomazin for responses to NFA's inquiries about the firm and its operations.

7.      According to Vest, Madigan is a "passive owner" of R2 Capital.  However, at least one investor that NFA spoke to at the start of the exam indicated Madigan solicited his investment in the Commercial Pool, and records NFA obtained about R2 Capital's accounts at one FCM show that Madigan was the sole signatory in 2010 and 2011 on all the account opening documents for R2 Capital and both of its pools.  Despite this information, Madigan is not a registered AP or principal of R2 Capital, or an NFA Associate.

8.      Although R2 Capital indicated its business records were located in Colorado, the exam team did not find any books, records or firm personnel at the address provided to NFA.  In addition, throughout the ongoing examination and investigation of R2 Capital, NFA has repeatedly received incomplete records and information from the firm, Vest and Tomazin. Specifically, R2 Capital, Vest and Tomazin have failed to produce all requested trading and bank records, including cancelled checks, wire advices, and support for deposits and withdrawals, as well as full and complete answers to numerous questions posed by the exam team about the firm's operations and activities.  In addition, neither Vest nor Tomazin could definitively identify the banks that held funds for the Commercial Pool or the dates when those accounts were opened and closed.  In fact, at one time, Tomazin said there were accounts at two separate banks for the pool but, thus far, records for only one bank account have been provided to NFA.

9.      From the records NFA has obtained, it appears that pool participants contributed approximately $2.4 million to the Commercial Pool during 2010 and 2011.  NFA is unable to fully analyze the pool's trading performance at one FCM (FCM 1) due to a lack of records provided by R2 Capital, and NFA cannot obtain the records on its own since the FCM is now defunct.  However, bank records provided to NFA show that approximately $2.2 million of the total contributions to the Commercial Pool were transferred to FCM 1 in 2010, of which almost $780,000 was eventually returned to the bank account of the Commercial Pool or transmitted to R2 Capital's bank account on or before October 2010. Based on this information, NFA estimates the pool incurred trading losses of just over $1.4 million at FCM 1.

10.     The only other trading account for the Commercial Pool that has been
        disclosed to NFA was at another FCM (FCM 2).  The deposits at FCM 2
        totaled approximately $535,000 and apparently consisted of $365,000 in
        funds that were previously held in the pool's account at FCM 1 and
        additional deposits of $170,000 the Commercial Pool received from a new
        participant.  NFA's analysis also shows that the Commercial Pool realized
        trading gains of close to $240,000 at FCM 2.

11.     After accounting for the gains and losses at both FCMs for net trading
        losses of approximately $1.2 million, the Commercial Pool's remaining
        assets should total approximately $1.2 million.  However, NFA cannot
        account for any remaining liquid assets in the Commercial Pool other than
        $800 at FCM 2, and most of those funds were withdrawn by R2 Capital
        soon after NFA's exam commenced.  Instead, the bank records NFA has
        received indicate that Vest, Tomazin and Madigan may have converted
        pool assets totaling more than $1 million for their own personal use,
        through numerous payments to themselves or their holding companies.

12.     R2 Capital, Vest and Tomazin have explained to NFA that a portion of the
        pool's missing funds – approximately $300,000 – represent purported
        "loans" to Vest and Madigan, supposedly for building and developing the
        R2 Capital trading platform.  Vest admitted that the Commercial Pool was
        "one source of financial support at R2 Capital."  Vest also indicated that he
        viewed the "loans" as a "line of credit" and estimates that he owes
        approximately $115,000, including principal and interest, to the
        Commercial Pool.

13.     Although R2 Capital has provided NFA with purported "loan schedules"
        showing loan amounts, interest rates, and other information, NFA has
        received no further evidence of the loans, including any promissory notes
        or written agreements between the parties.  Moreover, there is no
        evidence these purported loans are secured by any collateral.  In addition,
        while the loan schedules reflected supposed repayments by Vest and
        Madigan totaling $57,500, the bank records NFA reviewed did not show
        any corresponding credits.

14.     Even after factoring in the supposed $300,000 in unpaid loans, R2 Capital,
        Vest and Tomazin have been unable to account for the remainder of the
        Commercial Pool's assets of approximately $1.2 million.  A review of the
        bank records of R2 Capital and the Commercial Pool revealed numerous
        unexplained disbursements to Vest, Tomazin and Madigan between May
        2010 and August 2011, revealing their apparent misappropriation of the
        Commercial Pool's assets.  For example, NFA noted a transaction in
        August 2011 involving a $172,500 transfer from the Commercial Pool's
        bank account to R2 Capital's bank account, where the holding companies

of Tomazin and Madigan each received $5,000 transfers the very same
day, while $125,000 was paid to Vest's holding company two days later.

15.  The "loans" from the Commercial Pool not only violate NFA Compliance
Rule 2-45, which prohibits commodity pools from making direct or indirect
loans or advances of pool assets to the CPO or any other affiliated person
or entity, but are also contrary to representations that R2 Capital has
made to participants in the Commercial Pool.  Specifically, the pool's
offering memorandum expressly states, "There <u>will be no loans</u> between
this Partnership and any other entities controlled by the General Partner or
its Affiliates."  (Emphasis added.)

