IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No. 14-CV-02182-MSK-KLM

UNITED STATES COMMODITY FUTURES TRADING COMMISSION,

       Plaintiff,

v.

R2 CAPITAL GROUP, LLC,
RAST INVESTOR GROUP,
LLC, MADIGAN
ENTERPRISES, INC.,
BULLETPROOF VEST, INC.,
RYAN TOMAZIN,
RYAN MADIGAN, and
RANDELL A. VEST,

       Defendants.

---

## PLAINTIFF COMMODITY FUTURES TRADING COMMISSION'S
## MOTION FOR SUMMARY JUDGMENT
## AGAINST MADIGAN AND VEST DEFENDANTS

# Table of Contents

I.    INTRODUCTION ................................................................................................................ 1

II.   FACTUAL SUMMARY........................................................................................................ 3

III.  CLAIMS UPON WHICH JUDGMENT IS SOUGHT AGAINST MADIGAN DEFENDANTS ....... 11

A.    Plaintiff Is Entitled To Summary Judgment Against Madigan Defendants On Counts One And
      Two: Fraud In Connection With Commodity Futures Contracts And/Or Forex ................................. 11

   1.   Burden Of Proof And Elements Of Fraud In Connection With Commodity Futures Contracts
   And/Or Forex ...................................................................................................................... 11

   2.   Undisputed Proof Of These Elements........................................................................... 13

      a.     Defendant Madigan's Distributing False Trading Account Statements To Investors.................. 13

      Element 1:  Proof Of Madigan's Misrepresentations By False Trading Account Statements. ............. 13

      Element 2:  Proof That Madigan's Misrepresentations Were Material. ................................................ 16

      Element 3:  Proof That Madigan Had The Requisite Scienter. ............................................................. 16

         (1) Burden Of Proof And Elements Of Scienter ............................................................ 16

         (2) Undisputed Proof Of Defendant Madigan's Scienter.............................................. 18

      b.   Defendant Madigan's Misrepresentations Regarding Profitability..................................... 24

      Element 1:  Proof Madigan Misrepresented The Profitability Of The Pool. ....................................... 24

      Element 2:  Proof That Misrepresentations Regarding Profitability Were Material........................... 25

      Element 3:  Proof That Defendant Made Profitability Misrepresentations With Scienter.................. 26

      c.   Defendant Madigan Misrepresented That He Had Invested In The Commercial Pool.................... 29

      Element 1:  Proof That Defendant Madigan Misrepresented His Investment. ..................................... 29

      Element 2:  Proof That Misrepresentations Regarding Investing In Pool Were Material. ................... 30

i

Element 3:  Proof That Misrepresentations Regarding Investing In Pool Were Made With Scienter. . 30

d.  Defendant Madigan's Misrepresentations Regarding Investing In Forex .......................................... 31

Element 1:  Proof That Defendant Misrepresented That The Pool Was Trading Forex. ...................... 31

Element 2:  Proof That Defendant's Misrepresentation That The Commercial Pool Was Trading Forex Was Material. ................................................................................................................... 31

Element 3:  Proof Of Defendant's Material Misrepresentations Regarding The Type Of Trading Were Made With The Requisite Scienter................................................................................... 32

e.  Defendants Misappropriated Pool Participant Funds........................................................................ 33

i.     Misappropriation Of Pool Participant Funds Violates The CEA.................................................... 33

ii.    Proof That Defendants Misappropriated Pool Participant Funds................................................... 34

iii.   Proof Of Misappropriation With Scienter ..................................................................................... 35

f.  Proof Of Defendants' Material Misrepresentations Regarding Madigan's Background ................. 38

Element 1:  Proof Defendant Madigan Misrepresented His Educational Background........................ 38

Element 2:  Proof Misrepresentations Of Background And Experience Were Material. .................... 39

Element 3:  Misrepresentations Regarding Education Were Made With Scienter. .............................. 39

B.    Plaintiff Is Entitled To Summary Judgment Against Madigan Defendants On All Counts Because They Were Controlling Persons Of Defendant R2 Capital. .......................................................................... 40

1.    Defendant Madigan Had The Requisite Power To Control Defendant R2 Capital ......................... 41

a.  Burden Of Proof And Elements Of Control Person Liability ........................................................... 41

b.  Undisputed Proof Of The Elements Establishing Madigan's Control Of R2 Capital...................... 41

Element 1:  Proof That Defendant Madigan Had The Power To Control R2 Capital. ........................ 41

2.    Burden And Elements Of Failure To Act In Good Faith *OR* Knowingly Induced Violations ......... 56

a.  Burden And Elements To Establish That Defendant Madigan Did Not Act In Good Faith............. 57

b.  Undisputed Proof Of The Elements That Defendant Madigan  Failed To Act In Good Faith ......... 57

Element 2a:  Proof Of Defendant Madigan's Failure To Act In Good Faith ........................................ 57

c.  Defendant Madigan Knowingly Induced R2 Capital's CEA Violations ........................................... 58

i)  Burden Of Proof And Elements Of Knowing Inducement. ........................................................... 58

Element 2b:  Proof Of Defendant Madigan's Knowing Inducement. .................................................... 59

c.  Plaintiff Is Entitled To Summary Judgment Against Madigan And Madigan Enterprises On All Counts Based On R2 Capital's Vicarious Liability ........................................................................... 61

IV.   CLAIMS UPON WHICH JUDGMENT IS SOUGHT AGAINST DEFENDANT R2 CAPITAL ...... 62

A.   Plaintiff Is Entitled To Summary Judgment On All Claims Against Defendant R2 Capital Because R2 Capital Is Vicariously Liable For The Acts Of The Other Defendants .................................................. 62

1.   Burden Of Proof And Elements Of Vicarious Liability Under 7 U.S.C. § 2(a)(1)(B) And 17 C.F.R. § 1.2 ........................................................................................................................................ 62

2.   Undisputed Proof Of These Elements ............................................................................................. 63

Element 1:  Proof Defendants Were Acting As The Principal's Agents Or Officials ......................... 63

Element 2:  Proof The Defendants Were Acting Within The Scope Of Their Agency. ....................... 64

B.   Plaintiff Is Entitled To Summary Judgment Against Defendants On Count Three:  Fraud By A Commodity Pool Operator ........................................................................................................................ 66

1.   Burden Of Proof And Elements Of Fraud By A Commodity Pool Operator ................................... 66

2.   Undisputed Proof Of Elements Of Violation Of Section 4o Under The Act .................................... 67

a.   Defendant R2 Capital Was A Commodity Pool Operator ........................................................... 67

Element 1: Proof Defendant Was A Commodity Pool Operator. ........................................................ 67

b.   Defendant R2 Capital Made Material Misrepresentations ............................................................ 68

Elements 2 and 3:  Proof Defendant Made Material Misrepresentations. ............................................ 68

C.   Plaintiff Is Entitled To Summary Judgment As To Count Four: Commingling Of Funds .................. 68

1.   Burden Of Proof And Elements Of Violation ................................................................................. 68

2.    Undisputed Facts Establishing Violation ........................................................................... 69

D.    Plaintiff Is Entitled To Summary Judgment On All Claims Against Defendants Madigan And
Madigan Enterprises Because They Are Alter Egos Of Each Other ............................................. 69

1.    Burden Of Proof And Elements Of Vicarious Liability Under Alter Ego Doctrine ........................ 69

2.    Undisputed Proof Of These Elements ............................................................................... 70

V.    CLAIMS UPON WHICH JUDGMENT IS SOUGHT AGAINST VEST DEFENDANTS ............... 72

A.    Plaintiff Is Entitled To Summary Judgment On All Claims Against Vest Defendants Because They
Have Admitted Liability ............................................................................................................. 72

VI.    RELIEF SOUGHT BY PLAINTIFF .......................................................................................... 72

A.    Permanent Injunction ............................................................................................................. 72

1.    Elements Required For A Permanent Injunction .............................................................. 73

2.    Undisputed Proof Of These Elements ............................................................................... 73

a.    The Madigan Defendants Violated The Act And Regulations ...................................... 73

b.    The Madigan Defendants' Past Conduct Makes It Likely That They Will Violate The Act And
Regulations Absent A Permanent Injunction ........................................................................ 74

B.    Restitution ............................................................................................................................... 74

1.    Elements Required For Restitution .................................................................................... 74

2.    Undisputed Proof Of These Elements ............................................................................... 75

3.    Calculation of Restitution .................................................................................................. 75

C.    Disgorgement ........................................................................................................................... 76

D.    Civil Monetary Penalty ............................................................................................................ 76

1.    Undisputed Proof That The Madigan Defendants Should Be Ordered To Pay A Civil Monetary
Penalty ........................................................................................................................................ 78

a.    The Madigan Defendants Knowingly Committed Core Violations Of The Act And Regulations. 78

b.    The Madigan Defendants' Litigation Conduct Warrants A Significant Civil Monetary Penalty . 78

2.  Calculation of Civil Monetary Penalty .............................................................................. 79

E.  Prejudgment Interest and Costs ........................................................................................... 80

VI. CONCLUSION ............................................................................................................................. 81

Pursuant to Federal Rule of Civil Procedure 56, Plaintiff United States Commodity Futures Trading Commission ("CFTC" or "Commission") respectfully moves the Court to enter Summary Judgment in its favor, and against Defendants R2 Capital Group, LLC, Ryan Madigan, and Madigan Enterprises, Inc. (collectively, "Madigan Defendants"), and against Defendants Randell Vest and Bulletproof Vest, Inc. (together, "Vest Defendants"), as follows:

## I.   INTRODUCTION

This civil enforcement action arises out of Defendants' operation of a fraudulent investment scheme involving the futures and foreign exchange markets, defrauding investors out of millions of dollars. Accordingly, on November 4, 2014, Plaintiff CFTC filed its First Amended Complaint against the Madigan Defendants, and others, for Permanent Injunction, Civil Penalties, and Other Equitable Relief for violations of the Commodity Exchange Act ("Act" or "CEA"), 7 U.S.C. §§ 1-26 (2012), and the Commission's Regulations ("Regulations") promulgated thereunder, 17 C.F.R. §§ 1.1-190.10 (2013). (#38)[1]

This Motion primarily concerns the Madigan Defendants because liability has essentially already been determined against all other Defendants, as follows:

In October 2015, in the Southern District of New York, Defendant Ryan Tomazin—the Madigan Defendants' co-conspirator—pleaded guilty to, and was sentenced for, his participation in the fraudulent investment scheme and criminal violations of the Act.[2] Accordingly, Plaintiff CFTC and Defendants Ryan Tomazin and RAST Investor Group, LLC (Tomazin's alter ego

---

[1] The # symbol is the convention used in this brief to identify documents filed in this case by their docket entry number.

[2] *See* United States Attorney's Office for the Southern District of New York, "Founder and Managing Partner of Investment Firm Sentenced in Manhattan Federal Court for Securities and Commodities Fraud," Oct. 13, 2015, *available at* https://www.justice.gov/usao-sdny/pr/founder-and-managing-partner-investment-firm-sentenced-manhattan-federal-court.

holding company), (together, the "Tomazin Defendants"), reached a settlement wherein the Tomazin Defendants agreed to the entry of a proposed Joint Consent Order, in which Tomazin accepted responsibility for his participation in the scheme with Madigan and Vest and agreed to pay restitution and a yet-to-be determined Civil Monetary Penalty.  (#134-1-Proposed Order on Motion for Consent Order)

The Madigan Defendants' other co-conspirators, Defendants Randell Vest and Bulletproof Vest, Inc. (Randell Vest's alter ego holding company), (together, the "Vest Defendants"), have abandoned their defense of this case.  Although the Vest Defendants initially filed an Answer to the First Amended Complaint, they refused to participate in discovery, in violation of Fed. R. Civ. P. 37(b)(2)(A).  This led to the Court's January 11, 2017, Order that the Vest Defendants be prevented from producing any evidence at trial in defense of Plaintiff's claims; that their Answer and Affirmative Defenses be stricken; and, to the extent the facts and allegations in the First Amended Complaint impact the claims against the Vest Defendants, that those facts and allegations are deemed admitted.  (#133)

Plaintiff now brings the instant Motion for Summary Judgment against the Madigan Defendants because:

1)      the undisputed facts establish that the Madigan Defendants, like their co-conspirators, defrauded investors and committed other acts in violation of the Act and Regulations; and

2)      Defendant Ryan Madigan was a "controlling person" of Defendant R2 Capital Group, LLC ("R2 Capital"), such that he is liable for all of Defendant R2 Capital's violations of the Act and Regulations.  As a matter of law, Defendant R2 Capital is vicariously liable for the illegal conduct of its agents:  Defendants Tomazin (who has admitted liability), Madigan, and

2

Vest.  Therefore, as a matter of law Defendant Madigan is liable for those same violations of the

Act and Regulations for which R2 Capital is vicariously liable.

Plaintiff brings this Motion for Summary Judgment against the Vest Defendants because

all of the facts alleged in the First Amended Complaint have been deemed admitted by the Court.

(#133)

## II.   FACTUAL SUMMARY

<u>Formation And Control Of Defendant R2 Capital By Defendant Madigan</u>

Defendant R2 Capital is a Colorado limited liability company founded in November 2008

by Defendants Madigan and Tomazin as equal owners of the company.[3]  When R2 Capital was

formed, Defendants Madigan and Tomazin became signatories on the R2 Capital USBank

account, giving them each the power to withdraw or deposit funds, or review the account.

In July 2009, Defendant Randell Vest was added as the third owner and Managing

Partner of R2 Capital.  Thereafter, Defendants Madigan, Tomazin, and Vest maintained their

ownership of R2 Capital through their respective defendant holding companies, each holding a

1/3 ownership interest in R2 Capital.  The three individual defendants were the only officers of

R2 Capital.

Defendants Madigan's, Tomazin's, and Vest's powers as founders, owners, members and

managing partners of R2 Capital were established in the R2 Capital Operating Agreement.

Under that Operating Agreement, Madigan, Tomazin and Vest had sole and complete power

over management decisions of R2 Capital through a majority 2/3 vote, such that Madigan and

Tomazin, or Madigan and Vest, had complete authority over management decisions in R2

---

[3] This "Factual Summary" section contains almost no citations to evidence to reduce space and because it is intended only to give context to the facts cited in the "Argument" section, *infra*. However, all facts are supported by citations to evidence in the Argument section.

Capital.  Likewise, some management decisions at R2 Capital required unanimous approval of

Madigan, Vest and Tomazin, giving Defendant Madigan complete power over whether R2

Capital would take such action.  To date, none of the Managing Partners have transferred or

withdrawn from, or dissolved or terminated, the partnership.  In fact, Defendant Madigan has

been executing discovery verifications on behalf of Defendant R2 Capital throughout this

litigation.

On September 18, 2009, Defendant R2 Capital established R2 Commercial Capital

Partners I L.P. ("Commercial Pool" or "Commercial Fund"), a limited partnership initially

intended to trade foreign currency exchange ("forex") contracts, with Defendant R2 Capital

acting as the General Partner.   (#38 at ¶ 23; #74 at ¶ 23; #76 at ¶ 23); attached Declaration of

Luke B. Marsh,[4] Ex. A—Madigan Dep. at 56:5-9, 59:19-21; Ex. G—Tomazin Dec. at ¶ 8.  The

Commercial Pool was designed to, and in fact did, pool investors' funds to invest in in forex and

later, futures contracts.  Investors' funds were solicited for the purpose of pooling the funds,

investing those pooled funds in forex, and dividing the profits 50/50 between R2 Capital as the

General Partner, and the investors as limited partners.  The investors' profits were to be

distributed on a pro rata basis, depending on investment size.

In the fall of 2009, Defendant Madigan introduced R2 Capital to David Simpson, who

was retained to trade forex for R2 Capital.  Defendant Madigan handled the negotiations on

behalf of R2 Capital in retaining Mr. Simpson to trade forex in the Commercial Pool, and

Defendant Madigan and his partners jointly decided to hire Mr. Simpson.

---

[4] All the exhibits in support of this motion are attached as exhibits to the Declaration of Luke B.
Marsh, including others' Declarations.  Whenever possible the citation to the record does not
reference the Declaration of Luke B. Marsh because it is implied.  "Deposition" and "Exhibit"
and other reference terms are abbreviated wherever possible to reduce space.

<u>R2 Capital Solicits Its First Pool Participant</u>

On January 12, 2010, the entire R2 Capital management team (Defendants Madigan, Tomazin, and Vest) and trader David Simpson met in Chicago with R2 Capital's first potential pool participant, a firm known as Northport Investments ("Northport").

During or immediately after this meeting, Defendant Tomazin provided Northport with a "Confidential Information Memorandum," a "Limited Partnership Agreement," and a "Subscription Agreement."  These documents falsely represented the following:

1.   R2 Capital would receive a management fee of 50% of the profits earned by the Commercial FundFund, but only if profits were earned;

2.   All pool participant funds would be deposited directly into the Commercial FundFund's bank account and there would be no commingling of funds between the Commercial Fund and R2 Capital except for the payment of bills or disbursements on behalf of the Commercial Pool;

3.   There would be no loans between the Commercial Fund and any other entities controlled by R2 Capital or any person or entity directly or indirectly controlling, controlled by or under common control of R2 Capital;

4.   The Commercial Fund would be subject to an annual third party audit; and

5.   R2 Capital, as the General Partner, would not possess Commercial Fund property.

Ex. F—Morgan Dec. at ¶ 8

Defendants Madigan, Vest, and Tomazin also promised expected profits of "double digit returns" on an investment into the pool.  All of these statements were false and fraudulent.  In truth, the Defendants routinely misappropriated pool participant funds for themselves while the Commercial Fund was losing money, or not trading at all.  Pool participants' funds were not

always directly deposited into the Commercial Pool bank account and were routinely commingled with R2 Capital's and other Defendant's bank accounts.  Defendant R2 Capital also routinely loaned pool participant funds to Defendant's Madigan, Vest, and Tomazin.  There was never an external third party audit of the Commercial Fund.

As a result of Defendants' misrepresentations, between January 22 and March 31, 2010, pool participant Northport deposited $1,105,000 into the Commercial Pool.  Ex. F—Morgan Dec. at ¶ 9; Ex. G—Tomazin Dec. at ¶¶ 12-14.

<u>Defendant Madigan's Powers As Managing Partner Of Defendant R2 Capital</u>

It was Defendant Madigan's custom and practice to identify himself as "Managing Partner" of R2 Capital because that was, in fact, his role.  Defendant Madigan was in charge of nearly all aspects of running R2 Capital, including soliciting pool participants, opening and monitoring trading accounts, and hiring and supervising traders.

On January 15, 2010, Defendant Madigan submitted the account opening documents for the Commercial Fund's first trading account at now-defunct Futures Commission Merchant ("FCM") PFG Best.  Defendant Madigan instructed PFG Best to contact him, R2 Capital Managing Partner Madigan, if there were any questions about the documents Madigan submitted on behalf of R2 Capital.

Defendant Madigan had the power and the ability to exercise full trading authority in the PFG Best forex account, and to access, and deposit or withdraw money from, the account at any time.

