IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No. 14-CV-02182-MSK-KLM

UNITED STATES COMMODITY FUTURES TRADING COMMISSION,

      Plaintiff,

v.

R2 CAPITAL GROUP, LLC,
RAST INVESTOR GROUP, LLC,
MADIGAN ENTERPRISES, INC.,
BULLETPROOF VEST, INC.,
RYAN TOMAZIN,
RYAN MADIGAN, and
RANDELL A. VEST,

      Defendants.

---

**DEFENDANTS R2 CAPITAL GROUP, LLC, RYAN MADIGAN, AND MADIGAN ENTERPRISES, INC.'S RESPONSE IN OPPOSITION TO PLAINTIFF COMMODITY FUTURES TRADING COMMISSION'S MOTION FOR SUMMARY JUDGMENT AGAINST MADIGAN AND VEST DEFENDANTS**

---

Defendants R2 Capital, LLC, Ryan Madigan, Madigan Enterprises, Inc. (collectively, "Madigan Defendants"), by their attorney Michael J. Davis, request oral argument pursuant to D.C.COLO.LCivR 7.1(h) and respectfully submit this Response In Opposition To Plaintiff Commodity Futures Trading Commission's Motion For Summary Judgment Against Madigan And Vest Defendants pursuant to Fed. R. Civ. P. 56, stating as follows:

## INTRODUCTION

The existing record in this case does not establish that Ryan Madigan ("Madigan") or R2 Capital Group, LLC ("R2 Capital") violated the Commodity Exchange Act ("Act") or its

1

Regulations.  Specifically, Madigan acted in good faith in executing his responsibilities and did not know the allegedly fraudulent nature of his actions.

The primary explanation for Madigan's position, which is noticeably absent from CFTC's Motion for Summary Judgment ("MSJ"), is the fact that R2 Capital and its affiliate R2 Commercial Capital Partners I L.P. ("R2 Commercial") had external investments starting in 2010 apart from its single trading account.  These investments focused on a company called Assured Capital that purported to be highly profitable.  Assured Capital, which was owned and controlled by Jennifer Hoffman ("Hoffman"), has since been investigated and its principals indicted for securities fraud.  At the time, however, Madigan believed that as a result of this investment both R2 Capital and R2 Commercial were profitable.

To the extent that there is a dispute of these facts, all inferences should be for Madigan on review of this MSJ.  Accordingly, the MSJ should be denied and the Court should not award an injunction or damages against the Madigan Defendants.

## STATEMENT OF FACTS

Ryan Tomazin created R2 Capital in November 2008.  ECF No. 6-2.  Under the original Operating Agreement, both he and Ryan Madigan were member/managers.  ECF No. 6-3.  In 2009, they amended the Operating Agreement to reflect three equal ownership shares among (1) Tomazin's company RAST Investor Group, LLC ("RAST"), (2) Madigan's company Madigan Enterprises, Inc. ("Madigan Enterprises"), and (3) Randell Vest's company Bulletproof Vest, Inc. ("Bulletproof Vest").  ECF No. 6-4.  R2 Capital was intended to be an "investment club."  Ex A (Madigan Dep) at 22:3-4.  In September 2009, Tomazin, Madigan, and Vest also formed a limited partnership, R2 Commercial.  ECF No. 6-14.

The partners designed R2 Commercial to be exempt from registration requirements with CFTC on the basis that its members were sophisticated, high dollar investors. ECF No. 6-18 at 6 ¶ 20. Tomazin's role within the company was as general operations and administration of the company. Ex. A (Madigan Dep.) at 47:21-25, 93:21-24; Ex. B (NFA e-mail) at 6-7. Vest was primarily responsible for overseeing trading and relationships with trading partners. *Id.* at 5; Ex A (Madigan Dep.) at 161:16-20. Madigan's main responsibility was communications with investors. Ex A (Madigan Dep.) at 143: 3-144:3. The first trading partner R2 Capital contracted with was David Simpson/Maven Funds, who traded using a Peregrine Financial Group (PFG) account. Ex. A (Madigan Dep.) at 46:1-23, 85:13-20.

Tomazin, Vest, and Madigan contacted and recruited a number of investors/limited partners into R2 Commercial between January 2010 and April 2011. The first investor that they signed was Northport Investments. Ex. C (Tomazin Responses) at 1, 4. All three of R2 Capital's member/managers, David Simpson, and Ryan Madigan's father met with members of Northport in Chicago in January 2010. Ex. A (Madigan Dep.) at 71:4-72:1. During this meeting, Madigan represented that the investment strategy of R2 Commercial would be primarily to trade forex, but that there were other investment possibilities as well. *Id.* at 73:3-12. Northport invested a total of $1,105,000 into the account between January and March 2010. Ex. C (Tomazin Responses) at1-2.

Three additional investors later joined. Derek Miller joined in April 2010 with an investment of $1,000,000. *Id.* Sean Irvine joined in May 2010 with an initial investment of $100,000 and three later investments of $10,000 for a total of $130,000. *Id.* at 2. Allen Gamble joined in September 2010 with total investment of $236,182 between September 2010 and April

2011.  *Id.*  Madigan never had any contact with Sean Irvine.  Ex. A (Madigan Dep.) at 319:21-320:2.  Madigan was involved with the recruitment of Derek Miller and Allen Gamble to join the limited partnership.  *Id.* at 95:21-24.  During these meetings, Madigan continued to represent that R2 Commercial's investment strategy would be primarily in professionally managed forex accounts, but that there were other investment possibilities as well.  *Id.* at 153:11-16.  Madigan also had ongoing contact with Derek Miller and Allen Gamble.  *Id.* at 98:21-25, 155:22-156:1.

