IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No. 14-CV-02182-MSK-KLM

UNITED STATES COMMODITY FUTURES TRADING COMMISSION,

       Plaintiff,

v.

R2 CAPITAL GROUP, LLC,
RAST INVESTOR GROUP,
LLC, MADIGAN
ENTERPRISES, INC.,
BULLETPROOF VEST, INC.,
RYAN TOMAZIN,
RYAN MADIGAN, and
RANDELL A. VEST,

       Defendants.

_____

**PLAINTIFF COMMODITY FUTURES TRADING COMMISSION'S
REPLY TO RESPONSE IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
AGAINST MADIGAN AND VEST DEFENDANTS**
_____

Plaintiff United States Commodity Futures Trading Commission ("CFTC" or

"Commission") replies to the Response in Opposition ("Opp." or the "Opposition") (#157) to

Plaintiff's Motion for Summary Judgment ("MSJ" or the "Motion") (#149) filed by Defendants

R2 Capital Group, LLC, Ryan Madigan, and Madigan Enterprises, Inc. (collectively, "Madigan

Defendants") as follows:

## I.      INTRODUCTION

The Opposition admits that Defendant Madigan "misrepresented information" to investors

to an "extent", but that Madigan lacked the requisite scienter because he was somehow duped by

his co-conspirator fraudster.  (Opp. at 10, lines 6-7).  Madigan did indeed misrepresent information to his victims but, contrary to his contentions, he knew or had to have known that his misrepresentations were false; at best—under Madigan's version of events—he recklessly relied upon the representations of his partners.  Under either scenario Madigan is liable for his fraud under the Commodity Exchange Act ("CEA" or the "Act") and its implementing Regulations, and the Court should enter an Order of Summary Judgment in Plaintiff's favor.

## II. SUMMARY JUDGMENT STANDARD

a.  <u>Scienter is appropriately determined by summary judgment.</u>

Courts frequently resolve cases involving state of mind issues through summary judgment.  *See, e.g.*, *CFTC v. Prestige Ventures Corp.*, No. CIV-09-1284-R, 2010 WL 8355003, at *1, *3 (W.D. Okla. Oct. 27, 2010), *aff'd sub nom. CFTC v. Lee*, 445 F. App'x 126 (10th Cir. Oct. 2011) (granting CFTC's summary judgment motion as to liability for futures and forex fraud and finding that CFTC established scienter).

Indeed, Defendants' contention that the scienter element of Plaintiff's fraud claims cannot be resolved in Plaintiff's favor at the summary judgment stage (*see* Opp. at 9) has been rejected by jurisdictions across the country. *See*, *e.g.*, *CFTC v. Miklovich*, No. 15-4426, 2017 WL 1403194, at *1 (6th Cir. Apr. 19, 2017); *CFTC v. JBW Cap.*, 812 F.3d 98, 107-08 (1st Cir. 2016); *CFTC v. Kratville*, 796 F.3d 873, 893 (8th Cir. 2015); *CFTC v. Driver*, 877 F. Supp. 2d 968, 977-78 (C.D. Cal. 2012), *aff'd*,  585 F. App'x 366 (9th Cir. 2014); *CFTC v. Complete Devs., LLC*, No. 4:10 CV 2287, 2014 WL 794181, at *14 (N.D. Ohio Feb. 26, 2014) (citing *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479 (6th Cir. 1989); *CFTC v. Am. Metals Exch. Corp.*, 991 F.2d 71, 81-82 (3d Cir. 1993).[1]

---

[1] *See also*, *CFTC v. Cook*, Civ. No. 09-3332 (MJD/FLN), 2016 WL 128131, at *4-5 (D. Minn.

In short, summary judgment is appropriate when there is but one reasonable conclusion. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250–51 (1986); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (when the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, then there is no genuine issue for trial) (citations and internal quotation marks omitted); *Amway Distribs. Benefits Ass'n v. Northfield Ins. Co.,* 323 F.3d 386, 390 (6th Cir. 2003) (central issue is whether evidence presents sufficient disagreement to require a jury, or whether evidence is so one-sided that one party must prevail as a matter of law) (quoting *Anderson,* 477 U.S. at 251–52); *Street,* 886 F.2d at 1478.

   b.   The Opposition Fails To Cite Facts Creating A Genuine Triable Issue

If the movant establishes that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial." *First Nat'l Bank of Ariz. v. Cities Serv. Co.,* 391 U.S. 253, 270 (1968) (citing Fed. R. Civ. P. 56(e)) (emphasis supplied); *see also McLean v. 988011 Ontario, Ltd.,* 224 F.3d 797, 800 (6th Cir. 2000). Mere allegations or denials in the non-movant's pleadings will not meet this burden, nor will a mere scintilla of evidence supporting the non-moving party. *Anderson,* 477 U.S. at 248, 252. Rather, "there must be evidence on which a jury could reasonably find for the non-movant." *McLean,* 224 F.3d at 800 (quoting *Anderson,* 477 U.S. at 252); *see also  S.E.C. v. Gagnon,* No. 10-cv-11891, 2012 WL 994892, at *6 (E.D. Mich. Mar. 22, 2012).

---

Jan. 12, 2016); *CFTC v. Wilson*, 19 F. Supp. 3d 352, 362-63 (D. Mass. 2014); *CFTC v. PMC Strategy, LLC*, No. 3:11CV73, 2013 WL 1349177, at *4-6 (W.D.N.C. Apr. 3, 2013); *CFTC v. Sarvey*, No. 08 C 192, 2012 WL 426746, at *4-5 (N.D. Ill. Feb. 10, 2012); *CFTC v. Gresham*, No. 3:09-CV-75-TWT, 2011 WL 8249266, at *4 (N.D. Ga. Sept. 8, 2011); *CFTC v. Aurifex Commodities Res Co.*, No. 1:06-CV-166, 2008 WL 299002, at *6 (W.D. Mich. Feb. 1, 2008); *CFTC v. Int'l Fin. Servs. (N.Y.), Inc.*, 323 F. Supp. 2d 482, 499-500 (S.D.N.Y. 2004); *CFTC v. Schafer*, No. Civ.A.H-96-1213, 1997 WL 33547409, at *4-5 (S.D. Tex. Dec. 23, 1997).

Here, Defendants make little effort to support their assertions with citations to the record, instead relying primarily upon Madigan's non-corroborated deposition testimony.  (*See* Opp. at 2-7, 10, 12, 13, 15, 18).  Defendants cannot survive summary judgment on this basis.  *See, e.g.*, *Baros v. Advantage Logistics USA W., LLC*, No. 09-cv-00012-CMA-BNB, 2010 WL 1416812, at *8 (D. Colo. Apr. 8, 2010), *aff'd,* 414 F. App'x 130 (10th Cir. 2011) (granting motion for summary judgment where a respondent "merely cites to her own deposition testimony[,]" as "this mere scintilla of evidence" could not create dispute of material fact); *McNeel v. Pub. Serv. Co. of Colo.*, 923 F. Supp. 1316, 1318 n.1 (D. Colo. 1996) (granting motion for summary judgment where a respondent's "only effort to set forth specific facts showing there is a genuine issue for trial is with his own affidavit."); *Eckert v. Bowen*, No. 1:11CV211LMB, 2013 WL 3884165, at *4 (E.D. Mo. July 26, 2013) (granting motion for summary judgment because the non-movant's "own self-serving allegations do not create a genuine issue of material fact that precludes summary judgment."); *Zeigler v. J-M Mfg. Co.*, No. 10-CV-0014-CVE-FHM, 2010 WL 4922585, at *8 (N.D. Okla. Nov. 29, 2010) (granting motion for summary judgment where respondent's objections were "based only on her own deposition testimony").

Elsewhere, the Opposition cites to *nothing*, leaving the Court with little more than bald assertions to weigh against Plaintiff's record citations.  *See, e.g*., Opp. at 7, 10, 12-18, 21-25. This approach directly contradicts the Court's Civil Practice Standards,, which provide that respondent "shall identify all elements for which there are disputed material facts *and identify where in the record* the disputed facts are located[.]" (Hon. Chief Judge Krieger Civ. Prac. Standard 7.62(c)(2)(B),emphasis supplied).

