**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Chief Judge Marcia S. Krieger**

**Civil Action No. 14-cv-02182-MSK-KLM**

**UNITED STATES COMMODITY FUTURES TRADING COMMISSION,**

>        **Plaintiff,**

**v.**

**R2 CAPITAL GROUP, LLC;
RAST INVESTOR GROUP, LLC;
MADIGAN ENTERPRISES, INC.;
BULLETPROOF VEST, INC.;
RYAN TOMAZIN;
RYAN MADIGAN; and
RANDELL A. VEST,**

>        **Defendants.**

_____

**OPINION AND ORDER DENYING MOTION FOR PERMANENT INJUNCTION,
DENYING RECONSIDERATION OF ATTORNEY FEE AWARD, AND GRANTING IN
PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT**
_____

**THIS MATTER** comes before the Court pursuant to the Plaintiff's ("CFTC") Joint

Motion for Permanent Injunction (**# 134**) against Defendants Ryan Tomazin and RAST Investor

Group, LLC (collectively, the "Tomazin Defendants"), Defendants Ryan Madigan, R2 Capital

Group, and Madigan Enterprises, Inc.'s (collectively, the "Madigan Defendants") response

(**#136**), and the CFTC's reply (**# 143**); the Madigan Defendants' Motion for Reconsideration

(**#138**) of a January 27, 2017 Order (**# 135**) by the Magistrate Judge granting attorney fees

against the Madigan Defendants, and the CFTC's response (**# 142**); and the CFTC's Motion for

Summary Judgment (**# 149**) against the Madigan Defendants and Defendants Randell Vest and

Bulletproof Vest, Inc. (collectively, the "Vest Defendants"), the Madigan Defendants' response (**# 157**), and the CFTC's reply (**# 158**).

## BACKGROUND

The Court provides a brief background for purposes of context, and provides a more detailed analysis as part of its consideration of the summary judgment motion.

According to the Complaint, in or about 2009, the three individual Defendants – Mr. Madigan, Mr. Tomazin, and Mr. Vest – and their associated business entities (also named here as Defendants) formed a new business, R2 Capital Group ("R2 Capital"), for the purpose of soliciting investors in a currency-trading pool.  R2 Capital secured some $2.4 million in investment capital from four investors and began trading.  Within a year, the pool had trading losses of about $1.2 million, but the Defendants falsely represented to the investors that the business was making profits.  The Defendants then, without informing the investors, appropriated the remaining $1.2 million for their own personal use.

Based on these facts, the CFTC brought this action alleging that the Defendants violated the Commodity Exchange Act, 7 U.S.C. § 1 *et seq.*, as follows: (i) engaging in fraud in connection with commodities futures contracts in violation of 7 U.S.C. § 6b(a)(1)(A)-(C); (ii) engaging in fraud in connection with foreign exchange contracts in violation of 7 U.S.C. § 6(b)(2)(A)-(C); (iii) engaging in fraud by R2 Capital as a commodity pool operator in violation of 7 U.S.C. § 6o(1); (iv) comingling of pool participant funds in violation of 17 C.F.R. § 4.20(c).

### A.  Motion for Permanent Injunction

The CFTC has reached a settlement of its claims with the Tomazin Defendants.  The parties request that that settlement be memorialized in a Consent Decree to be issued by the Court.  The Madigan Defendants have opposed that request, arguing that certain statements in

the proposed Consent Decree could be construed as implicating them in the Tomazin

Defendants' admitted wrongdoing.  The Madigan Defendants request that the Court strike the

offending provisions of the proposed Consent Decree or decline to enter it.

This Court pauses to note its skepticism of the use of a Consent Decree as a routine

mechanism for effecting a settlement.  Few cases are brought under a statutory or regulatory

scheme that requires a Consent Decree, and in the majority of cases where parties have requested

entry of a consent decree, little justification is offered for the procedure other than the

administrative inertia of "we've always done it that way."

Conceptually, routine use of a Consent Decree has several problems.  First, it conflates

the parties' agreement with determinations made by the Court.  The long list of findings

purportedly made by the Court are really nothing more than the agreement of parties to such

facts.  There has been no presentation of evidence, no adversary process, no application of a

standard or burden of proof.  The factual statements thus are not findings by a Court, only the

agreement between the participant parties.

Second, the essence of a Consent Decree is continued supervision by the Court, and the

right of a party to seek relief for non-performance by invoking the Court's contempt powers.

Rare is the circumstance where the terms of the parties' settlement warrants continued

supervision of the Court, and even rarer is justification for use of the Court's contempt power to

enforce a private settlement which does not arise from a Court order.  Continuing judicial

oversight is appropriate where the parties' agreement requires a defendant to affirmatively

undertake wide-ranging, complex, or numerous affirmative steps in order to enforce the parties'

agreement.  In such circumstances, disputes may arise over whether the proper steps are being

taken and the court, familiar with the proceedings that led to that agreement, is well-positioned to

resolve those disputes.  But such circumstances usually are not present when an agreement

requires the payment of a sum certain the cessation of the conduct that led to the lawsuit. A

simple judgment premised upon the parties' settlement agreement is usually effective.

As with most proposed Consent Decrees, the one offered here suffers from both

problems. Reduced to its essence, it purports to be a settlement between the CFTC and the

Tomazin Defendants with three operative components: (i) a broad "obey the law" injunction,

prohibiting the Defendants from engaging in future fraudulent conduct or other statutory

violations; (ii) a requirement that the Tomazin Defendants, jointly and severally with the other

Defendants in this action, pay restitution in the amount of approximately $1.28 million; and (iii)

a requirement that the Tomazin Defendants pay an additional unquantified civil monetary

penalty to be determined either by agreement of the parties or by the court through future

proceedings that have yet to be raised.

The premise for the Consent Decree are 13 pages of factual findings none of which the

Court has made.  The parties' motion for entry of the decree is not supported by affidavits,

evidence, or other material from which the Court could derive these purported "findings."  These

appear, instead to simply be agreements between the parties.  As the Madigan Defendants

recognize, once the  factual agreements between these two  parties become "findings of the

court", there is a risk that they will on a degree of finality under various legal doctrines that may

preclude other Defendants from asserting their rights.   The Court declines the invitation to make

binding findings based simply on the parties' say-so.

As with most Consent Decrees, the need for continued court supervision is unstated.

The "obey the law" injunction, once commonly issued by courts, has been the subject of significant judicial criticism from various angles in recent years. *See generally EEOC v. AutoZone, Inc.*, 707 F.3d 824, 841 (7th Cir. 2013) (noting overbreadth and vagueness concerns); *S.E.C. v. Goble*, 682 F.3d 934, 949 (11th Cir. 2012) ("they lack specificity and deprive defendants of the procedural protections that would ordinarily accompany a future charge of a violation"). Their ostensible purpose is to allow the government to enforce future violations of the controlling law via contempt proceedings, rather than another full-blown civil lawsuit. Of course, every convenience that the government obtains in proceeding via contempt is offset by a corresponding detriment that inures to the defendant in exchange: contempt proceedings efficiently bypass the pleading stage of a lawsuit, but they deprive the defendant of the opportunity to promptly challenge the sufficiency of the allegations against him or her; they can be expedited by the court, but at the expense of the defendant's ability to engage in meaningful discovery; they can be resolved quickly by the court making findings and conclusions after a brief hearing, but deprive the defendant of the ability to request determination of contested facts by a jury. As such, courts have observed that "obey-the-law" injunctions may improperly impinge upon a defendant's Due Process rights in future proceedings. *See e.g. S.E.C. v. Smyth*, 420 F.3d 1225, 1233 n. 14 (11th Cir. 2005). No need for such an injunction has been shown - for example, the defendant is a serial violator of the governing statute or that the defendant intends to continue to engage in conduct extremely similar to that charged.

The remaining two components of the proposed Consent Decree simply relate to the payment of money. Payments of money can be accomplished through enforcement of money judgments or litigation settlements, but they rarely require ongoing judicial oversight. There is nothing unique about the Tomazin Defendants' agreement to the "restitution" portion of the

proposed Consent Decree that differentiates it from any ordinary settlement agreement.  The

Court has some question as to whether the vagaries in the monetary provisions prevent the

formation of an enforceable contract.  The proposed Decree details how payments will be

processed and distributed, but it is silent as to the frequency and the amount of periodic

payments that the Tomazin Defendants must make.  In addition, the amount of any civil penalty

is both undetermined,  and the process by which it will be determined is undefined. The proposed

Consent Decree explains that "[t]he Court shall determine the amount of civil monetary penalty"

at some indeterminate point in the future, upon either "the parties submitting to the Court a

proposed consent order setting out their agreement on the amount" of the penalty or upon

"subsequent motion by the CFTC and/or hearing before this Court."   This is at most an

agreement to agree.