16.  NFA also found that the owners of R2 Capital apparently converted
monies directly from the Commercial Pool bank account for their own use.
For example, NFA noticed deposits to the Commercial Pool's bank
account totaling $40,000 in July 2010 from FCM 1 and an individual whom
Tomazin represented was a participant in the Commercial Pool.  However,
it appears $30,000 of these funds was never transferred to the pool's
trading account at FCM 2 and, instead, was paid out to each of the owners
or their respective holding companies a few days after the bank account
received the funds.

17.  When questioned by NFA, Tomazin claimed the Commercial Pool's
remaining assets currently total approximately $1.2 million and consist of
investments R2 Capital made on the pool's behalf into several privately-
held companies.  R2 Capital, Vest and Tomazin have represented that the
pool acquired these assets with a total investment of $625,000 via
cashier's checks or wire transfers.  However, NFA has not received any
documents to confirm these purported transactions, nor has NFA received
any credible documentation, such as shares or stock certificates, to
confirm the investments even exist.  In addition, Tomazin also recently
represented he is going to pay the Commercial Pool participants $1.2
million for their remaining shares in the pool by December 31, 2013.
However, when NFA asked Tomazin to substantiate his ability to pay this
amount, the only liquid assets he could demonstrate totaled less than
$20,000.

18.  Moreover, information NFA has received – mainly from Tomazin – has
been misleading or changed repeatedly throughout NFA's ongoing exam
and investigation.  For example, Tomazin initially claimed he had
"personal relationships" with all the private companies in which the
Commercial Pool supposedly invested.  However, Tomazin later said he
had relationships with only two of the companies and is now claiming
some of these investments were made through an individual whom the
Securities and Exchange Commission has charged with operating a Ponzi

scheme. Tomazin supposedly met this individual at a real estate conference.

19.     Tomazin also indicated several payments from the R2 Capital bank account in 2010 and 2011, totaling more than $50,000, represented fees for legal services. However, based on information NFA independently obtained, it appears these payments actually represent the return of capital to an undisclosed participant in the Commercial Pool and its principal. Other records that NFA has reviewed raise further questions about R2 Capital and its operations, including whether the firm is operating other commodity pools or investment vehicles that have not been disclosed to NFA.

20.     As the exam has progressed, NFA attempted to speak with participants in more detail about their investments and dealings with R2 Capital, but none of them have returned NFA's recent calls. Therefore, NFA has been unable to confirm whether the participants are aware of the true nature and value of their investments in the Commercial Pool, particularly with regard to the supposed investments in the private companies; that pool assets have been loaned and likely converted through numerous payments to R2 Capital's owners (and their affiliates) and the amount of those loans/payments; or that pool assets have been used to fund R2 Capital's operations and develop the firm's trading platform.

21.     Additionally, NFA is uncertain whether the Commercial and Global Pools actually qualify for the exemptions from CFTC registration that R2 Capital previously filed on their behalf. Specifically, in 2010, R2 Capital filed an exemption from CFTC registration under CFTC Regulation 4.13(a)(4) for both pools based on the fact that the pools had purported sophisticated investors. However, based on the limited records received, NFA has been unable to independently verify if the Commercial and Global Pools actually qualified for the claimed exemption.

22.     Furthermore, soon after R2 Capital became pending as an NFA Member CPO, the firm changed the 4.13(a)(4) exemptions for the Commercial and Global Pools, due to the CFTC's rescission of the 4.13(a)(4) exemption, and filed exemptions, effective January 1, 2013, under CFTC Regulation 4.13(a)(3) since each pool supposedly traded a minimal amount of futures. Then, when NFA's exam commenced in November 2013, R2 Capital withdrew the 4.13(a)(3) exemption for the Commercial Pool the very next day and indicated the pool was no longer active, even though it continued to have a futures trading account at FCM 2.

23.     Further, the day after NFA's exam commenced, R2 Capital changed the Global Pool's 4.13(a)(3) exemption and claimed relief under CFTC Regulation 4.7, which applies to pools whose participants are all qualified eligible persons (QEPs). Information NFA has obtained from FCM 2

seems to indicate that, since the Global Pool started trading at FCM 2 in 2011, the pool's assets have been directed to futures trading only and, based on NFA's analysis, the pool did not meet the tests as outlined in CFTC Regulation 4.13(a)(3) on several days.  Therefore, the Global Pool apparently did not qualify for the 4.13(a)(3) exemption it had claimed effective January 1, 2013.  In addition, even though R2 Capital recently filed a 4.7 exemption for the Global Pool, NFA has been unable to independently verify if all the participants in the Global Pool are QEPs and, therefore, whether the pool actually qualifies for the 4.7 exemption.

24.     The failure of R2 Capital and Vest to produce all of the requested bank, trading and other records, including adequate, credible documentation to support the Commercial Pool's supposed investments in various private companies, has prevented NFA from determining the nature of all transactions, the true and current NAV of the Commercial Pool, and whether any pool assets have been misappropriated by the owners of R2 Capital.  R2 Capital has also permitted approximately $300,000 in loans and advances from the assets of the Commercial Pool, which currently remain unpaid and due to the pool.  Further, R2 Capital, Vest and Tomazin have provided misleading information to NFA, as well as indirect and contradictory responses to questions NFA has posed throughout its exam and investigation.

Further Affiant sayeth naught.

_Jason Gonzalez_

Subscribed and sworn to before me
on this 20th day of December 2013.

_Notary Public_

OFFICIAL SEAL
MARGARET A VANDERMYDE
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 03/15/2014

6