Defendant Madigan also had and exercised the power to negotiate and enter into contracts on behalf of R2 Capital.  For example, in addition to opening R2 Capital's trading and bank accounts, Defendant Madigan found, and negotiated the hiring of, trader Simpson, and drafted

and/or edited a non-interference contract with pool participant Northport.  Defendant Madigan also executed a lease of virtual office space in New York City on behalf of R2 Capital.  Further, Defendant Madigan to this day still continues to legally bind Defendant R2 Capital by routinely executing verifications of Interrogatory Answers in this litigation on behalf of R2 Capital.

Defendant Madigan also was the Managing Partner who served as R2 Capital's primary point of contact with three of the four total pool participants who invested with R2 Capital.  As such, he hosted webinars, conference calls, and was in weekly contact with at least one of the pool participants from September 2010 through January 2014.

<u>The Commercial Pool Switches From Forex To Futures Trading In August 2010</u>

By August 2010, the Commercial Pool had brought in approximately $2.2 million from 3 investors, and had lost approximately $1.3 million of those investor funds trading in the PFG Best forex account.  Accordingly, R2 Capital severed its relationship with its existing forex trader, and retained Peter Campbell as its new trader.  Further, at that time the Commercial Fund switched its trading account from PFG Best to Interactive Brokers ("IB"), a different FCM.

Defendant Madigan was the R2 Capital Managing Partner who opened the IB trading account for the Commercial Fund.  By doing so, Defendant Madigan could access and review the IB trading account at any time, could trade in the account, and could deposit or withdraw funds from the account.  The IB trading account statements—available at all times to Defendant Madigan—show that only futures were traded in this account; there was no forex traded in this account.

Ryan Madigan was the only person with the authority to withdraw funds from the IB account from its August 2010 opening until April 3, 2012, when Defendant Randell Vest also obtained the authority to withdraw funds.

7

Further, when Defendant Madigan opened the IB account, IB provided only him with an electronic key card that issued temporary passcodes allowing only Madigan to withdraw funds from the account after signing in with his personal username and password.

Defendant Madigan's Misrepresentations To Pool Participants

Between at least March 2010 and January 2014, Defendant Madigan made repeated misrepresentations to potential and existing pool participants. He misrepresented expected and actual profits earned by the Commercial Pool; he lied to pool participants about his educational background; he distributed false account statements which showed purported profits even after trading ceased; he misrepresented that he himself invested in the pool; and he misrepresented that the Commercial Pool was trading forex when in fact it had switched to trading futures.

For example, in March, 2010, Defendant Madigan solicited potential pool participant Derek Miller by verbally promising returns of 8% to 10% per month in the forex investment pool, and represented that he himself had invested $1 million of his personal funds in the pool. As a result of Defendant Madigan's misrepresentations, on April 1, 2010, pool participant Miller invested $1 million in the Commercial Pool. In truth, the Commercial Pool had lost $350,659.46 trading forex by the end of February 2010, and the only funds remaining in the Commercial Pool by March of 2010 was pool participant Northport's $754,340.54 investment. Further, Defendant Madigan never deposited any of his own money into the Commercial Pool.

In September 2010, while soliciting pool participant Allan Gamble to invest in the Commercial Pool, Defendant Madigan misrepresented that the Commercial Pool would be investing in forex. Defendant Madigan did not reveal that the Commercial Pool had stopped trading in forex the month before, and was now trading only in the futures markets. Defendant Madigan represented that the Commercial Pool had experienced year-to-date profit performance

of 33%, even though the Commercial Pool had actually lost more than half its value at that point.

Further, in August and October 2010, Defendant Madigan misrepresented to pool participants that he had obtained a Master of Business Administration degree, or MBA. This was another lie: He has never received a MBA, or any graduate degree of any kind.

### Defendant Madigan Distributed False Trading Account Statements

Defendant Madigan also sent fraudulent Commercial Pool trading account statements to pool participants, despite having had the ability to check whether the account statements accurately reflected actual trading profits. At least four of the account statements Madigan distributed during the first half of 2011 represented that the Commercial Pool was successfully trading in the IB account, when in fact during those months the Commercial Pool was suffering trading losses.

In July, 2011, the Commercial Pool ceased all trading in the IB account. Nevertheless, in late 2011 and 2012, Defendant Madigan sent pool participant Gamble account statements falsely showing that the Commercial Pool was still successfully trading in the IB account, when in fact trading had ceased months earlier.

### Defendants Misappropriated Pool Participant Funds

Between January 2010 and April 2011, Madigan and his co-defendants took in $2,471,181.64 from the four pool participants. After deducting the Commercial Pool's total net losses of $1,122,932.12, the Commercial Pool should have had $1,348,249.52 in remaining funds when it stopped trading in July 2011.

When the Commercial Pool stopped trading in July 2011, however, only $194,348.03 remained of the $1,348,249.52 that should have been in the IB account. In August 2011, $192,500 was withdrawn from the IB account and distributed to Defendants Madigan, Vest and

9

Tomazin, and R2 trader Peter Campbell, leaving only $1,838.03 in the IB trading account; $2,780.93 in the R2 Capital USBank account; and $157.57 in the Commercial Fund's USBank account.

Of the $2,471,181.64 received from the four pool participants, only one received a purported partial redemption totaling approximately $111,000, while the other three lost their entire investments. The total loss to all investors was $2,360,181.64. Defendant Madigan and his co-defendants, however, fared much better: Defendant Madigan received distributions or loans of $413,592.41 from the Commercial Pool; Defendant Vest received distributions or loans of $308,640.00 from the Commercial Pool; and Defendant Tomazin received distributions or loans of $209,275 from the Commercial Pool.

### Defendants Concealed Their Misappropriation Of Funds

Defendants concealed their misappropriation from pool participants. For example, on October 30, 2012, Defendants Madigan and Tomazin exchanged emails regarding "buying time" with investors by "keeping the backstory alive," in order to prevent pool participants from attempting to obtain return of their invested funds. Other times, in response to a pool participant's request for a partial redemption of funds, Defendants fraudulently represented that the funds were still held by the Commercial Pool and that technical difficulties at banks, FCMs, or the government prevented the redemption.

### Defendant Tomazin's Role As Managing Partner Of R2 Capital

Defendant Tomazin has accepted responsibility for his part in the fraud, pleaded guilty to criminal violations of the Commodity Exchange Act, paid $288,000 in criminal restitution, and served time in federal prison. As to his role in the fraud, Defendant Tomazin testified to the following at his plea hearing:

Between 2009 and 2014, I was the manager of R2 Capital, which managed the R2 Commercial Fund. During that time, I made false statements to investors, both in emails and on the phone, concerning the management of the commodity investment pool, the use of the funds, performance of the fund, and the use of the funds for trades. I knew my conduct was wrong.

Ex. G—Tomazin Dec. at ¶ 26.

Defendant Tomazin admits that he provided false monthly account statements to a pool participant, and issued periodic narrative reports fraudulently misrepresenting that the pool had returned profits from its successful trading.

Defendant Tomazin also acknowledges that he, <u>in collaboration with Defendant Madigan</u>, prepared the false account statements that Madigan forwarded to pool participant Gamble, as described above. Ex. G—Tomazin Dec. at ¶ 28.

## III.   CLAIMS UPON WHICH JUDGMENT IS SOUGHT AGAINST MADIGAN DEFENDANTS

**A. Plaintiff Is Entitled To Summary Judgment Against Madigan Defendants On Counts One And Two: Fraud In Connection With Commodity Futures Contracts And/Or Forex**

**1. Burden Of Proof And Elements Of Fraud In Connection With Commodity Futures Contracts And/Or Forex**

Sections 4b(a)(1)(A)-(C) of the Act, 7 U.S.C. § 6b(a)(1)(A)-(C) (2012), provide, in relevant part, that it is unlawful:

"for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity in interstate commerce or for future delivery that is made, or to be made, on or subject to the rules of a designated contract market, for or on behalf of any other person . . . (A) to cheat or defraud or attempt to cheat or defraud the other person; (B) willfully to make or cause to be made to the other person any false report or statement or willfully to enter or cause to be entered for the other person any false record; [or] (C) willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the

disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract for or, in the case of paragraph (2), with the other person[.]"

Sections 4b(a)(2)(A)-(C) of the Act apply to the forex transactions, agreements, or contracts offered by Defendants as if they were futures contracts.  Section 2(c)(2)(C)(iv) of the Act, 7 U.S.C. § 2(c)(2)(C)(iv)(2012).  *See also CFTC v. Trimble*, No. 11-CV-02887-PAB-KMT, 2012 WL 4478962, at *7 (D. Colo. Sept. 28, 2012).

Therefore, to establish fraud in connection with commodity futures contracts and/or forex, Plaintiff CFTC must prove by a preponderance of evidence that (1) a misrepresentation, misleading statement, or deceptive omission was made; and (2) that the misrepresentation, misleading statement, or deceptive omission was material; and (3) made with scienter. *CFTC v. R.J. Fitzgerald & Co.,* 310 F.3d 1321, 1328 (11th Cir. 2002); *CFTC v. Flint McClung Capital LLC*, No. 11-CV-01644-CMA-BNB, 2012 WL 639321, at *6 (D. Colo. Feb. 28, 2012) (citing *Fitzgerald*).[5]

Here, Defendant Madigan's fraudulent misrepresentations included a. sending false trading account statements to investors; b. misrepresenting prior and expected future profitability of the pool; c. misrepresenting that he himself had invested in the pool; d. misrepresenting that the pool was trading forex; e. personally misappropriating pool participant funds; and f. lying to investors about his educational background.  The proof of the elements establishing Defendant Madigan's liability for these lies is addressed immediately below:

---

[5] Unlike a cause of action for fraud under the common law of torts, "reliance" on the representations is *not* a requisite element in a CFTC civil enforcement action.  *R.J. Fitzgerald & Co.*, 310 F.3d at 1328 n.6.

**2.   Undisputed Proof Of These Elements**

**a.   Defendant Madigan's Distributing <u>False Trading Account Statements</u> To Investors**

<u>Element 1</u>:   **Proof Of Madigan's <u>Misrepresentations</u> By False Trading Account Statements.**

It is undisputed that Defendant Madigan sent out the following <u>six false trading account statements</u> to pool participants:

<u>First And Second False Trading Account Statements Distributed By Madigan</u>

a)      On April 4, 2011, Defendant Madigan sent pool participant Allan Gamble his Commercial Pool account "Trading Statements" for trading in the IB account during January and February 2011, showing that Gamble's Commercial Pool account earned "Total Trading Profits" of $1,114.62 and $1,942.83 in January and February, 2011, respectively, with "Ending Trade Balances" of $109,764.20 and $110,626.71, respectively.   These also depicted "Trading Expenses" of "IB Fees" of $217.81.   *See* Ex. A—Madigan Dep. at 190:2-9, 192:5-16; Ex. C—Deposition Exhibit 32, trading account statements at pages RMDepo_000422-24.

b)      These trading account statements misrepresented the trading profits in the Commercial Pool because, contrary to these representations, the Commercial Pool's IB trading account sustained losses of $23,786.32 in January 2011 and losses of $79,342.51 in February 2011.   Ex. D—Koh Dec. at ¶ 24.

<u>Third False Trading Statement Distributed By Defendant Madigan</u>

c)      On June 17, 2011, Defendant Madigan sent pool participant Gamble his Commercial Pool account "Trading Statement" for trading in the IB account during May 2011, showing that Mr. Gamble's Commercial Pool account earned "Total Trading Profits" of

13

$8,676.08 in May 2011, with "Ending Trade Balances" of $257,496.20.  These also depicted "Total Trading Expenses" including "IB Fees" of $1,056.79.  Ex. B—Gamble Dep. at 61:11-23; Ex. A—Madigan Dep. at 196:25-197:16; Ex. C—Dep. Ex. 34, trading statements, at RMDepo_000430.1-430.4.

        d)        This trading account statement misrepresented the trading profits in the Commercial Pool because, contrary to these representations, the Commercial Pool's IB trading account did not turn a profit that month, but instead sustained losses of $1,448.12 in May 2011. Ex. D—Koh Dec. ¶ 24.

        <u>Fourth False Trading Account Statement Distributed By Defendant Madigan</u>

        e)        It is undisputed that in July, 2011, all trading ceased in the Commercial Pool's IB futures trading account.  Ex. D—Koh Dec. at ¶ 19.  Nevertheless, Defendant Madigan continued to send false account statements to pool participant Gamble, as established by the following:

        f)        On November 15, 2011, Defendant Madigan sent pool participant Gamble his Commercial Pool account "Trading Statement" showing that Mr. Gamble's earned "Total Trading Profits" of $19,754.06 in the IB trading account during the third quarter of 2011 (i.e., July 1, 2011 to September 30, 2011), with an "Ending Trade Balance of $269,183.48".  Ex. A—Madigan Dep. at 277:14-279:3; Ex. B—Gamble Dep. at 80:5-81:2; Ex. C—Dep. Ex. 48, trading statement at RMDepo_000492-93.

        g)        In truth, all trading in the IB trading account had stopped back in July 2011, and $192,500 had been withdrawn from the IB account in August 2011, and distributed to the Defendant Madigan and his partners in R2 Capital, and their trader.   Ex. D—Koh Dec. at ¶¶ 19, 26-27.

        h)        This left only $1,838 in the IB trading account as of August 10, 2011, which

remained the amount in the IB trading account when Defendant Madigan sent this and all
subsequent trading account statements to Mr. Gamble.  Ex. D—Koh Dec. at ¶ 27.

Fifth False Trading Account Statement Distributed By Defendant Madigan

i)      On August 14, 2012, Defendant Madigan sent pool participant Gamble his
Commercial Pool account "Trading Statement" showing that Mr. Gamble earned "Total Trading
Profits" of $13,524.42 in the IB trading account during the third quarter of 2011 (i.e., April 1,
2012 to June 30, 2012), with an "Ending Trade Balance of $292,521.91", and "Trading
Expenses" including $1,852.14 in IB trading fees.  Ex. A—Madigan Dep. at 299-301:18, Ex. C—
Dep. Ex. 54, trading statement, at RMDepo_000523-24; Ex. B, Gamble Dep. at 82:3-18, 84:17-
85:1.

j)      Again, in truth, all trading in the IB trading account had ceased in July 2011, and
all but $1,838 was distributed to Defendant Madigan and his partners in R2 Capital, and their
trader.  Ex. D—Koh Dec. at ¶¶ 19, 27.  This left only $1,838 in the IB trading account when
Defendant Madigan sent the July 2011 trading account statement and all subsequent statements to
Mr. Gamble.  Ex. D—Koh Dec. at ¶ 27.

Sixth False Trading Account Statement Distributed By Defendant Madigan

k)      On October 30, 2012, Defendant Madigan sent pool participant Gamble his
Commercial Pool account "Trading Statement" showing that Mr. Gamble earned "Total Trading
Profits" of $12,348.96 in the IB trading account during the third quarter of 2012 (i.e., July 1, 2012
to September 30, 2012), with an "Ending Trade Balance of $297,389.03", and "Trading
Expenses" including $1,873.77 in IB trading fees.  Ex. A—Madigan Dep. at 304:1-305:16,
307:19-308:10; Ex. C—Dep. Ex. 56, trading statement at RMDepo_000486.

l)      Again, in truth, all trading in the IB trading account had stopped back in July 2011,

and at this time all but $1,838 had been distributed to Defendant Madigan and his partners in R2 Capital, and their trader.  Ex. D—Koh Dec. at ¶ 27.

**Element 2:  Proof That Madigan's Misrepresentations Were Material.**

As a matter of law, false representations of account activity as reflected in customer account statements are material because a customer's understanding of whether he or she is making a profit on an investment will almost certainly influence the decision as to whether to invest additional funds. *CFTC v. Noble Wealth Data Info. Servs., Inc.*, 90 F. Supp. 2d 676, 687 (D. Md. 2000), *aff'd in part, vacated in part sub nom. CFTC v. Baragosh*, 278 F.3d 319 (4th Cir. 2002).

**Element 3:  Proof That Madigan Had The Requisite Scienter.**

Defendant Madigan knew or must have known that the account statements were false because he knew or must have known of the losses and absence of trading in the accounts.  .

**(1) Burden Of Proof And Elements Of Scienter**

To establish scienter, Plaintiff only needs to show by a preponderance of evidence, "highly unreasonable omissions or misrepresentations . . . that present a danger of misleading [customers] which is either known to the Defendant[s] or so obvious that Defendant[s] must have been aware of it." *R.J. Fitzgerald.*, 310 F.3d at 1328 (quoting *Ziemba v. Cascade Int'l*, 256 F.3d 1194, 1202 (11th Cir. 2001)).

"[T]he Commission need not find an actual intent to misrepresent a fact or to deceive." *CFTC v. Wilson*, 19 F. Supp. 3d 352, 362 (D. Mass. 2014), *aff'd sub nom. CFTC v. JBW Capital*, 812 F.3d 98 (1st Cir. 2016) (granting summary judgment for Plaintiff CFTC, and finding requisite scienter despite defendant's "rather dubious contention that he didn't intend to defraud

anyone.") (citing *First Commodity Corp. of Boston v. CFTC*, 676 F.2d 1, 6 (1st Cir. 1982)). Rather, "the Commission has the power to base liability upon "willful" behavior, liberally defined to include 'reckless' behavior." *Id.* *See CFTC v. Noble Metals, Int'l,* 67 F.3d 766, 774 (9th Cir.1995) (providing that scienter exists when defendants act intentionally or with "careless disregard"). Scienter can be inferred from circumstantial evidence. *In re JCC, Inc.,* CFTC No. 89-4, 1994 WL 183817, *11 (CFTC May 12, 1994) *aff'd sub nom.* *JCC, Inc. v. CFTC*, 63 F.3d 1557 (11th Cir. 1995).

Reckless disregard of truth satisfies scienter when a defendant deliberately fails to acquire the information that would have revealed that defendant's statements were false or misleading. *In re Kidder Peabody Sec. Litig.,* 10 F. Supp. 2d 398, 415 (S.D.N.Y. 1998). For example, scienter is established as a matter of law even though a defendant held a "good faith belief" that the information passed on to investors was accurate, where defendant failed to verify the accuracy of information in solicitation brochures he used to attract investors. *See CFTC v. Complete Devs., LLC*, No. 4:10 CV 2287, 2014 WL 794181, at *16, 19-20 (N.D. Ohio Feb. 26, 2014) (granting summary judgment for plaintiff CFTC); *see also CFTC v. Savage,* 611 F.2d 270, 283 (9th Cir.1979) (holding, "knowledge cannot be precluded by ignorance brought about by willfully or carelessly ignoring the truth").

Likewise, failure to review monthly account statements and bank records or to verify information in trade brochures constitutes recklessness establishing scienter under the CEA. *See CFTC v. Vandeveld*, No. 04-2181-D/an, 2007 WL 2823307, at *5-6 (W.D. Tenn. Sept. 27, 2007), *modified sub nom. CFTC v. FxTrade Fin., LLC*, No. 04-2181-D/an, 2007 WL 4790810 (W.D. Tenn. Oct. 18, 2007).