In addition to other subscription paperwork, Tomazin, Madigan and/or Vest distributed a Confidential Information Memorandum ("CIM") to investors.  ECF No. 6-16.  The CIM made it clear in several places that investment as a limited partner was highly risky, that there were no guaranteed results, and that the investment would not necessarily be liquid at all times.  ECF No. 6-15.  The CIM also listed permitted investments including financial contracts and instruments, debt securities, and investment in approved companies and funds.  ECF No. 6-15 at 12.  Finally, the CIM stated that additional information should only be relied upon when furnished in written form signed by an officer of R2 Capital.  ECF No. 6-15 at 78.

Tomazin operated separate bank accounts for R2 Capital and R2 Commercial.  ECF No. 6 at 5.  Most of the earlier investments were directed first to R2 Commercial.  ECF No. 6-19.  A few of the investments were placed in R2 Capital's account but later transferred out and into R2 Commercial, and from there into various trading accounts.  *Id.*  At first, nearly all of the R2 Commercial investment was placed under David Simpson's control for trading with PFG (in accounts separated for each investor).  ECF No. 6-20.

The PFG account did not perform well.  By October 2010, the total investments of $2.2 million had dwindled to less than $780,000.  ECF No. 6-18 ¶ 8.  During this period, each

investor had access to a PFG account and was receiving regular (monthly or quarterly) statements showing the account profits/loses. Ex A (Madigan Dep.) at 88:5- 22; ECF No. 5-6. By late 2010, it was clear that the strategy was not working and investors were losing money. Ex. A (Madigan Dep.) 148:18-20.

Around 2011, Tomazin, Vest, and Madigan found a different trader, Peter Campbell ("Campbell"). *Id.* (Madigan Dep.) at 148:20-149:1. Campbell traded under the Interactive Brokers ("IB") platform, so Tomazin, Vest and/or Madigan set up an IB account in August 2010. *Id.* at 149:8-14. They fired David Simpson and started to move the remaining investment funds from PFG to IB. *Id.* at 148:18-20. Madigan informed Miller that David Simpson was no longer working for R2 Commercial and that they would be relocating the funds with another trader. ECF No. 149-7 at 23. Mr. Gamble's investments were never with PFG. ECF No. 6-19. The IB account(s), which was trading primarily in S&P 500 minis and financial futures, showed steady progress from August 2010 to July 2011. ECF No. 6 at 12-13.

Tomazin also made several other investments on behalf of R2 Capital and/or R2 Commercial, but the primary investments were with Hoffman. ECF No. 6-18 ¶ 16; Ex. C (Tomazin Responses) at 5-7. The first of these was a $200,000 investment on behalf of R2 Capital (the three partners) with a fund called International Finance and Trust that in turn invested the funds into Assured Capital, which was owned and operated by Hoffman. Ex. B (Tomazin Responses) at 5-6. In September 2010, Hoffman asked Tomazin if R2 Capital had investment capital to issue a loan, in exchange for which she would issue a sizeable fee. *Id.* at 6. Tomazin made the investment with capital from R2 Commercial. *Id.*

Tomazin, who maintained the accounting and reporting structure for R2 Capital and R2 Commercial, generated statements for investors that showed progress in the IB account as well as these other investments.  Ex. B (NFA e-mail) at 6-7; Ex A (Madigan Dep.) at 121:3-17.  The statements, which were labeled as "R2 Commercial Capital Partners I, L.P. (A Limited Partnership) Trading Statement" did not distinguish between progress in the PFG/IB accounts and these other investments.  ECF No. 5-6.  Madigan would receive these statements from Tomazin and forward them on to his investor contacts, Mr. Miller and Mr. Gamble.  ECF No. 149-9.    According to Miller, he stopped receiving statements after a few months.  ECF No. 149-11.

While it appeared from Tomazin's accounting and the statements that R2 Commercial overall was overall making gains from 2011 into 2013, there was a cash flow/liquidity problem.  Ex. A (Madigan Dep.) at 144:11-17.  All of the investor funds appeared tied up with the investment with Hoffman.  *Id.* at 144:18-145:12.  Between 2010 and 2014, Hoffman continued to convey her intent to return funds to R2 Capital, including by making claims of returning a finally agreed upon amount of $3,500,000 for full value of the promissory note and prior investments.  Ex. C (Tomazin Responses) at 6-7.  Madigan reported on the specific issues releasing investment moneys to both Miller and Gamble.  ECF No. 149-7 at 18-19, 23-26; ECF No. 149-9 at 54-55.

During this period, Tomazin, Vest, and Madigan continued to take distributions from the R2 Capital account.  ECF No. 6-23.  They did not receive distributions from the R2 Commercial account except on two limited occasions.  Ex. C (Tomazin Responses) at 3.  Madigan believed based on information he received from Tomazin that the distributions from the R2 Capital

account were his monies based on profits earned by R2 Capital in R2 Commercial and the investment with Hoffman.  Ex. A (Madigan Dep.) at 25:6-11, 131:13-132:1, 154:12-18.

Madigan took a different full time job with Hill-Rom starting in 2011 or 2012 and thereafter took a passive role in R2 Capital, including R2 Commercial activities.  *Id.* (Madigan Dep.) at 184:2-5, 2016:24-25.  Madigan did not receive any draws from the account after September 2012.  ECF No. 6-23.  He continued to believe that he had investments worth upwards of $1 million owed to him from his work with R2 Capital and R2 Commercial until late 2014. Ex. A (Madigan Dep.) at 57:11-12.