Defendants' unsupported claims cannot create a dispute of material fact sufficient to survive summary judgment.  *See*, *e.g*., *Schioppi*, 2007 WL 4277455, at *12 (summary judgment

entered where respondent's brief was "devoid of '*any* citation to *any* record evidence,'" as "it is not this court's duty to go hunting through briefs and exhibits for evidence to give clout to [respondent's] unsupported allegations.") (emphasis in original); *Vassos v. Dolce Int'l/Aspen, Inc.*, No. CIVA04CV01874EWNMEH, 2006 WL 893601, at *6 (D. Colo. Mar. 31, 2006) (granting summary judgment where respondent "makes no citation to the record to support her allegations," which "cannot create a genuine issue of fact to defeat summary judgment . . . ."); *KMMentor, LLC v. Knowledge Mgmt. Prof'l Soc'y, Inc.*, 712 F. Supp. 2d 1222, 1229 n.6 (D. Kan. 2010) (denying facts "with no citation to any evidence . . . does not appropriately controvert a fact for summary judgment.")

## III. ARGUMENT

**A.  The Opposition Creates No Triable Issues Regarding Madigan's Fraudulent Conduct in Counts One and Two**

1.  No Triable Issues Regarding Fraudulent Trading Statements

a.      Trading Statements Contained Misrepresentations.  Contrary to Defendants' unsupported assertions, the Commercial Pool trading account statements Madigan sent to pool participant Gamble misrepresented purported profits in the IB futures trading accounts; they did not depict gains from other investments.  Nevertheless, Madigan makes unsupported claims that these IB statements contained information pertaining to so-called "other investments. . . including the Hoffman note balance."  Opp. at 12.  This is totally contrary to all the undisputed evidence for the following reasons:

First, Madigan testified that the R2 Commercial Fund trading account statements that he sent to pool participant Gamble represented Gamble's purported profits in the IB trading account. MSJ at 20-21 (citing Ex. A—Madigan Dep. at 190:2-9, 192:5-16; Ex. C—Dep. Ex. 32, trading statements at RMDepo_000422-24.)  Therefore, these statements' misrepresentations of profit and

expenses generated by trading—when there was no profit and/or trading—were false and fraudulent.

Second, the Commercial Pool Trading statements <u>on their face establish that they concern only IB *trading* in the Commercial Pool, and not other investments</u>:

- The Trading Statements are entitled "***R2 Commercial*** Capital Partners I, L.P. (A limited Partnership) ***Trading*** Statements" (emphasis supplied) indicating that they pertain to *trading* profits in the R2 *Commercial Pool*, and not money generated from Defendant R2 Capital's private equity investments. *See e.g.*, #149-9, at 9.

- Each Commercial Pool trading statement reflected profits and earnings only *<u>from "Trading"</u>*, at least 10 times, including:

  - "*<u>TRADING</u>* STATEMENT FOR MONTH ENDING"

  - "*<u>TRADING</u>* BALANCE"

  - "Total *<u>Trading</u>* Account"

  - "*<u>TRADING</u>* PROFITS"

  - "*<u>Trading</u>* Account #1"

  - "*<u>Trading</u>* Account #2"

  - "Total *<u>Trading</u>* Profits"

  - Gross *<u>Trade</u>* Account with Profits"

  - "*<u>TRADING</u>* EXPENSES"

  - "ENDING *<u>TRADE</u>* BALANCE"

*See, e.g.*, MSJ, Ex 54 to Madigan Dep. at RMDepo_000523-524 (#149 at 9)(emphasis supplied).

- Nowhere on the Commercial Pool trading account statements is there any indication or suggestion that the earnings and profits and expenses were coming from anywhere other than _trading_.  *Id.*

- The Commercial Pool trading account statements, on their face, indicate that they represent trading in the Interactive Brokers account by specifically stating that "Trading Expenses" are generated by "_IB Fees_".  *Id.*  There could be no "IB Fees" without trading in the Interactive Brokers account.  Nonetheless, Defendant Madigan sent these statements more than a year after he became aware that the IB account stopped trading—so he knew or must have known that the statements were false.

Third, the so-called "other investments" and "Hoffman Note" were not represented on the Commercial Pool trading account statements because these other investments did not involve trading, and were not part of the Commercial Pool.  Rather, it is undisputed that these investments were purportedly small private equity investments and a loan—_not trading accounts_—made by Defendants Tomazin and RAST on behalf of R2 Capital, not the Commercial Pool, as established by the following:

- Madigan testified that, other than forex trading, Defendant R2 Capital would only be investing in private equity and real estate. Opposition Ex. A--Madigan Dep. at 36:23-37:5(#157-1)[2]

- Defendant Tomazin's Interrogatory Answers—submitted by Defendants in support of the Opposition—establish that these other investments were private equity

---

[2] Investor Gamble testified that he was never informed of these so-called private equity investments or loans, but instead Madigan informed him that the Commercial Pool would only be investing in Forex.  MSJ, Ex. B - Gamble Deposition at 12:19-13:6 (#147-3).

investments, and not trading accounts.  Opposition Ex. C – Tomazin Responses at 5-7 (#157-3) (describing R2 Capital's private equity investments and loans).

• Defendant Madigan does not dispute Tomazin's Declaration, which establishes that these so-called other investments were private equity investments by Defendant Tomazin, Defendant RAST (Tomazin's holding company), or Defendant R2 Capital, but not the Commercial Pool. MSJ, Ex. G—Tomazin Dec. at ¶¶ 39, 40, 48, 49, 53 (#149-13).

• Therefore there were no other trading accounts other than the PFG Best and IB trading accounts, and the "trading" statements, on their face, indicated they only represented the profits and expenses from the Commercial Pool *trading* accounts—NOT the so-called private equity investments or the Hoffman Note.

Fourth, it is undisputed that these private equity investments and the Hoffman Note were not part of the Commercial Pool, but instead were investments made by Defendants R2 Capital, RAST, or Tomazin.  The Commercial Pool was a limited partnership established with Defendant R2 Capital as the general partner.  #38 at ¶ 23; #74 at ¶ 23.  Therefore, pool participants invested in the Commercial Pool, not in Defendant R2 Capital—which was solely owned by Defendant Madigan and his co-conspirators.[3]  Madigan's Opposition brief, citing to Tomazin's Interrogatory Answers, admits that these investments and loans were made by Defendant R2

---

[3] It is undisputed that the Commercial Pool –and not R2 Capital—was designed to, and in fact did, pool investors' funds for purposes of generating returns by investing in forex and later, futures contracts.  Investors' funds were solicited for the purpose of pooling the funds, investing those pooled funds in the forex markets, and then dividing the profits 50/50 between the R2 Capital as the General Partner, and the investors as limited partners.  The Commercial Pool's investors' profits from the pooled funds trading forex was to be distributed to them on a *pro rata* basis, depending on the size of their investment.  MSJ, Ex. G—Tomazin Dec. at  ¶¶ 9-10 (#149-13); MSJ, Ex. B—Gamble Dep. at 14:13-15:4 (#149-3); MSJ, Ex. A—Madigan Dep. at 135:13-136:20 (#149-2); MSJ, Ex. C—Dep. Ex.  20, Madigan Email at RMDepo_000336 (#149-6), referencing "other clients" in the pool.

Capital—not the Commercial Pool. *See* Opp. at 5-6 (". . . a $200,000 investment on behalf of *R2 Capital (the three partners)* . . ."; "Hoffman asked Tomazin if *R2 Capital* had investment capital to issue a loan. . ."; "Hoffman continued to convey her intent to return funds to *R2 Capital* . . .") (citing Opp. Ex. C – Tomazin Responses, #157-3 at 5-7). Further, the Opposition brief later again admits, "The $200,000 note [came] *from R2 Capital*. . ." Opp. at 7 (citing Opp. Ex. F - Judgement).