Assuming that the omitted terms are not material and a valid contract has been formed,

there is not showing as to why court supervision is required.  Money obligations can be reduced

to judgment and enforced as such.  Alternatively, if the parties prefer to have a contractual

construct, the CFTC has a ready cause of action to enforce that breach of contract.   Thus, the

Court sees no reason why a consent decree is justified to enforce the parties' agreed-upon

restitution term.

Accordingly, the Court denies the parties' Motion for entry of the proposed Consent

Decree.

### B.  Reconsideration of fee award

On August 4, 2016, after presiding over several discovery disputes, the Magistrate Judge

determined (**# 114**) that the CFTC should be awarded its costs and attorney fees against the

Madigan Defendants.  Thereafter, the CFTC made its motion for costs (**# 123**), requesting nearly

$40,000 in fees.  On January 27, 2017, the Magistrate Judge granted that motion in part (**# 135**), awarding the CFTC the reduced sum of approximately $31,000 in fees.  In doing so, the Magistrate Judge noted that the CFTC was successful with respect to all three of its motions to compel discovery, but that it had "at least in part needlessly complicated the dispute."  Applying her "experience and judgment," the Magistrate Judge determined that the CFTC should receive 80% of the fees it requested, and entered an award in that amount.

The Madigan Defendants now request reconsideration (**# 138**) of the Magistrate Judge's order.  They argue, among other things, that: (i) the Magistrate Judge erred in not specifically addressing the Madigan Defendants' argument that certain hours claimed by the CFTC's were excessive, related to clerical tasks, or were improperly related to a subsequent Motion for Clarification filed by the Madigan Defendants; and (ii) the Magistrate Judge erred in making only a "slight" reduction of 20% of the CFTC's claimed fees, when the Madigan Defendants demonstrated that the CFTC acted unreasonably in various respects.

The Madigan Defendants take the position that, pursuant to Fed. R. Civ. P. 54(d)(2)(D), this Court should treat the Magistrate Judge's Order as a Recommendation, subject to *de novo* review by this Court pursuant to Fed. R. Civ. P. 72(b).  The CFTC argues that the proper standard of review of fee awards imposed as discovery sanctions pursuant to Rule 37 is Rule 72(a)'s "clearly erroneous or contrary to law" standard, and that Rule 54 relates to post-judgment awards of fees.  *Citing Trujillo v. Campbell*, 2012 WL 1835245 (D.Colo. May 31, 2012).  This Court need not specifically resolve the dispute as, even upon a *de novo* review, this Court finds no error in the Magistrate Judge's decision.

The parties appear to agree that the proper analysis for a fee award imposed as a sanction under Rule 37 is the familiar "lodestar" analysis, in which the Court multiplies a reasonable

hourly rate by the reasonable number of hours expended.  *Hensley v. Eckerhart*, 461 U.S. 424,

433 (1983).  The Madigan Defendants object only to the Magistrate Judge's failure to find that

certain CFTC billing entries the Madigan Defendants had flagged were unrelated to the

discovery disputes in question.  Specifically, the Madigan Defendants contend here that 14.75

hours claimed by the CFTC were either clerical tasks improperly billed as attorney time or time

spent on a Motion to Clarify that was unrelated to the discovery dispute that generated the award

of sanctions.[1]

The Magistrate Judge did not specifically address the particular billing entries that the

Madigan Defendants challenge, but the tacit implication of the Magistrate Judge's order suggests

that she rejected the Madigan Defendants' argument.  Upon *de novo* review, this Court does also.

As to the Madigan Defendants' argument that these hours improperly include clerical time, the

Madigan Defendants offer little more than that bare conclusory assertion.  It does not specify

which of the listed tasks it believes are clerical in nature, nor explain why it believes that.

Although the challenged billing entries do make some reference to the preparation of a

"summary chart" or the task of "calculat[ing] hours billed for work on discovery disputes," the

Court will not necessarily assume that all of those tasks are necessarily of a clerical nature—

summarizing a collection of data might, in some circumstances be clerical in nature, but in other

circumstances, the application of legal knowledge and experience to the task of summarizing the

information may be appropriate.  Moreover, the record reflects that the CFTC requested only a

portion of the total amount of hours billed to tasks of this sort, suggesting that even if the billing

---

[1]      To the extent the Madigan Defendants intend to incorporate by reference additional
arguments contained in their opposition to the CFTC's motion for fees, the Court finds that those
arguments are not presented here with sufficient specificity to warrant review under Rule 72.
*See U.S. v. One Parcel of Real Property*, 73 F.3d 1057, 1060 (10th Cir. 1996) (objections that
merely incorporate prior briefing are insufficiently specific).

entry includes time spent on clerical tasks, that time may have been excluded from the CFTC's actual request. Taken at face value, the Court sees nothing particularly objectionable in the number of hours actually requested by the CFTC for the performance by an attorney of tasks identified in each billing entry.

The Court also rejects the Madigan Defendants' argument that the Magistrate Judge improperly granted fees to the CFTC for time it spent reviewing and responding to the Madigan Defendants' Motion for Clarification of the Magistrate Judge's discovery order. Once again, the Madigan Defendants' response to the CFTC's fee motion made only a perfunctory argument that time spent responding to the Motion for Clarification should not be the subject of a fee award, but offered no explanation why. The Magistrate Judge, once again, appeared to silently reject this argument, and this Court does so as well. At the discovery hearing, the Magistrate Judge found that the Madigan Defendants had engaged in "egregious misconduct in terms of failure to respond to discovery" and "simply don't want to comply." One could very well conclude that the Motion for Clarification was part of the same pattern of obstruction and stalling, and thus, was properly part of the same fee award arising from the discovery hearing. Certainly, the Magistrate Judge's rulings on the Motion for Clarification suggest that she saw little justification for that motion, referring to one argument by the Madigan Defendants as "quibbl[ing] over a non-issue" and that their second argument was simply an attempt to take advantage of the Court having summarized an argument before rejecting it. This Court sees little reason why, when the court imposes discovery sanctions under Rule 37, a non-meritorious motion that seeks clarification of that order may not be deemed to be a continuation of the underlying discovery hearing itself, and thus, an appropriate basis for awarding additional fees. Certainly, had the Madigan Defendants made their motion for clarification orally at the conclusion of the August 4

hearing, the time spent by the CFTC's counsel in listening to and responding to that motion would be compensable time.  The mere fact that the Madigan Defendants waited until after the hearing to make such a request,  in writing, rather than orally, should not insulate them from having to compensate the CFTC for its fees in responding to such a motion.

Finally, although the Madigan Defendants agree with the Magistrate Judge's finding that the CFTC bears some responsibility for prolonging the discovery dispute, they object to the Magistrate Judge's conclusion that the CFTC's responsibility reflected no more than 20% of the amount of fees it sought.  The Madigan Defendants argue that such a reduction is "slight," and go on to argue – again in an entirely conclusory manner – that "Plaintiff's entire [discovery] motion was unnecessary."  The Madigan Defendants have not offered any meaningful and specific argument that the Magistrate Judge's finding that they engaged in "egregious" discovery misconduct was erroneous, and thus, the Court begins from that premise.  Beyond the naked assertion in the instant motion that a 20% reduction in the amount of fees claimed is "slight," they make no detailed explanation as to what particular acts the CFTC engaged in to prolong the discovery dispute, nor explain why those acts warrant more than a 20% reduction.  In their original opposition to the CFTC's motion, they argued that the CFTC acted hastily in bringing the motions to compel, rather than resolving the dispute through conferral, and argued that the relief ordered by the Magistrate Judge was nothing more than the Defendants had already agreed to provide.  It is clear that the Magistrate Judge disagreed with these arguments, given her finding that the Madigan Defendants' discovery misconduct was "egregious," a finding this Court again notes is not challenged by the Defendants.  In light of this, it is clear that the Magistrate Judge rejected the Defendants' argument that the CFTC bore an equal, if not majority, share of the blame for the dispute.  In such circumstances, this Court cannot say that a

reduction of 20% of the CFTC's claimed fees is insignificant, nor that the record justifies a more substantial reduction.