17

**(2) Undisputed Proof Of Defendant Madigan's Scienter**

Defendant Madigan had the requisite scienter when he sent the fraudulent trading account statements to pool participant Gamble because he knew or must have known of the losses and absence of trading in the accounts, as established by the following:

*First*, Defendant Madigan knew or must have known the trading account statements were false because he had daily access to the Commercial Pool's IB trading account, as established by the following:

a)      Defendant Ryan Madigan opened the Commercial Fund's IB trading account on behalf of R2 Capital.  Ex. A—Madigan Dep. at 150:5-17.   By doing so, Defendant Madigan could access and review the IB trading account at any time, could trade in the account, and could deposit or withdraw funds from the account.  Ex. A—Madigan Dep. at 150:18-151:5; Ex. C— Dep. Ex. 23, IB Account Opening Doc at RMDepo_000767-79.

b)      Between August 2010 and October 2013, IB emailed 178 notices to Defendant Madigan, informing him that the daily Commercial Pool's IB trading Activity Statement was available for Madigan to review online.  These notices were sent to Madigan every day trading occurred in the account.  After trading stopped in July 2011, the email notices continued to be sent to Madigan every month until October 2013.  Ex. H—Ward Dec. at ¶ 13.

c)      Had Defendant Madigan reviewed the Commercial Pool IB Trading Activity Statements available to him between August 2010 and December 2013, he would have seen that only futures were traded in this account; there was no forex traded in this account; and no trading of any kind occurred after July 2011.  Ex. H—Ward Dec. at ¶ 12.

d)      In fact, IB issued Defendant Madigan a token—a small electronic device that issues temporary passwords—which allowed Defendant Madigan to access and withdraw funds from the Commercial Fund's IB account at any time.   Ex. H—Ward Dec. at ¶ 6; Ex. A—

Madigan Dep. at 174:5-175:22; Ex. C—Dep. Ex. 27, Madigan email at RMDepo_000402-404.

e)      As a matter of law, Defendant Madigan cannot escape liability by recklessly avoiding the information in the trading accounts that was available to him at all relevant times. *See Complete Developments, LLC*, 2014 WL 794181, at *15, 19-20 (granting summary judgment for plaintiff CFTC even though defendant expressed "good faith belief" that information provided to investors was accurate, where defendant failed to verify the accuracy of information in solicitation brochures he used to attract investors.); *see also Vandeveld*, 2007 WL 2823307, at *5-6 (finding that failure to review monthly account statements or bank records, or to verify information in trade brochures constituted recklessness establishing scienter under the CEA). Defendant Madigan therefore had the requisite scienter because he knew, or must have known, of the losses in the IB trading account, that all trading ceased in the account after July 2011, and that the IB account had been drained of all but $1,838 in August 2011.

**Second**, Defendant Madigan knew or must have known about the trading losses, and lack of trading, in the IB account because he was the only person with the authority and the ability to withdraw funds from the account, he in fact withdrew funds from the account, and more than $774,000 was withdrawn from the account during the time he had exclusive authority and ability to withdraw funds from the account.  Ex. H—Ward Dec. at ¶¶ 6, 7b, 8, 9, 10, 11, 14.

**Third**, Defendant Madigan knew the trading account statements were false because he admitted that he reviewed trading account statements he sent to pool participants and compared them with actual trading in the IB account:

f)      Defendant Madigan represented to investors that, as Managing Partner of R2 Capital, he led "[q]ualitative and [q]uantitative reviews of fund performance in comparison to stated [f]und [p]erformance [o]bjectives".  Ex. A—Madigan Dep. at 156:3-157:14; Ex. B—

Gamble Dep. at 26:7-17, 29:1-30:1, 34:21-35:9; Ex. C—Dep. Ex. 25, Madigan Bio at

RMDepo_001097-99; *see also* Ex. G—Tomazin Dec. at ¶ 16.

      g)      Defendant Madigan testified that this included reviewing the account statements

that he sent to pool participants.  Ex. A—Madigan Dep. at 164:22-165:19.  Inasmuch as he also

had access to the trading accounts, he knew or must have known of the trading losses before July

2011, and he knew or must have known that the IB account had stopped all trading after July

2011.

      h)      During weekly conversations and emails with pool participant Gamble, Madigan

repeatedly indicated that he had prepared and/or reviewed the account statements to compare

them with actual Commercial Fund trading performance objectives, and that he was constantly

monitoring performance.  *See, e.g.*, Ex. B—Gamble Dep. at 34-35, 36:19-37:14; 38:19-40:9,

41:11-42:5 and Ex. C—Dep. Ex. 64, Madigan email, RMDepo_0000400-401; Ex. B—Gamble

Dep. 45:14-46:6, 46:21-48:16 and Ex. C—Dep. Ex. 28, Madigan email at RMDepo_0000407-

408; Ex. B—Gamble Dep. at 55:23-56:12, 59:1-19 and Ex. C—Dep. Ex. 33, Madigan email at

RMDepo_000425; Ex. B—Gamble Dep. at 61:11-63:1 and 65:3-19 and Ex. C—Dep. Ex. 34,

Madigan email at RMDepo_0000430.1-430.4; Ex. B—Gamble Dep. 91:15-93:1 and Ex. C—

Dep. Ex. 70, Madigan email.  Accordingly, Madigan knew of the losses in the IB trading

account, he knew that all trading ceased in the account after July 2011, and he knew that the IB

account had been drained of all but $1,838 in August 2011.

      i)      Madigan admits that the R2 Commercial Fund trading account statements that he

sent to pool participant Gamble represented Gamble's purported profits in the IB trading account.

Ex. A—Madigan Dep. at 190:2-9, 192:5-16; Ex. C—Dep. Ex. 32, trading statements at

RMDepo_000422-24.

*Fourth*, Madigan knew or had to have known the trading account statements were false because he was alerted on at least two occasions that the IB trading account had insufficient funds:

j)	In July, 2011, Defendant Madigan was notified that the balance in the Commercial Fund's trading account had fallen to less than $200,000.  On July 16, 2011, pool participant Miller sent Defendant Madigan an email stating: "We gave you 1 Mill USD.  You have managed it down to around 200K.  You keep telling me we are making money.  How exactly?"  Ex. A—Madigan Dep. at 198:3-200:20; Ex. C—Dep. Ex. 35, email chain at RMDepo_000437.

k)	Pool participant Miller was right—his $1 million investment in in the Commercial Fund's IB trading account was down to only $194,348.03.  Ex. D—Koh Dec. at ¶ 25.

l)	Had Madigan checked the IB trading account—and it would be reckless not to check it after this red-flag email—he would have seen that pool participant Miller was correct, and that the account balance had fallen to only $194,348.03.  Therefore, as of July 16, 2011, Madigan knew or must have known that the IB trading account had fallen to levels that would not allow Defendants to redeem investors.

m)	On October 10, 2011, approximately two months after the IB trading account was drained of all but $1,838, Defendant Madigan received another alert when IB notified him that there was insufficient equity in the IB trading account.  Ex. A—Madigan Dep. at 237:4-238:5; Ex. C—Dep. Ex. 43, email chain at RMDepo_000475-76.  Defendant Madigan forwarded the email to Tomazin, indicating that this information was important.  Ex. A—Madigan Dep. at 238:6-

240:25.[6]   Again, Defendant Madigan therefore knew of the lack of funds and trading in the IB account at this time.

n)      In this same October 10, 2011 email chain, Defendant Madigan indicated that he was trying to find new investors, such that an additional "$3m in the fund [true's] up all issue," meaning that Defendants would be able to pay back the amounts they misappropriated from the Commercial Fund without investors knowing that their funds had been stolen.  Ex. G—Tomazin Dec. at ¶ 45; Ex. C—Dep. Ex. 43, email chain at RMDepo_000475.

o)      As a matter of law, Defendant Madigan could not intentionally ignore these alerts that the IB trading account had insufficient funds.  *See Savage,* 611 F.2d at 283 (holding that knowledge cannot be precluded by ignorance brought about by willfully or carelessly ignoring the truth); *Vandeveld,* 2007 WL 2823307, at *5-6 (finding that failure to review monthly account statements or bank records or to verify information in trade brochures constituted recklessness establishing scienter under the CEA).

*Fifth*, Defendant Madigan knew that the trading account statements were false because it is undisputed that Defendant Madigan knew, by November 26, 2011 at the latest, that all trading had ceased in the IB trading account:

p)      Defendant Madigan testified that, by November 26, 2011, *he knew that the Commercial Fund had stopped trading in the IB account*.  Ex. A—Madigan Dep. at 282:14-25, 286:15-22; Ex. C—Dep. Ex. 50 at RMDepo_0000506.[7]  Accordingly, *Madigan knew that all the*

---

[6] Incredibly, Defendant Madigan claims he did not check the IB trading account after being notified that it had insufficient funds.  Ex. A—Madigan Dep. at 238-40.

[7] Defendant Madigan testified that by mid-November 2011 he knew that the decision had been made to close the Commercial Fund.  Ex. A—Madigan Dep. at 282:14-25, 284:2-285:13; Ex. C—Dep. Ex.50, email chain at RMDepo_000506. He also testified that he may have actually learned of the plan to wind down the Commercial Fund before October 19, 2011.  Ex. A—

*IB trading account statements he sent to pool participant Gamble after November 26, 2011, were fraudulent.*

q)      Even if Madigan claims he did not access the IB trading account, the notification from IB that the account held insufficient funds, and Madigan's admission that he knew it was no longer trading after November 2011 establishes that he knew or must have known that the trading account statements he sent to pool participants were fraudulent.

r)      Had Defendant Madigan accessed the IB account at any time after July 2011, he would have seen that the IB account was no longer being traded.  Ex. D—Koh Dec. at ¶ 19; Ex. H—Ward Dec. at ¶ 12.

s)      Had Defendant Madigan accessed the IB account at any time after August 10, 2011, he would have seen that the entire IB pooled account held only $1,838, and that $192,500 had been withdrawn from the IB account in August in 2011 (again, the IB account for which Madigan had been given a token allowing him with withdraw funds from).  Ex. D—Koh Dec. at ¶¶ 26-27.[8]  Ex. H—Ward Dec. at ¶12.

---

Madigan Dep. at 257-58.  For example, an August 2011 Madigan email indicates he knew at that time that Peter Campbell had ceased trading in the IB account.  Ex. C—Dep. Ex. 37 email.

[8] Defendant Madigan claims to be sufficiently financially sophisticated such that he would have easily recognized the losses in the IB account.  According to Madigan's representations to pool participants, Defendant Madigan was a "ridiculously successful investment banker" with "over 13 years experience in the financial services industry" who had "worked for several funds . . . as both senior management and board member".  Ex. E—Miller Dec. at ¶ 4; Ex. A--Madigan Dep. at 104:15-106:9 and Ex. C, Dep. Ex.10, Madigan powerpoint at RMDepo_000304; *see also* Ex. A—Madigan Dep. at 139:24-140:9, 141:16-142:10, discussing Ex. C—Dep. Ex. 22-Madigan powerpoint at RMDepo_000359.  Madigan represented that he had been extremely successful as Chief Operating Officer, running his family's business, where he "led a turnaround initiative," "was accountable for revenue generation, cost saving strategies . . . and multi-million dollar contract negotiations[,]"  and increased earnings by $4.5 million.  Ex. A—Madigan Dep. at 156:8-157:14 and Ex. C—Dep. Ex. 25-Madigan Bio at RMDepo_001099; Ex.  E—Miller Dec. at ¶13, Ex. B; Ex. A—Madigan Dep. at 42:4-43:20; Ex. B—Gamble Dep. at 30:18-31:1.

**b. Defendant Madigan's Misrepresentations Regarding Profitability**

**Element 1**:  **Proof Madigan Misrepresented The Profitability Of The Pool.**

Defendant Madigan misrepresented the past and future expected profitability of the Commercial Fund.

a)      In January 2010, Defendant Madigan and his co-Defendants told pool participant Northport that Northport could "expect double-digit" returns in the Commercial Pool.  Exhibit F—Morgan Dec., ¶ 7; Ex. G—Tomazin Dec. at ¶ 13.

b)      In March, 2010, Defendant Madigan informed pool participant Miller that Defendant Madigan had been a "ridiculously successful" investment banker, and he verbally promised returns of 8% to 10% per month in the forex investment pool. Ex. E—Miller Dec. ¶ 4.

c)      As a result of these representations, pool participant Miller invested $1 million in the Commercial Pool.  Id. at ¶ 5.

d)      In truth, by February 2010 the Commercial Pool had lost $350,659.46 trading forex, and the only money in the Commercial Pool in March of 2010 was the remaining $754,340.54 of Northport's investment in the Commercial Pool.[9]  Ex. D—Koh Dec. at ¶ 20.

e)      It is undisputed that the Commercial Pool lost over half its value between January and August 2010 in the Commercial Fund's PFG Best forex trading account.  Ex. D—Koh Dec. at ¶ 23.

---

[9] These facts are undisputed by Defendant Madigan because Madigan cannot recall the substance of those conversations he had with Miller before Miller invested.  Ex. A—Madigan Dep. at 95:4-97:17.

f)      Defendant Madigan did not reveal to Mr. Gamble, before Mr. Gamble invested in the Commercial Fund, about the losses that had been sustained during 2010.  Ex. A—Madigan Dep. at 153:1-154:2.

g)      In fact, although Defendant Madigan represented in his resume that, as of October 2010, the Commercial Pool had experienced year-to-date profit performance of 33%, Defendant Madigan never informed pool participant Gamble the Commercial Pool had actually lost more than half its value at that point.  Ex. A—Madigan Dep. at 156:8-15; Ex. C—Dep. Ex. 25, Madigan bio at RMDepo_001099; Ex. B—Gamble Dep. at 36.

h)      Defendant Madigan also represented that the Commercial Pool was extremely low risk in that no more than 1% of Mr. Gamble's investment in the pool would be at risk at any time. Ex. B—Gamble Dep. at 12:3-14.

**Element 2**:  **Proof That Misrepresentations Regarding Profitability Were Material.**

a)      As a matter of law, misrepresentations and deceptive omissions concerning the likelihood of profiting from futures or forex trading are material and violate the antifraud provisions of the CEA.  *CFTC v. Wall St. Underground, Inc.*, 281 F. Supp. 2d 1260, 1269–70 (D. Kan. 2003), *modified sub nom. CFTC v. Wall St. Underground, Inc.*, No. CIV.A. 03-2193-CM, 2004 WL 1900588 (D. Kan. June 24, 2004), *and aff'd and remanded*, 128 F. App'x 726 (10th Cir. 2005).

b)      Likewise, promises and guarantees of profit, in light of the uncertainties of the marketplace, are inherently fraudulent.  *Id.* (citing *Munnell v. Paine Webber, Jackson & Curtis*, [1986–87 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 23,313 at 32,863 (CFTC Oct. 8, 1986)). "Indeed, misrepresentations concerning profit and risk go to the heart of a customer's investment decision and are therefore material as a matter of law." *Id. (*citing *Noble Wealth Data*, 90 F.

25

Supp. 2d 676 at 686).  See also *CFTC v. Commonwealth Fin. Grp., Inc.,* 874 F. Supp. 1345,

1353–54 (S.D. Fla.1994) (holding that misrepresentations regarding the trading record of a firm or

broker are fraudulent because past success and experience are material factors that a reasonable

investor would consider when deciding to invest); *CFTC v. U.S. Metals Depository Co.,* 468 F.

Supp. 1149, 1159 (S.D.N.Y. 1979) (holding that unreasonable predictions of profits constitute

material misrepresentations and omissions); *CFTC v. Total Call Grp., Inc.*, No. 4:10-CV-00513-

RAS, 2012 WL 1642196, at *8 (E.D. Tex. Mar. 30, 2012)

   c)  Therefore, Defendant Madigan's misrepresentations regarding the 33% increase in

pool's performance through October 8, 2010—when the pool had lost more than half its value—

and his representation that pool participants could expect profits of 8% to 10% per month, were

material misrepresentations.

   d)  Moreover, given Madigan's overall portrayal of the pool as being successful, his

failure to reveal the Commercial Pool's abysmal track record was a material omission which

satisfies this element.  *See R.J. Fitzgerald*, 310 F.3d at 1332-33  (finding that when brokers

solicit futures customers with "rosy" claims of profit potential while, in reality, they know that

95% of the firm's customers are losing money, the failure to disclose such an abysmal track

record is a material omission and violates the CEA), and *Swickard v. A.G. Edwards & Sons*,

[1984-1986 Transfer Binder] (CCH) Comm. Fut. L. Rep. ¶ 22,522 at 30,275 (CFTC Mar. 7, 1985)

(holding that half the truth may amount to a lie if it is understood to be the whole)

### Element 3:  Proof That Defendant Made Profitability Misrepresentations With Scienter.

It cannot be disputed that Defendant Madigan knew or must have known of the trading

losses in the Commercial Pool when he misrepresented that it had been, and would be, profitable.

*First*, it is undisputed that Defendant Madigan actually knew about the trading losses:

a)      Madigan knew about the trading losses in the PFG Best forex trading account. Defendant Madigan testified that in July 2010 he was aware that the PFG Best account was failing to turn a profit, and was losing money.  Ex. A—Madigan Dep. at 137:14-138:4.

b)      Madigan testified that it was because the Commercial Pool "lost a ton of money" trading that, in August of 2010, R2 Capital severed its relationship with its existing trader, and retained Peter Campbell as its trader.  Ex. A—Madigan Dep. at 148:10-149:1.

*Second*, as a matter of law, Defendant Madigan had the requisite scienter because he could access Commercial Pool's PFG Best account at any time, such that it was reckless of him to make profitability representations without verifying the accuracy of those representations.  See *Complete Devs., LLC*, 2014 WL 794181, at *16, 19-20 (granting summary judgment for plaintiff CFTC even though defendant expressed "good faith belief" that the information passed on to investors was accurate, where defendant failed to verify the accuracy of information in solicitation brochures he used to attract investors.);  *Vandeveld*,  2007 WL 2823307, at *5-6 (holding failure to review monthly account statements, bank records or verify information in trade brochures constitutes recklessness establishing scienter under the CEA).  Madigan's recklessness in misrepresenting the profitability of the pool, while having complete access to review the lack of profitability in the account, is established by the following:

c)      It is undisputed that Defendant Madigan had the ability to access the PFG Best forex account at any time.  Ex. A—Madigan Dep. at 65:18-21; Ex. C—Dep. Ex. 5 at RMDepo_000134.

d)      In fact, it was an easy and simple process for Defendant Madigan to access the account, and he even provided a "walk through" to at least one pool participant on how to access the account.  Ex. A—Madigan Dep. at 88:16-25.