In February 2013, Derek Miller first requested a withdrawal of $25,000 of his remaining funds.  CITE   Madigan communicated that his money was tied up with Hoffman.  CITE   This was based on information he received from Tomazin, who received his information from Hoffman.  CITE   Madigan continued to believe until 2014 that the fund's investment with Jennifer Hoffman would amount to a profit for him and his investors.  CITE

The National Futures Association began investigating R2 Capital and R2 Commercial in 2013.  ECF No. 6.  In 2014, the partners still believed they would be able to exit their investors into the R2 Global fund as soon as the Hoffman money was liquid.  Ex. D (Madigan emails).  In August 2014, Hoffman was indicted.  Ex. E (Indictment).  Hoffman and the other two principles of Assured Capital have all pled guilty to fraudulently taking monies from their investors and are serving sentences in prison.  Ex. C (Tomazin Responses) at 7.  The $200,000 note from R2 Capital (under the name Invest Financial Group, LLC) appears on the judgment documents relating to the criminal case.  Ex. F (Judgment).  The charges are consistent with what Madigan communicated to Miller.  ECF No. 149-7 at 18-19, 23-26.

None of the investors brought individual charges against any of the defendants.  Miller received a return of $111,000 total of his funds in late 2010.  Ex. C (Tomazin Responses) at 3. Northport received a return of $288,000 of its funds in 2016.  *Id.*

## SUMMARY OF ARGUMENT

CFTC cannot prevail because (1) there are substantial questions of material fact related to essential elements of its First and Second Claims, including whether Madigan made material misrepresentations or misappropriated participant pool funds and whether he did so with the requisite scienter; (2) there are questions of material fact regarding essential elements of its Third and Fourth Claims, including whether R2 Capital made material representations or comingled funds; (3) there are questions of material fact related to whether Madigan was a controlling person of R2 Capital; (4) CFTC has not demonstrated that R2 Capital has any liability as a result of the actions or inactions of Tomazin and Vest and their respective companies; and (5) there are questions of material fact related to the types and amounts of relief to which CFTC would be entitled even if it prevailed on its claims on summary judgment.  Due to these material fact disputes, trial is necessary.  *See In re Ribozyme Pharmaceuticals, Inc. Securities Litigation*, 209 F.Supp.2d 1106, 1009 (D. Colo. 2002) ("The civil legal process favors factual dispute resolution by live testimony presented at a trial; summary determination based solely on documentary evidence short circuits that process.").

## ARGUMENT

Rule 56 of the Federal Rules provides that "judgment ... shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

party is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(c).  A fact is "material" if

its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc*., 477 U.S.

242, 248 (1986).   All inferences to be drawn from the facts should be resolved in favor of the

nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

   **A. CFTC Is Not Entitled To Summary Judgment Against Madigan Defendants On
       Claim 1 (Fraud in Connection with Commodity Futures Contracts) or Claim 2
       (Fraud in Connection with Forex Contract).**

   1.  Overview Of Position And Evidentiary Issues

   These claims are especially inappropriate for resolution on summary judgement given the

type of claims and evidence involved.  Most importantly, the element of scienter (whether

Madigan acted recklessly or with knowing disregard of risks) makes the case particularly

inappropriate for resolution on summary judgment.  *See SEC v. Seaboard Corp*., 677 F. 2d 1297,

1298 (9th Cir. 1982) ("Since resolution of the question of scienter will typically involve

evaluation of witness demeanor and credibility, the issue is usually treated as inappropriate for

summary judgment"); *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479 (6th Cir. 1989) (cases

involving state of mind issues not necessarily inappropriate for summary judgment).  In addition,

there are substantial questions of material fact that relate to the core elements of CFTC's claims.

"Failure to establish any one of these elements is dispositive and would preclude CFTC's

fraud/deception claims." *Commodity Futures Trading Comm'n v. R.J. Fitzgerald & Co., Inc*.,

310 F.3d 1321, 1328 (11th Cir. 2002).

   Madigan has made numerous statements, of which CFTC is aware.  As mentioned above,

Madigan has indicated he did not intend to defraud investors and was not directly involved with

R2 Capital's investment strategy, that he believed that the funds were profitable until 2014, and

that he was unaware of the issues with Hoffman's investment and/or Tomazin's management of the fund until after the start of this lawsuit. *See generally* Ex. A (Madigan Dep.); *see also* Ex. E (Madigan Responses) at 1-3.  Madigan did not trade.  It was not his job responsibility to understand the nuances of the company's accounting or trading.  He made representations to others believing that there were other profitable investments in the pool.  He was the middle-man to communicate with investors.  To the extent he misrepresented information, it was information that he was fed by Tomazin or one of the traders.  The information was consistent with believing that one particular investment with Jennifer Hoffman was profitable.

CFTC's general and specific statements of fact does not establish Madigan Defendant's liability.  In general, Madigan Defendants dispute each and every reference in the MSJ to *fraud* or *fraudulent*, *conspiracy* or *co-conspirator*, *misrepresentations* or *falsely represented*, *misappropriation*, a defendant's intent to *conceal* misappropriation, or *prevent* redemption of funds.  The CFTC's core case consists of (1) assuming that information Madigan sent regarding the investments was false because the IB account was not generating the profit reported, and (2) assuming that Madigan knew or should have known about the falsity of the reporting.  Whether Madigan knew or should have known of the falsity of his claims is a fact question.

The CFTC instead characterizes its evidence as demonstrating that Madigan was reckless or willfully ignorant as a matter of law.  CFTC tries to establish reckless behavior based upon Madigan's failure to inquire more about the investments.   Recklessness requires "highly unreasonable conduct which is an extreme departure from the standards of ordinary care." *SEC v. George*, 426 F. 3d at 792.  It is equally, if not more probable that Madigan was truly ignorant of the fraudulent nature of the underlying investments.  The evidence as a whole does not read like

conduct that would have occurred if Madigan knew that R2 Capital was running a fraudulent investment scheme.  To the extent the evidence raises questions, these should be resolved at trial not on the limited record currently before the Court.