Moreover, Tomazin's sworn declaration establishes that that these private equity investments and loans were made by Defendant Tomazin, Defendant RAST, or Defendant R2 Capital, but not the Commercial Pool. MSJ, Ex. G—Tomazin Dec. at ¶¶ 39, 40, 48, 49, 53 (#149-13).[4]

Finally, Madigan has not—and cannot—provide any evidentiary support for the notion that these account statement sent to pool participant Gamble referenced other non-trading investments. The only support proffered by the Opposition is deposition testimony relating to emails exchanged with a completely different investor (i.e., Miller) and does not relate to the fraudulent Commercial Pool trading account statements Madigan sent to Gamble. Opp. at 12 (citing inapplicable Madigan Deposition testimony at 210:20-212:19).

    b.    <u>The Fraudulent Account Statements Were Material</u>. Contrary to Defendant's claim, materiality exists where the misrepresentation could influence a reasonable investor's decision to initially invest, or the decision to <u>keep funds</u> with Defendant or invest additional

---

[4] The National Futures Association ("NFA") apparently noted that Tomazin may have at one time indicated that the Commercial Pool had other non-trading investments, but the NFA could find *no evidence* to support the existence of these investments. #6-18 at ¶16. Further, Tomazin's own sworn declaration establishes that these investments were not part of the Commercial Pool, and were instead made by Tomazin himself, RAST, or R2 Capital. MSJ, Ex. G—Tomazin Dec. at ¶¶39, 40, 48, 49, 53 (#149-13).

funds. *JBW Cap.*, 812 F.3d at 109 (affirming summary judgment for CFTC, and finding misrepresentations of pool's value to be material even if investors did not react to it).  It is of no moment that Gamble did not invest additional funds after Defendants sent him the false trading statements.

Further, that these false statements *could* influence the decision of a reasonable investor is sufficient to create materiality.  Reliance upon Defendants' misrepresentations is not required to establish liability under the anti-fraud provisions of the CEA.  *Id*.

c.  <u>The Opposition Creates No Triable Issue Regarding Scienter</u>.  Scienter exists where the defendant makes "omissions or misrepresentations that present a risk of misleading customers, either known to the defendant or sufficiently manifest that the defendant "must have been aware of" the risk."  *Commodity Futures Trading Comm'n v. King*, No. 3:06-CV-1583-M, 2007 WL 1321762, at *2 (N.D. Tex. May 7, 2007), citing *R.J. Fitzgerald*, 310 F.3d at 1328. Here, Defendants provide no evidence to controvert the undisputed proof that Madigan knew or must have known that the account statements were false.

First, for the reasons cited above, Defendant Madigan knew or must have known that these account statements reflected only purported profits and expenses related to the Commercial Pool's IB trading account, and not other investments made by Defendant R2 Capital.  As established above, the Opposition admits that the Jennifer Hoffman investment was made by R2 Capital—not the Commercial Pool.  Accordingly, Madigan knew that any profits flowing from the Hoffman investment belonged to R2 Capital, and not the Commercial Pool.

Second, Defendant Madigan knew or must have known that the Commercial Pool trading statements misrepresented the profitability of the trading in the IB account, or any trading at all, for the following uncontroverted reasons:

- On April 13, 2013, Defendant Madigan represented to pool participant Gamble that his investment could not be redeemed *until a trade in the Commercial Pool IB account was unwound*.  MSJ at 37-38 (citing Ex. B—Gamble Dep. at 87:14-90:22, 91:3-14; Ex. C— Dep. Ex. 70, Madigan email).  That is, Defendant Madigan represented in this April 13, 2013 email that the Commercial Pool was still trading.  MSJ, Ex. B—Gamble Dep. at 93:11-22 (#149-3); MSJ, Ex. C—Dep. Ex. 70, Madigan email (#149-9).  This representation was made 18 months after late November 2011—the date that Madigan admits he knew that the Commercial Pool IB account had ceased trading.  MSJ, Ex. A—Madigan Dep. at 282:14-25, 286:15-22 (#149-2); MSJ, Ex. C—Dep. Ex. 50 at RMDepo_0000506 (#149-8).  This was also almost two years after all trading had stopped in the Commercial Pool's IB account in July 2011—the IB account that Defendant Madigan could access at any time.  Importantly, Madigan's email refers to *trading,* and the inability to return Gamble's money to him because he could not get out of a trade, and *not* because of a liquidity problem with the Hoffman investment.

- Defendant Madigan does not dispute his September 8, 2011 email, in which he misrepresented that he could not provide a redemption to pool participant Miller because "[i]ts mid-month.  We do not take money out of a *trade* during the month."  This was untrue—the money was not held up in a trade because no money had been traded since July 2011.  MSJ at 36 (citing Ex. G—Tomazin Dec. at ¶ 36; Ex. C—Dep. Ex. 39) (emphasis supplied).  Madigan sent this email one month after the IB account—from which only Madigan could withdraw funds—was drained of almost all assets.   This again demonstrates that Defendant R2 Capital's Hoffman investment had no bearing on the Commercial Pool trading account, and that Madigan knew the account statements were fraudulent.

11

Third, Madigan does not dispute the following facts which conclusively demonstrate he knew or must have known the account statements showed false profits:

- Defendant Madigan knew or must have known about the trading losses, and lack of trading, in the IB account because he had daily access to the Commercial Pool's IB trading account, which would inform him of the precise amounts of the losses in the IB account, the amount in the account, and the complete lack of trading in the account after July 2011.  MSJ at 18-19.

- Defendant Madigan knew or must have known about the trading losses, and lack of trading, in the IB account because from August 2010 until April 2012, he alone had the sole power, ability, and authority to withdraw funds from the IB trading account, and he did withdraw funds from this account during that time.  MSJ at 45-47; Opp. at 17.  Madigan does not dispute the fact that during the this time $774,000 was withdrawn from the Commercial Pool IB trading account, by transactions initiated using Defendant Madigan's IB account usernames, and using the token key cards issued only to Ryan Madigan for those two usernames.  MSJ at 47 (citing Ex. H—Ward Dec. at ¶ 10; Ex. D—Koh Dec. at  ¶ 13). Defendant Madigan provides no evidence to dispute the uncontroverted October 2012 emails he sent admitting he was "buying time" by "keeping the backstory alive" to prevent pool participants from attempting to redeem their funds.  MSJ at 37 (citing Ex. A—Madigan Dep. at 304:1-20, 306:1-19); Opp. at 18.  Nor does Madigan dispute that the reason he was fraudulently trying to avoid redemption requests was because he knew or must have known when he sent these emails in October 2012, that (i) the Commercial Pool had not traded in the IB account for over a year and had only $788.03; (ii) the Commercial Pool USBank account

12

had only $32.57; and (iii) the R2 Capital USBank account had only $1,404.66.  MSJ, Ex. D—Koh Dec. at ¶ 29 (#149-10); Opp. at 18.

- Madigan knew or must have known about the trading losses, and lack of trading, in the IB account to the extent he claims he reviewed the account statements for accuracy. MSJ at 19-20; Opp. at 22 ("Madigan did periodically review statements for their accuracy.")

- Madigan knew or must have known about the trading losses, and lack of trading, in the IB account because in July 2011 Madigan was informed by pool participant Miller that the Commercial Pool's trading account balance had dropped below $200,000, and had fallen to levels that would not allow Defendants to redeem investors.  MSJ at 21.

- Madigan knew or must have known about the trading losses, and lack of trading, in the IB account because in August 2011, when Madigan was the only person authorized to withdraw funds from the IB trading account, all but $1,838 was drained from that account. MSJ at 21.

- Madigan does not dispute that he knew by November 2011, at the latest, that the Commercial Pool had ceased all trading in the IB account.  MSJ at 22.  Nevertheless, he continued to send trading account statements to Gamble in 2012 which reflected trading profits and Interactive Broker trading fees (*i.e.*, "IB fees") from an account which he knew was no longer trading.

Finally, that Defendant Madigan claims he made inquiries to, or was duped by, Tomazin is irrelevant.  Madigan's failure to actually verify information in the trading statements by comparing it to the actual trading was reckless as a matter of law.[5]  *Complete Devs., LLC*, 2014

---

[5] Madigan claims to be a sophisticated businessman.  MSJ at 23, n.8.  Therefore Madigan must have known that the trading account statements were false.  Madigan's claim that he thought the

WL 794181, at *15 (granting summary judgment and finding scienter where defendant did not independently verify information received from co-fraudster).