Accordingly, the Court grants in part the Madigan Defendants' Motion for Reconsideration, in that it has considered their arguments regarding the Magistrate Judge's fee award.  However, it also denies that motion in part, insofar as upon *de novo* reconsideration, the Court finds that the amount of fees awarded to the CFTC by the Magistrate Judge was appropriate.

### C.  Summary judgment

The CFTC seeks summary judgment on its own claims against the Madigan and Vest Defendants.  The Madigan Defendants oppose that motion; the Vest Defendants have not responded to it.[2]

#### 1.  Standard of review

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary.  *See White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995).  Summary adjudication is authorized when there is no genuine dispute as to any material fact and a party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Substantive law governs what facts are material and what issues must be determined.  It also specifies the elements that must be proved for a given claim or defense, sets the standard of proof and identifies the party with the burden of proof.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989).  A factual dispute is "genuine" and summary judgment is precluded if the evidence presented in support of

---

[2]     The Magistrate Judge previously sanctioned (**# 133**) the Vest Defendants for failing to participate in discovery, precluding them from producing any evidence at trial.  Presumably, the Vest Defendants understand this sanction to preclude them from presenting evidence here as well.

and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter for either party. *See Anderson*, 477 U.S. at 248.  When considering a summary judgment motion, a court views all evidence in the light most favorable to the non-moving party, thereby favoring the right to a trial. *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).

Here, where the movant has the burden of proof on a claim or defense, the movant must establish every element of its claim or defense by sufficient, competent evidence. *See* Fed. R. Civ. P. 56(c)(1)(A).  Once the moving party has met its burden, to avoid summary judgment the responding party must present sufficient, competent, contradictory evidence to establish a genuine factual dispute. *See Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991); *Perry v. Woodward*, 199 F.3d 1126, 1131 (10th Cir. 1999).  If there is a genuine dispute as to a material fact, a trial is required.  If there is no genuine dispute as to any material fact, no trial is required.  The court then applies the law to the undisputed facts and  enters judgment.

2. <u>Facts</u>

The following facts are undisputed, except where noted.

In 2008, Mr. Madigan and Mr. Tomazin formed R2 Capital, and later took on Mr. Vest as an additional officer.  In 2009, R2 Capital formed a separate limited partnership that this Court will refer to as "the Pool."  The Pool was designed to collect funds from investors and use those funds for making trades on foreign currency exchanges ("forex").  Profits from such trading would be split evenly between R2 Capital and the investors.  R2 Capital hired David Simpson as the forex trader on behalf of the Pool.  Mr. Simpson traded using an account at an entity called PFG.

The Defendants then solicited investors.  When pitching the Pool to potential investors, the Defendants assured them that there would be no co-mingling of Pool funds with funds belonging to R2 Capital,  that the Pool would be audited annually, and that Mr. Madigan had invested $1 million of his own funds in the Pool. In early 2010, they recruited two investors, Northport and Miller, who each contributed approximately $1 million to the Pool.  Later that year, the Defendants recruited two additional investors who each made investments in the Pool of approximately $100,000 - $200,000.

Mr. Simpson proved to be an unsuccessful forex trader, and by August 2010, the Pool's value had diminished from more than $2.2 million to less than $780,000.  At that time, the Defendants fired Mr. Simpson and retained the services of Peter Campbell as a new trader.  Mr. Campbell traded under an account at an entity known as IB.  The Pool also shifted its investment strategy.  It ceased trading in forex and instead, traded in financial futures and other investments in securities.  From August 2010 to July 2011, the Pool showed small gains as a result of Mr. Campbell's trading, rising in value from roughly $500,000 to $780,000.  After July 2011, the Pool ceased trading entirely.  Nevertheless, the Defendants continued to provide investors with monthly account statements until 2013, all of which showed profits being made from successful trades and deductions for trading expenses.  According to the CFTC, these statements were entirely fraudulent; in the meantime, the Defendants were extracting the remaining funds from the Pool (usually via "loans" made by the Pool to the Defendants' respective holding companies, even though no loans were ever paid back) and spending the funds for their own personal use.

The Madigan Defendants offer an alternative explanation for the account statements from mid-July 2011 through 2013.  They contend that, beginning in 2011, Mr. Tomazin was using R2 Capital funds to invest with or make loans to an individual named Jennifer Hoffman.  Ms.

Hoffman promised investment gains and a sizeable return on the loan, and Mr. Tomazin reported

to the other Defendants that the investments were producing positive returns.  Mr. Madigan

contends that he relied upon Mr. Tomazin's representations when informing investors in the Pool

that their investments were providing positive returns.  Thus, although the Madigan Defendants

do not directly deny that account statements and other representations made to Pool investors

reflecting investment growth after 2011 were false, they do appear to dispute that they made such

statements with the requisite intent.

### 3. Fraud claims

The CFTC first seeks summary judgment on its first two claims against the Madigan and

Vest Defendants: fraud in connection with commodity futures contracts, 7 U.S.C. § 6b(a)(1)(A)-

(C); and fraud in connection with forex contracts, 7 U.S.C. § 6b(a)(2)(A)-(C).  The parties agree

that the elements of these claims are: (i) that each charged Defendant made a misrepresentation,

misleading statement, or deceptive omission; (ii) that the misrepresentation or omission was

material, such that a reasonable investor would have considered it important when deciding

whether to invest; and (iii) that the deceptive statement or omission was made by the Defendant

with scienter amounting to an intent to deceive or recklessness as to its truth.  *U.S. Commodity*

*Futures Trading Com'n. v. Kratville*, 796 F.3d 873, 892-93 (8th Cir. 2015).

The CFTC's motion lists six categories of false statements or omissions that Mr. Madigan

allegedly made.  Three categories relate to the solicitation of investors: (i) Mr. Madigan claimed

to have an MBA degree when, in fact, he does not; (ii) Mr. Madgian stated to investors that he

expected that the Pool would produce "double digit returns" and returns of "8% to 10% per

month," at a time when he knew that the Pool was already suffering heavy losses in its forex

trading; and (iii) that Mr. Madigan had invested $1 million of his own personal funds in the Pool

when, in fact, he had not.  The remaining three categories relate to the operation of the Pool: (i) Mr. Madigan represented to investors in the Fall of 2010 that the Pool would be trading in forex when, in fact, it had stopped all forex trades the month before and had begun trading only in securities; (ii) that Mr. Madigan sent investors false trading statements that showed profits when, in fact, the Pool had suffered trading losses during the period in question; and (iii) Mr. Madigan sent investors statements that claimed trading profits when, in fact, the Pool had ceased all trading activity entirely.  The CFTC also asserts a seventh act by Mr. Madigan that, although not a representation or omission, it still contends constitutes fraud: that Mr. Madigan diverted funds belonging to the Pool to his own use and benefit.  The Court will address each of these allegations in turn.

### a. Mr. Madigan's degree

Turning first to the statements made during the solicitation of investors, the Court begins with Mr. Madigan's false statement that he possessed an MBA degree.  It is undisputed that the Defendants distributed documents to investors that, among other things, represented that Mr. Madigan had an MBA from the Rochester Institute of Technology.  The CFTC has produced evidence from that institution that denies ever issuing any degree to Mr. Madigan.  Mr. Madigan's response brief makes a single, passing contention that "he did attend the executive MBA program" at that institution, citing to his own deposition testimony that he "got an EMBA" from that school – that is, an "Executive MBA" which is "an abridged version of an MBA designed for working executives."  In reply, the CFTC seizes upon Mr. Madigan's use of the word "attend" in his brief – arguing that "attending" a program and "receiving a degree" are distinctly different – but does not address the actual statement by Mr. Madigan in his deposition

15

that he "got a [degree]." Thus, there is a genuine dispute of fact[3] as to whether Mr. Madigan does indeed possess an MBA (or EMBA) degree from the Rochester Institute of Technology, precluding summary judgment on the CFTC's fraud claims based on this statement.