27

e)      Defendant Madigan also had the power and ability "to deposit and withdraw from [the Commercial Fund PFG Best Account] money, commodities, [and] contracts for the purchase or sale of commodities[.]"  Ex. A—Madigan Dep. at 66:6-21; Ex. C—Dep. Ex. 5, excerpt of account opening documents at RMDepo_000134.

f)      Defendant Madigan sent Commercial Pool trading account statements to pool participants, and he had the ability to check to ensure that the account statements accurately reflected actual trading profits.  Ex. A—Madigan Dep. at 110:2-111:8; Ex. C—Dep. Ex. 11 at RMDepo_000305-06.

g)      In April 2010 Defendant Madigan pointed out an error in a trading statement he had sent to a pool participant.  Ex. A—Madigan Dep. at 113:5-114:10; Ex. C—Dep. Ex. 12, email and trading statement at RMDepo_000307-08.

h)      Even when others had problems logging into the Commercial Fund's PFG Best account, Defendant Madigan had no trouble logging in.  Ex. A—Madigan Dep. at 115:6-116:6.

i)      Occasionally, Defendant Madigan would have his father, Joe Madigan—co-owner of Defendant Madigan Enterprises with Defendant Madigan—review account trading statements for accuracy.  Ex. A—Madigan Dep. at 117:4-118:9; Ex. C—Dep. Ex. 14, email chain.

j)      Defendant Madigan must have known about the losses because it is undisputed that he was "working closely" with R2 Capital's trader, David Simpson, regarding the forex trading and performance in the Commercial Pool's PFG Best trading account in 2010.  Ex. A— Madigan Dep. at 90:18-91:23; Ex. C—Dep. Ex. 9, Madigan email, RMDepo_000283.

Therefore, Defendant Madigan had the requisite scienter because knew of the losses in the PFG Best trading account, and therefore knew that the there was no reasonable basis to promise trading returns of 8% to 10% per month to pool participant Miller, and that the Commercial Pool

had not earned 33% profits in 2010.

### c.  **Defendant Madigan Misrepresented That He Had Invested In The Commercial Pool**

Defendant Madigan misrepresented to pool participants that he had invested his own funds in the Commercial Pool, when in actuality he not.

### <u>Element 1</u>:  **Proof That Defendant Madigan <u>Misrepresented</u> His Investment.**

a)      It is undisputed that Defendant Madigan represented to both pool participants Miller and Gamble that he himself had invested substantial sums into the Commercial Pool. Ex. E—Miller Dec. at ¶ 4c; Ex. A—Madigan Dep. at 299:10-300:6; Ex. C—Dep. Ex. 54, Madigan email at RMDepo_000523-24; Ex. B—Gamble Dep. 82:3-18.

b)      It is also undisputed that neither Madigan nor Madigan Enterprises deposited money into R2 Capital or the Commercial Pool for purposes of investing in the Commercial Pool. Ex. A—Madigan Dep. at 26:17-27:1, 28:11-29:4.

c)      On October 7, 2010, in an email to Mr. Gamble, Defendant Madigan represented: "I am dumping a good deal of capital into the fund this month [October 2010]."  Ex. A—Madigan Dep. at 156, 158-59; Ex. C—Dep. Ex. 25, email chain, at RMDepo_001098.

d)      In truth, in October 2010 no money was deposited into the Commercial Fund's IB trading account, and in fact $80,000 was withdrawn from the IB trading account that Defendant Madigan had the ability to withdraw funds from.  Ex. D—Koh Dec. at ¶ 22.

e)      Madigan also admitted that he made this representation even though he did not know if any money was deposited in the fund in October 2010, nor did he remember if any money was ever deposited into fund after this email.  Ex. A—Madigan Dep. at 159:3-14.

**Element 2**:  **Proof That Misrepresentations Regarding Investing In Pool Were Material**.

Defendant's representations to potential and existing investors that Defendant himself had invested in the Commercial Pool is material because it is something that a reasonable investor would consider important in deciding to invest. *CFTC v. Trimble*, No. 11-CV-02887-PAB-KMT, 2013 WL 317576, at *6 (D. Colo. Jan. 28, 2013) (finding representations of others investing substantial amounts into commodity pool was material fact a reasonable investor would consider important).

**Element 3**:  **Proof That Misrepresentations Regarding Investing In Pool Were Made with Scienter.**

Defendant Madigan misrepresentations regarding his own contributions to the pool were made with the requisite scienter.

a)      Defendant Madigan admitted that he never directly wired or deposited his own funds to invest in the Commercial Pool.  Ex. A—Madigan Dep. at 26:17-27:1, 28:11-29:4. Therefore he knew that his statements to the contrary were false.

b)      Further, Defendant's October 7, 2010 representation that "I am dumping a great deal of capital into the fund this month" was, at minimum, reckless because he admits he had no idea whether any money would be deposited into the fund that month.  Ex. A—Madigan Dep. at 158:20-159:7.  *See SEC v. Loomis*, 969 F. Supp. 2d 1226, 1234 (E.D. Cal. 2013) (finding "[w]hen the defendant is aware of the facts that made the statement misleading, 'he cannot ignore the facts and plead ignorance of the risk.'" (quoting *SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1094 (9th Cir. 2010)).  Here, according to Defendant Madigan, he knew that he didn't know whether his (or anyone else's) funds were deposited in the Commercial Pool, but he made that material misrepresentation nonetheless.

30

### d.  Defendant Madigan's Misrepresentations Regarding Investing In Forex

Defendant Madigan also misrepresented that the Commercial Pool was only investing in forex, when in truth it had changed investment strategies and had switched to trading only futures.

### Element 1:  Proof That Defendant **Misrepresented** That The Pool Was Trading Forex.

a)      It is undisputed that in April 2010 Defendant Madigan represented to pool participant Miller that the Commercial Pool would be investing in forex, and that Defendant Madigan never represented to pool participant Miller that the Commercial Pool would be invested in the futures markets.  Ex. E—Miller Dec. at ¶ 4.

b)      Likewise, it is undisputed that in September and October 2010 Madigan represented to Defendant Gamble that the Commercial Pool would be invested in forex; Defendant Madigan never told him that the pool actually would be investing in the futures markets.  Ex. B—Gamble Dep. at 10:25-12:2, 12:19-13:6.

c)      It is undisputed that, contrary to Madigan's representations, the Commercial Pool stopped trading forex in August 2010, and began trading only futures contracts in September 2010.  Ex. D—Koh Dec. at ¶¶ 18, 21; Ex. H—Ward Dec. at ¶ 12.

### Element 2:  Proof That Defendant's Misrepresentation That The Commercial Pool Was Trading Forex Was **Material**.

Defendant's misrepresentations that the Commercial Pool was trading forex were material misrepresentations.  *See Flint McClung Capital LLC*,  2012 WL 639321, at *7 ("[d]efendants' misrepresentations and omissions were material in that a reasonable customer would want to know, among other things, that [d]efendants were not trading forex as promised and that pool participant funds were being misappropriated") (citing *Saxe v. E.F. Hutton & Co., Inc.,* 789 F.2d 105, 110 (2d Cir. 1986)) ("'material misrepresentations about . . . the type of

trading [the] funds were used for' would be sufficient to state a cause of action pursuant to the [Act]."); *CFTC v. Rolando*, 589 F. Supp. 2d 159, 170 (D. Conn. 2008) ("Trading in futures and options is inherently risky. . . . As such, a reasonable investor would want to know that his funds were being invested in futures and options and the risks associated with that investment.")

**<u>Element 3</u>:  Proof Of Defendant's Material Misrepresentations Regarding The Type Of Trading Were Made With The Requisite <u>Scienter</u>.**

Defendant Madigan's material misrepresentations were made with scienter because he knew, or must have known, that the Commercial Pool's IB account was trading futures when he represented it was trading forex, as established by the following:

a)      It is undisputed that Madigan was aware that, because the Commercial Pool "lost a ton of money" trading forex in the first half of 2010, R2 Capital in August of 2010 severed its relationship with its existing forex trader, and retained Peter Campbell as R2 Capital's trader.  Ex. A—Madigan Dep. at 148:18-149:1.

b)      The PFG Best forex account was closed and Defendant Madigan opened a new account at IB.  Ex. A—Madigan Dep. at 148:1-3, 150:1-17.

c)      Further, any time that Madigan logged into the account he would have seen that the new IB account traded only futures. Ex. D—Koh Dec. at ¶ 21; Ex. H—Ward Dec. at ¶ 12

d)      Defendant Madigan had daily access to the Commercial Pool's IB trading account. After Defendant Ryan Madigan opened up the Commercial Fund's IB trading account on behalf of R2 Capital, he could access and review the IB trading account at any time, could trade in the account, and could deposit or withdraw funds from the account.   Ex. A—Madigan Dep. at 150:18-151:5; Ex. C—Dep. Ex. 23, IB Customer Agreement, RMDepo_000767-79; Ex. G—Tomazin Dec. at ¶ 19.

e)      In fact, IB issued Defendant Madigan a token—an small electronic device that

issues temporary passwords—which allowed Defendant Madigan to access and withdraw funds from the Commercial Funds' IB account at any time.   Ex. H—Ward Dec. at ¶ 6; Ex. A—Madigan Depo. at 174:5-175:22; Ex. C—Dep. Ex. 27, email at RMDepo_000402-404.

f)        Between August 2010 and October 2013, IB emailed 178 notices to Defendant Madigan, informing him that the daily Commercial Pool's IB trading Activity Statement was available for Madigan to review online.   These notices were sent to Madigan every day there was trading in the account.   After trading stopped in July 2011, the email notices continued to be sent every month to Madigan until October 2013. Ex. H—Ward Dec. at ¶ 13.   Had Defendant Madigan reviewed the Commercial Pool IB Trading Activity Statements available to Defendant Madigan between August 2010 and December 2013, he would have seen that only futures were traded in this account.   Ex. H—Ward Dec. at ¶ 12.

g)        Therefore Madigan knew, or must have known, that the IB account was trading futures contracts.

**e.   Defendants Misappropriated Pool Participant Funds**

**i.       Misappropriation Of Pool Participant Funds Violates The CEA**

Misappropriation of customer funds constitutes "willful and blatant fraudulent activity" in violation of Sections 4b(a)(2)(A) and (C) of the Act, 7 U.S.C. §§ 6b(a)(2)(A) and (C). *Trimble*, 2013 WL 317576, at *6 (citing *Noble Wealth Data Info.*, 90 F. Supp. 2d at 687 (defendants violated Sections 4b(a)(2)(I) and (iii) (the predecessor to 4b(a)(2)(A) and (C)) by diverting investor funds for operating expenses and personal use)); *see also CFTC v. Skorupskas,* 605 F. Supp. 923, 932 (E.D. Mich.1985) (holding that defendant violated Section 4b when she misappropriated customer funds by soliciting funds for trading and then traded only a small

percentage of those funds, while disbursing the rest of the funds to investors, herself, and her family).

ii.      **Proof That Defendants Misappropriated Pool Participant Funds**

a)      It is undisputed that between January 2010 and May 2010, $2,205,000 was transferred from the R2 Commercial Pool's USBank account to its PFG Best trading account, where pool participant funds were used to trade forex.  *See* Ex. D—Koh Dec. at ¶ 8.  Defendants deposited $2,205,000 into the PFG Best forex account, sustaining losses of $1,354,737.03.  *Id.* at ¶¶ 8-9.

b)      In August 2010, Defendant Madigan opened another trading account at FCM Interactive Brokers (the "IB trading account"), and R2 Capital used the account to trade E-mini S&P 500 futures and other security products, realizing net gains of $231,804.91.  *Id.* at ¶¶ 11-12.

c)      After netting the Commercial Pool's $1,354,737.03 losses in the PFG Best forex account and the approximately $231,804.91 trading gains in the IB trading account, $1,348,249.52 in assets should have remained in the Commercial Pool.  *Id.* at ¶ 13.

d)       It is also undisputed that, in July 2011, Defendants ceased all trading in the Commercial Fund, leaving only $194,348.03 from $2,471,181.64 invested by pool participants.  Ex. D—Koh Dec. at ¶¶ 19, 26.

e)      The remainder of these $194,348.03 funds was transferred to Defendants' holding companies through a standard routing that exemplifies Defendants' typical method used for misappropriating pool participants' funds:  On August 1, 2011, $20,000 was wired from the Commercial Fund's IB trading account to the Commercial Fund's USBank account, and then later that same day, $20,000 was wired from that Commercial Pool's USBank account to the Defendant R2 Capital USBank account.  The next day, August 2, 2011, $5,000 was wired from the R2 Capital USBank account directly into Defendant Madigan Enterprises' bank account; and $15,000 directly

into Bulletproof Vest's bank account.  Ex. G—Tomazin Dec. at ¶ 32; Ex. D—Koh Dec. at ¶ 26.

f)        And again, on August 9, 2011, another $172,500 was wired from the IB trading account to the Commercial Fund USBank account, then the next day wired on to the R2 Capital USBank account, where it was distributed to Defendant Madigan Enterprises, Defendant Bulletproof Vest, Defendant RAST and Peter Campbell.  Ex. D—Koh Dec. at ¶ 27; Ex. G—Tomazin Dec. at ¶ 34; Ex. C—Dep. Ex. 38.

g)        At the end of August, 2011, there was only $1,838.03 in the IB trading account; $2,780.93 in the R2 Capital USBank account; and $157.57 in the Commercial Pool's USBank account.  Ex. D—Koh Dec. at ¶ 27.

h)        In total, Defendants Ryan Madigan and Madigan Enterprises received purported loans and disbursements of $413,592.41 in pool participant funds from the R2 Capital USBank account; Defendants Randell Vest and Bulletproof Vest received purported loans and disbursements of $308,640.00 in pool participant funds from the R2 Capital USBank account; and Defendants Ryan Tomazin and RAST received purported loans and disbursements of $209,275.00 in pool participant funds from the R2 Capital USBank account.  Ex. D—Koh Dec. at ¶ 15.

i)        These money transfers to defendants were misappropriations of pool participant funds to pay for living expenses of the Defendants Madigan, Vest and Tomazin.  Ex. G—Tomazin Dec. at ¶¶ 15, 23.

### iii.        Proof Of Misappropriation With Scienter

*First*, misappropriation of customer funds, as a matter of law, constitutes "willful and blatant fraudulent activity" in violation of Sections 4b(a)(2)(A) and (C) of the Act, 7 U.S.C. §§

6b(a)(2)(A) and (C).  *Trimble*, 2013 WL 317576, at *6 (citing *Noble Wealth Data Info..*, 90 F. Supp. 2d at 687 (defendants violated Sections 4b(a)(2)(I) and (iii) (the predecessor to 4b(a)(2)(A) and (C)) by diverting investor funds for operating expenses and personal use); *see also CFTC v. Skorupskas,* 605 F. Supp. 923, 932 (E.D. Mich.1985)

**Second**, scienter is also established by evidence that Defendant Madigan made misrepresentations to hide from participants what was truly occurring in their accounts and, thus, to perpetuate his fraudulent scheme.  *Rolando*, 589 F. Supp. 2d at 170 (finding scienter buttressed by defendant's hiding from customers what was truly happening in their accounts). Defendant Madigan's concealing his fraudulent acts is established by the following:

a)      Defendants concealed their misappropriation from pool participants by sending them the fraudulent account statements discussed above, and by repeated written and oral representations delaying pool participants redemption requests:  For example, in response to a pool participant's request for a partial redemption of funds, defendants fraudulently represented that the funds were still held by the Commercial Pool and that technical difficulties at banks or FCMs, the SEC, CFTC, and/or NFA, or the government shutdown in October 2013 is preventing redemption.  Ex. G—Tomazin Dec. at ¶¶ 15, 23; Ex. E—Miller Decl. at ¶¶ 18-22.

b)      Another example of hiding their misappropriation occurred in a September 8, 2011 email in which Defendant Madigan misrepresented that he could not provide a redemption on Derek Miller's investment because "[i]ts mid-month.  We do not take money out of a trade during the month."  This was untrue—the money was not held up in a trade because no money had been traded since July 2011.  Ex. G—Tomazin Dec. at ¶ 36; Ex. C—Dep. Ex. 39.

c)      In a November 21, 2011 email Defendant Madigan referenced his continued efforts to stall pool participant Derek Miller's request for redemptions.  Ex. G—Tomazin Dec. at ¶ 49; Ex. C—Dep. Ex. 49.

d)      Another example of Defendant's hiding their misappropriation occurred on October 30, 2012, Defendants Madigan and Tomazin exchanged emails regarding their "buying time" with investors by "keeping the backstory alive."  Ex. A—Madigan Dep. at 304:1-20, 306:1-19; Ex. C—Dep. Ex. 56, email chain at RMDepo_000483-84; Ex. G—Tomazin Dec. at ¶ 24.

e)      Significantly, Defendant Madigan admits that the reason they were "buying time" by "keeping the backstory alive" was to prevent pool participants from attempting to obtain return of their invested funds.  Ex. A—Madigan Dep. at 304:1-20, 306:1-19.

f)      Defendant Madigan had good reason to "buy time" with a fraudulent "backstory" to keep their victims from attempting to redeem their investments:  In October 2012, the Commercial Pool had not traded in the IB account for over a year and had only $788.03; the Commercial Pool USBank account had only $32.57; and the R2 Capital USBank account had only $1,404.66.  Ex. D—Koh Dec. at ¶ 29.

g)      Finally, to further conceal the misappropriation, Defendant Madigan stretched out Mr. Gamble's request for a simple $25,000 redemption over two months in 2013.  On February 25, 2013 pool participant Gamble for the first time requested a redemption from his investment in the Commercial Pool.  After some delayed responses to further, emails, on April 3 and April 13, 2013 Defendant Madigan represented that Mr. Gamble's investment could not be redeemed _until a trade in the Commercial Pool IB account was unwound_.  Ex. B—Gamble Dep. at 87:14-90:22, 91:3-14; Ex. C—Dep. Ex. 70, Madigan email.  That is, during this April 13, 2013 email

Defendant Madigan represented that the Commercial Pool was still trading.  Ex. B—Gamble Dep. at 93:11-22; Ex. C—Dep. Ex. 70, Madigan email.

       h)       Importantly, Madigan's April 13, 2013 representation that the pool was still trading was 18 months after late November 2011, which is when Madigan admits he knew that the Commercial Pool IB account had stopped trading.  Ex. A—Madigan Dep. at 282:14-25, 286:15-22; Ex. C—Dep. Ex. 50 at RMDepo_0000506.

       i)       This was also almost two years after R2 Capital had stopped trading in the Commercial Pool's IB account in July 2011—the IB account that Defendant Madigan could access at any time.

       j)       Pool participant Gamble never received the requested $25,000 redemption, or any redemption, of his investment in the Commercial Pool.  Ex. B—Gamble Dep. at 103:13-104:10.

### f.  Proof Of Defendants' Material Misrepresentations Regarding Madigan's Background

Defendant Madigan also lied to pool participants about his educational background—claiming he had an MBA when in fact, he had no MBA or graduate degree of any kind.

### **Element 1**:  Proof Defendant Madigan **Misrepresented** His Educational Background.

       a)       Madigan represented that he had received a MBA from Rochester Institute of Technology.  Ex. A—Madigan Dep. at 139:24-140:9, 141:16-142:10; Ex C—Dep. Ex. 22, Madigan bio at RMDepo_000351-60; Ex. E—Miller Dec. at ¶ 13, Ex. B.  These representations were false:  He has never received a Masters of Business Administration, or Executive MBA or graduate degree of any kind.  Ex. O—RIT Registrar Dec. at  ¶ 4.