There are also substantial disputes between various witnesses' testimony and questions regarding their credibility.  Tomazin's Declaration is not credible due to numerous inconsistent statements between Tomazin's interrogatory responses and his Declaration.  Compare Ex. C (Tomazin Responses) to ECF No. 149-13.  Allen Gamble's testimony is also not credible as it is contradicted by emails to him.  There has been no testimony at all in the case from Vest.

Other evidence CFTC presented on this motion should be excluded under  Rule 37 (c). Fed. R. Civ. P. 37(c) ("If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial . . .").  For instance, Koh's Declaration should be excluded because CFTC did not disclose Koh as an expert witness, and his testimony is outside the knowledge of a lay person.   The Declaration of Loredo should also be excluded because it was untimely disclosed.  *See CFTC v. Am. Bullion Exchange ABEX Corp*., No. SACV 10-01876 DOC (RNBx), (C.D. Cal. Aug. 7, 2014) (excluding exhibits not disclosed to Plaintiff).

With this background, Madigan Defendants will turn to the individual statements and acts that CFTC asserts establish Madigan's violation of Sections 4b(a) of the Act.

2.  <u>Madigan Did Not Knowingly Or Recklessly Distribute Materially False Trading Statements To Investors[1]</u>

---

[1] Unless otherwise noted, Madigan Defendants do not dispute Plaintiff's recitations of the burden of proof or elements of their claims or damages.

CFTC points to six trading statements to support its claim that Madigan acted recklessly by distributing false trading statements to investors. CFTC claims that the trading statements are false because the information they contain doesn't reflect the status of the trading in the IB account. CFTC conflates R2 Commercial with the IB account.

The trade statements did not only represent trading in the IB account. These statements, which were correctly labeled as "R2 Commercial Capital Partners I, L.P. (A Limited Partnership) Trading Statements," included other investments apart from IB balance including the Hoffman note balance. Ex. A (Madigan Dep.) at 210:20-212:19. CFTC is incorrect when it states that Madigan admits the trading account statements represented profits in the IB trading account. *Id*. Madigan in fact tried to clarify that point during his deposition. *Id*.

As support for its claim that these statements are material, CFTC references *Commodity Futures Trading Comm'n v. Noble Wealth Data Info. Servs., Inc.*, 90 F.Supp.2d 676, 687 (D. Md. 2000), which affirms that false statements are material because they will influence decision as to whether to invest <u>additional</u> funds. This case is inapposite because Gamble didn't invest additional funds after 2011. Moreover, CFTC provides no evidence indicating actual materiality as it related to any of the investors' decisions to invest or hold their investments.

CFTC's case law finding scienter from deliberate failure to acquire information or to verify statements is also not applicable. *First,* it was not Madigan's position in R2 Capital to acquire information about the status of investments. He received the statements from Tomazin and forwarded them to Gamble. Ex. A (Madigan Dep.) at 110:6-111:4; ECF No. 149-9 at 12-13. *Second*, Madigan had no indication that the information on the statements was wrong, because they indicated overall fund progress, which was consistent with his understanding. Madigan

believed that the profits were coming from an investment with Jennifer Hoffman.  *Id.* (Madigan Dep.) at 25:6-11, 131:13-132:1, 154:12-18.

The CFTC's evidence regarding Madigan's receipt of emails showing that the IB account was low do not establish Madigan's scienter.  As Madigan explained in his deposition, insufficient equity can be a result of having a number of open positions; it doesn't necessarily indicate there is no money in the account.  *Id.* (Madigan Dep.) at 240:6-242:6.  In addition, that Madigan was continuing to look for cash does not mean he did not believe the fund was profitable – it means the fund was not liquid.

*Third*, he did inquire.  Madigan inquired regarding the statements.  *Id.* (Madigan Dep.) at 301:19-302:4.  He also inquired regarding Hoffman and the liquidity issues.  *Id.* at 146:24-147:11.  There is no indication that Madigan was ever suspicious of account activity and chose to be willfully ignorant.  *Id*. at 202:25-203:6; 211:4-13.

The scienter element is established when an individual's conduct involves intentional omissions or misrepresentations that present a risk of misleading customers, either known to the defendant or sufficiently manifest that defendant must have been aware of the risk."  *Commodity Futures Trading Comm'n v. Trimble*, 11-cv-02887 *n4 (citing *Commodity Futures Trading Comm'n v. R.J. Fitzgerald & Co*., 310 F.3d 1321, 1328 (11th Cir. 2002)).  Hundreds of people were misled by Hoffman.  Ex. F (Judgment).  There is thus a question of fact whether Madigan should have been aware of the risk, given the weight of contrary evidence.

3.  Madigan Did Not Knowingly Or Recklessly Make Material Misrepresentations
Regarding Profitability

To support this claim, CFTC lists one statement in a declaration by Northport's principal, Tyson Morgan, stating that Tomazin, Vest, and Madigan represented at their initial meeting that

R2 Commercial was expected to generate double-digit returns.  That statement is allegedly

supported by the declaration by Tomazin. The next statement regarding expected profits is from

Miller, who stated that Madigan verbally promised 8-10% returns. Next, CFTC asserts that

Madigan misrepresented profitability of the fund in the biography that he sent to Gamble.

      First, Morgan's Declaration isn't clear regarding who made the statement, and therefore a

question of material fact exists regarding who made this statement.  Madigan claims that he

never promised profits to investors.  Tomazin's declaration is also not credible, as discussed

above.  In any case, stating the belief that the fund could perform in double digits is not a

promise, but a best estimate at future performance.  It is a material question of fact whether those

predictions were reasonable in light of the overall message and common understanding of the

information that was conveyed.  *See R.J. Fitzgerald*, 310 F.3d 1321 ("Whether a

misrepresentation has been made depends on the overall message and the common understanding

of the information conveyed.") (citation and internal quotation marks omitted).  CFTC also has

not established that it was false that, to date, the fund had experienced performance of 33%

profit.  As discussed above, CFTC takes the flawed position that the only activity in the

Commercial fund was the trading action, which was incorrect.