Relying, without thorough investigation, on information provided by corporate representatives is also reckless conduct sufficient to establish scienter. *Id.* (citing *SEC v. Blavin*, 760 F.2d 706, 711 (6th Cir. 1985)); *SEC v. Gagnon*, No. 10-cv-11891, 2012 WL 994892, at *3–4, *10 (E.D. Mich. Mar. 22, 2012) (scienter established where defendant conducted no due diligence before offering programs to investors but simply relied on fraudster's representations "at face value" without making any independent investigation). *See also CFTC v. Vandeveld,* No. 04-2181-D/An, 2007 WL 2823307, at *5-6 (W.D. Tenn. Sept. 27, 2007), *modified sub nom. CFTC v. FxTrade Fin., LLC,* No. 04-2181-D/An, 2007 WL 4790810 (W.D. Tenn. Oct. 18, 2007) (finding that failure to review monthly account statements or bank records or to verify information in trade brochures constituted recklessness establishing scienter under the CEA).

Moreover, Madigan's admitted failure to independently investigate Tomazin's purported representations of profitability was contrary to Madigan's representations to investors that Madigan, as Managing Partner of R2 Capital, "leads qualitative and quantitative reviews of fund performance in comparison with stated fund performance objectives at R2 Capital."  MSJ at 55 (citing Ex. E—Miller Dec. at ¶ 13; Ex. B—Gamble Dep. at 26:7-17, 29:1-30:1; Ex. C—Dep. Ex. 25 at RMDepo_001099; Ex. G—Tomazin Dec. at ¶ 16).  Madigan testified that, contrary to these representations, he never compared fund performance with objectives, and instead merely reviewed account statements before sending them out.  MSJ, Ex. A—Madigan Dep. at 164:8-16 (#149-2).  Further, Defendants represented to investors that the Commercial Pool would be

---

Commercial Pool trading statements referred to something other than trading, even if it could be believed, was reckless at best.

subject to a yearly independent audit, yet Madigan knew that no audit ever took place.  Ex. F—Morgan Dec. at ¶ 8; Ex. A—Madigan Dep. at 310.

These undisputed misrepresentations further establish Madigan's scienter.  *See SEC v. HedgeLender LLC,* 786 F. Supp. 2d 1365, 1370–71 (S.D. Ohio 2011) (defendants acted at least recklessly by making representations to potential investors that they had conducted due diligence and regarding the validity of the investment program when defendants knew due diligence had not been conducted) (citing *Blavin,*760 F.2d at 711).

Madigan's claimed good faith belief in his material false representations does not negate his recklessness.  *See Complete Devs., LLC*, 2014 WL 794181, at *16 (citing *SEC v. Infinity Grp. Co.,* 212 F.3d 180, 193 (3d Cir. 2000)) ("A good faith belief is not a 'get out of jail free card' ... [and] will not insulate the defendants from liability for [civil securities fraud] if it is the result of reckless conduct.")  A subjective belief based on a reckless inquiry cannot be considered a "good faith" belief, and ignorance does not negate recklessness "where a reasonable investigation would have revealed the truth."  *Complete Devs., LLC*, 2014 WL 794181, at *16 (quoting *Infinity Grp.,* 212 F.3d at 193).

2.  <u>Misrepresentations regarding Profitability of the Commercial Pool</u>

a.  <u>The Opposition Creates No Triable Issues Regarding Misrepresentations</u>

As to his misrepresentations to investors regarding the profitability of the Commercial Pool, Madigan does not dispute, or provides no evidence to dispute, the following facts established in the Motion:

- That in March 2010 Madigan promised pool participant Miller returns of 8% to 10% per month, when in truth the Commercial Pool had by that time lost $350,659.46.  MSJ

at 24.  Madigan admits that he cannot dispute these facts because he cannot recall his conversations with Miller.  MSJ at 24, n.9.

- That the Commercial Pool lost over half its value by August 2010, but when Madigan solicited pool participant Gamble in September 2010, he never informed Gamble of these losses.  MSJ at 24-25; Opp. at 14-15.

- That in October 2010 Madigan represented to pool participant Gamble that the Commercial Pool had generated 33% profit.  MSJ at 25.   Madigan admits that this was false because at the time he made this representation in October 2010, "the total investments of $2.2 million had dwindled to less than $780,000."  Opp. at 4; *see also* MSJ at 25.

- That either he or one of his co-conspirators promised pool participant Northport "double-digit returns".  Opp. at 14.

   b.   <u>The Opposition Fails To Create Triable Issues Regarding Materiality</u>.

As to the materiality of these representations, Madigan asserts that they are not material because—Madigan claims—he either lacked scienter, his victims did not rely on his lies, or his victims were given risk disclosures.  Opp. at 14-15.

First, Madigan's scienter arguments do not relate to the materiality element.

Second, as discussed above, reliance on a defendant's misrepresentations is not required to establish liability under the anti-fraud provisions of the CEA.  *JBW Cap.*, 812 F.3d at 109.

Third, as to materiality, the Opposition cites only language from a district court decision that <u>*was reversed by the Eleventh Circuit*</u> in *CFTC v. R.J. Fitzgerald & Co.*, 310 F.3d 1321 (11th Cir. 2002).  *See* Opp. at 15 (quoting and citing to the reversed district court decision *CFTC v. R.J. Fitzgerald*, 173 F.Supp.2d 1295, 1301 (M.D. Fla. 2001), but incompletely citing it as "*See R.J. Fitzgerald*, 173 at 1301" (sic)).  In reversing the district court decision cited by the

Opposition, the Circuit court held, directly contrary to the Opposition's contentions, that purported risk disclosures to victims do <u>not</u> negate the materiality of Defendant Madigan's misrepresentations. *R.J. Fitzgerald*, 310 F.3d at 1330 ("[T]he fact that [there is] a general risk disclosure statement does not automatically preclude liability under the [Commodity Exchange Act] where the overall message is clearly and objectively misleading or deceptive."); *see also CFTC v. Sidoti,* 178 F.3d 1132, 1136 (11th Cir.1999) ("We seriously doubt whether boilerplate risk disclosure language could ever render an earlier material misrepresentation immaterial."); *Clayton Brokerage Co. of St. Louis, Inc. v. CFTC,* 794 F.2d 573, 580 (11th Cir.1986) ("[P]resentation of the risk disclosure statement does not relieve a broker of any obligation under the [Commodity Exchange Act] to disclose all material information about risk to customers.").

The so-called "risk disclosures", if they were given at all, do not negate Madigan's fraud.

c.      No Triable Issues As To Scienter Regarding Profitability

First, Madigan does not dispute that he knew of the hundreds of thousands of dollars in trading losses in the PFG Best forex account when he represented in October 2010 that the pool had increased in value by 33%.  MSJ at 26-28

Second, Madigan does not dispute that he had total access to the PFG Best forex account in March 2010, when he promised pool participant Miller 8% to 10% monthly returns even though the pool had already lost $350,659.46.  *Id*. at 24.

Third, as establish above, Madigan's claimed good faith belief in his misrepresentations of profitability is not a 'get out of jail free card', and does not negate scienter.  *Infinity Grp.,* 212 F.3d at 193.

3.   <u>No Triable Issues Regarding Misrepresentations Regarding Madigan Investing in Pool</u>.

a.   <u>The Opposition Creates No Triable Issues As To Misrepresentations</u>

As to Madigan's misrepresenting that he himself had invested in the Commercial Pool, Madigan does not dispute, or provides no evidence to dispute:

- That he represented to pool participant Gamble that Madigan had invested $1 million in the pool and "I am dumping a good deal of capital into the fund this month [October 2010]."  MSJ at 29 (citing Ex. A – Madigan Dep. At 156, 158-59; Ex. C – Dep. Ex. 25, email chain, at RMDepo_001098).

- That, contrary to this representation, Madigan never deposited any money, directly or indirectly, into the Commercial Pool.  *Id*.