The Court need not reach the question of whether Mr. Madigan's misrepresentation, if any, of his educational background is sufficiently material to support a claim of fraud. Although the CFTC has cited several cases in which courts have considered, more or less, whether a defendant's statement about his education or experience can be material, those cases arise in unusual procedural postures or address the materiality of statements about a manager's experience collectively with numerous other alleged misstatements; none of the CFTC's cited cases address the question of materiality of an investment manager's educational background squarely. *See e.g. Commodity Futures Trading Com'n. v. White Pine Trust Corp.*, 2007 WL 1754819 S.D.Ca. Apr. 20, 2007) (finding generally that allegations that defendant's "misrepresentations to customers regarding the earning record and history of WPT, the education of WPT employees, and the segregation of customer accounts" were sufficiently material to warrant entry of default judgment). Without authority finding that an investment manager's educational background is material as a matter of <u>law</u>, the question of materiality of Mr. Madigan's statement about his education must necessarily be one of <u>fact</u>, and that factual question takes on layers of nuance that are not addressed in the CFTC's briefing. As just one example, if the presence of absence of an MBA degree would be material to investors because it represents that Mr. Madigan had a certain degree of financial and business knowledge, then the

---

[3]       The Court is mindful of the CFTC's belief that Mr. Madigan knows that his own testimony about receiving the degree is patently false. As the non-movant at the summary judgment stage, Mr. Madigan receives the benefit of having all of his competent evidence treated as true and all inferences drawn in his favor. If the CFTC can show at trial that Mr. Madigan's testimony on this point is both false and knowingly so, the Court will entertain a request for sanctions, including the possibility of a referral for criminal prosecution for perjury.

actual extent of his (allegedly incomplete) graduate studies would seem to become relevant as well.  After all, a student who successfully completes all (or perhaps even most, or some) of the coursework for a degree but fails to actually secure that degree – say, because of a failure to pay a final semester's tuition or because of unpaid on-campus parking tickets – is no less knowledgeable on matters of finance and business than his fellow students who were awarded the degree.  Because the question of the materiality of Mr. Madigan's educational experience is one of fact and is ill-developed on the instant record, the question of materiality must await presentation at trial.

b.  <u>Double-digit returns</u>

Although Mr. Madigan made rosy promises of returns at various points in time, the Court focuses on two events: in March 2010, he promised investor Miller that the Pool would return 8% to 10% per month, despite knowing by that time that the Pool had already lost several hundred thousand dollars in its initial month of trading; and that in October 2010, Mr. Madigan sent prospective investor Gamble a document that claimed that the "year-to-date profit performance of [the Pool was] 33%" when, in fact, the Pool had lost nearly half its assets by that point.

Mr. Madigan's response does not clearly dispute that he made representations to Mr. Miller promising future profits.  Instead, he argues that the statement is not one of fact, but rather, "a best estimate of future performance."  He cites to no authority, factual or legal, for this proposition.  Promises of future profits have been described as "inherently fraudulent," due to the volatile nature of the market. *Commodity Futures Trading Com'n. v. Wall Street Underground, Inc.*, 281 F.Supp.2d 1260, 1269-70 (D.Kan. 2003).  Indeed, even if Mr. Madigan were correct that "estimates" of future profitability were not assertions of fact that could be said to be

17

fraudulent, he provided his "estimates" of future profitability to Mr. Miller despite knowing that Mr. Simpson had already begun trading on behalf of the Pool and had lost hundreds of thousands of dollars in the span of weeks.  At best, then, Mr. Madigan was obligated to couple his profit "estimates" to Mr. Miller with a disclosure that, to date, the Pool's <u>actual</u> trading had not generated profits at that level.  Whether one characterizes Mr. Madigan's promises of profits as a false statement of actual fact or an "estimate" that was rendered misleading by Mr. Madigan's omission of important factual caveats, the Court finds that Mr. Madigan's statements concerning future profits were indeed misleading.

Mr. Madigan makes an abbreviated argument that his representations to Mr. Gamble about the year-to-date profitability of the Pool were not false because "trading action" was not "the only activity in the Commercial fund."  He does not elaborate on this argument or cite to supporting evidence, leaving to the Court the task of parsing his prior statement of facts to determine what this argument means.  As best the Court can determine, Mr. Madigan is referring to two investments that <u>R2 Capital</u>, not the Pool, made with Ms. Hoffman.  Even assuming that Mr. Madigan could reasonably conflate gains made by R2 Capital with those of the Pool, the evidence he cites to does not support the proposition that even R2 Capital's investments with Ms. Hoffman produced "year-to-date profits of 33%," especially when taking the Pool's catastrophic losses into account.  Mr. Madigan cites to Mr. Tomazin's explanation of his dealings with Mr. Hoffman, and that explanation identifies two instances prior to October 2010 when R2 Capital made investments with Ms. Hoffman.  One was an investment in a company called International Finance and Trust, and Mr. Tomazin states that "R2 Capital [later] requested that those funds be returned" by Ms. Hoffman, but that R2 Capital experienced "months of failure and exhaustion" in attempting to have that request honored.  The second was a loan to Ms. Hoffman that,

ostensibly, would be returned by Ms. Hoffman along with the payment of "a sizeable fee."  Mr.

Tomazin's statement notes that "The money was not returned, nor the return of the previously

stated investment capital."  Thus, it is clear that neither of R2 Capital's investments with Ms.

Hoffman ever generated any <u>actual</u> profits, and certainly not enough to warrant Mr. Madigan

representing to Mr. Gamble that the Pool (or even R2 Capital <u>plus</u> the Pool) experienced a 33%

profit on their activities in 2010.[4]  Thus, Mr. Madigan clearly made false statements to Mr.

Gamble in October 2010.

 The Court then turns to the question of materiality.  Mr. Madigan makes only a

perfunctory argument that misleading projections of future profits cannot be considered material

to potential investors, and indeed, such an argument would seem to be preposterous.

Representations concerning the profitability –past or future -- of an investment "go to the heart

of a customer's investment decision and are therefor material as a matter of law."  *Commodity*

*Futures Trading Com'n. v. Noble Wealth Servs.*, 90 F.Supp.2d 676, 686 (D.Md. 2000).  Thus,

Mr. Madigan's misrepresentations to both Mr. Miller and Mr. Gamble are clearly material.

 That leaves only the question of whether Mr. Madigan's misrepresentations concerning

profits were made by him with knowledge or recklessness as to their falsity.  Mr. Madigan's

argument on this point, offered up in a single sentence without supporting citation, is that

"Madigan <u>didn't know</u> that the fund was losing money when he made these statements."

(Emphasis in original.)  However, the CFTC has come forward with evidence, both direct and

circumstantial, that indicates that Mr. Madigan knew and had the ability to readily discover the

---

[4] Mr. Madigan correctly notes that the Pool turned a small profit in October 2010 when
Mr. Campbell began trading in securities.  Besides the fact that such profits were not realized
until <u>after</u> Mr. Madigan represented to Mr. Gamble that the Pool had experienced 33% growth in
2010, that small profit is dwarfed by the Pool's huge trading losses in the prior months.  Notably,
Mr. Madigan's statement to Mr. Gamble concerned the Pool's <u>year-to-date</u> performance in 2010,
not its performance over some shorter period.

performance of the Pool's investments throughout 2010.  Among other things, Mr. Madigan knew how to access the Pool's trading account, and in March 2010 – the same time frame that he was soliciting Mr. Miller – he was instructing Northpoint as to how to access the PFG trading account for information about its trades.  Mr. Madigan acknowledged in his deposition that he knew by July 29, 2010 that the Pool was losing money.  These facts make clear that Mr. Madigan knew or acted recklessly in failing to know about the profitability of the Pool when he was soliciting Mr. Miller and Mr. Gamble.

Accordingly, the Court finds that the CFTC has established, based on undisputed evidence, its claims of fraud against Mr. Madigan based on his statements to Mr. Miller and Mr. Gamble about the Pool's profitability.  The CFTC is entitled to summary judgment on those claims.

c.  Mr. Madigan's own investment

Mr. Miller attests that, when Mr. Madigan was soliciting his investment, Mr. Madigan represented that he had $1 million of his own funds invested in the Pool.  In an e-mail to Mr. Gamble, in October 2010, Mr. Madigan stated that "I am dumping a good deal of capital into the fund this month," and later represented to Mr. Gamble that both he and Mr. Gamble were investors in the Pool.  In reality, Mr. Madigan had never directed money from his own bank accounts to R2 Capital and never made any actual investment in the Pool.

Mr. Madigan's response offers a somewhat scattershot defense of this portion of the CFTC's claim.  He argues that the e-mails he sent to Mr. Gamble were ambiguous as to whether they were referring to Mr. Madigan's own investment or some other person's – an argument that is readily refuted by Mr. Madigan's e-mail that states that both he and Mr. Gamble are investors in the Pool.  He contends that "there are both hearsay and credibility evidentiary issues with

Miller's recollection of Madigan telling him about his investment," but he does not elaborate.[5]

Finally, Mr. Madigan argues that he "certainly believed at some point he had $1 million invested with R2 Capital," in the form of "profits he was entitled to." (Emphasis in original.) Mr. Madigan's contention that he had funds invested with R2 Capital is not responsive to Mr. Miller's statement that Mr. Madigan claimed to have "invested $1 million of his personal funds in the pool." Moreover, Mr. Madigan's belief that he was entitled to profits generated by R2 Capital as a part-owner of that business is entirely distinct from a representation that he was an investor in the Pool itself using his "personal funds." Thus, the record is undisputed that Mr. Madigan made false statements to Mr. Miller and Mr. Gamble about his own investments in the Pool.