**Element 2:   Proof Misrepresentations Of Background And Experience Were Material.**

Representations and omissions regarding background and experience are material.  As a matter of law, any fact that enables customers to assess independently the risk inherent in their investment and the likelihood of profit is a material fact. This includes the background of the firm or its members. *CFTC v. White Pine Trust Corp.*, No. 04CV2093 J (NLS), 2007 WL 1754819, at *5 (S.D. Cal. Apr. 20, 2007) (finding that lying regarding educational background of account manager is a material misrepresentation under Section 4c(b) of the CEA); *In re Commodities Int'l Corp.,* [1996–1998 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 26,943,at 44,563–64 (CFTC Jan. 14, 1997); *see also Saxe,* 789 F.2d at 110 ("'material misrepresentations about the nature of the organization handling [an] account, the people [dealt] with, and the type of trading [the] funds were used for' would be sufficient to state a cause of action pursuant to the [Act]."); *Commonwealth Fin. Group,,* 874 F. Supp. at 1353–54 (misrepresentations concerning trading record and experience of a firm or broker are fraudulent because past success and experience are material factors to reasonable customers).

Therefore, Defendant Madigan's lying about having received an MBA was material.

**Element 3:   Misrepresentations Regarding Education Were Made With Scienter.**

Defendant Madigan necessarily had the requisite scienter because he knows his own background and experience, and therefore knows when he misrepresents that information.

**B.     Plaintiff Is Entitled To Summary Judgment Against Madigan Defendants On All Counts Because They Were Controlling Persons Of Defendant R2 Capital.**

Section 13(b) of the Act provides: "Any person who, directly or indirectly, controls any person who has violated any provision of this chapter or any of the rules, regulations, or orders issued pursuant to this chapter may be held liable for such violation in any action brought by the Commission to the same extent as such controlled person. In such action, the Commission has the burden of proving that the controlling person did not act in good faith or knowingly induced, directly or indirectly, the act or acts constituting the violation."  7 U.S.C. § 13c(b) (2012).

Section 13(b) of the Act "allow[s] the Commission to reach behind a corporate entity to the controlling individuals of the corporation and to impose liability for violations of the Act directly on such individuals as well as the corporation itself." *JCC*, 63 F.3d at 1567 (quoting *In re Apache Trading Corp.,* [1990-1992 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 25,251, at 38,794 (CFTC Mar. 11, 1992)).

Therefore, Under Section 13(b), to demonstrate that the individual Defendants had control over the entity Defendants requires the CFTC to show the controlling individual: (1) had control and (2) lacked good faith **_or_** knowingly induced the acts constituting the violation.  *CFTC v. Hunter Wise Commodities, LLC,* 1 F. Supp. 3d 1311, 1322–23 (S.D. Fla. 2014) (citing  *In re First Nat'l Trading Corp.,* [1992–1994 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 26,142, at 41,787 (CFTC July 20, 1994), *aff'd without opinion sub nom., Pick v. CFTC,* 99 F.3d 1139 (6th Cir. 1996)).

1.      **Defendant Madigan Had The Requisite Power To Control Defendant R2 Capital**

    a.      **Burden Of Proof And Elements Of Control Person Liability**

To establish the control element, Plaintiff must prove by a preponderance of the evidence

that the alleged control person had "general control over the operation of the entity principally

liable." *Monieson v. CFTC*, 996 F.2d 852, 859 (7th Cir. 1993) (quoting *Donohoe v. Consol.*

*Operating & Prod. Corp.*, 982 F.2d 1130, 1138 (7th Cir. 1992)).   Control person liability will

attach if the defendant "possessed the power or ability to control the specific transaction or

activity upon which the primary violation was predicated." *Id.*  Making management and hiring

decisions and being involved in day-to-day operations, too, serve to show that the alleged

controlling person exercised "general control" over the enterprise. *See id.* at 860 (citing *G.A.*

*Thompson & Co., Inc. v. Partridge,* 636 F.2d 945, 958 (5th Cir. 1981)).

It is the existence of the "power" or ability to control the illegal transaction or activity

"that matters, not the exercise of the power by participating in or benefitting from the illegal

acts."  *See id.* (rejecting the "culpable participant" test for a liberal construction of control).

    b.      **Undisputed Proof Of The Elements Establishing Madigan's Control Of R2**
        **Capital**

**Element 1**:  **Proof That Defendant Madigan Had The <u>Power To Control</u> R2 Capital.**

(1)      General control exists because Defendant Madigan is an **officer, founder,**

**principal, or the authorized signatory** on the company's bank accounts.

a)      In determining whether a defendant had the power to exercise sufficient control of

an entity to establish "control person liability" under the act, control exists where the individual

is an officer, founder, principal, or the authorized signatory on the company's bank accounts.

*Hunter Wise Commodities, LLC*, 1 F. Supp. 3d at 1323 (citing *In re Spiegel,* [1987–1990

Transfer Binder] Comm. Fut. L. Rep (CCH) ¶ 24,103 at 34,767 (CFTC Jan. 12, 1988)).

b)      Here, it is undisputed that Defendant Madigan is a founder, owner, Managing

Partner of Defendant R2 Capital.  Ex. A—Madigan Dep. at 21:14-23:4, 325:25-326:8; Ex. C—

Dep. Ex. 1, R2 Operating Agreement, at RMDepo_000083-85; Ex. G—Tomazin Dec. at  ¶¶ 2-4.

c)      It is also undisputed that Defendant Madigan was an authorized signatory on the

R2 Capital Bank account, and an authorized signatory on both of R2 Capital's trading accounts

that he, Defendant Madigan opened on behalf of R2 Capital.  Ex. A—Madigan Dep. at 34:1-11;

Ex. C—Dep. Ex. 2, R2 USBank account opening documents; Ex. G—Tomazin Dec. at ¶ 7; Ex.

A—Madigan Dep. at 62:23-63:15; Ex. C—Dep. Ex. 5, PFG Best Account Opening docs., at

RMDepo_000097-99; Ex. A—Madigan Dep. at 150:1-17; Ex. C—Dep. Ex. 23, IB Account

Agreement signed by Madigan for R2 Capital.

d)      Accordingly, Defendant Madigan is a controlling person of R2 Capital.

(2)      Independent of the other reasons cited herein, Defendant Madigan is also a

controlling person of R2 Capital because he had **ownership and voting rights** sufficient to

control it:

a)      A person is a controlling person when he has "the possession, direct or indirect, of

the power to direct or cause the direction of the management and policies of a person whether

through the ***ownership of voting securities***, by contract, or otherwise."  *CFTC v. Arrington*, 998

F. Supp. 2d 847, 872 (D. Neb. 2014) (emphasis added), *aff'd sub nom. CFTC v. Kratville*, 796

F.3d 873 (8th Cir. 2015) (quoting *In re Spiegel,* Comm. Fut. L. Rep. (CCH) ¶ 24,103 at 34,765

n.4 (CFTC Jan. 12, 1988)).  Further, "[b]ecause control may be exercised jointly by a group,

[such that] several persons may simultaneously be controlling persons of the same corporation."

*Kratville*, 796 F.3d at 894 (quoting *Baragosh*, 278 F.3d at 330).

b)        Defendant R2 Capital was founded in November 2008 by Defendants Madigan and Tomazin as equal owners of the company.  Ex. A—Madigan Dep. at 21:14-23:4, 326; Ex. C—Dep. Ex. 1 at 000083-85; Ex. G—Tomazin Dec. at ¶ 2.

c)        In July 2009, Defendant Randell Vest was added as the third owner and Managing Partner of R2 Capital.  Thereafter, Defendants Madigan, Tomazin, and Vest maintained their ownership of R2 Capital through their respective defendant holding companies, each holding a 1/3 ownership interest in R2 Capital.  Ex. A—Madigan Dep. at 29:13-20, 31:3-20, 34:24-35:3; Ex. C—Dep. Ex. 1, R2 Operating Agreement at RMDepo_000086, 89.

d)        The three individual defendants were the only officers of R2 Capital.  *Id.*

e)        Madigan's, Tomazin's and Vest's powers as founders, owners, members and managing partners of R2 Capital was established in the R2 Capital Operating Agreement.  Ex. G—Tomazin Dec. at ¶ 4; Ex. C—Dep. Ex. 1.

f)        Under that Operating Agreement, Madigan, Tomazin and Vest had sole and complete power over management decisions of R2 Capital through a majority 2/3 vote, such that Madigan and Tomazin, or Madigan and Vest, had complete authority over management decisions in R2 Capital.  Ex. C—Dep. Ex. 1 at RMDepo_000069; Ex. A—Madigan Dep. at 31:24-32:11.

g)        Where, as here, an entity is owned equally by three partners, such that any two partners can outvote the remaining partner, each partner has the requisite control for control person liability.  *Donohoe*, 982 F.2d at 1138-39 (finding all three partners controlled the entity because any two partners could outvote the third partner).  Accordingly, Defendant Madigan had the requisite power to control R2 Capital.

43

h)     Likewise, some management decisions at R2 Capital <u>required unanimous approval of Madigan</u>, Vest and Tomazin, <u>giving Defendant Madigan complete power</u> over whether such action would be taken by R2 Capital:  For example, Defendant Madigan had complete power to prevent R2 Capital from adding members or from making any changes to the Operating Agreement.  Ex. G—Tomazin Dec. at  ¶¶ 4-5; Ex. C—Dep. Ex. 1, Operating Agreement at RMDepo_000079,82, ¶¶ 11.1 and 13.4, respectively.

i)     The R2 Capital Operating agreement contains provisions for the transfer or withdrawal of membership, or dissolution and termination of the partnership by written agreement, by any of the Managing Partners.  Ex. C—Dep. Ex. 1, Operating Agreement at RMDepo_000076-81.

j)     To date, none of the R2 Capital Managing Partners have transferred or withdrawn from, or dissolved or terminated, the partnership.  Ex. G—Tomazin Dec. at ¶ 6.

k)     In fact, Defendant Madigan has been executing discovery verifications on behalf of Defendant R2 Capital through at least January 2017 in this litigation.  Exhibit I to Marsh Declaration—Interrogatory Verifications on behalf of R2 Capital.

(3)     <u>Independent of the other reasons cited herein, Defendant Madigan is also a controlling person of R2 Capital because he had access to, and the **power to control, all of the trading accounts**</u>.  *See CFTC v. S. Trust Metals, Inc.*, 180 F. Supp. 3d 1124, 1131 (S.D. Fla. 2016) (finding defendant a controlling person where he opened the entity's trading accounts, and had authority to trade in those accounts).  This is established by the following:

a)     When Defendant Madigan opened the first R2 Capital trading account, he instructed PFG Best to contact him, R2 Capital managing partner Madigan, if there were any questions about the documents Madigan submitted on behalf of R2 Capital.  Ex. A—Madigan

Dep. at 62:23-63:15, 64:8-21; Ex. C—Dep. Ex. 5, PFG Best Account Opening docs. at RMDepo_000097-99.

b)      Defendant Madigan had the power and the ability to exercise full trading authority in the PFG Best forex account.  Ex. A—Madigan Dep. at 65:7-17, Ex. C—Dep. Ex. 5, PFG Account Opening docs. at RMDepo_000134.

c)      Defendant Madigan also had the power and the ability to access the PFG Best forex account at any time.  Ex. A—Madigan Dep. at 65:18-21, Ex. C—Dep. Ex. 5, PFG Best Account Opening docs. at RMDepo_000134.

d)      In fact, it was an easy for Defendant Madigan to access the account, and he even provided a "walk through" to at least one pool participant regarding how to access the account. Ex. A—Madigan Dep. at 88:16-25.  Defendant Madigan also had the power and ability "to deposit and withdraw from [the Commercial Fund's PFG Best Account] money, commodities, [and] contracts for the purchase or sale of commodities".  Ex. A—Madigan Dep. at 66:6-21; Ex. C—Dep. Ex. 5, PFG Best Account Opening docs. at RMDepo_000134.

e)      In August 2010, the Commercial Fund switched its trading account from PFG Best to IB, a different FCM.  Ex. A—Madigan Dep. at 149:2-6.

f)      Accordingly, on August 23, 2010, Defendant Ryan Madigan opened up the Commercial Fund's IB trading account on behalf of R2 Capital.  Ex. A—Madigan Dep. at 150:1-17.

g)      By doing so, Defendant Madigan could access and review the IB trading account at any time, could trade in the account, and could deposit or withdraw funds from the account. Ex. A—Madigan Dep. at 150:18-151:5; Ex. C—Dep. Ex. 23, IB Account Opening Agreement signed by Madigan at RMDepo_000767-79.

45

h)       On the R2 Capital master account, Madigan took the username of "rcapi952"; on the Commercial Pool sub-account, where the Commercial Pool funds were traded, Madigan took the username "rcapi037".  Ex. C—Dep. Ex. 23 at RMDepo_000778; Ex. H—Ward Dec. at ¶¶ 4, 5.

i)        IB issued Defendant Madigan a token—a small electronic device in the form of a keycard that issues temporary passcodes—which allowed Defendant Madigan to access and withdraw funds from the Commercial Funds' IB account at any time.   Ex. H—Ward Dec. at ¶ 6; Ex. A—Madigan Dep. at 174:6-175:13; Ex. C—Dep. Ex.  27 at RMDepo_000402-404.

j)        Defendant Madigan opened the Commercial Pool's IB account as the "Managing Member, Signatory, Fund Manager and sole user" on the Commercial Pool's IB Account, with username "rcapi037".  Ex. H—Ward Dec. at ¶ 5.  As such, Defendant Madigan was the only person authorized to withdraw funds from that account.[10]  Ex. H—Ward Dec. at ¶¶ 5, 14.

k)       Further, between August 23, 2010 and April 3, 2012, Defendant Madigan was the only person with the ability to withdraw funds from the Commercial Pool IB account. Ex. H—Ward Dec. at ¶¶ 6, 11.

l)        Defendant Madigan withdrew funds from the IB account (e.g., on March 10, 2011, Defendant Madigan (username "rcapi037") telephoned IB to inquire about "Deposits and Withdrawals" from the account, and that on January 20, 2013, Defendant Madigan telephoned IB and withdrew funds from the Commercial Pool IB account). Ex. H—Ward Dec. at ¶¶ 7b, 8.

---

[10] On April 3, 2012, Randell Vest was also given authority, in addition to Ryan Madigan, to initiate the withdrawal of funds from the R2 Commercial Pool account   However, between August 25, 2010 and April 3, 2012, only Ryan Madigan had the authority to initiate the withdrawal of funds from the R2 Commercial account.  Ex. H—Ward Dec. at ¶ 14.

m)      On August 1, 2011, $20,000 was withdrawn from this account, and on August 9, 2011, another $172,500 was withdrawn from this account.  Both withdrawals were performed by—and could only have been performed by—Madigan's username rapi037, using the token and password issued to Ryan Madigan.  Ex. H—Ward Dec. at ¶ 9

n)      Between August 23, 2010 and April 3, 2012, $774,000 was withdrawn from the Commercial IB trading account, by transactions initiated using Defendant Madigan's usernames rcapi952 or rcapi037, and using the token key cards issued to Ryan Madigan for those two usernames.  Ex. H—Ward Dec. at ¶ 10; Ex. D—Koh Dec. at ¶ 13.

o)      When R2 Capital was formed in November 2008, Defendant Madigan became a signatory on the R2 Capital USBank account, giving him the power to at any time withdraw or deposit funds and to review the account.  Ex. A—Madigan Dep. at 34:1-23; Ex. C – Dep. Ex. 2 at RMDepo_000259; Ex. G—Tomazin Dec. at ¶ 7.

(4)      Independent of the other reasons cited herein, Defendant Madigan is also a controlling person of R2 Capital because he was **in charge of hiring, supervising** and working closely with the traders retained by R2 Capital.  *See Kratville*, 796 F.3d at 895 (finding defendant controlling person where he jointly selected with partners the traders and financial institutions that controlled the entity); *Monieson*, 996 F.2d at 859 (defendant liable as control person where he "made management and hiring decisions and often instructed [others] on day-to-day matters.")  This is established by the following:

a)      In the fall of 2009, Defendant Madigan introduced R2 Capital to David Simpson, who was retained to trade forex for R2 Capital.[11]  Ex. G—Tomazin Dec. at ¶ 11; Ex. A—Madigan Dep. at 45:2-46:4.

---

[11] Defendant Madigan cannot recall how R2 Capital learned of David Simpson, or which Managing Partner introduced him to R2 Capital.  Ex. A—Madigan Dep. at 45:2-46:4.

47

b)      Defendant Madigan handled the negotiations on behalf of R2 Capital in its retaining Mr. Simpson to conduct the forex trading in the Commercial Pool.  Ex. A—Madigan Dep. at 47-48; Ex. C—Dep. Ex. 4, RMDepo_000264-67.

c)      Defendant Madigan and his two partners in R2 Capital jointly decided to hire Mr. Simpson.  Ex. A—Madigan Dep. at 59:12-18, 60:2-10.

d)      In fact, Defendant Madigan held himself out to pool participants as the Managing Partner responsible for "trader and quantitative analyst relationships" at R2 Capital.   Ex. A—Madigan Dep. at 156-157; Ex. C—Dep. Ex. 25 at RMDepo_001097-99; Ex. E—Miller Dec. at ¶ 13; Ex. B—Gamble Dep. at 26:7-17, 29:1-30:1.

e)      Defendant Madigan admits that in 2010 he was working closely with the R2 Capital forex trader, David Simpson, regarding the trading in the PFG Best account.  Ex. A—Madigan Dep. at 89:22-90:8; Ex. C—Dep. Ex.  9 at RMDepo_000283.

f)      Defendant Madigan likewise admitted in a November 2011 email to his R2 Capital partners that he "built and own[s] the relationship with Peter [Campbell, R2 Capital's trader in the subsequent IB futures trading account in 2010-2011]."  Ex. A—Madigan Dep. at 292:13-16, Ex. C—Dep. Ex. 52 at RMDepo_000510; Ex. G—Tomazin Dec. at ¶ 21.

g)      Defendant Randell Vest also had close interaction with the IB trader Peter Campbell while he was trading.  Ex. A—Madigan Dep. at 293.  However, Defendant Madigan claimed that "[n]o matter what conversation [between Defendant Vest and Peter Campbell], [P]eter always calls me after to confirm . . . [t]hen I [Defendant Madigan] need to re-explain or settle Peter down."  Ex. A—Madigan Dep. at 294:13-23; Ex. C—Dep. Ex. 52 at RMDepo_000510.