      CFTC's cites *R.J. Fitzgerald*, 310 F.3d 1321, to assert that failure to reveal failure of fund

to profit is material.  However, *R.J. Fitzgerald* is inapposite because Madigan <u>didn't know</u> that

fund was losing money when he made these statements.  Plus, as with the other alleged

misrepresentations, CFTC has provided no direct evidence that any investor relied on these

statements.  In fact, Gamble didn't receive Madigan's executive biography until after he had

already made the investment, so it was not material.  ECF No. 149-6 at 32-34.

In addition, any statement about the pool being low risk would have been negated by documents that Gamble signed.  The CIM was very clear that profits are not guaranteed.  ECF No. 6-16.  It is also well-known that both forex and futures trading are high risk, and therefore investors would be presumed to know these risks.  *See R.J. Fitzgerald*, 173 at 1301 ("The majority of people who trade in futures and options in commodities markets lose money. As a result, an individual's risk tolerance has to a certain extent already been demonstrated by their very choosing to enter into this very risky market. All the clients who traded with RJFCO expressly acknowledged by their signatures that they understood the level of risk involved.")

Finally, there are material fact questions regarding whether Madigan said these statements with reckless intent to deceive investors.  Again, negligence alone is insufficient.  *See* Ex. A (Madigan Dep.) at 165:20-166:9.  In addition, as discussed at length above, while Madigan knew that the IB account wasn't returning huge profits, he had a good faith belief that other investments were making up for the difference.

4.   <u>Madigan Did Not Knowingly Or Recklessly Materially Misrepresent His Investment</u>

It is a disputed fact whether Madigan insinuated he had invested in Commercial Pool. CFTC misrepresents the October 7, 2010 statement.  Gamble himself admits that he didn't know whether that referred to Madigan's investment or other investor's capital.  ECF No. 149-3 at 19/28.  There are both hearsay and credibility evidentiary issues with Miller's recollection of Madigan telling him about his investment.   CFTC also misrepresents Madigan's deposition testimony that know whether money would be deposited into the fund; instead he represented that he didn't presently recall past investments. Ex. A (Madigan Dep.) at 158:20-159:7.

Regardless, Madigan certainly believed at some point he had $1 million invested with R2 Capital. *Id.* (Madigan Dep.) at 57:11-12. As discussed above, he believed that the money was from profits he was entitled to. This was again based on his belief that the fund invested in profitable investments, despite the fact that those investments were not liquid.

5.   Madigan Did Not Knowingly Or Recklessly Materially Misrepresent That The Commercial Pool Was Trading In Forex

It is also disputed that Madigan represented to any investor, including Miller and Gamble, that R2 Commercial only would trade forex. The investors knew that the investment strategy was always diverse. *Id.* (Madigan Dep.) at 37:2-7, 56:8-21, 73:3-12, 153:1-16. The CIM which they both received indicated that there was a range of permitted investments.

There are questions of material fact relating to whether Madigan represented to Miller that the investment strategy had changed. Madigan informed Miller that R2 Capital wasn't trading with Simpson any more. ECF No. 149-7 at 23-26. Tomazin told Gamble they were investing in futures. ECF No. 149-9 at 54-55.

The cases CFTC sites establishing that this was a material misstatement are not relevant. One case refers to an investor's right to know that the fund is not trading at all; whereas the other case refers to an investor's expectation of knowing that forex trades are occurring because those trades are *more* risky than other forms of investments (this same logic would not apply to knowing that forex trading has stopped). Moreover, these cases don't have fact patterns like here where the investment strategy was always diverse and high risk.

Madigan also disputes that he acted with scienter. He wasn't a trader, and it wasn't his position in the company to look at the accounts—despite CFTC's making much of the fact it was his option to access the accounts. Madigan was tasked with maintaining and managing client

relationships.  He wasn't a trader and didn't have particular knowledge in the area.  In any case, CFTC didn't meet its higher burden to establish  scienter with regard to an omission than an affirmative misstatement.  *Rudolph v. Arthur Andersen & Co.*, 800 F.2d 1040, 1043 (11th Cir. 1986) ("[A] defendant's omission to state a material fact is proscribed only when the defendant has a duty to disclose") (emphasis added).

In sum, it is disputed whether Madigan indicated that the fund was no longer trading forex.  Regardless, Madigan did not act with scienter for a number of reasons, including that he had no mandatory duty to disclose.

6.   <u>Madigan Did Not Knowingly Or Recklessly Materially Misappropriate Funds</u>

CFTC asserts as the basis for its misappropriation claim the fact that $20,000 and then $172,500 of the funds were wired out of the IB trading account into the R2 Commercial bank account and then into the R2 Capital account and then to Madigan Enterprises, Bulletproof Vest, RAST and Campbell.  There is a material question of fact regarding why the funds were removed from the IB trading accounts and R2 Commercial accounts and how they were used.  Moreover, there is a question of whether Madigan knew about and sanctioned these withdrawals.

First, CFTC's statements misrepresent the transaction history.  $125,000 of those withdrawals went directly to M3, which is Campbell's company.  The remaining distributions, to Madigan Enterprises, Bulletproof Vest, and RAST, occurred over the next months and years.

More significantly, it is not clear that Madigan's acceptance of payments constitute misappropriation.  There is a question of fact whether Madigan controlled the accounts and was responsible for any distributions that occurred.  Tomazin controlled the bank accounts and wired money.  Madigan did not initiate payments, but accepted payments based on a good faith belief

that they were generating profits. Therefore, Madigan was used to receiving distributions during profitable months. Ex. A (Madigan Dep.) at 25:6-11. Even when the company wasn't profitable, or wasn't cash flowing, Madigan believed he had $1 million in equity.