- That no funds were ever deposited into the Commercial Pool from any source in October 2010.  *Id*.

b.   <u>The Opposition does not dispute, or even address, the materiality of these misrepresentations regarding profitability</u>.  Opp. at 15-16

c.   <u>The Opposition Creates No Triable Issues as to Scienter</u>,

Madigan does not dispute that he made these representations even though he knew that he never deposited any of his own funds into the Commercial Pool.  MSJ at 30, Opp. at 15-16. Further, he admits that he made the October 2010 misrepresentations to Mr. Gamble without actually knowing whether funds would be deposited in October 2010.  Opp. at 15-16.  At best, these were recklessly misleading statements which establish the requisite scienter.  A defendant's own losses in a fraudulent investment program do not negate scienter.  *Complete Devs.*, 2014 WL 794181, at *16 (citing *SEC v. George,* 426 F.3d 786, 793 (6th Cir. 2005)) (defendant's

contention that he truly believed fraudster and that defendant himself lost money does not negate reckless representations).

4. No Triable Issues Regarding Misrepresentations concerning ceasing trading in forex, switching to investing in futures, and eventually abandoning all trading

a. The Opposition creates no triable issues regarding misrepresentations.

As to making the above-listed misrepresentations, the Opposition admits that the Commercial Pool switched from trading forex to trading futures in August 2010, and ceased trading all together in July 2011.  Opp. at 4-5 ("The IB account(s), which was trading primarily in the S&P 500 minis and financial futures . . . from August 2010 to July 2011."); MSJ at 31.

But Madigan does not dispute that he never informed pool participant Miller that the Commercial Pool had switched to trading futures, or that it ceased all trading in July 2011. Instead, the Opposition claims that Madigan informed Miller that the Commercial Pool had switched traders, but Madigan does not deny, and provides no evidence to contradict, Mr. Miller's sworn declaration that he was never informed that the Commercial Pool had switched to trading futures or stopped trading altogether in 2011.  Opp. at 16; MSJ Ex. E-Miller Dec. ¶¶4, 16

Madigan also does not dispute that he never informed pool participant Gamble in 2010 or 2011, when the Commercial Pool was still trading, that it had switched to trading futures, or that it abandoned all trading in July 2011.  Instead, incredibly, the Opposition cites to an April 2013 email from Madigan to pool participant Gamble—sent two years after Madigan was aware that the Commercial Pool had ceased all trading back in July 2011—in which Madigan fraudulently represented that the Commercial Pool was still trading when it was not.  Opp. at 16 (citing MSJ, Ex. C – Dep. Ex. 70 at 54-55(#149-9)).  Further, this was more than two years after Madigan told Gamble that the pool was investing in forex, when it was actually investing in futures (MSJ, Ex. B—Gamble Dep. at 10:25-12:2, 12:19-13:6 (#149-3)).

19

Finally, contrary to the Opposition, only pool participant Northport was provided with the Confidential Information Memorandum ("CIM").  MSJ at 5-6; MSJ, Ex. F—Morgan Dec. at ¶8 (#149-12).  The deposition and declarations of Gamble and Miller conclusively establish that they were never provided with this document.  MSJ, Ex. E—Miller Dec. at ¶¶4-5 (#149-12) (Miller provided with subscription agreement only); MSJ, Ex. B—Gamble Dep. at 16:15-19 (#149-3) (Gamble provided with subscription agreement and eligibility questionnaire only).

### b.   The Opposition Creates No Triable Issues Regarding Materiality

As to materiality, the Opposition cites no cases to support the notion that switching the type of investment, or not investing at all, is not something that would be important to a reasonable investor.  As such, Defendant Madigan fails to distinguish well-settled law that his misrepresentations that the Commercial Pool was trading forex, when in fact it was actually trading futures or, eventually, not trading at all, were material misrepresentations.  *See CFTC v. Flint McClung Capital LLC*,  No. 11-cv-01644-CMA-BNB, 2012 WL 639321, at *7 (D. Colo. Feb. 28, 2012) ("[d]efendants' misrepresentations and omissions were material in that a reasonable customer would want to know, among other things, that [d]efendants were not trading forex as promised and that pool participant funds were being misappropriated") (citing *Saxe v. E.F. Hutton & Co., Inc.,* 789 F.2d 105, 110 (2d Cir. 1986)) ("'material misrepresentations about . . . the type of trading [the] funds were used for' would be sufficient to state a cause of action pursuant to the [Act]."); *CFTC v. Rolando*, 589 F. Supp. 2d 159, 170 (D. Conn. 2008) ("Trading in futures and options is inherently risky. . . . As such, a reasonable investor would want to know that his funds were being invested in futures and options and the risks associated with that investment.")

### c.   The Opposition Creates No Triable Issues Regarding Scienter

As to scienter, the duty to disclose arises where a "defendant's failure to speak would render the defendant's *own* prior speech misleading or deceptive". *R.J. Fitzgerald & Co.*, 310 F.3d at 1333 (citing *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1206 (11th Cir. 2001) (emphasis supplied)).  Moreover, "half of the truth may obviously amount to a lie, if it is understood to be the whole." *Id*.  Therefore, by fraudulently representing that the Commercial Pool would trade forex—and omitting any reference to any other type of trading—and by failing to disclose that it had switched from trading forex to trading futures, and ceased trading altogether, Defendant Madigan had a duty to disclose the truth, and avoid these fraudulent representations he knew he was making.

### 5.   Defendant Madigan's Misappropriation of Pool Participant Funds

### a.   There Are No Triable Issues of Fact Regarding Madigan's Misappropriation

Madigan does not dispute the $1,348,249.52 in assets which should have been in the Commercial Pool, but were not.  Madigan does not dispute the normal routing of the extraction of money from the pool—transferring money from the IB trading account to the R2 Commercial bank account, then from the R2 Commercial bank account the R2 Capital bank account, and from there into Madigan's and his co-conspirators' pockets.  Madigan does not dispute that by the end of August, 2011, there was only $1,838.03 in the IB trading account; $2,780.93 in the R2 Capital USBank account; and $157.57 in the Commercial Pool's USBank account.  Madigan does not dispute he received purported loans and disbursements of $413,592.41 in pool participant funds from the R2 Capital USBank account, while his investors each lost hundreds of thousands of dollars. MSJ at 34-35; Opp. at 17.

Defendant Madigan provides no evidence to dispute the uncontroverted fact that from August 2010 until April 2012, he alone had the sole power, ability, and authority to withdraw funds from the IB trading account, and he did withdraw funds from this account during that time. MSJ at 45-47; Opp. at 17.  Nor does Madigan dispute the fact that during this time $774,000 was withdrawn from the Commercial IB trading account, by transactions initiated using Defendant Madigan's IB account usernames, and using the token key cards issued only to Ryan Madigan for those two usernames.  MSJ at 47 (citing Ex. H—Ward Dec. at ¶ 10; Ex. D—Koh Dec. at ¶ 13).

b.   <u>The Opposition Creates No Triable Issues Regarding Scienter</u>

As to Defendant Madigan's scienter while misappropriating these funds, he knew or must have known that the $192,500 he himself siphoned out of the IB trading accounts in August 2011 were not from profits because all trading had stopped the previous month, and—as Madigan admits—all remaining funds in the IB account were distributed to the defendants and their trader, but not to the investors.  Opp. at 17 (". . .those withdrawals went directly to [the trader]. . . [and] [t]he remaining distributions, to Madigan Enterprises, [and the other defendants]").  Madigan does not dispute that he was the only person with the authority and ability withdraw funds from the IB trading account, and that he did so.  Further, Madigan provides no evidence to dispute the uncontroverted emails he sent admitting he was "buying time" by "keeping the backstory alive" to prevent pool participants from attempting to redeem their funds.  MSJ at 37 (citing Ex. A— Madigan Dep. at 304:1-20, 306:1-19; Ex. C – Dep. Ex. 56, email chain at RMDepo_000483-84; Ex. G – Tomazin Dec. at ¶ 24); Opp. at 18.  And that the reason he was fraudulently trying to avoid redemption requests was because by October 2012, the Commercial Pool had not traded in the IB account for over a year and had only $788.03; the Commercial Pool USBank account had only $32.57; and the R2 Capital USBank account had only $1,404.66.  MSJ, Ex. D—Koh Dec. at

¶ 29 (#149-10); Opp. at 18.   Madigan also fails to dispute the evidence of his other efforts to

conceal his misappropriation, as referenced in Plaintiff's Motion.  MSJ at 36-38; Opp. at 18.