The Court need not belabor the analysis of whether Mr. Madigan's representations about his own investment in the Pool would be material to prospective investors. Materiality merely requires a showing that a reasonable investor would consider the fact important in deciding whether to invest. *Kratville*, 796 F.3d at 895. A representation that the manager of an investment has the confidence to invest his own personal funds in it is clearly designed to instill that same confidence in prospective investors. Thus, such statements are clearly material as a matter of law.

That leaves the question of scienter. It is apparent that Mr. Madigan would know whether or not he had invested his personal funds in the Pool when he represented to Mr. Miller

_____

[5]     The Court sees no hearsay problem with Mr. Miller's statement. Mr. Miller is not offering Mr. Madigan's assertion that he had invested $1 million of his own funds in the Pool for its truth; indeed, he offers it for precisely the opposite reason – that what Mr. Madigan told him was not true. And, of course, "credibility" issues fall outside the scope of summary judgment analysis, but only when there is competent evidence disputing the underlying fact. Here, Mr. Madigan has offered no evidence to support a contention that he did, indeed, invest his own funds in the Pool.

and Mr. Gamble that he had, and the fact that he hadn't makes it clear that he spoke falsely while knowing the true facts. Mr. Madigan offers no meaningful argument to the contrary, other than his irrelevant assertion that he was entitled to take profits from R2 Capital as its owner. Thus, the Court finds that the CFTC has shown that it is entitled to summary judgment on its fraud claims against Mr. Madigan with regard to these representations.

d. Pool trading in forex

The CFTC contends that Mr. Madigan represented to both Mr. Miller and Mr. Gamble that the Pool would only be trading in forex, not any other investments. The Court reflexively rejects this contention as it relates to Mr. Miller: the evidence that the CFTC presents from Mr. Miller states only that Mr. Madigan stated that the Pool "generated profits from buying and selling foreign currencies." Mr. Miller makes no assertion that Mr. Madigan promised that the Pool would only ever trade in forex.

The evidence regarding Mr. Gamble is different. When Mr. Madigan solicited Mr. Gamble's investment in September and October 2010, he represented that the Pool would be engaged in forex trading. In reality, the Pool had ceased all forex trading by August 2010, and its only trading activity after that time was in securities futures. (The Court notes that Mr. Gamble's testimony does not assert that he was told, much less that he understood, that forex trading would be the Pool's only investment strategy. His testimony is simply that he was told that the Pool would be trading in forex.)

The Court will not belabor analysis on this particular claim because it is clear that, even if Mr. Madigan made a false and material representation to Mr. Gamble about what trading activities the Pool was engaged in, the CFTC has not come forward with evidence that such a misrepresentation was made with scienter. The CFTC focuses on the fact that the Pool only

engaged in securities trading after August 2010, but it does not point to any evidence to suggest that the Pool had made a conscious decision to completely abandon forex trading at that point, much less that Mr. Madigan was aware of any such decision.  It may very well be that the Defendants intended to continue trading in forex, but the trader they hired had other priorities, or that no suitable opportunities for forex trading occurred thereafter.  The CFTC's argument is a classic example of *post hoc ergo propter hoc* – that because the Pool never traded forex again after August 2010, the Defendants must have <u>known</u> in August 2010 that it would never do so.  Because the CFTC has not come forward with evidence that establishes that the Defendants consciously abandoned any intent to engage in forex trading after August 2010, it cannot show that Mr. Madigan's representations to Mr. Gamble that the Pool would continue to engage in forex trading (perhaps among other things) was a misrepresentation made with scienter.

e. <u>False trading statements</u>

The Court consolidates the final two aspects of the CFTC's theory for purposes of analysis.

On five occasions, Mr. Madigan issued trading account statements to Pool investors that, the CFTC contends, falsely represented that the Pool had mad profits from trading.  Specifically:

1. An April 2011 trading statement Mr. Madigan sent to Mr. Gamble asserted that the Pool had made trading profits in January and February 2011, when, in fact, the Pool had suffered trading losses in both months.

2. A June 2011 statement claimed that the Pool had trading profits for May 2011, when, in fact, it had sustained losses in that month.

3. A November 2011 statement claimed that the Pool had trading profits for the third quarter of 2011 and ended that quarter with a six-figure balance.  In fact, the Pool had ceased all trading activity in July 2011 and distributed all but approximately $2,000 of its balance to the Defendants by August 2011.

4.  An August 14, 2012 statement that showed trading profits and trading expenses for the second quarter of 2012, along with a six figure balance, when, again, the Pool had ceased trading in 2011 and had distributed all but a *di minimis* balance to the Defendants.

5.  A similar statement in October 2012 making the same false representations with regard to the third quarter of 2012.

Mr. Madigan's response makes an abbreviated argument that the trading statements are not false because they "did not only represent trading in the IB account" -- that is, that they also represented gains from "other investments apart from the IB balance including the Hoffman note balance." The evidence that Mr. Madigan cites to for this proposition – his own deposition – does not necessarily support that contention. Testifying about correspondence he had with Mr. Miller about how the reported gains were consistent with the apparent trading losses, Mr. Madigan explained that Mr. Miller "had no visibility into the other investments that [Mr. Tomazin] had made to me, so from the lens [Mr. Miller] was looking, it would appear" that the Pool was experiencing losses. Asked "what portion of his investment did you see?," Mr. Madigan responded "That's all I saw as well," meaning that he, too, saw only the trading losses and not gains from any other investment sources.

Mr. Madigan's response also suffers from a persistent flaw in his defense: it conflates the Pool with R2 Capital. It appears to be undisputed that the Pool and R2 Capital were separate entities, with only the latter purportedly "investing" with Ms. Hoffman. Even assuming that one could conflate the two entities, it still remains inherently misleading for the Defendants to report to Pool participants that proceeds earned from investing with Ms. Hoffman – and the record does not disclose any <u>actual</u> revenues that the Defendants ever received from Ms. Hoffman – were "trading profits." To the extent the record reveals anything about the investments with Ms.

24

Hoffman, they were in the nature of a loan that Ms. Hoffman would pay back with interest. Characterizing an interest payment as a "trading profit" to the Pool investors clearly served to mislead the Pool investors as to the types of activities that were generating profits.  Accordingly, the record demonstrates that the trading statements Mr. Madigan issued were misleading.

Mr. Madigan offers a half-hearted argument that the misleading trading statements were not material, contending that Mr. Gamble never demonstrated reliance upon them by investing additional funds.  This argument is irrelevant, as it is well-settled that claims of commodities fraud by the CFTC do not require proof that an investor relied upon the false representation. *Slusser v. Commodity Futures Trading Com'n.*, 210 F.3d 783, 785-86 (7th Cir. 2000).  In any event, it is readily-apparent that a investment manager's misleading of investors as to the performance of their investments (or even the performance of particular components of their investments) is information that an investor would consider important.  Therefore, the misleading trading statements were material.

Mr. Madigan saves most of his argument for the element of scienter.  He argues that he was duped just as much as the investors were, as it was Mr. Tomazin who provided all the information for the trading statements and Mr. Madigan had no reason to believe that Mr. Tomazin's reporting of the Pool's successes were incorrect.  The CFTC contends that even if Mr. Madigan lacked <u>actual</u> knowledge of the falsity of the trading statements, he was reckless in maintaining his ignorance.  The Court agrees.  It is undisputed that Mr. Madigan had full access to the IB account where Mr. Campbell was purportedly doing the trading that generated the alleged trading profits.  It would be trivial for Mr. Madigan to access that account, learn that no trading was occurring after July 2011, and therefore conclude that statements showing trading profits after that date were false.

Mr. Madigan was placed on notice that the trading statements were confusing, if not outright misleading, by communications with Mr. Miller in July 2011, and communications with Mr. Gamble thereafter, both of whom inquired about why their investment balance had shrunk so dramatically.  A reasonable investment manager receiving this communication, being unable to square it with trading statements that continually showed profits, would then investigate the trading account to determine what had become of the alleged profits.