48

(5)     <u>Independent of the other reasons cited herein, Defendant Madigan is also a</u> <u>controlling person of R2 Capital because he was actively involved, and largely in charge of,</u> <u>**soliciting new pool participants** to invest in the Commercial Pool.</u>  *See Kratville*, 796 F.3d at 895 (finding defendant controlling person where he solicited pool participants and jointly prepared marketing materials); *Total Call Grp.*, 2012 WL 1642196, at *10-11 (finding defendant in charge of soliciting pool participants was control person).  This is established by the following:

a)     Defendant Madigan was involved in soliciting three of the four pool participants who invested in the Commercial Pool.  Ex. G—Tomazin Dec. at ¶¶ 16, 21.

b)     On January 12, 2010, Defendant Madigan and the rest of the R2 Capital management team (Defendants Tomazin and Vest) and trader David Simpson met with potential pool participant Northport in Chicago.  Ex. A—Madigan Dep. at 71:4-72:17; Ex. F—Morgan Dec. at ¶ 6; Ex. G—Tomazin Dec. at ¶ 12.

c)     Based upon fraudulent representations Defendants made to Northport during that meeting, and those immediately thereafter, pool participant Northport invested in the Commercial Pool.  Ex. G—Tomazin Dec. at ¶¶ 11-13; Ex. F—Morgan Dec. at ¶ 9.

d)     Defendant Madigan also solicited pool participant Miller, resulting in Miller's investing in the Commercial Pool.  Ex. E—Miller Dec. at ¶ 6.

e)     Finally, Defendant Madigan, as Managing Partner of R2 Capital, also brought investor Gamble into the Commercial Pool.  Ex. B—Gamble Dep. at 8-9.

f)     In an October 2010 "Executive Biography" he sent to pool participants, Defendant Madigan held himself out as R2 Capital's Managing Partner "responsible for assisting in raising capital", and the Managing Partner who raised the $2.5 million that was brought into the

49

Commercial Fund.   Ex. A—Madigan Dep. at 156:4-157:14; Ex. C—Dep. Ex. 25 at RMDepo_001097-99; Ex. E—Miller Dec. at ¶ 13; Ex. B—Gamble Dep. at 26:7-17, 29:1-30:1; Ex. G—Tomazin Dec. at ¶ 16.

g)      Likewise, in a November 30, 2011 email, Defendant Madigan claimed that he had "raised more than half of the money [in the Commercial Fund] we lost the first time and played a big part in the other half [of the money in the Commercial Fund]."   Ex. A—Madigan Dep. at 291:22—292:12; Ex. C—Dep. Ex.  52 at RMDepo_000510; Ex. G—Tomazin Dec. at ¶ 21.

h)      In that same November 30, 2011 email Defendant Madigan admitted that "I also, along with [Defendant Tomazin], crafted [R2 Capital's] entire presentation material, site structure and operational structure."  Ex. A—Madigan Dep. at 292:20-24; Ex. C—Dep. Ex. 52 at RMDepo_000510;

i)      During discovery, Defendant Madigan admitted that he, along with Defendant Vest, was the Managing Partner "[i]n charge of soliciting contacts for investment" at R2 Capital. Ex. J—Interrogatory Answer No. 10.

j)      Defendant Madigan also admits that he engaged in conference calls with potential investors in the Commercial Fund and that, on at least one occasion, he co-hosted a webinar for several existing or potential investors regarding R2 Capital's trading "systems, strategies, risk management, etc."  Ex. A—Madigan Dep. at 125:4-126:15; 172:4-173:10; Ex. C—Dep. Ex. 26 at RMDepo_000399; see also Ex. G—Tomazin Dec. at ¶¶ 18, 37; see also Ex. C—Dep. Ex. 40.

k)      Defendant Madigan drafted documents, which were later used by Defendant Madigan to create R2 Capital Commercial Fund's website and solicitation power point.  Ex. A—Madigan Dep. at 138:6-139:15; Ex. C—Dep. Ex. 21 at RMDepo_000347.

l)      On August 14, 2010, Defendant Madigan sent the solicitation materials that he had

prepared to pool participant Northport.  Ex. A—Madigan Dep. at 139:24-140:9, 141:16-142:10;

Ex. C—Dep. Ex. 22, RMDepo_000351-60.

m)      Defendant Madigan collaborated with Defendants Vest and Tomazin on power

point presentations that were to be used to pitch new investors.  Ex. A—Madigan Dep. at 213:8-

214:3; Ex. C—Dep. Ex. 36 at RMDepo_000445-52

n)      On or about April 1, 2011, Madigan started a job at Hill-Rom, a medical supply

company in Raleigh, North Carolina.  Ex. A—Madigan Dep. at 184:3-14.  Nevertheless, Madigan

remained active as a Managing Partner of R2 Capital after he started the job at Hill-Rom,

continuing to liaise with pool participants, soliciting new participants, and misappropriate pool

participant funds.  Ex. G—Tomazin Dec. at ¶ 22.  For example, after starting this new job, he

continued attempting to enlist existing pool participants to solicit more investors to join the

Commercial Fund.  Ex. B—Gamble Dep. at 68:5-24.  Among these efforts, Defendant Madigan

prepared and forwarded to pool participant Gamble solicitation materials to pass along to

potential investors.  Ex. B—Gamble Dep. at 68:12-70:7; Ex. C—Dep. Ex. 67 at CFTC-

0000007436-65.

o)      Defendant Madigan also continued to directly solicit new pool participants after

he started at Hill-Rom.  In September, 2011, Defendant Madigan solicited an acquaintance of

pool participant Gamble.  Ex. B—Gamble Dep. at 71:20-73:13; Ex. C—Dep. Ex. 40 at

RMDepo_0000464.

p)      Defendant Madigan even solicited some of his colleagues at Hill-Rom to invest

with R2 Capital.  Ex. K, Madigan Emails soliciting colleagues to invest with R2 Capital.

q)      In October, 2011, six months after he began a job at Hill-Rom, Defendant

Madigan drafted a new Commercial Pool investment contract to solicit more investors into the

Commercial Pool.  Ex. G—Tomazin Dec. at ¶ 46;  Ex. C—Dep. Ex. 44, email chain at

RMDepo_000478.

(6)      Independent of the other reasons cited herein, Defendant Madigan is also a

controlling person of R2 Capital because he was the **primary contact with existing pool**

**participants**.

a)      In *CFTC v. Arrington*, 998 F. Supp. 2d 847, 873 (D. Neb. 2014), the court found

the defendant a controlling person because he jointly selected traders and financial institutions

used by the corporate entity, and "solicited pool participants, held meetings with pool participants,

and represented to various pool participants and prospective pool participants that he was an

owner and officer of [the corporate entity]."  *See also CFTC v. PMC Strategy, LLC*, No.

3:11CV73, 2013 WL 1349177, at *6-7 (W.D.N.C. Apr. 3, 2013) (finding a controlling person in

defendant who "solicited and issued regular performance updates to pool participants, signed the

monthly 'profit' checks sent to pool participants, and had the authority and ability to examine the

trading account records to determine if PMC's trading was in fact profitable.")

b)      Here, Defendant Madigan admits that he was the primary contact for the majority

of pool participants.  Ex. A—Madigan Dep. at 94:6-9, 143-44; see also Ex. G—Tomazin Dec. at

¶ 18.

c)      Defendant Madigan was the only R2 Capital Managing Partner to have contact

with pool participant Gamble before he invested in the Commercial Pool.  Ex. A—Madigan Dep.

at 153:1-3.

d)      In fact, throughout the time that pool participant Gamble invested in the

Commercial Fund, Defendant Madigan was his only contact at R2 Capital, and Defendant

Madigan was in contact either telephonically or via email with pool participant Gamble on a

weekly basis from September 2010 through December 2013.  Ex. B—Gamble Dep. at 34:1-3,

35:10-15, 49:14-25.

e)      Defendant Madigan informed pool participant Gamble that Defendant Madigan

would be Gamble's main contact at R2 Capital, and that Madigan's responsibility would include

raising capital, managing key clients, and managing and working alongside R2 Capital's trader.

Ex. B—Gamble Dep. at 10:3-8.

f)      It was not until December 27, 2013, that Defendant Madigan transferred his

responsibilities as Gamble's sole R2 Capital point of contact to Defendant Tomazin, representing

that "my partner" (Ryan Tomazin) would be handling the redemptions of pool participant

Gamble's investment in the Commercial Pool starting in January 2014.  Ex. B—Gamble Dep. at

96:8-97:24; Ex. C—Dep. Ex. 59 at RMDepo_0001102-1104.

g)      Up until this moment in late 2014, except for a single email from Tomazin,

Defendant Madigan had been pool participant Gamble's sole point of contact with Defendant R2

Capital.  Ex. B—Gamble Dep. at 96:8-16; Ex. C—Dep. Ex. 59 at RMDepo_0001102-1104.

h)      In January 2014, Defendant Madigan was still liaising with pool participant

Gamble, and still referring to Defendant Tomazin as his "partner" in R2 Capital.  Ex. A—

Madigan Dep. at 314:14-315:7; Ex. C—Dep. Ex. 59 at RMDepo_001102-04.[12]

---

[12] As another example, in early March 2010, Defendant Madigan, as Managing Partner of R2
Capital, hosted pool participant Northport at Defendant R2 Capital's trading operations in
Atlanta.  Defendant Madigan memorialized the meeting in a March 4, 2010 email, and wrote that
he would walk Northport through the process of how to access the R2 Capital forex trading
account at PFG Best.  Ex. A—Madigan Dep. at 87:1-88:22; Ex. C—Dep. Ex. 8 at

53

(7) <u>Independent of the other reasons cited herein, Defendant Madigan is also a controlling person of R2 Capital because he was **actively involved in the trading and operational aspects** of R2 Capital</u>.  *See Monieson*, 996 F.2d at 859-60 (finding defendant liable as control person where he "made management and hiring decisions and often instructed [others] on day-to-day matters.")

a) It was Defendant Madigan's custom and practice to identify himself as "Managing Partner" of R2 Capital because that was, in fact, his role.  Ex. A—Madigan Dep. at 62:23-63:2; Ex. B—Gamble Dep. at 32:19-24.

b) Defendant Madigan was the R2 Capital Managing Partner who opened both the PFG Best and the IB trading accounts, and he was a signatory on the R2 Capital USBank account. Ex. A—Madigan Dep. at 62:23-63:15, 150:5-17; Ex. C—Dep. Ex. 5, Account Opening docs. at RMDepo_000097-99.  Ex. A—Madigan Dep. at 34; Ex. C—Dep Ex. 2, Account Opening docs.

c) When opening the PFG Best account for R2 Capital, Defendant Madigan instructed PFG Best to contact him, R2 Capital managing partner Madigan, if there were any questions about the documents Madigan submitted on behalf of R2 Capital.  Ex. A—Madigan Dep. at 64:8-21; Ex. C—Dep. Ex. 5 at RMDepo_000099.

d) By opening the PFG Best and IB trading accounts, Defendant Madigan could access and review the PFG and IB trading accounts at any time, Defendant Madigan had the power to trade in the accounts, and Defendant Madigan could deposit or withdraw funds from the accounts at any time.  Ex. A—Madigan Dep. at 150:18-151:5; Ex. C—Dep. Ex. 23, IB Account Opening docs. at RMDepo_000767-79.   Ex. A—Madigan Dep. at 65:7-21, 66:6-21; Ex. C—Dep. Ex. 5 at RMDepo_000134.

---

RMDepo_000277.

e)       In an October 2010 "Executive Biography" that Defendant Madigan sent to pool participants, he held himself out as the Managing Partner responsible for the "day-to-day management of dealer relationships" at R2 Capital; responsible for "securing dealer relationships typically out of reach for similar-sized investment funds"; the Managing Partner who "increased [R2 Capital]'s offering abilities and decreased overall costs" at R2 Capital; who "leads qualitative and quantitative reviews of fund performance in comparison with stated fund performance objectives" at R2 Capital; and who "contributed to year-to-date profit performance" at R2 Capital.   Ex. E—Miller Dec. at ¶ 13; Ex. B—Gamble Dep. at 26:7-17, 29:1-30:1; Ex. C—Dep. Ex. 25 at RMDepo_001099; Ex. G—Tomazin Dec. at ¶ 16.

(8)       Independent of the other reasons cited herein, Defendant Madigan is also a controlling person of R2 Capital because he had the **power to negotiate and enter contracts** legally binding the entity.   *See CFTC v. First Capitol Futures Grp.*, No. 1:09-00488-CV-W-DW, 2010 WL 1713617, at *9 (W.D. Mo. Feb. 18, 2010) (control person status evidenced by defendant signing contracts and checks for defendant entity).

a)       As established above, Defendant Madigan had the power to bind R2 Capital, and exercised that power, when he opened the trading and bank accounts on behalf of R2 Capital.   Ex. A—Madigan Dep. at 62:23-63:15, 150:5-17; Ex. C—Dep. Ex. 5, Account Opening docs., at RMDepo_000097-99.   Ex. A—Madigan Dep. at 34; Ex. C—Dep Ex. 2, Account Opening docs.

b)       Defendant Madigan also had the power to negotiate and enter into other contractual relationships on behalf of R2 Capital.   For example, Defendant Madigan negotiated the contract to hire David Simpson as R2 Capital's trader.   Ex. A—Madigan Dep. at 48:1-25; Ex. C—Dep. Ex. 4, memorialization of negotiations, at RMDepo_000264-267; Ex. G—Tomazin Dec. at ¶ 17.

c)       As another example, on February 15, 2010, Defendant Madigan, as Managing

Partner of R2 Capital, sent pool participant Northport investments a draft "non-interference

agreement" with an email from Defendant Madigan representing that Defendant Madigan had

himself edited the document, and would be signing it on behalf of Defendant R2 Capital.  The

non-interference agreement had a signature line for Defendant Madigan to execute as Managing

Partner of Defendant R2 Capital.  Ex. A—Madigan Dep. at 74:4-78:6; Ex. C—Dep. Ex. 6 at

RMDepo_000268-74; Ex. G—Tomazin Dec. at ¶ 17.

d)       In 2010 R2 Capital leased virtual office space on Park Avenue in New York City.

Although any of the three managing partners had the power to sign the lease, it was Defendant

Madigan who leased the New York property on behalf of R2 Capital.  Ex. A—Madigan Dep. at

60:22-61-6; Ex. L—Email confirming Madigan's leasing virtual office space for R2 Capital; Ex.

G—Tomazin Dec. at ¶ 17.

e)       To this day, Defendant Madigan still exercises his power as Managing Partner to

bind R2 Capital:  He has repeatedly executed discovery verifications on behalf of Defendant R2

Capital through at least January 2017 in this litigation.  Ex. I, Interrogatory Answers.

## 2.   Burden And Elements Of Failure To Act In Good Faith *OR* Knowingly Induced Violations

As to the second prong of control person liability, the CFTC must also establish by a

preponderance of the evidence that the controlling person ***either*** "did not act in good faith ***or***

knowingly induced, directly or indirectly, the act or acts constituting the violation."  7 U.S.C. §

13c(b) (emphasis supplied).

a.     **Burden And Elements To Establish That Defendant Madigan Did Not Act In Good Faith**

Plaintiff CFTC has the burden to show by a preponderance of the evidence that

Defendant Madigan failed to act in good faith by not maintaining a "reasonably adequate system

of internal supervision and control over the [employee] **_or_** did not enforce with any reasonable

diligence such system," or "[w]hen there are repeated charges of illegal behavior from different

sources[.]" *Monieson*, 996 F.2d at 860-61 (citations omitted and emphasis supplied). "[A]

controlling person has a duty to act; he cannot simply avoid addressing the issue and hope it goes

away." *Id.*

b.     **Undisputed Proof Of The Elements That Defendant Madigan Failed To Act In Good Faith**

**Element 2a**:  **Proof Of Defendant Madigan's Failure To Act In Good Faith**

a)     Here, none of the Defendants, including Madigan, maintained any system to

ensure that pool participants would not be defrauded.  Defendant R2 Capital had no compliance

manual.  Ex. A—Madigan Dep. at 54:6-10.

b)     None of the three Defendant Managing Partners received any compliance training

whatsoever.  Ex. A—Madigan Dep. at 54:11-17.

c)     In their operation of R2 Capital, the three Defendant Managing Partners had no

compliance requirements whatsoever.  Ex. A—Madigan Dep. at 55:3-7.

d)     R2 Capital had no procedure or policy for checking the accuracy of the account

statements they sent to pool participants.  Ex. A—Madigan Dep. at 120:4-121:22.

e)     Accordingly, Defendant Madigan failed to act in good faith.  *See CFTC v. S. Trust

Metals, Inc.*, 180 F. Supp. 3d 1124, 1132 (S.D. Fla. 2016) (finding defendant failed to act in good

faith where there was no compliance department and defendants lacked any system of internal

controls).

f)      Further, to the extent that any compliance system existed, Defendant Madigan failed to implement it.  Although Defendant Madigan represented to pool participants that he compared fund performance with actual trading results, he claims that he only reviewed the account statements.   Ex. A—Madigan Dep. at 165:8-19.

g)      However, he never "double check[ed] these trading statements that were sent to the commercial fund investors to make sure that they accurately and truthfully represented the profits that was being earned[.]"  Ex. A—Madigan Dep. at 181:6-12.

h)      Nor did Defendant Madigan "ever double check the ending trade balance of the trading statements sent to commercial pool, commercial fund investors to make sure what was being invested was true and accurate[.]"  Ex. A—Madigan Dep. at 181:13-18.

Accordingly, Defendant Madigan failed to act in good faith, and is liable as a controlling person of Defendant R2 Capital.

### c.      Defendant Madigan Knowingly Induced R2 Capital's CEA Violations

Alternatively, liability also attaches when a controlling person "knowingly induces" an illegal act for Section 13(b) liability purposes.

### i)      Burden Of Proof And Elements Of Knowing Inducement.

To establish "knowing inducement, the CFTC must show by a preponderance of the evidence that Defendant Madigan "had actual or constructive knowledge of the core activities that make up the violation at issue and allowed them to continue." *Kratville*, 796 F.3d at 894–95 (citing *R.J. Fitzgerald,* 310 F.3d at 1334).

Section 13(b) of the Act aims to impose liability on those who have control but fail to exercise it, allowing illegal acts to occur.   Knowledge can be found, too, when the controlling

person only "lacked actual knowledge because he consciously avoid[ed] it." *JCC*, 63 F.3d at

1569 (quoting *In re Spiegel,* [1987–1990 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 24,103,

at 34,767 (CFTC Jan. 12, 1988)).

**Element 2b:** **Proof Of Defendant Madigan's Knowing Inducement.**

(1)     As a matter of law, Defendant Madigan's "knowing inducement" is established

by the same undisputed facts which prove his scienter, *supra*. *Kratville*, 796 F.3d at 895 (finding

the same undisputed facts showing defendant's scienter also establish he knowingly induced the

entities' fraud). Furthermore, recklessness is sufficient to establish control person liability. *See*

*G.A. Thompson & Co.*, 636 F.2d at 959 (citing *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 209

n.28 (1976)). "If the rule were otherwise, corporate officers and directors could escape control

liability by remaining as ignorant as possible—surely not the result Congress intended."

*Donohoe*, 982 F.2d at 1138.

(2)     Defendant Madigan had "actual knowledge of the core activities that make up the

violation at issue," as established by the following:

a)     Defendant Madigan admits that he was aware by November 26, 2011—at the

latest—that the Commercial Pool had ceased trading. Ex. A—Madigan Dep. at 282:14-25,

286:15-22; Ex. C—Dep. Ex. 50 at RMDepo_0000506. Yet in 2012, Defendant Madigan

continued to send false account statements to pool participant Gamble showing trading profits.

See pages 15-16, above.

b)     Likewise, Defendant Madigan had actual knowledge of his own

misrepresentations, including his lying that he had an MBA, his misleading investors that he had

deposited his own money into the pool, and that the IB account (that Defendant Madigan alone

opened on behalf of R2 Capital) to which he had access was trading futures and not forex as he

represented to pool participants. *See First Capitol Futures Grp.*, 2010 WL 1713617, at \*9 (finding defendant knowingly induced violations where he "himself directly solicited customers using fraudulent statements").