CFTC asserts that Madigan's attempts to "stall" investors from redeeming their money indicate misappropriation. This conflates whether Madigan, as a principal of R2 Capital was entitled to a share of his profits once it had been distributed to R2 Capital accounts, and whether an investor was entitled to redeem his investment. In fact, Madigan was very clear with investors regarding the cash flow problems with R2 Commercial.

In sum, consistent with the other the alleged misrepresentations, these are factual issues that must be resolved at trial rather than on summary judgment.

7.   <u>Madigan Did Not Knowingly Or Recklessly Materially Misrepresent His Background</u>

As indicated above, CFTC's evidence on this issue should be excluded due, in part, to the late-disclosed Loredo Declaration. Fed. R. Civ. P. 37(c). In addition, there are no allegations related to Madigan's misstatement of his educational background in the Complaint. Madigan objects to this variance between the pleadings and CFTC's evidence.

If the Court allows the evidence, there is a significant question of material fact whether Madigan misrepresented his degree. As Madigan's deposition testimony indicated, he did attend the executive MBA program at Rochester Institute of Technology. Ex. A (Madigan Dep.) at 12:2-3. More importantly, however, even if Madigan had exaggerated his degree, this is not a material fact. A statement or omitted fact is material if "there is a substantial likelihood that a reasonable investor would consider the information important in making a decision to invest." *R & W Tech. Serv. Ltd. v. Commodity Futures Trading Comm'n*, 205 F.3d 165, 169 (5th Cir.

2000).  As repeated above, CFTC has not produced any actual evidence that an investor relied on this statement.  In fact, the only investor who CFTC asserts received this information was Gamble, who received it after Gamble had already invested.  ECF No. 149-6 at 32-34.

Finally, CFTC provides no indication apart from actual knowledge of his educational background that Madigan made this statement with fraudulent intent.  As CFTC asserted in its MSJ, it is not the topic of the misrepresentation that must be known to CFTC, but instead the danger of misleading customers.  *See R.J. Fitzgerald*, 173 at 1328 (to establish scienter, plaintiff must show "highly unreasonable omissions or representations . . . that present a danger of misleading [customers] which is either known to Defendant[s] or so obvious that Defendant[s] must have been aware of it.") (citation omitted).

    8.   R2 Capital Is Not Liabile For Claims 1 And 2

As argued above, CFTC is not entitled to summary judgment against Madigan on its First or Second Claims due to outstanding questions of material fact.  CFTC does not assert that R2 Capital is independently liable for these claims.  Therefore, on the basis of the arguments above, R2 Capital is not vicariously liable as Madigan's principal.[2]

**B.  CFTC Is Not Entitled To Summary Judgment Against Madigan Defendants On Claim 3 (Fraud By A Commodity Pool Operator) or Claim 4 (Commingling Of Pool Participant Funds)**

    1.   Tomazin and Vest's Alleged Liability Is Not Attributable To R2 Capital

Contrary to what CFTC implies, the pending Consent Order regarding claims against Tomazin and RAST or a prospective default against Defendants Randell Vest ("Vest") or Bulletproof Vest, Inc. ("Bulletproof Vest") do not establish Madigan Defendants' liability.

---

[2] Madigan Defendants admit Madigan Enterprises, Inc.'s and Ryan Madigan's alter ego status; however, it does not thereby admit the facts and allegations contained in pages 69 through 71 of CFTC's MSJ.

CFTC and Tomazin and RAST have agreed to the entry of a proposed Joint Consent Order. However, Madigan Defendants have challenged entry of that order on the basis that it imposes liability on R2 Capital and, potentially Madigan Defendants, and as such imposes terms on third parties who do not agree to the terms of the settlement.  ECF No. 136.

> Tomazin's guilty plea is similarly not conclusive.

> A prior criminal conviction may work an estoppel in favor of the Government in a subsequent civil proceeding. The standard for determining whether the litigation of a question in a civil suit is barred by a prior criminal trial is whether the question was distinctly put in issue and directly determined in the criminal prosecution.... In the case of a criminal conviction based on a jury verdict of guilty, issues which were essential to the verdict must be regarded as having been determined by the judgment.

> *Commodity Futures Trading Comm'n v. American Metals Exchange Corp*., 775 F.Supp.

767, 777-78 (D.N.J. 1991) (quotation marks omitted).  Tomazin's liability in the present case was not directly determined by his criminal conviction because the issues were not distinctly put in issue and directly determined—certainly not by a jury.  In addition, Tomazin only pleaded guilty to one count of commodity fraud, not the full range of claims here.  ECF No. 149-20.

CFTC is correct that Vest and Bulletproof Vest have abandoned their defense and the Court Ordered a series of sanctions that effectively result in all factual and legal inferences being taken against them. However, no default or judgement has yet been established.

There would also be a remaining question of material fact whether Tomazin and Vest and their respective companies were acting on behalf of R2 Capital and were acting within the scope of their employment.  7 U.S.C. § 2(a)(1)(B).  If Tomazin/RAST and Vest/Bulletproof Vest acted in a way that would be in violation of the Act, they would not have been acting in the scope of their employment, because they would have been acting unlawfully.  In addition, to the extent

they did anything other than what the CIM prescribed or what the Operating Agreement called for, they would also have been acting outside the scope of their employment. These are questions of fact that are not resolved by the present MSJ.

2. R2 Capital Did Not Make Material Misrepresentations

CFTC claims that R2 Capital violated Section 4o(1) of the Act, 7 U.S.C. § 6o(1) (2012), by making material misrepresentations. For the reasons discussed above, CFTC has not demonstrated that R2 made material representations because there are remaining questions of fact that must be resolved before it is clear that any of the representations were materially false or whether R2 Capital misrepresented funds. Even though the element of scienter is not required, any doubt about the remaining elements must be resolved in favor of R2 Capital. For the reasons discussed immediately above, it is also not appropriate for the Court to project any wrongdoing on the part of Tomazin or Vest or their respective companies to R2 Capital, as those defendants' liability has not been formally adjudged.