    6.   Madigan's Misrepresentations Regarding His Educational Background

        a.   The Opposition Creates No Triable Issues Regarding Misrepresenting The MBA

Defendant Madigan does not dispute that he misrepresented to investors that he received

an MBA from Rochester Institute of Technology, when in truth he did not, and in fact has no

graduate degree whatsoever.  MSJ at 38; Opp. at 18.  Instead, Madigan now claims that he

merely "exaggerated his degree" because he once "attend[ed]" an executive MBA program.

Opp. at 18.  Madigan claiming he has <u>received</u> a graduate MBA degree, when he has not, is a

misrepresentation.  Further, even a misleading half-truth is nevertheless a fraudulent

misrepresentation.  *R.J. Fitzgerald*, 310 F.3d at 1333 ("half of the truth may obviously amount to

a lie, if it is understood to be the whole.").

Madigan incorrectly claims this misrepresentation was not "material" because, he

contends, no investor relied on this fraudulent statement.  Opp. at 18.  However, unlike a cause

of action for fraud under the common law of torts, "reliance" on the representations is not a

requisite element in an action to enforce the antifraud provision of the CEA.  *R.J. Fitzgerald* ,

310 F.3d at 1328 n.6.[6]  Finally, as to scienter, Madigan does not dispute that he knew that he did

not have an MBA when he made this fraudulent misrepresentation to investors.  Opp. at 18.

_____

[6] In any event, the uncontroverted evidence establishes that investors did in fact rely on his lying about his educational background.  Madigan fraudulently represented that he held an MBA degree to both pool participants Gamble and Miller in October 2010.  MSJ at 49-50 (citing Ex. A—Madigan Dep. at 156:4-157:14; Ex. C—Dep. Ex. 25 at RMDepo_001097-99; Ex. E—Miller Dec. at ¶ 13; Ex. B—Gamble Dep. at 26:7-17, 29:1-30:1).  Thereafter, Gamble deposited (under the name of "Specialty Glazing") an additional $100,000 in February 2011, and $36,184.64 in April, 2011.  MSJ, Ex. D—Koh Dec., at Exhibit 1 (#149-10); Opp., Ex. C – Tomazin Responses at 4-5 (#157-3).

Further, the Loffredo Declaration was timely disclosed.  As established by the attached Exhibit P, Plaintiff first learned of Madigan's misrepresentations about his educational background at 4:30 p.m. on the afternoon of January 6, 2017, when Plaintiff received confirmation that Madigan had never received an MBA or degree of any kind from Rochester Institute of Technology.  Ex. P—Rule 26(e) email and notice of non-degree.  Pursuant to Fed. R. Civ. P. 26(e), 90 minutes later, Plaintiff notified defense counsel that Plaintiff had discovered this misrepresentation and that the Registrar at Rochester Institute of Technology had information relevant to this issue.  *Id.*  Plaintiff might have discovered this information earlier, but for Defendant Madigan's obstreperous conduct during discovery.[7]  Defendant had ample opportunity to depose the RIT Registrar inasmuch as fact discovery was extended through mid-February 2017. #130.

Finally, Madigan's misrepresentations regarding his background are within the existing allegations of the First Amended Complaint, which plainly asserts that the case is based on Defendant's "fraudulently soliciting prospective and existing pool participants by making material misrepresentations and omissions, including *but not limited to*" those specific misrepresentations listed in the Complaint.  #38, First Amended Complaint, ¶ 53.  Further, even if Defendant's misrepresentations regarding his background were considered to be outside the First Amended Complaint, Plaintiff will move the Court to amend the pleadings to conform to proof pursuant to Fed. R. Civ. P. 15 (a)(2) ("The court should freely give leave when justice so requires.")

---

[7] Madigan falsely testified—or at best gave intentionally misleading testimony—during his deposition that he had received an executive MBA from Rochester Institute of Technology, when he knew he had not.  Opposition Ex. A—Madigan Dep. at 11:24-12:17 (#157-1).

7.     The Declaration of CFTC Investigator Kyong Koh should not be excluded.

Citing no authority, Defendants seek to exclude the Koh Declaration (#149-10) on

grounds that Plaintiff did not disclose him as an expert witness. (Opp. at 11). But the Koh

Declaration describes "simply . . . what the government's evidence show[s]," making Koh a

summary witness under Federal Rules of Evidence 701 and 1006. *See United States v. Hamaker*,

455 F.3d 1316, 1330 (11th Cir. 2006) (FBI agent who summarized financial records and made

calculations was a lay witness under Federal Rule of Evidence 701); *see also United States v.*

*Swanquist*, 161 F.3d 1064, 1073 (7th Cir. 1998) (FBI agent who assembled financial evidence

into charts "did not testify as an expert witness," making testimony admissible).

The summaries attached to the Koh Declaration are similarly admissible. *See Gagnon*,

2012 WL 994892, at *8 (finding spreadsheets prepared by Commission accountant qualified as

admissible summary evidence under Fed. R. Evid. 1006). This summary testimony also

comports with the D.C.Colo.LCivR 56.1(c), which discourages the use of voluminous exhibits

on a Motion for Summary Judgment.

## B. The Opposition Fails to Create Triable Issues As To Madigan's Control Person Liability

The Opposition admits that Defendant Madigan controlled R2 Capital such that the first

element of control person liability is satisfied, and all facts on pages 41 through 56 of the Motion

should be considered undisputed. Fed. R. Civ. P. 56(e)(2). See Opp. at 22.[8]

---

[8] In admitting this first element of control person liability, Defendant provides no challenge to the Motion's undisputed facts establishing Madigan's control of R2 Capital—except for a blanket unsupported refusal to admit those facts. Opp. at 22 n.4. In opposing the Motion, Madigan must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric*, 475 U.S. at 586; *Williams v. Prison Health Servs., Inc.*, 35 F. App'x 774, 774 (10th Cir. 2002) (affirming summary judgment where non-movant vaguely argued "'several issues of material fact exist' . . . without citation to the record."). Thus, all the facts in pages 41-56 of the Motion should be considered undisputed. Fed. R. Civ. P. 56(e)(2).

As to the second element, Madigan's failure to act in good faith, the Opposition cites to no evidence in the record to challenge the uncontroverted evidence in the Motion. The Opposition does not dispute that Madigan and his co-defendants did not have, and knew they did not have, any compliance system, training, or procedures. MSJ at 57. As demonstrated in the Motion, this satisfies the "lack of good faith" element. *See* MSJ at 57-58, citing *CFTC v. S. Trust Metals, Inc.*, 180 F. Supp. 3d 1124, 1132 (S.D. Fla. 2016) (finding defendant failed to act in good faith where there was no compliance department and defendants lacked any system of internal controls).

Nor does the Opposition provide any citation to the factual record to challenge the uncontroverted evidence that Madigan failed to diligently enforce any compliance system. Instead, the Opposition claims, incredibly and without legal or factual citation, that there was nothing Madigan could have done to discover the fraud. This ignores the undisputed evidence in the Motion—unchallenged by the Opposition—establishing what Madigan could have done but recklessly failed to do: Madigan only reviewed the account statements, but—contrary to what he told investors—claims he did not compare those statements with actual fund performance (MSJ, Ex. A—Madigan Dep. at 165:8-19 (#149-2)); Madigan claims he never "double check[ed] these trading statements that were sent to the commercial fund investors to make sure that they accurately and truthfully represented the profits that was being earned[.]" (MSJ, Ex. A— Madigan Dep. at 181:6-12(#149-2)); and Madigan claims he never bothered to "double check the ending trade balance of the trading statements sent to commercial pool, commercial fund investors to make sure what was being invested was true and accurate[.]" MSJ, Ex. A—Madigan Dep. at 181:13-18 (#149-2); *see* MSJ at 58.