Indeed, Mr. Madigan testified at his deposition that he did have suspicions about the accuracy of the trading statements.  Mr. Madigan testified that "there were some times in there where I started asking [Mr. Tomazin] how – how he was getting to his numbers."  Nevertheless, although he could readily have consulted the IB account to verify the existence of trading profits, he did not do so.  Thus, it is clear that Mr. Madigan, having both the opportunity and the reason to review the trading records to confirm the contents of the trading statements, did not do so. The only reasonable conclusion that the factfinder could draw from this evidence is that Mr. Madigan's failure to do so was to maintain willful blindness as to the accuracy of the trading statements. Thus, the undisputed facts establish that Mr. Madigan distributed the false trading statements with reckless disregard for the fact that they were misleading.  The CFTC is entitled to summary judgment on its Second Cause of Action (fraud in connection with futures) against Mr. Madigan as it relates to the false trading statements.

### f.  Diversion of Pool assets

Finally, the CFTC asserts that Mr. Madigan engaged in fraudulent conduct by diverting Pool asserts to his own personal use.  Courts have recognized that the misappropriation of investor funds constitutes fraud under the Commodities Act. *See generally Commodity Futures*

*Trading Com'n. v. Noble Wealth Data Information Servs.*, 90 F.Supp.2d 676, 687 (D.Md. 2000) *and cases cited therein*.

The CFTC contends that Mr. Madigan's misappropriation of funds can be proven mathematically: Pool investors contributed approximately $ 2.2 million in funds to the Pool, the Pool lost $1.35 million through Mr. Simpson's trading, the Pool made $231,000 through Mr. Campbell's trading, and thus, the Pool should have had a balance of approximately $ 1.34 million remaining. However, when the Pool ceased trading activity in 2011, it had only $194,000 in its balance, leaving approximately $ 1.1 million unaccounted for. On several occasions during that time, the Pool caused transfers of tens or hundreds of thousands of dollars from its account to that of R2 Capital, and R2 Capital made disbursements to the Defendant holding companies the next day. The CFTC concludes that these transfers from the Pool to R2 Capital, and then on to the Defendants, constituted the Defendants misappropriating Pool funds.

More specifically, with regard to Mr. Madigan himself, the CFTC contends that between 2010 and 2012, Mr. Madigan was the only person at R2 Capital authorized to make withdrawals from the IB account. The CFTC focuses on two withdrawals that Mr. Madigan made from the IB account in August 2011, totaling $195,000. It notes that these funds were distributed to Mr. Campbell, the trader, and to the Defendants themselves.

Mr. Madigan contends that, if any misappropriation occurred, he was unaware of it. He testifies that Mr. Tomazin was responsible for accounting for the Pool's (and R2 Capital's) profits and losses, and that Mr. Tomazin was solely responsible for transferring funds from the Pool to R2 Capital. Mr. Madigan states that he would take funds out of R2 Capital when Mr. Tomazin reported those funds as being profits that R2 Capital was entitled to under the terms of its contract with the investors. With regard to the $195,000 withdrawal, Mr. Madigan contends

(without citation to the record) that some $125,000 of that sum was paid to Mr. Campbell for his trading services; the remaining $70,000 was paid to the various Defendants.

Although the Court agrees with the CFTC that there it appears that $ 1.3 million went missing from the Pool, it cannot say, on the record before it, that there is no genuine dispute that it was Mr. Madigan who misappropriated it.  Mr. Madigan shifts the blame to Mr. Tomaiz for any improper transfers from the Pool to R2 Capital, and the CFTC's reply does not refute Mr. Madigan's denial on this point.  As to the $195,000 that Mr. Madigan personally withdrew from the IB account, the record taken in the light most favorable to Mr. Madigan indicates that all but $70,000 of this sum was used to pay Mr. Campbell for his trading services.  Mr. Madigan's contention appears to be that the remaining $70,000 was distributed to the owners of R2 Capital as their share of trading profits.  Through a certain lens, there is some merit in this contention, as it is undisputed that Mr. Campbell's trading from August 2010 to July 2011 produced genuine profits of nearly $300,000.  R2 Capital's agreement with its investors was that it would be entitled to 50% of any trading profits.  Thus, an argument could be made that, looking solely at August 2010 to July 2011 – that is, ignoring accumulated trading losses occurring before this time – R2 Capital was entitled to $150,000 of the $300,000 in trading profits earned by the Pool during this period.  In that light, Mr. Madigan's withdrawal of $70,000 to be distributed to R2 Capital's owners could be said to be an honest claim to R2 Capital's share of the trading profits, not misappropriation.

Ultimately, the record on this point too underdeveloped to permit the Court to conclude that there is no genuine dispute of fact as to whether Mr. Madigan misappropriated some or all of the $195,000 withdrawn from the IB account in August 2011.  Accordingly, the Court denies the

CFTC's request for summary judgment on its fraud claims against Mr. Madigan as they related to alleged misappropriation of Pool funds.

### 4. Liability of R2 Capital and Madigan Enterprises

Having concluded that the CFTC has established that Mr. Madigan personally engaged in various acts of commodities fraud, the Court then turns to the question of whether that fraud taints Defendants R2 Capital and Madigan Enterprises.

### (a). Control Person liability

The CFTC offers a lengthy argument that it is entitled to summary judgment "against [the] Madigan Defendants . . . because they were controlling persons of R2 Capital." The argument is premised upon a "control person" theory pursuant to 7 U.S.C. § 13c(b). That statute provides that where "a person has violated" the Commodities Act, "any person who . . . controls [that] person . . . may be held liable for such violation." Here, the CFTC has argued and established, as set forth above, that Mr. Madigan has violated the Act. Thus, control person liability would attach to "any person who controls" Mr. Madigan. To state the issue is to demonstrate the folly of the CFTC's argument: the CFTC is not alleging that the "Madigan Defendants" – against whom this argument seeks judgment – controlled Mr. Madigan.

The Court is unable to re-frame this portion of the CFTC's argument in a way that is cognizable. In the ordinary "control person" paradigm, the CFTC would first prove that R2 Capital violated the Act, and then seek to attribute that violation to the individual defendants who controlled R2. But the CFTC's summary judgment motion does not offer arguments that R2 Capital committed primary violations of the Act. The CFTC's motion argues that Mr. Madigan committed primary acts of fraud, and it later argues that R2 Capital is vicariously liable for such

acts, but nowhere does the CFTC argue that R2 Capital itself committed any direct violations. Thus, the ordinary "control person" paradigm does not appear to apply here.

Nor does the CFTC's extended argument that Mr. Madigan controlled R2 Capital suffice to establish that R2 Capital can be held liable for Mr. Madigan's misconduct. This is not only contrary to the premise of the argument expressed in the CFTC's point heading – that judgment should be entered against the Madigan Defendants – it is also a complete inversion of the "control person" concept. In essence, the CFTC would be arguing that because Mr. Madigan controlled R2 Capital, his individual acts of fraud warrant holding R2 Capital liable as well. This is entirely contrary to what 7 U.S.C. § 13c(b) provides.

Accordingly, the Court rejects the CFTC's "control person" argument in its entirety.

(b).  Vicarious liability

The CFTC's next argument is presented with a point heading that contends that it is entitled to summary judgment "against [the Madigan Defendants] . . . based on R2 Capital's vicarious liability." This argument consists of a mere four paragraphs: the first primarily cites two statutory provisions: (i) that R2 Capital is vicariously liable for acts committed by its agents acting within the scope of their authority, 7 U.S.C. § 2(a)(1)(B), and (ii) that R2 Capital's controlling persons can be liable for violations committed by R2 Capital. The second sentence refers back to the CFTC's "control person" argument referenced above, arguing that Mr. Madigan is responsible for R2 Capital's violations. The third sentence invokes an argument that follows below: that R2 Capital is vicariously liable for the acts of Mr. Tomazin, Mr. Vest, and Mr. Madigan. The fourth argument attempts to complete the syllogism by arguing that "[t]herefore, [the Madigan Defendants] are also liable for all violations of Defendant R2 Capital's agents, Defendants Tomazin and Vest."

The CFTC cites no actual authority for the argument that one can use control person and vicarious liability to create a "bridge" that allows one corporate official to be held individually liable for wrongs performed by a different individual corporate official.  But the Court rejects the argument for a different reason: it assumes a premise that the CFTC does not establish.  For the reasons noted above, the argument that Mr. Madigan is responsible for R2 Capital's violations is not sound, as the CFTC has not shown any primary violations committed by R2 Capital itself. Without that link, the chain of reasoning set forth in this argument is broken.