(3)     Defendant Madigan also had <u>constructive knowledge</u> of the violations. Controlling persons cannot avoid liability by deliberately or recklessly avoiding knowledge about potential wrongdoing. *Arrington*, 998 F. Supp. 2d at 873 (citing *In re Spiegel,* [1987–1990 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 24,103 at 34,767 (CFTC Jan. 12, 1988)). Therefore, constructive knowledge of wrongdoing is sufficient for a finding of knowing inducement. *Id.* (citing *JCC*, 63 F.3d at 1568).  To support a finding of constructive knowledge, the CFTC must show that a defendant "lack[ed] actual knowledge only because [he] consciously avoided it." *Id.* (citing *JCC*, 63 F.3d at 1569).

a)     As a matter of law, as a signatory on the R2 Capital bank account, and with ready access to the IB account, Defendant Madigan also had to have known about the issuance of false account statements, the misappropriation of pool participant assets, and the illegal comingling of customer funds with his own funds and the funds of his partners.  In *Total Call Grp., Inc.*, 2012 WL 1642196, at \*9-10, the court found that the defendant had constructive knowledge even though he did not prepare fraudulent account statements, but "had the ability to examine the trading account records at [the FCM] and compare that data to the information reported in the false account statements sent to customers.  Thus, [defendant] knew, consciously avoided learning, or acted recklessly in failing to learn that the customer account statements sent by [by his partner] contained false information."  Here, as in *Total Call Grp.*, Defendant Madigan had constructive knowledge of the false account statements because, even if he did not prepare those

account statements, he had the ability to examine the IB trading account and compare that data to the information in the false statements sent to customers.  See pages 19-20, above.

b)	As established above, Defendant Madigan also had constructive knowledge of the violations when he was alerted by both a pool participant and by IB that the trading account had all but been depleted, yet the account statements he distributed showed active trading profits. See page 21, above.  To the extent Defendant Madigan claims he ignored these alerts, claims he never checked the trading account to which he had ready access, and sent false account statements to investors without—he claims—checking their accuracy, he is admitting that he had constructive knowledge of the falsity of the account statements and misappropriation of customer funds.

**C.	Plaintiff Is Entitled To Summary Judgment Against Madigan And Madigan Enterprises On All Counts Based On R2 Capital's Vicarious Liability**

1.	The Madigan Defendants have conceded that, under the Act:

"liability flows from agents to principals, and from entities to their owners. . . . Therefore, if an agent of R2 Capital acting within the scope of his/her/their employment or office violates the Act, then that violation is attributed to R2 Capital as well.  7 U.S.C. § 2(a)(1)(B).  And, if R2 Capital is deemed to have violated the Act, then any person who directly or indirectly controlled R2 Capital would also be liable for the same violations if the controlling person did not act in good faith or knowingly induced the violations.  7 U.S.C. § 13c(b).

(#136, Madigan Defendants' Opposition to Entry of Consent Order at 4-5)

2.	As established above, Defendant Madigan is a "controlling person" of R2 Capital such that he is liable the violations of the Act for which Defendant R2 Capital is liable.

3.	As established immediately below, Defendant R2 Capital is vicariously liable for the acts of its agents, Tomazin, Vest and Madigan, and their alter ego holding companies.

4.   Therefore, Defendants Madigan and Madigan Enterprises are also liable for all violations of Defendant R2 Capital's agents, Defendant's Tomazin and Vest.

## IV.   CLAIMS UPON WHICH JUDGMENT IS SOUGHT AGAINST DEFENDANT R2 CAPITAL

### A.   Plaintiff Is Entitled To Summary Judgment On All Claims Against Defendant R2 Capital Because R2 Capital Is Vicariously Liable For The Acts Of The Other Defendants

#### 1.   Burden of Proof And Elements Of Vicarious Liability Under 7U.S.C. § 2(a)(1)(B) And 17 C.F.R. § 1.2

Defendant R2 Capital is vicariously liable for all the individual Defendants' violations of the Act.  7 U.S.C. § 2(a)(1)(B) and its predecessor provision imposes vicarious liability upon a principal for its agent's or official's violations of the Act committed within the scope of employment.  *Stotler & Co. v. CFTC*, 855 F.2d 1288, 1292 (7th Cir.1988)*.*  Therefore, liability is imposed upon Defendant R2 Capital, as the principal, if the CFTC shows by a preponderance of evidence that (1) the agent or official was acting as the principal's agent or official at the time of the unlawful acts, and (2) the agent's or official's actions were within the scope of their employment or office.  *Guttman v. CFTC*, 197 F.3d 33, 39 (2d Cir. 1999).

It does not matter if the principal participated in or even knew about the agent's acts; the *principal is strictly liable* for them.  *Stotler & Co.*, 855 F.2d at 1292; *Rosenthal & Co. v. CFTC,* 802 F.2d 963, 966-67 (7th Cir. 1986);  *see also CFTC v. Driver*, 877 F. Supp. 2d 968, 980 (C.D. Cal. 2012), *aff'd sub nom.* 585 F. App'x 366 (9th Cir. 2014) (granting summary judgment where misrepresentations were by corporate officer of principal entity defendant and, therefore, the principal entity defendant was liable for fraud, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B));  *CFTC v. Allegheny Gulf Investments, Inc.*, No. Civ. A. H-03-3526, 2004 WL 3677481, at *4 (S.D. Tex. Dec. 17, 2004) (same).  Agency liability may be found even if the

principal does not direct the unlawful acts or even if the principal lacks any knowledge of the unlawful activities.  *See Cange v. Stotler & Co., Inc.,* 826 F.2d 581, 589 (7th Cir. 1987); *Rosenthal,* 802 F.2d at 967; *CFTC v. Premex, Inc.,* 655 F.2d 779, 784 n.10 (7th Cir. 1981). Vicarious liability may attach even where in the "particular case nothing could be done by the [principal] to prevent the agent's wrongdoing."  *Cange,* 826 F.2d at 594; *see also CFTC v. Millenium Trading Grp., Inc.*, No. 07-CV-11626, 2007 WL 2639474, at *9 (E.D. Mich. Sept. 6, 2007).

### 2.  **Undisputed Proof Of These Elements**

**Element 1:  Proof Defendants Were <u>Acting As The Principal's Agents Or Officials</u>.**

It is undisputed that the three individual Defendants were agents or officials of Defendant R2 Capital because they, through their defendant holding companies, were the officers (e.g., "Managing Partners") of Defendant R2 Capital, as established by the following:

a)      Defendant R2 Capital admitted in its Answer to the First Amended Complaint that "defendants Tomazin, Madigan and Vest, through RAST, Madigan Enterprises and Bulletproof Vest (collectively, "defendant holding companies"), assumed equal ownership of R2 Capital. . ." (#74 at ¶ 20).

b)      Defendant R2 Capital admitted in its Answer to the First Amended Complaint that "During the relevant period, [Defendant Ryan] Madigan was also an officer and principal of defendant Madigan Enterprises, Madigan's alter ego and holding company."  (#38 at ¶ 16, #74 at ¶16).

c)      Defendant R2 Capital admitted in its Answer to the First Amended Complaint that "Defendant Bulletproof Vest, Inc., is a corporation formed in 2009 by [individual] defendant [Randell] Vest . . . through which defendant Vest co-owned, controlled and operated defendant

R2 Capital."  (#74 at ¶ 19).

     d)     Defendant R2 Capital admitted in its Answer to the First Amended Complaint that "Defendant Ryan Tomazin formed R2 Capital as a limited liability company, with himself as its registered agent. . .  Tomazin was the sole owner, manager and principal of defendant RAST Investor Group, Tomazin's alter ego and holding company. . . and through which defendant Tomazin co-owned, controlled and operated defendant R2 Capital."  (#38 at paragraphs ¶¶ 14-15, #74 at ¶¶ 14-15).

     e)     Defendant Ryan Tomazin has admitted that he was acting as an officer and agent of R2 Capital when he committed the fraudulent acts which are the subject of this lawsuit.  Ex. G—Tomazin Dec. at ¶ 30.

     f)     Madigan testified that he was Managing Partner of R2 Capital because that was, in fact, his role.  Ex. A—Madigan Dep. at 62:23-63:2; Ex. B—Gamble Dep. at 32:19-24.

     g)     The R2 Capital Operating Agreement establishes that the three individual Defendants were the three officers acting on behalf of Defendant R2 Capital through their defendant holding companies.  Ex. C—Dep. Ex.1, R2 Capital Operating Agreement at RMDepo_000086-87.

**<u>Element 2</u>:  Proof The Defendants Were Acting <u>Within The Scope</u> Of Their Agency.**

It is undisputed that the conduct of these three individual Defendants was within the scope of their agency with Defendant R2 Capital, as established by the following:

     a)     Defendant Ryan Tomazin admitted during his guilty plea that all of his fraudulent conduct occurred as a managing partner of Defendant R2 Capital.  Ex. M—Tomazin Guilty Plea Hearing Transcript, at 13.

     b)     Defendant Madigan admitted in his deposition that Defendant Tomazin's

fraudulent conduct occurred as a managing partner of Defendant R2 Capital.  Ex. A—Madigan

Dep. at 319:2-12, 320:1-7.

        c)      Defendants Ryan Madigan and Madigan Enterprises repeatedly admitted in their

Answer to the First Amended Complaint that the "acts and omissions of Tomazin . . . and Vest

occurred within the scope of their agency, employment, and/or office with RAST, Madigan

Enterprises and Bulletproof Vest, respectively, and with R2 Capital; therefore, RAST . . .

Bulletproof Vest and R2 Capital are liable for these acts and omissions pursuant to Section

2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2012), and Regulation 1.2, 17 C.F.R. § 1.2 (2013)."

(#38 at ¶¶ 6, 56, 64, 71, and 76; #76 at ¶¶ 6, 56, 64, 71, and 76).

        d)      Defendant Ryan Tomazin has admitted that all of the acts as described in the First

Amended Complaint are true, and that they were committed while he, Vest and Madigan were

acting within the course and scope of their duties as Managing Partners of Defendant R2 Capital.

Ex. G—Tomazin Dec. generally throughout, and at ¶¶ 1, 25, 30.

        e)      It is undisputed that Defendant Tomazin routinely orally misrepresented to

existing pool participants that the pool was successfully generating profits from trading, when in

fact it was losing money or not trading at all.  Ex. G—Tomazin Dec. at ¶ 27; Ex. N—Irvine Dec.

at ¶ 7.  Defendant Tomazin also admits that he falsely and fraudulently represented to a pool

participant that the pool was continuing to trade forex, when in truth the pool had ceased trading

forex and was instead trading in financial futures and other securities products.  Ex. G—Tomazin

Dec. at ¶ 29; Ex. N—Irvine Dec. at ¶¶ 4, 9.

        f)      As is established above, the individual Defendants were "controlling persons" of

Defendant R2 Capital, such that their conduct was within the course and scope of their acting as

Managing Partners of R2 Capital.

**B.**     **Plaintiff Is Entitled To Summary Judgment Against Defendants On Count Three: Fraud By A Commodity Pool Operator**

**1.   Burden Of Proof And Elements Of Fraud By A Commodity Pool Operator**

Section 4o(1) of the Act, 7 U.S.C. § 6o(1) (2012), prohibits Commodity Pool Operators

("CPO") from using the mail or any other means or instrumentality of interstate commerce to (A)

employ any device, scheme or artifice to defraud any client or participant or prospective client or

participant; or (B) engage in any transaction, practice or course of business which operates as a

fraud or deceit upon any client or participant or prospective participant.

7 U.S.C. § 6o(1) is a "parallel statute" to section 6b of the Act (the general anti-fraud

provision discussed above), such that "[t]he same intentional or reckless misappropriations,

misrepresentations, and omissions of material fact violative of section [6]b of the Act ... also

violate section [6]o(1)(A)-(B) of the Act." *Wilson*, 19 F. Supp. 3d at 363 (quoting *Driver*, 877 F.

Supp. 2d at 978).

However, fraud by a CPO under Section 6o(1)(B), unlike fraud under Section 6b, has _no_

_scienter requirement_.  *See First Commodity Corp.,* 676 F.2d at 6 (noting that section 6o is an

"antifraud provision that does not depend on scienter"); *In re Kolter,* Comm. Fut. L. Rep. ¶

26,262, 1994 WL 621595 at *7 (CFTC Nov. 8, 1994) ("Although scienter must be proved to

establish a violation of section [6]b and section [6]o(1)(A), it is not necessary to establish a

violation of section [6]o(1)(B)."); *Wilson*, 19 F. Supp. 3d at 363.

Therefore, the CFTC must prove, by a preponderance of the evidence, that (1) Defendant

R2 Capital was a CPO; (2) that made misrepresentations; (3) that were material.

**2. Undisputed Proof Of Elements Of Violation Of Section 4<u>o</u> Under The Act**

**a. Defendant R2 Capital Was A Commodity Pool Operator**

<u>Element 1</u>:  **Proof Defendant Was A <u>Commodity Pool Operator</u>.**

(1)      A "[c]ommodity pool operator" is "any person engaged in a business that is of the nature of a commodity pool, investment trust, syndicate, or similar form of enterprise, and who, in connection therewith, solicits, accepts, or receives from others, funds ... for the purpose of trading in…any commodity for future delivery .... [or transactions in foreign currency]."  7 U.S.C. § 1a(11)(A)(i)(1) and (2).  This statute does not require proof of actual commodities trading or the pro rata distribution of profits and losses. It requires that investor funds or property be solicited, accepted or received "*for the purpose* of trading in any commodity for future delivery[]" or forex.  *CFTC v. Vision Capital Corp.*, No. 2:04-CV-0804BSJ, 2007 WL 4246302, at *4 (D. Utah Nov. 28, 2007) (emphasis in the original).  "Essentially, a commodity pool operator is one who manages an investment fund, similar to a mutual fund, in which the assets of several investors are invested together with gains or losses shared pro rata by the participants." *CFTC v. Perkins*, No. 06-4674(RBK), 2009 WL 806576, at *4 (D.N.J. Mar. 25, 2009), *aff'd*, 385 F. App'x 251 (3d Cir. 2010) (quoting *Nilsen v. Prudential-Bache Sec.*, 761 F. Supp. 279, 292 (S.D.N.Y. 1991)).

(2)      Here, it is undisputed that Defendant R2 Capital initially established the Commercial Pool to primarily trade forex.   (#38, ¶ 23; #74, para 23; #76, ¶ 23); Ex. A—Madigan Dep. at 56:5-9, 59:19-21; Ex. G—Tomazin Dec. at ¶ 8.

(3)      It is also undisputed that the Commercial Pool was designed to, and in fact did, pool investors' funds for purposes of generating returns by investing in forex and later, futures contracts.  Investors' funds were solicited for the purpose of pooling the funds, investing those pooled funds in the forex markets, and then dividing the profits 50/50 between the R2 Capital as

the General Partner, and the investors as limited partners.  The investors' profits from the pooled

funds trading forex was to be distributed to them on a pro rata basis, depending on the size of their

investment.  Ex. G—Tomazin Dec. at  ¶¶ 9-10; Ex. B—Gamble Dep. at 14:13-15:4; Ex. A—

Madigan Dep. at 135:13-136:20; Ex. C—Dep. Ex.  20, Madigan Email at RMDepo_000336,

referencing "other clients" in the pool.

     Accordingly, Defendant R2 Capital was a CPO as defined in the Act.

**b.     Defendant R2 Capital Made Material Misrepresentations**

**Elements 2 and 3**:  **Proof Defendant Made Material Misrepresentations.**

     Except for Section 4b's scienter requirement, the same undisputed facts establishing

violation of 4b under the act, discussed above, also establish Defendant R2 Capital's—through

the vicarious liability imposed through its agents, as established above—violation of 4o.

**C.     Plaintiff Is Entitled To Summary Judgment As To Count Four: Commingling Of Funds**

**1.     Burden Of Proof And Elements Of Violation**

     "No commodity pool operator may commingle the property of any pool that it operates or

that it intends to operate with the property of any other person." 17 C.F.R. § 4.20(c).   Therefore,

to establish liability under this Regulation, the CFTC has the burden to show by a preponderance

of the evidence that Defendant R2 Capital, and/or those through which it is vicariously liable,

commingled pool participant funds with that of its own or others.  *See Driver,* 877 F. Supp. 2d at

979  (granting summary judgment where defendant commingled pool funds with non-pool

property by transferring funds to his personal bank accounts.)

**2. Undisputed Facts Establishing Violation**

a.   As established above, Defendant R2 Capital was a CPO.

b.   Further, it is undisputed that Defendants transferred pool participant funds to the bank accounts of the individual Defendants Madigan, Vest and Tomazin, and their respective Defendant holding companies. Ex. D—Koh Dec. at ¶¶ 15, 31; Ex. G—Tomazin Dec. at ¶¶ 15, 31.  Accordingly, Defendant R2 Capital violated CFTC Regulation 4.20(c), 17 C.F.R. § 4.20(c); *See Driver,* 877 F. Supp. 2d at 979.

**D.   Plaintiff Is Entitled To Summary Judgment On All Claims Against Defendants Madigan And Madigan Enterprises Because They Are Alter Egos Of Each Other**

**1.   Burden Of Proof And Elements Of Vicarious Liability Under Alter Ego Doctrine**

Where an alter ego relationship is present, a corporation and its owner are liable for each other's conduct.  *See, e.g.*, *In re Armstrong*, CFTC No. 87-10, Comm. Fut. L. Rep. ¶ 24,545, 1989 WL 242257, at *5 (CFTC Oct. 30, 1989) (concluding that corporate owner and corporations "are responsible as a single enterprise" under the Act).  As Madigan Enterprises was merely an extension of Ryan Madigan, summary judgment against Ryan Madigan for violations of the Act and Regulations warrants summary judgment against Madigan Enterprises.

"An alter ego relationship exists when the corporation is a 'mere instrumentality for the transaction of the shareholders' own affairs, and there is such unity of interest in ownership that that the separate personalities of the corporation and the owners no longer exist.'"  *W. Convenience Stores, Inc. v. Thielen*, No. 09-cv-02626-LTB-BNB, 2011 WL 866755, at *9 (D. Colo. Mar. 14, 2011) (quoting *Krystkowiak v. W.O. Brisben Co., Inc.*, 90 P.3d 859, 867 n.7 (Colo. 2004)).

Courts consider several factors when making an alter ego determination, including whether:

- the nature and form of the entity's ownership and control allow misuse by an insider;

- the corporation is thinly capitalized;

- the corporation is a mere shell;

- shareholders disregard legal formalities;

- the corporation has no employees and pays no wages;

- the corporation has no assets;

- the corporation acts only for the benefit of its owner or controller.

*W. Convenience Stores*, 2011 WL 866755, at *11 (citing *Newport Steel Corp. v. Thompson*, 757 F. Supp. 1152, 1156 (D. Colo. 1990)); *G.M. Leasing Corp. v. U.S.*, 514 F.2d 935, 940 (10th Cir. 1975), *aff'd in part, rev'd in part on other grounds*, 429 U.S. 338, 351 (1977); *Marshall v. Great W. Employ. Agency, Inc.*, No. 7 M 822, 1978 WL 1689, at *1 (D. Colo. June 27, 1978).