3. R2 Did Not Comingle Funds

CFTC finally claims that R2 Capital violated Commission Regulation 4.20(c), 17 C.P.R. § 4.20(c) (2013), by comingling pool participant funds with those of others. CFTC asserts as evidence of comingling the fact that R2 Capital transferred pool participant funds to the bank accounts of Madigan and others.

It is a question of fact whether these were participant funds when they were transferred or whether Madigan and the other defendants were entitled to these funds on the basis of the profitability of the account. Madigan has repeatedly asserted that he, if not the other defendants, believed that the fund was profitable and were entitled to take cuts.

CFTC takes a strict liability approach by stating that, because participant funds went into the bank accounts of individuals, there was a violation. If given CFTC's interpretation, this regulation would prohibit any payout from any pool, whether to individual investors or managers. It would also likely prohibit investments into any outside fund. This is an illogical result and the Court should avoid this narrow interpretation.

    4.   Madigan And Madigan Enterprises Were Not Controlling Persons of R2 Capital[3]

CFTC asserts that Madigan was a controlling person of R2 Capital under Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2012), which requires that Madigan had control of R2 Capital and lacked good faith or knowingly induced violations of the Act. Madigan does not dispute the first element: that he had the power to control of R2 Capital.[4] However there are remaining questions of material fact related to the other elements.

In order to show that Madigan did not act in good faith, CFTC must establish that he did not maintain a reasonable system of internal supervision and that he acted recklessly. "[N]egligence alone is insufficient." *Monieson v. Commodity Futures Trading Comm'n*, 996 F.2d 852, 860 (7th Cir. 1993). For the reasons described above, there is a material question of fact regarding whether Madigan's efforts amounted to a failure to implement reasonable compliance measures. Madigan did periodically review statements for their accuracy and he did inquire of Tomazin what was the status of the investment with Hoffman. It is unclear, in fact, what more Madigan could have done to "pull back the sheet" on the Hoffman investment. In addition, CFTC has not asserted facts under this section to indicate that Madigan's failure to

---

[3] This section corresponds to Section III.B of the MSJ.
[4] By doing so, Madigan does not admit the facts and allegations contained in pages 41 through 56 of CFTC's MSJ.

maintain an internal supervision system was reckless.  Thus, there are remaining questions of material fact concerning the good faith element.

There is also a remaining dispute concerning whether Madigan knowingly induced violations of the Act.  CFTC concedes this element significantly, if not completely, overlaps with the question of scienter above.  As established above, there are serious and material questions of fact regarding whether Madigan acted with scienter because Madigan believed that R2 Capital and R2 Commercial had profitable investments through 2014.  CFTC's claim that Madigan must have known the statements and information were false because they turned out to be false is circular and does not resolve the disputed facts.

**C.  There Are Material Questions Of Fact Concerning The Relief To Which CFTC Would Be Entitled Even If The Above Claims Were Established As A Matter Of Law.**

1.  Injunction

For the reasons presented above, Madigan Defendants did not violate the Act and there are material questions of fact that preclude summary judgment on CFTC's claims.  Therefore, CFTC cannot demonstrate the first element to support a permanent injunction.  In addition, CFTC has not established the second element: a likelihood of future violations.  Madigan has not worked for R2 Capital in an active capacity since at least 2011.  He was never a trader for R2 Capital and has not held other positions in the commodity or futures markets since that time. Instead, he has worked as a business consultant with various companies.  Currently, Madigan is employed as a consultant for a technology firm in the Wi-Fi location services business in San Diego, CA.  Ex. G (Madigan Responses).  Madigan's past conduct should not be suggestive of

his future conduct in this case because, since he exited R2 Capital, he has not continued to operate investment funds or shown any evidence of fraudulent activity.

2. Restitution

Restitution is not an appropriate remedy against Madigan. Proof of an investor's reasonable reliance and/or proximate cause is a requirement of restitution. *See Commodity Futures Trading Comm'n v. Rosenberg*, 85 F.Supp.2d 424, 447 (D.N.J. 2000). To the extent that CFTC asserts the individual investors reasonably relied on Madigan's representations, there is a material fact dispute. In its request for restitution, CFTC provides no direct evidence that any of the investors <u>actually</u> relied on any of Madigan's allegedly false statements. It also does not argue this as an element of its First or Second Claims. As discussed above, the credibility of Miller's Declaration and Gamble's deposition testimony is a question for the fact finder.

Even if investors reasonably relied on Madigan's allegedly-fraudulent conduct, restitution of the full amount of investor's investment is still not appropriate because (1) Madigan did not make representations to all investors, and (2) the proximate cause of the majority of the losses was forex trading. CFTC provides evidence of one initial meeting with Northport, at which Tomazin, Madigan, and Vest were all present, but there is no evidence that Madigan's actions had any causal effect on Northport's investment. With regard to the forex losses, CFTC asserts that Derek Miller's trading account at one time "was down to only $194,384.03" from an initial investment of $1,000,000. Mot. Summ. J. (ECF No. 149) at 21. Those losses were not proximately caused by Madigan. Instead, they were legitimate losses caused by unprofitable forex trades. These forex losses should be excluded from any restitution award. The amount of restitution owed, if any, is therefore also a question of material fact.