The Opposition claims that Madigan made inquiries of Tomazin, but as established above, Madigan's purported reliance on representation of co-fraudsters, without independently verifying the information, is itself reckless.  *See Complete Devs., LLC*, 2014 WL 794181, at *16 ("ignorance does not negate recklessness 'where a reasonable investigation would have revealed the truth.'")  Further, Defendants could have called for an independent audit of the Commercial Pool but failed to do so—again, contrary to what Defendants represented to investors (MSJ, Ex. F—Morgan Dec. at ¶8 (#149-12)) —and Madigan understood that no such audit was ever conducted.  MSJ, Ex. A—Madigan Dep. at 310:19-25 (#149-2).

Finally, as to the alternative method of establishing the second element—knowingly induced violations of the CEA—the Opposition correctly concedes that this can be established by the scienter element in the anti-fraud provisions of the CEA.  MSJ at 59; Opp. at 23.  The Opposition, however, fails to challenge the undisputed facts that Defendant Madigan had <u>actual knowledge</u> because of his knowledge of his own violations of the CEA.  MSJ 59-60.  Further, the Opposition fails to address Madigan's <u>constructive knowledge</u> of the violations of the CEA by his "recklessly avoiding knowledge about potential wrongdoing."  MSJ at 60-61.  Significantly, the Opposition fails to address the holding in *CFTC v. Total Call Grp., Inc.*, No. 4:10-cv-00513-RAS-DDB, 2012 WL 1642196, at *9-10 (E.D. Tex. Mar. 30, 2012), in which the court found that the defendant had constructive knowledge even though he did not prepare fraudulent account statements, but "had the ability to examine the trading account records at [the FCM] and compare that data to the information reported in the false account statements sent to customers. Thus, [defendant] knew, consciously avoided learning, or acted recklessly in failing to learn that the customer account statements sent by [by his partner] contained false information."  As established in the MSJ, here, as in *Total Call Group*, Madigan had constructive knowledge of the

27

false account statements because, even if he did not prepare those account statements, he had the ability to examine the IB trading account and compare that data to the information in the false statements sent to customers.  *See* MSJ 60-61

### C.  The Opposition Fails to Raise Triable Issues As to R2 Capital's Vicariously Liability For Acts of the Other Defendants Under 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2

The Opposition does not dispute that Defendant R2 Capital is vicariously liable for all the individual Defendants' violations of the Act under 7 U.S.C. § 2(a)(1)(B) if (1) the agent or official was acting as the principal's agent or official at the time of the unlawful acts, and (2) the agent's or official's actions were within the scope of their employment or office.  *Guttman v. CFTC*, 197 F.3d 33, 39 (2d Cir. 1999).

Nor does the Opposition dispute that the first element exists—that Defendants Madigan, Vest, and Tomazin were acting as R2 Capital's agents or officials at the time of the wrongful acts. Instead, the Opposition seeks to challenge only the second element by making the factually unsupported claim that neither Tomazin nor Vest were acting within the scope of their agency with R2 Capital, and that Tomazin's guilty plea does not work an estoppel in favor of the CFTC in this case.  Opp. at 19-21.

First, the Opposition's circular argument that employees who violate the CEA are necessarily acting outside their scope of employment is foreclosed by 7 U.S.C. § 2(a)(1)(B), which imposes vicarious liability for violations of the CEA.  Contrary to the Opposition's assertion, an employer may be liable for even intentional and criminal acts committed by its employee.  *CFTC v. Byrnes*, 58 F. Supp. 3d 319, 327 (S.D.N.Y. 2014) (citing *In re Ivan F. Boesky Sec. Litig.*, 36 F.3d 255, 265 (2d Cir. 1994)).  That employees were violating the Act does not remove their conduct from the scope of employment, but rather is the basis for vicarious liability. *Cf. Byrnes*, 58 F. Supp. 3d at 326 (employees' conduct was within the scope of their agency

under § 2(a)(1)(B), and vicarious liability was imposed even where employees' CEA violations were "inconsistent with the performance of their official[ ] duties as employees") (alteration in original).

Second, the Madigan Defendants admitted in their Answers to the First Amended Complaint that Tomazin and Vest were acting within the scope of their employment, and that Tomazin and Vest, and their alter ego holding companies, were acting within the scope of their agency at R2 Capital. *See* MSJ at 65.

The Opposition fails to provide any facts—as is required to defeat the Motion—to dispute the following facts established in the Motion: (i) Madigan's own testimony admitting that Tomazin's fraudulent conduct occurred within the scope of his agency at R2 Capital (MSJ at 64-65); (ii) Tomazin's allocution during his guilty plea in which he testified he committed these acts within the scope of his agency at R2 Capital (MSJ at 64); (iii) Tomazin's 19-page sworn declaration in support of the MSJ, in which he admits that all of the acts in the First Amended Complaint are true, and committed while he and Vest, and Madigan, were acting within the scope of their agency at R2 Capital (MSJ at 65; MSJ, Ex. G—Tomazin Dec. (#149-13)).

Third, contrary to the Opposition's mischaracterizations, Plaintiff does not claim that Tomazin's signed proposed Consent Order "work[s] an estoppel in favor of the government" to establish Defendants' liability under the CEA. Opp. at 20. Instead, Tomazin's signed Consent Order admitting liability under the CEA simply provides uncontroverted evidence of Tomazin's liability under the CEA, and the Opposition has failed to cite to any evidence to dispute this fact. Opp. at 20; #134-1-Proposed Order on Motion for Consent Order.

The Opposition also fails to cite any evidence—or make any arguments at all—to dispute the uncontroverted evidence that Tomazin routinely orally misrepresented to existing pool

participants that the pool was successfully generating profits from trading, when in fact it was losing money or not trading at all. *See* MSJ at 65 (citing Ex. G—Tomazin Dec. at ¶ 27; Ex. N—Irvine Dec. at ¶ 7). Defendant Tomazin also admits that he falsely and fraudulently represented to a pool participant that the pool was continuing to trade forex, when in truth the pool had ceased trading forex and was instead trading in financial futures and other securities products. MSJ at 65 (citing Ex. G—Tomazin Dec. at ¶ 29; Ex. N—Irvine Dec. at ¶¶ 4, 9). And Madigan testified that Tomazin defrauded investors. MSJ at 64-65.

**D. The Opposition Fails to Create Triable Issues as to Count Three: Fraud by a Commodity Pool Operator under Section 4o(1) of the Act**

As to Element 1, the Opposition does not dispute the evidence and arguments that R2 Capital was a Commodity Pool Operator ("CPO") under the CEA. MSJ 67-68; Opp. at 21.

Nor does the Opposition dispute that fraud by a CPO under Section 4o(1)(B), unlike fraud under Section 6b, has *no scienter requirement*. *See First Commodity Corp. of Boston v. CFTC,* 676 F.2d 1, 6 (1st Cir. 1982) (noting that section 6o is an "antifraud provision that does not depend on scienter").

Instead, the Opposition only claims there are triable issues that Defendants made material misrepresentations. As set forth above, the Opposition fails to cite any facts to dispute that Tomazin, Madigan, and Vest each made material misrepresentations imputed to R2 Capital. The Motion should therefore be granted as to Count Three.

**E. The Opposition Fails to Create Triable Issues as to Count Four: Commingling of Funds in Violation of 17 C.F.R. § 4.20(c)**

The Opposition cites no evidence to dispute that Defendants transferred investor funds to their personal bank accounts via the following route: first from the IB trading account to the R2 Commercial Bank account, from there to the R2 Capital bank account, and then to the personal

bank accounts of the individual Defendants and their holding companies.  MSJ at 34-35, 69

(citing Ex. D—Koh Dec. at ¶¶ 15, 31; Ex. G—Tomazin Dec. at ¶¶ 15, 31).  Madigan does not

dispute that he received purported loans and disbursements of $413,592.41—all in pool

participant funds—from the R2 Capital USBank account, while his investors each lost hundreds

of thousands of dollars.  MSJ at 34-35; Opp. at 17.