The CFTC then goes on to argue that it "is entitled to summary judgment on all claims against Defendant R2 Capital because R2 Capital is vicariously liable for the acts of the other defendants."  This argument is, once again, premised upon 7 U.S.C. § 2(a)(1)(B), which provides that "[t]he act, omission, or failure of any official, agent, or other person acting for any . . . corporation within the scope of his employment or office shall be deemed the act, omission, or failure of such . . . corporation."  An entity's liability under this statute is strict: so long as the official or agent was acting within the scope of his employment, his wrongdoing is imputed to the entity regardless of whether the entity engaged in, abetted, or even knew about the wrongdoing.  *Stoler and Co. v. Commodity Futures Trading Com'n.*, 855 F.2d 1288, 1292 (7th Cir. 1988).

Although the CFTC argues that R2 Capital is vicariously liable for "all the individual Defendant's violations," the CFTC's summary judgment motion limits itself to providing evidence and argument of only Mr. Madigan's misconduct.  Thus, the Court limits its consideration of R2 Capital's vicarious liability for only Mr. Madigan's conduct.  The CFTC points to various items of evidence – Mr. Madigan's status as an officer of R2 Capital and his arguments that actions he took on behalf of the Pool and R2 Capital were for the benefit of each

31

other, among other things – and admissions by Mr. Madigan as to his status as an agent of R2

Capital to warrant the conclusion that R2 Capital is vicariously liable for his fraudulent conduct.

Mr. Madigan's response to the CFTC's motion relies upon the assumption that Mr. Madigan has

no individual liability, and he offers no alternative argument that would divorce R2 Capital's

liability from any personal liability he is found to have.   Accordingly, the Court finds that the

CFTC's undisputed evidence establishes that Mr. Madigan was acting as an agent of and within

the scope of his authority for R2 Capital at the time he engaged in the conduct found above to be

fraudulent.  Thus, R2 Capital is vicariously liable alongside Mr. Madigan for those actions.

The CFTC also seeks summary judgment against Defendant Madigan Enterprises for Mr.

Madigan's fraud, on the grounds that Madigan Enterprises is Mr. Madigan's alter ego.  Under

Colorado law, the Court may disregard corporate formalities if the corporate entity is "a mere

instrumentality for the transaction of the shareholders' own affairs" and "the separate

personalities of the corporation and the owners no longer exist." *Lester v. Career Building

Academy*, 338 P.3d 1054,1062 (Colo.App. 2014).  To determine whether a corporate entity is the

alter ego of its owner, the Court examines an array of factors, such as the nature of the entity's

ownership and control, its capitalization and the use of its assets, the creation of corporate

records and observance of corporate formalities, and so on. *Leonard v. McMorris*, 63 p.3d

323,330 (Colo. 2003).

Mr. Madigan's response "admit[s] Madigan Enterprises Inc.'s and Ryan Madigan's alter

ego status," but refuses to "admit the facts and allegations" contained in the CFTC's motion on

this point.  The Court is somewhat confused: it appears that the Madigan Defendants are willing

to concede the <u>conclusion</u> that Madigan Enterprises is Mr. Madigan's alter ego, even though they

disagree with the <u>facts</u> upon which it is based.  Whatever may be the justification for taking such

a nuanced position, this Court need not explore it.  It is sufficient to observe that the Madigan

Defendants concede that Madigan Enterprises is Mr. Madigan's alter ego, and thus, any

judgment for fraud that runs against Mr. Madigan runs against Madigan Enterprises as well.

At this point, then, the Court pauses to sum up.  The CFTC is entitled to summary

judgment against Mr. Madigan on its Claims One and Two, sounding in fraud under the

Commodities Act.  That fraud encompasses some, but not all, of the conduct the CFTC alleges in

this action; to the extent the CFTC wishes to pursue fraud claims based on the remaining

instances of conduct, a trial will be required.  Madigan Enterprises, as the alter ego of Mr.

Madigan, is liable for fraud on Counts One and Two to the same extent (and no more) as Mr.

Madigan himself.  Similarly, R2 Capital is vicariously liable for Mr. Madigan's fraud on Counts

One and Two, to the same extent (and no more) as Mr. Madigan.

5. <u>Fraud by a Pool Operator</u>

Next, the CFTC seeks summary judgment against R2 Capital on its third claim, fraud by

a commodity pool operator in violation of 7 U.S.C. § 6o(1)(B).  That statute provides that "[i]t

shall be unlawful for a . . . commodity pool operator . . ., by use of the mails or any means or

instrumentality of interstate commerce, directly or indirectly, to engage in any transaction,

practice, or course of business which operates as a fraud or deceit upon any client or participant

or prospective client or participant."  As the CFTC notes, this provision is a "parallel statute" to

the anti-fraud provisions of the Commodities Act.  *U.S. Commodity Futures Trading Com'n. v.

Wilson*, 19 F.Supp.3d 352, 363 (D.Mass. 2014).  The CFTC argues, and *Wilson* nominally

supports, the conclusion that a pool operator claim under § 6o(1)(B) differs from a fraud claim

under § 6b in that the former does not require a showing of scienter.  *But see First Commodity*

*Corp. of Boston v. Commodity Futures Trading Com'n.*, 676 F.2d 1, 6 (1st Cir. 1982) (cited in

*Wilson*, but refusing to conclude that scienter is not required in § 6o cases).

The Court need not belabor this portion of its analysis, as the CFTC proves that R2

Capital engaged in "a course of business which operate[d] as a fraud or deceit" on its customers

by referring back to the same actions of Mr. Madigan discussed above.  The Court has previously

found that Mr. Madigan acted fraudulently in some, but not all, of the instances cited by the

CFTC, and those findings apply with equal force here.[6]  The Court has also found that R2

Capital is vicariously liable for those fraudulent actions taken by Mr. Madigan.  Thus, R2

Capital's liability on a claim under § 6o as a pool operator is entirely coterminous with the

Court's finding that R2 Capital is liable under § 6b for Mr. Madigan's fraudulent actions.  The

CFTC is entitled to summary judgment on its pool operator claim to this extent, but not further.

6.  <u>Comingling of funds</u>

Finally, the CFTC seeks summary judgment against R2 Capital on its fourth claim, that

R2 Capital comingled the property of the Pool with that of any other person, in violation of 17

C.F.R. § 4.20(c).  This claim has two elements: (i) that R2 Capital was a commodity pool

operator, and (ii) that it co-mingled Pool funds with those of others.   There is no apparent

scienter requirement for a claim of comingling.  *Commodity Futures Trading Com'n v.*

*Amerman*, 645 Fed.Appx. 938, 944 (11th Cir. 2016).  Misappropriation of investor funds and

distribution of those funds to the pool's owners constitutes unlawful comingling.  *See U.S.*

*Commodity Futures Trading Com'n. v. Leben*, 2015 WL 73554359 (D.S.C. Aug. 5. 2016) (slip

op.)

---

[6]      To recap, the Court found that the CFTC established that Mr. Madigan engaged in fraud
by misrepresenting his own investment in the Pool, by promising certain investors double-digit
returns when he knew the Pool was incurring losses, and by sending trading statements to
investors that falsely represented the Pool's investment gains from trading activities.

The record reflects that from February 2010 to February 2012, the Pool transferred more than $700,000 to R2 Capital, and that all of that sum (and more) was later transferred to the Defendants.  Although, as discussed above, there is a genuine dispute as to whether Mr. Madigan properly took a $70,000 withdrawal from the Pool's IB account as R2 Capital's share of Mr. Campbell's trading profits, that explanation cannot justify withdrawals of $700,000.  It is undisputed that the only trading gains the Pool ever achieved totaled less than $300,000.  Even assuming that the Pool's "investments" with Ms. Holland generated some actual return – a proposition that appears dubious on this record – nothing in the record supports a conclusion that those returns were in the ballpark of $1.4 million, as they would have to be to justify R2 Capital taking $700,000 as its 50% share of the Pool's gains.  Thus, the record reflects that, at a minimum, R2 Capital took possession of several hundred thousand dollars in Pool assets and distributed them to the Defendants.  This is sufficient to constitute co-mingling of asserts and entitles the CFTC to summary judgment against R2 Capital on its claims of improper comingling under 17 C.F.R. §4.20(c).

### 7. Claims against Vest Defendants

The CFTC offers a single sentence argument in support of its argument that it is entitled to summary judgment on all of its claims against the Vest Defendants: that these Defendants "abandoned their defense of this case and therefore have been deemed to . . . admit[ ] all the allegations in the First Amended Complaint."