### 2. Undisputed Proof Of These Elements

Defendant Madigan's testimony establishes that Madigan Enterprises is his alter ego:

a) Madigan testified that Madigan Enterprises "was a shell company that my father has owned for years that we ran for personal expenses and other business opportunities . . . ." Ex. A—Madigan Dep. at 13:19-23. Use of a "shell company" for "personal" business provides two indicia of an alter ego relationship. *See W. Convenience Stores*, 2011 WL 866755, at **9, 11; *see also Marshall*, 1978 WL 1689, at *1.

b) Madigan testified that Madigan Enterprises had "[n]o" employees. Ex. A— Madigan Dep. at 13:24-14:1. The absence of employees is a characteristic of an alter ego

70

relationship, and supports the notion that Madigan Enterprises existed only for Madigan's benefit.  *See Marshall*, 1978 WL 1689, at *1; *see also G.M. Leasing*, 514 F.2d at 940.

        c)      Madigan testified that Madigan Enterprises, following the 2008 sale of its packaging business, existed only to providing "consulting" services to R2 Capital, the vehicle through which Madigan committed fraud.  Ex. A—Madigan Dep. at 14:2-22.  Alter ego relationships exist where a corporation is used as a "'mere instrumentality for the transaction of the shareholders' own affairs,'"  *W. Convenience Stores*, 2011 WL 866755, at *9, and where a corporation "[h]ad no function to perform other than to act for" its alter ego owner.  *Marshall*, 1978 WL 1689, at *1.  Madigan Enterprises was Madigan's alter ego because the only purpose of Madigan Enterprises was to facilitate Madigan's ability to commit fraud through R2 Capital.

        d)      Madigan testified that Madigan Enterprises does not have "any assets, such as a building or real estate[.]"  Ex. A—Madigan Dep. at 14:23-25.  The absence of corporate assets is indicia of an alter ego relationship.  *See W. Convenience Stores*, 2011 WL 866755, at *11; *see also Marshall*, 1978 WL 1689, at *1.

        e)      When asked whether Madigan Enterprises was formed with start-up money, Madigan testified that any start-up funds were limited to "whatever the founding fees were to start [Madigan Enterprises]."  Ex. A—Madigan Dep. at 15:1-12.  Undercapitalization is indicative of an alter ego relationship.  *See W. Convenience Stores*, 2011 WL 866755, at *11.

## V.      CLAIMS UPON WHICH JUDGMENT IS SOUGHT AGAINST VEST DEFENDANTS

**A.      Plaintiff Is Entitled To Summary Judgment On All Claims Against Vest Defendants Because They Have Admitted Liability**

Defendants Randell Vest and his holding company, Bulletproof Vest, abandoned their defense of this case, and have therefore been deemed to have waived all defenses and admitted all the allegation in the First Amended Complaint.  (#133).  Accordingly, they are liable not only for the their own violations of the Act, but also vicariously liable as controlling persons for the acts of Defendant R2 Capital and its agents.

## VI.      RELIEF SOUGHT BY PLAINTIFF

As a result of the Madigan Defendants' violations of the Act and Regulations as set forth above, the CFTC requests that the Court enter a permanent injunction against them, and order them to pay a civil money penalty, restitution, and disgorgement, with prejudgment interest thereon, as requested in the First Amended Complaint.

**A.      Permanent Injunction**

Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a) (2012), authorizes the Commission to seek injunctive relief against any person whenever it shall appear to the Commission that such person "has engaged, is engaging, or is about to engage in any act or practice constituting a violation of" any provision of the Act or Regulations.  Injunctive relief under Section 6c of the Act "is remedial in nature, designed to prevent injury to the public and to deter illegal conduct." *CFTC v. Trimble*, No. 11-cv-02887-PAB-KMT, 2013 WL 317576, at *7 (D. Colo. Jan. 28, 2013).  As a result, "restrictive concepts ordinarily associated with private litigation—such as proof of irreparable injury or inadequacy of other remedies—are not applicable" to injunctions pursuant to the Act.  *Id.*

### 1.  Elements Required For A Permanent Injunction

To obtain a permanent injunction, the CFTC "must show only two things:  (1) that a violation of the Act has occurred; and (2) that there is a reasonable likelihood of future violations."  *Id.*  As a result, "'[o]nce a violation is demonstrated, the [CFTC] need only show that there is some reasonable likelihood of future violations.'"  *CFTC v. Wilson*, No. 11CV1651 WQH (BLM), 2011 WL 6398933, at *2 (S.D. Cal. Dec. 20, 2011) (citing *CFTC v. Hunt*, 591 F.2d 1211, 1220 (7th Cir. 1979)).  This Court has applied these elements to permanently enjoin defendants engaged in forex fraud, where defendants' misconduct "was extensive" and included "numerous knowing misrepresentations about . . . defendants' ability to trade forex," as well as misappropriation of customer funds.  *Trimble*, 2013 WL 317576, at *7.

The Court may infer a likelihood of future violations of the Act and Regulations from past unlawful conduct.  *See CFTC v. Brockbank*, 505 F. Supp. 2d 1169, 1173 (D. Utah 2007), *aff'd* 316 F. App'x 707 (10th Cir. 2008) (past misconduct is "'highly suggestive of the likelihood of future violations.'"); *see also CFTC v. Yu*, No. 12-CV-3921 YGR, 2012 WL 3283430, at *4 (N.D. Cal. Aug. 10, 2012) (in assessing the likelihood that a defendant will commit future violations of the Act or Regulations, "a court must look to the totality of the circumstances," including whether defendant's past violations "require a showing of knowledge of wrongdoing, were persistent or recurrent, or occurred over a long span of time . . . ." )

### 2.  Undisputed Proof Of These Elements

#### a.  The Madigan Defendants Violated The Act And Regulations

As set forth above, the Madigan Defendants' numerous fraudulent solicitations, creation

and dissemination of false account and performance statements, and misappropriation of millions of dollars of pool participants' funds over a 4-year period all warrant entry of a permanent injunction, including registration and trading bans.

### b. The Madigan Defendants' Past Conduct Makes It Likely That They Will Violate The Act And Regulations Absent A Permanent Injunction

Given the Madigan Defendants' extensive violations of the Act and Regulations, it is likely that they will commit future violations unless permanently enjoined by this Court. *See Brockbank*, 505 F. Supp. 2d at 1173; *see also Yu*, 2012 WL 3283430, at *4.

Based on the foregoing, the CFTC requests that the Court impose a permanent injunction against the Madigan Defendants, including trading and registration bans, as set forth in detail in Section VII of the First Amendment Complaint.  (#38 at 23-25)

## B.      Restitution

### 1.      Elements Required For Restitution

Section 6c of the Act permits the Commission to seek equitable remedies for violations of the Act, including "restitution to persons who have sustained losses proximately caused by such violation (in the amount of such losses)."  7 U.S.C. § 13a-1(d)(3)(A).  The Court "has complete authority" to require defendants "to make full restitution to every one of their customers who invested funds as a result of violations of the Act . . . ."  *Millenium Trading Grp.*, No. 07-11626, 2007 WL 2639474, at *11 (E.D. Mich. Sept. 6, 2007) (ordering defendants to pay restitution for fraudulently soliciting and misappropriating funds in connection with forex trading).  Proximate causation exists where (1) a customer would not have suffered losses but for the defendant's actions; and (2) the causal connection between the conduct and the losses is not too attenuated. *United States v. Cutter*, 313 F.3d 1, 7 (1st Cir. 2002).

### 2.      Undisputed Proof Of These Elements

As set forth above, the facts make clear that pool participants would not have incurred

losses but for the false and fraudulent activity of the Madigan Defendants, which included

material misrepresentations and omissions, as well as false account and performance statements

designed to prevent pool participants from becoming aware of their losses.  In *First Nat'l

Monetary Corp. v. Weinberger*, the court found defendant's "misrepresentations were the

proximate cause" of a customer's investment losses due in part to defendant's "'lulling

conduct'—his continued assurances that [the customer] was suffering only 'paper losses' and

[defendant's] predictions that the market was about to turn around."  819 F.2d 1334, 1339 (6th

Cir. 1987).  The Madigan Defendants similarly were the proximate cause of pool participants'

losses by fraudulently inducing them to invest funds in the Commercial Pool, and by "lulling"

them into leaving those funds with Defendants by use of false account and performance

statements.

### 3.  Calculation Of Restitution

 "[R]estitution . . . 'is measured by the amount invested by customers less any refunds

made by the defendants.'"  *Brockbank*, 505 F.Supp. 2d  at 1175, quoting *CFTC v. Noble Wealth

Data*, 90 F. Supp.2d 676, 693 (D. Md.), *aff'd in part and vacated in part*, 278 F.3d 319 (4th Cir.

2002).  *See also CFTC v. Leben*, No. 3:14-CV-866-TLW, 2016 WL 7354359, at *9 (D.S.C. Aug.

5, 2016) ("restitution is determined by calculating the total amount of funds solicited from

victims of the fraud by a defendant, less any funds returned to the victims by defendant.")

"Restitution is not based on any profit to [defendants], but on the amount of . . . investors'

losses."  *Brockbank*, 505 F. Supp. 2d at 1175.

Accordingly, the Court should order the Madigan Defendants to pay restitution in the

amount of pool participants' total losses, or $2,471,181.64, minus the $111,000 returned in purported redemptions to one of the pool participants, and minus the $288,000 Defendant Tomazin already paid in criminal restitution.   *See supra* note 2.  Plaintiff therefore requests that the Court order the Madigan Defendants to pay $2,072,181.64, plus prejudgment interest thereon, on a joint-and-several basis.

### C.      Disgorgement

Section 6c of the Act permits the Court to order the Madigan Defendants to disgorge the ill-gotten gains from their violation of the Act or Regulations.  7 U.S.C. § 13a-1(d)(3)(B).  *See also CFTC v. Am. Metals Exchange Corp.*, 991 F.2d 71, 76 (3rd Cir. 1993) (district courts have the power to order disgorgement "for the purpose of depriving the wrongdoer of his ill-gotten gains and deterring violations of the law.")  Disgorgement amounts reflect "the amount of investor money Defendants retained after accounting for repayments and trading losses."  *Id*.  As a result, the Madigan Defendants should disgorge $949,249.52., which reflects the funds the Madigan Defendants fraudulently solicited ($2,471,181.64), minus their trading losses of $1,122,932.12,  minus the $111,000 returned in purported redemptions to one of the pool participants, and minus the $288,000 Defendant Tomazin already paid in criminal restitution. Ex. D—Koh Dec. ¶¶ 4c-4d; Ex. G—Tomazin Dec. at ¶ 25.  The Court should order the Madigan Defendants to pay $949,249.52 in disgorgement, plus prejudgment interest thereon, on a joint-and-several basis.

### D.      Civil Monetary Penalty

Section 6c(d)(1) of the Act, 7 U.S.C. § 13a-1(d)(1) (2012), and Regulation 143.8(a)(2), 17 C.F.R. § 143.8(a)(2) (2016), authorize the Commission to seek a civil monetary penalty of not more than the greater of triple the monetary gain for each violation of the Act or Regulations, or

76

$140,000 for each violation committed.  The Court is "free to fashion a civil monetary penalty appropriate to the gravity of the offense and sufficient to act as a deterrent."  *Trimble*, 2013 WL 317576, at *9 (citing *Miller v. CFTC*, 197 F.3d 1227, 1236 (9th Cir. 1999)).  In fashioning civil monetary penalties, courts consider the relationship between the violation and the regulatory purpose of the Act, whether the defendant possessed scienter, the consequences of the violation, the financial benefit to the defendant, and the harm to customers.  *CFTC v. Am. Bullion Exchange ABEX Corp.*, No. SACV 10-01876 DOC (RNBx), 2014 WL 3896023, at *18 (C.D. Cal. Aug. 7, 2014).

"'Conduct that violates core provisions of the Act's regulatory system—such as . . . defrauding customers should be considered very serious even if there are mitigating facts." *JCC*, 63 F.3d at 1571 (quoting *In re Premex, Inc.*, [1987-1990 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 24,165 at 34,892 to 34,893 (CFTC Feb. 17, 1988) (emphasis omitted).)  In addition, "[c]ourts and the CFTC have found that a high civil monetary penalty is warranted where customers have been defrauded of a substantial amount of money."  *CFTC v. Driver*, 877 F. Supp. 2d 968, 982 (C.D. Cal. 2012) (granting summary judgment to CFTC in commodity pool Ponzi scheme case and imposing permanent injunction and civil monetary penalty upon defendant).

The Court may also consider a defendant's litigation conduct when determining the appropriate civil monetary penalty.  In *Brockbank*, the court found that defendant's "destroying evidence, and . . . total lack of cooperation with and actual obstruction of the CFTC" factored in favor of "imposition of the highest possible civil fine."  505 F. Supp. 2d at 1177.

1.  **Undisputed Proof That The Madigan Defendants Should Be Ordered To Pay A Civil Monetary Penalty**

     a.  **The Madigan Defendants Knowingly Committed Core Violations Of The Act And Regulations**

As set forth in the First Amended Complaint (#38 ¶¶ 1, 24) and above, the Madigan

Defendants fraudulently solicited more than $2.4 million through a series of misrepresentations

about the use of pool participants' funds, Madigan's educational background, and pool's

profitability.  In addition, the Madigan Defendants knowingly created and sent to pool

participants fabricated account statements and performance reports that falsely represented that

the Commercial Pool was profitable, when in fact it was losing money through Defendants' loss-

making trades and intentional misappropriation.

Courts have imposed significant civil monetary penalties upon defendants in similar

circumstances.  *See*, *e.g.*, *JCC*, 63 F.3d at 1571 ("[t]he weight of the evidence demonstrates that

the violations of the Act . . . were 'knowingly and repeatedly' committed," and "directly

harmed" futures trading customers); *CFTC v. Stuckey*, No. 11-311, 2012 WL 2128091, at *2

(E.D. Mo. June 12, 2012) (defendants' use of false statements to solicit funds from currency

futures investors and to conceal losses "constitute[d] serious violations [of the Act] and

warrant[ed] a substantial monetary penalty."); *CFTC v. Capital Blu Mgmt.*, No. 6:09-cv-508-Orl-

28DAB, 2011 WL 2357629, at **8, 10 (M.D. Fla. June 9, 2011) (misappropriating investor

funds and issuing false account statements warranted "severe sanctions" under the Act).

     b.  **The Madigan Defendants' Litigation Conduct Warrants A Significant Civil Monetary Penalty**

In this litigation, the Madigan Defendants' discovery abuses amounted to what the

Magistrate Judge called "**the most egregious conduct**" she has seen in nearly a decade on the

bench, including "what amounts to, in [the Court's] view, **what could be viewed as spoliation**." (#119 at 27:6-14, 30:5-8) (emphasis supplied).   Defendant Madigan's discovery abuses, and his lack of respect for the discovery orders of this Court, have continued.   *See generally*, #142, Plaintiff's Response to Objections to Discovery Order, at 8-11.   Accordingly, the Madigan Defendants' conduct warrants imposing a significant civil monetary penalty upon them.   *See Brockbank*, 505 F. Supp. 2d at 1177.

### 2.   Calculation of Civil Monetary Penalty

The appropriate civil monetary penalty in this case is three times the amount of money the Madigan Defendants' gained from their unlawful activity.   *See* Section 6c(d)(1) of the Act; Regulation 143.8(a)(2).   In determining the base amount of the penalty, the Court should use "the total value of the investments solicited," minus the funds returned to pool participants.   *ABEX*, 2014 WL 3896023, at *18.   *See also CFTC v. Premium Income Corp.*, No. Civ.A. 3:05VC0416B, 2007 WL 429092, at *12 (N.D. Tex. Jan. 26, 2007) (in forex fraud case, imposing a civil monetary penalty that "represents triple the monetary gain as measured by triple the amount of customer funds received by [defendants], less the funds returned to customers.")

Moreover, the total funds the Madigan Defendants received from pool participants is an appropriate base for a civil monetary penalty because the Madigan Defendants fraudulently induced customers to deposit funds by "intentionally misrepresent[ing] or omit[ting] crucial information to investors" through misrepresentations about the use of pool participants' funds, Madigan's educational background, and the Defendants' trading abilities.   Inasmuch as the Madigan Defendants used false pretenses to entice customers to deposit funds with them, all funds the Madigan Defendants received resulted from fraud.

Accordingly, the Court could order the Madigan Defendants to pay a civil monetary

penalty in the amount of three times the net funds they took in (*i.e.*, $2,471,181.64 minus

$111,000 in purported redemptions = $2,360,181.64), or 3 times $2,360,181.64, for total of

$7,080,544.92, plus prejudgment interest thereon.

### E.  Prejudgment Interest and Costs

The Madigan Defendants should pay prejudgment interest upon the restitution,

disgorgement, and civil monetary penalty amounts identified above.  Prejudgment interest "is

necessary to compensate the investors for the monetary value and time of the losses."

*Brockbank*, 505 F.Supp. 2d at 1176.

Also, an award of costs and fees is appropriate, pursuant to 28 U.S.C. §§ 1920 and

2412(a)(2), if the Court grants the CFTC's motion for summary judgment on the entirety of its

Complaint.  *Perkins*, 2009 WL 806576, at *11.  Therefore, the Madigan Defendants should be

ordered to pay Plaintiff's costs in prosecuting this action.

## VI.    CONCLUSION

For the foregoing reasons, the Court should grant Plaintiff CFTC's Motion for Summary

Judgment, and award the relief requested herein.

Dated: April 6, 2017

Respectfully submitted,

UNITED STATES COMMODITY
FUTURES TRADING COMMISSION

BY:   *s/Luke Marsh*
      LUKE B. MARSH
      Chief Trial Attorney
      DANIEL J. GRIMM
      Trial Attorney
      Commodity Futures Trading Commission
      Division of Enforcement
      1155 21st Street, N.W.
      Washington, D.C. 20581
      Tel: (202) 418-5000
      Facsimile: (202) 418-5124
      lmarsh@cftc.gov
      dgrimm@cftc.gov
      Counsel for Plaintiff
      U.S. Commodity Futures Trading Commission

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on April 6, 2017, I caused a copy of the foregoing to be filed with the

Clerk of the Court using the CM/ECF system, which will send notification of the filing to the

following counsel of record:

**Counsel for Defendants Ryan Tomazin and RAST**
**Investor Group, LLC**:

Richard J. Banta, Esq.
Law Office of Richard J. Banta, P.C.
3773 Cherry Creek North Drive
Denver, CO 80209
Ph:  (303) 331-3415
Fax:  (303) 331-1195
info@richardbantalaw.com

**Counsel for Defendants Madigan Enterprises, Inc.**
**and Ryan Madigan**:

Michael J. Davis, Esq.
DLG Law Group LLC
4100 E. Mississippi Avenue, Suite 420
Denver, Colorado  80246
Direct 720-361-6036
Office 303-758-5100
Fax 303-758-5055
mdavis@dlglaw.net

Additionally, I hereby certify that on April 6, 2017, service of the foregoing was made on

the following Defendants via First-Class United States Postal Service Mail:

*Pro Se* Defendant Randell A. Vest
9613 Halyards Ct.
Fort Myers, FL 33919

*Pro Se* Defendant Bulletproof Vest, Inc.
9613 Halyards Ct.
Fort Myers, FL 33919

*s/ Luke Marsh*
Luke Marsh