3. Disgorgement

Disgorgement is equitable remedy.  *Commodity Futures Trading Comm'n v. American Metals Exchange Corp.*, 991 F.2d 71, 76 (3rd Cir. 1993).  Whether a controlling person is liable for disgorgement turns on whether they were "intimately involved" in the fraud.  *See First Jersey Sec.*, 101 F.3d 1450, 1475-76 (2d Cir. 1996).  A controlling person is a lower standard than "intimately involved."  *See Commodity Futures Trading Comm'n v. Complete Developments, LLC*, 4:10 CV 2287 (N.D. Ohio Feb. 26, 2014) ("In cases where the controlling person is "intimately involved" in the fraud, that individual may be held jointly and severally liable for the disgorgement.").  For the reasons discussed above, Madigan was not "intimately involved" in the fraud because he acted in good faith and did not know that his statements were false and did not intend to misappropriate funds.  At the least, this is a question of material fact.  Finally, any disgorgement award should be limited to the amount that Madigan individually gained from his role in R2 Capital; he should not be jointly and severally liable for the funds distributed to Tomazin or Vest or their respective companies.

4. Monetary Penalty

Even if the Court were to award summary judgment, it should not award a significant monetary penalty because Madigan didn't knowingly commit core violation for the reasons described above.  As explained in detail elsewhere in this brief, Madigan acted in good faith and without knowledge that his actions were in violation of the Act.  At the least, there is a remaining question of fact that would preclude the award of summary judgment.

In addition, CFTC's request for a triple monetary penalty is extreme, even based on the conduct it asserted.  The Court may fashion a monetary penalty "appropriate to the gravity of the

offense and sufficient to act as a deterrent." *Trimble*, *supra*.  Madigan's conduct, even if found

to be fraudulent, would be more akin to cases where the Courts awarded a penalties in the

amount of a portion of the customer funds or equal to the customer funds.  *See e.g. Commodity*

*Futures Trading Comm'n v. Miklovich*, 3:14CV594 (N.D. Ohio Sept. 30, 2015) (awarding a civil

penalty of $100,000 in relation to conversion of $550, 000 of customer funds); *CFTC v. Am.*

*Bullion Exchange ABEX Corp.*, SACV 10-01876 (C.D. Cal. Aug. 7, 2014) (awarding a total

penalty of $3,430,000.00 based on the total value of the investments solicited, $5.5 million,

reduced by the money distributed to investors and the amount of an outstanding judgment).

In this case, the circumstances for awarding triple penalties are not present.  Madigan's

conduct was neither repeated nor egregious.  Nor are there aggravating circumstances such as

failure to defend in the action. *Compare to Commodity Futures Trading Comm'n v. Trimble*, 11-

cv-02887 ( D. Colo. Jan. 28, 2013) ("The amount of the civil monetary penalties is appropriate

given the repeated and egregious nature of defendants' fraudulent scheme."); *CFTC v. Premium*

*Income Corp*., 3:05-416B (N.D. Tex. Jan 26, 2007) (award against defendants who did not

answer complaint or otherwise defend in action).

Finally, Madigan's discovery conduct, to the extent that it warrants mention, does not rise

to the level of "destroying evidence" or "total lack of cooperation."  *Compare to Commodity*

*Futures Trading Comm'n v. Brockbank*, 505 F.Supp.2d 1169 (D. Utah 2007) (aggravating

circumstances included "destroying evidence" and "total lack of cooperation with and actual

obstruction of CFTC").  Moreover, Madigan has already been ordered to pay sanction for the

discovery dispute that CFTC references in its MSJ.  That order is currently stayed pending

review on objections.

1. <u>Pre-judgement Interest</u>

CFTC is not entitled to prejudgment interest on disgorgement or civil monetary amounts. *Commodity Futures Trading Comm'n v. Brockbank*, 505 F.Supp.2d 1169 (D. Utah 2007), which CFTC cites for its claim that prejudgment interest is necessary to compensate investors, applies to the remedy of restitution <u>only</u>. The *Brockbank* court did not award prejudgment interest on the total judgment and in fact stated, in relation to restitution, that "prejudgment interest is not recoverable as a matter of right. Rather, the district court must first determine whether an award of prejudgment interest would serve to compensate the wronged party." *Id.* at 1175-76. Therefore, if CFTC is entitled to prejudgment interest, it is only on restitution amounts and, even so, only if it would serve to compensate the wronged party. For the reasons discussed above, CFTC is not entitled to restitution or any prejudgment interest on summary judgment.

## CONCLUSION

Because material questions of fact remain concerning necessary elements of CFTC's claims and the relief it requests, CFTC is not entitled to summary judgment against Madigan Defendants. Madigan Defendants respectfully request that this Court deny CFTC's Motion for Summary Judgement and allow the case to proceed to trial.

Dated this May 11, 2017.

*/s/Michael J. Davis*
Michael J. Davis
DLG Law Group LLC
4100 E. Mississippi Ave., Ste. 420
Denver, CO 80246
Ph: (303) 758-5100
Fax: (303) 758-5055
E: mdavis@dlglaw.net

## CERTIFICATE OF SERVICE

I hereby certify that on May 11, 2017, I caused a copy of the foregoing Response In Opposition To Plaintiff Commodity Futures Trading Commission's Motion For Summary Judgment Against Madigan And Vest Defendants to be filed via the Court's CM/ECF system, which will cause notification of the following to be sent to the following:

Luke B. Marsh
Daniel J. Grimm
Danielle Karst
Commodity Futures Trading Commission
1155 21st Street NW
Washington, DC 20581

*Counsel for Plaintiff*

Richard J. Banta
Law Office of Richard J. Banta, .C.
3773 Cherry Creek North Drive
Denver, CO 80209

*Counsel for Tomazin and RAST*

Additionally, I certify that on May 11, 2017, service of the foregoing was made on the following Defendants via First-Class United States Postal Service Mail:

*Pro se* Defendant Randell A. Vest
9613 Halyards Ct.
Fort Myers, FL 33919

*Pro se* Defendant Bulletproof Vest, Inc.
9613 Halyards Ct.
Fort Myers, FL 33919

/s/Michael J. Davis
Michael J. Davis
DLG Law Group LLC