Defendant Madigan provides no evidence to dispute the uncontroverted fact that from

August 2010 until April 2012, he alone had the sole power, ability, and authority to withdraw

funds from the IB trading account, and he in fact did withdraw funds from this account during

that time.  MSJ at 45-47; Opp. at 17.  Madigan does not dispute the fact that during this time

$774,000 was withdrawn from the Commercial IB trading account, by transactions initiated using

Madigan's IB account usernames, and using the token key cards issued only to Ryan Madigan for

those two usernames.  MSJ at 47 (citing Ex. H—Ward Dec. at ¶ 10; Ex. D—Koh Dec. at ¶ 13).

The Opposition fails to provide any evidence to dispute Defendants' misappropriation of

investor funds.  This constitutes illegal comingling of customer funds.  *See Driver,* 877 F. Supp.

2d at 979  (granting summary judgment where defendant commingled pool funds with non-pool

property by transferring funds to his personal bank accounts.)

Finally, 17 C.F.R. § 4.20(c) has no scienter requirement, but instead simply states: "No

commodity pool operator may commingle the property of any pool that it operates or that it

intends to operate with the property of any other person."  Accordingly, Defendant Madigan's

claim that he believed he was entitled to these funds is irrelevant.  Moreover, Defendant Tomazin

has already admitted to the facts and allegations in the First Amended Complaint, including this

illegal comingling of funds, such that R2 Capital is vicariously liable for his actions in violation of

this Regulation.  MSJ, Ex. G—Tomazin Dec. (#149-13).

31

**F.  The Opposition Fails to Create Triable Issues as to the Relief Sought**

Permanent Injunction.  The Opposition does not dispute that if Madigan violated the

CEA, the Court may infer a likelihood of future violations of the Act and Regulations from his

past unlawful conduct, and may issue a permanent injunction.  *See*, *e.g*., *CFTC v. Brockbank*,

505 F. Supp. 2d 1169, 1173 (D. Utah 2007), *aff'd,* 316 F. App'x 707 (10th Cir. 2008) (past

misconduct is "'highly suggestive of the likelihood of future violations.'").  As the Madigan

Defendants violated the CEA, a permanent injunction should issue.

Restitution.  Contrary to the Opposition's assertions, there is direct evidence of reliance

by Madigan's victims on his, and/or his co-defendant's, fraudulent representations.  In addition,

it is not necessary Defendant's victims relied only on Madigan's misrepresentations, so long as

proximate cause and/or reliance resulted from <u>any</u> of the Defendants, whose conduct is imputed

to R2 Capital, and from R2 Capital to Madigan as a controlling person.  The undisputed evidence

of reliance is as follows:

First, pool participant Northport Investments relied on the fraudulent written and oral

representations of all Defendants at the initial January 2010 meeting, and additionally relied on

subsequent representations by Defendants in deciding to invest and keep its funds with R2

Capital.  MSJ, Ex. F—Morgan Dec. ¶¶ 9, 17 (#149-12) and throughout; second, pool participant

Miller relied on the fraudulent written and oral representations of Defendant Madigan in

deciding to invest and keep his funds with R2 Capital.  MSJ, Ex. E—Miller Dec. ¶ 6 (#149-11)

and throughout; third, pool participant Gamble relied on the fraudulent written and oral

representations of Defendant Madigan in deciding to invest and keep his funds with R2 Capital.

MSJ, Ex. B—Gamble Dep. at 16, 41-42 (#149-3), and throughout; fourth, pool participant Irvine

relied on the fraudulent written and oral representations of Defendant Tomazin in deciding to

invest and keep his funds with R2 Capital.  MSJ, Ex. N—Irvine Dec. ¶ 6 (#149-21) and throughout.

As set forth in the Motion, proximate causation exists where (1) a customer would not have suffered losses but for the defendant's actions; and (2) the causal connection between the conduct and the losses is not too attenuated.  *U.S. v. Cutter*, 313 F.3d 1, 7 (1st Cir. 2002).  As established by the Motion, Defendants' victims would not have suffered losses but for, and as a direct and proximate result of, Defendants' illegal actions.  Restitution is warranted.

Disgorgement.  For the reasons set forth in the Motion, Defendant Madigan should be compelled to disgorge his ill-gotten gains.

Civil Monetary Penalty.  Madigan's illegal conduct spanned several years, from at least early 2010 through early 2014.  MSJ at 53.  He was instrumental in the creation, design, and sustainability of the fraud.  *See* MSJ at 41-56, which the Opposition fails to dispute.  He was as much if not more involved and responsible for the fraudulent scheme as his co-conspirators, and he misappropriated more investor funds than any other Defendant, yet has never accepted responsibility for his actions.

In addition, Madigan's actions during this litigation rise to the level of "total lack of cooperation" and "destroying evidence," such that his conduct exceeds aggravating circumstances such as failure to defend the action.  Madigan's obstreperous conduct frustrated discovery attempts for many months in this case.  *See, e.g.*, #119—Transcript of Hearing of Discovery Abuses.  Madigan gave intentionally misleading testimony during his deposition when he indicated that he had received an executive MBA from Rochester Institute of Technology, when he knew that he had not.  Opp. Ex. A--Madigan Dep. at 11:24-12:17.  Madigan's

Opposition fails to cite to any law or evidence in many places, and misstates the law, including citing to a decision and holding that had been reversed.

Accordingly, Madigan should pay the maximum civil monetary policy permissible under the Act and Regulations.

<u>Prejudgment Interest</u>.  Prejudgment interest is "ordinarily awarded, absent some justification for withholding it." *Brockbank*, 505 F. Supp. 2d at 1175–76.  Prejudgment interest would serve to help compensate Defendants' victims (*see id.*), and the Opposition fails to cite any justification for withholding it.  Accordingly, the Court should award prejudgment interest.

<u>Costs</u>.  The Opposition fails to even address Plaintiff's requests for costs pursuant to 28 U.S.C. §§ 1920 and 2412(a)(2).  Therefore, the Madigan Defendants should be ordered to pay Plaintiff's costs in prosecuting this action.

## VI.   CONCLUSION

For the foregoing reasons, the Court should grant Plaintiff CFTC's Motion for Summary Judgment, and award the relief requested therein.

Dated: May 24, 2017                    Respectfully submitted,

                                       UNITED STATES COMMODITY
                                       FUTURES TRADING COMMISSION

                                  BY:  *s/Luke Marsh*
                                       LUKE B. MARSH
                                       DANIEL J. GRIMM
                                       Commodity Futures Trading Commission
                                       Division of Enforcement
                                       1155 21st Street, N.W.
                                       Washington, D.C. 20581
                                       Tel: (202) 418-5000
                                       Facsimile: (202) 418-5124
                                       lmarsh@cftc.gov
                                       dgrimm@cftc.gov
                                       Counsel for Plaintiff

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 24, 2017, I caused a copy of the foregoing to be filed with

the Clerk of the Court using the CM/ECF system, which will send notification of the filing to the

following counsel of record:

**Counsel for Defendants Ryan Tomazin and RAST**
**Investor Group, LLC**:

Richard J. Banta, Esq.
Law Office of Richard J. Banta, P.C.
3773 Cherry Creek North Drive
Denver, CO 80209
Ph:  (303) 331-3415
Fax:  (303) 331-1195
info@richardbantalaw.com

**Counsel for Defendants Madigan Enterprises, Inc.**
**and Ryan Madigan**:

Michael J. Davis, Esq.
DLG Law Group LLC
4100 E. Mississippi Avenue, Suite 420
Denver, Colorado  80246
Direct 720-361-6036
Office 303-758-5100
Fax 303-758-5055
mdavis@dlglaw.net

Additionally, I hereby certify that on May 24, 2017, service of the foregoing was made

on the following Defendants via First-Class United States Postal Service Mail:

*Pro Se* Defendant Randell A. Vest
9613 Halyards Ct.
Fort Myers, FL 33919

*Pro Se* Defendant Bulletproof Vest, Inc.
9613 Halyards Ct.
Fort Myers, FL 33919

*s/ Luke Marsh*
Luke Marsh