The Magistrate Judge's Order **(# 133)** imposing sanctions on the Vest Defendants provided that "all facts and allegations in the Amended Complaint are deemed admitted" by the Vest Defendants.  However, mere admission of these facts is not enough, of itself, to warrant judgment in favor of the CFTC against the Vest Defendants.  The CFTC must also show that

35

those facts are sufficient to support each of the causes of action that it seeks judgment on against the Vest Defendants.  It has not done so in the instant motion, and the Court declines the invitation to perform that task on the CFTC's behalf.  According, the Court denies the CFTC's request for summary judgment against the Vest Defendants.

> 8.  Remedy

Finally, the Court turns to the question of remedies requested for the claims upon which it grants summary judgment to the CFTC.  The CFTC requests four separate remedies: (i) an injunction, (ii) restitution in the amount of the full sums invested by Pool investors, less the small amount they were refunded, (iii) disgorgement of the Defendants' receipts from Pool funds; and (iv) a civil monetary penalty.

As to the injunction, the terms requested are, essentially, the same "obey the law" provisions discussed above with regard to Mr. Tomazin.  For the same reasons previously stated, the Court is reluctant to grant such an injunction.  Moreover, as the court explained in *Commodity Futures Trading Com'n. v. Wilshire Inv. Mgmt. Corp.*, 531 F.3d 1339, 1346 (11th Cir. 2008), an injunction against further violations is appropriate if "the defendant's past conduct indicates that there is a reasonable likelihood of further violations in the future."  It went on to note an array of factors that bear on that consideration, including the egregiousness of the actions, the isolated or recurrent nature of the infractions, the degree of scienter involved, the sincerity of assurances against future violations, and the likelihood that the defendant's occupation will present opportunities for future violations.  *Id.*  Mr. Madigan notes that he has not been active in R2 Capital's activities since 2011 and that he has not worked in the commodities or futures businesses since then; instead, he works as a business consultant.  The CFTC has not rebutted this evidence, and thus, there is some question as to whether there is any

likelihood of Mr. Madigan violating the Commodities Act in the future.  Thus, even if the Court

were to consider the imposition of a prohibitory injunction, it has some doubt that the record

presently before the Court justifies such a remedy.

As to the dual requests for restitution and disgorgement, the Court has some difficulty.

The restitution figure that the CFTC requests is roughly $ 2.4 million, less approximately,

$400,000 that has been returned to the investors already.  In essence, then, the restitution award,

if paid, would make the investors whole.  The disgorgement remedy the CFTC requests is

approximately $950,000, reflecting "the ill-gotten gains" the Defendants made.  The CFTC

calculates this sum by taking the full value of the investors' investments ($2.4 million), minus

the actual trading losses of $1.1 million, and minus the $400,000 that has already been returned

to the investors.  Thus, the disgorgement remedy and the restitution remedy seem to double-

count the funds allegedly misappropriated.  The restitution amount claimed by the CFTC returns

the full amount of the investors' investment, essentially undoing both the ill-advised trades that

generated losses and the Defendants' misappropriation of the remaining Pool funds.  The

disgorgement remedies then proceeds to count the misappropriated funds a second time.[7]  Were

the Court to award both items as requested by the CFTC, the investors would receive not only

their full investment, but an additional windfall of nearly a million dollars.  *See Noble Wealth,* 90

F.Supp.2d at 693 ("the Commission is asking that the salaries and commissions paid to Baragosh

be counted twice, first as part of the restitution award, then again as part of the disgorgement

award. That, in the Court's view, is inappropriate").

---

[7]     The CFTC has not segregated its disgorgement remedies to account for the particular
amounts improperly retained by each Defendant.  It is the CFTC's burden to show that its
request for a disgorgement award against each Defendant approximates the amount of unjust
enrichment obtained by that Defendant. *Commodity Futures Trading Com'n. v. Sidoti,* 178 F.3d
1132, 1138 (11th Cir. 1999).

Finally, as to the civil penalty, the Court has several additional concerns.  7 U.S.C. § 13-1(d)(1) allows the Court to impose a civil penalty of $100,000 or triple the monetary gain to the person," whichever is larger.  The CFTC calculates this sum as the full value of the investors' investments, less the $400,000 returned to them, trebled to slightly more than $7 million, and proposes that this full sum be assessed as a penalty against Mr. Madigan.  Although the Court has some doubts that these calculations are all justified, the Court has larger issues with the requested penalty.  The $7 million penalty requested is over and above the $2.4 million restitution remedy the CFTC has requested.  Such large sums raise questions about whether Mr. Madigan has (or will ever have) the ability to pay such sums and, if not, how any resources that Mr. Madigan is able to marshal in partial payment will be apportioned between the CFTC (presumably, the beneficiary of a civil penalty) and the investor victims (who are the likely beneficiaries of a restitution obligation).  Although the Court is mindful that one of the purposes of the civil penalty provision is deterrence, it must also "be realistic and not set a figure which is impossible for a defendant to comply with due to a lack of monetary resources."  *Commodity Futures Trading Com'n. v. Brockbank*, 505 F.Supp.2d 1169, 1177 (D.Ut. 2007).  Neither party has addressed the question of whether it is reasonable to believe that Mr. Madigan could, eventually, satisfy a $7 million civil penalty in addition to a large restitution order.

Put simply, the Court is not confident that the record before it allows it to adequately address any of the remedies that the CFTC requests here.  That fact, coupled with the fact that several of the CFTC's claims in this action remain unresolved despite this Order, suggest that further proceedings in this action will be necessary.  The Court finds it appropriate to defer consideration of remedies against the Madigan Defendants or R2 Capital until such further proceedings.

Accordingly, the Court grants the CFTC's Motion for Summary Judgment in part. It finds that:

(a) The CFTC is entitled to judgment against the Madigan Defendants on Claims 1 and 2, commodities fraud and forex fraud, in certain respects, but to the extent those claims are based on Mr. Madigan falsifying his educational background, his statement that the Pool continued to intend to engage in forex trading after August 2010, and him misappropriating $195,000 of Pool assets in August 2011, those claims must proceed to trial.

(b) It is not clear whether the CFTC alleges Claim 4, comingling of pool funds, against Mr. Madigan individually, but if it does, it has failed to show that Mr. Madigan himself was responsible for R2 Capital's comingling, and thus, this claim as against Mr. Madigan must proceed to trial.

(c) The CFTC is entitled to summary judgment against R2 Capital on Claims 1 and 2, but only to the same extent that the Madigan Defendants are liable to the CFTC on those claims. The CFTC is also entitled to summary judgment against R2 Capital on Claim 3, fraud by a pool operator, but again, that liability is limited to those acts that underlie the grant of summary judgment to the CFTC against the Madigan Defendants on Claims 1 and 3; to the extent that the CFTC views Claim 3 as encompassing more than that conduct, that claim remains for trial.

(d) The CFTC is entitled to summary judgment against R2 Capital on Claim 4, comingling. However, the record does not establish with sufficient precision the amount of the funds allegedly comingled. To determine that figure, a trial is required.

(e) The CFTC has failed to show that it is entitled to judgment on any claims against the Vest Defendants, and those claims will proceed to trial, subject to the sanctions previously imposed by the Magistrate Judge.

(f)  All issues of remedies as to all Defendants (including a civil penalty as against Mr. Tomazin) must await further proceedings.

Because there are an array of claims and issues that remain, the Court finds it appropriate to set a hearing to address the matters that the CFTC intends to proceed upon and to determine what additional proceedings will be necessary to resolve those matters.  Accordingly, the Court will conduct a hearing on **September 12, 2017** at **9:00 a.m.** to address these matters.

<u>CONCLUSION</u>

For the foregoing reasons, the Court **DENIES** the CFTC's Motion for Permanent Injunction (**# 134**).  The Court **GRANTS IN PART** and **DENIES IN PART** the Madigan Defendants' Motion for Reconsideration (**# 138**), insofar as the Court has reconsidered the Magistrate Judge's January 27, 2017 Order (**# 135**), but finds no error therein.  The Court **GRANTS IN PART** and **DENIES IN PART** the CFTC's Motion for Summary Judgment (**# 149**), as set forth herein.  The Court will conduct a hearing at **9:00 a.m.** on **September 12, 2017** to address further issues in this action as noted above.

Dated this 3rd day of August, 2017.

BY THE COURT:

_____

Marcia S. Krieger
Chief United States District Judge